# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES ex rel. CLARISSA ZAFIROV,

Plaintiff-Appellant, and

UNITED STATES OF AMERICA,

Intervenor-Appellant,

v.

FLORIDA MEDICAL ASSOCIATES, LLC, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Middle District of Florida

## BRIEF FOR APPELLANT UNITED STATES OF AMERICA

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

ROGER B. HANDBERG
*United States Attorney*

CATHERINE M.A. CARROLL
*Deputy Assistant Attorney General*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
DANIEL WINIK
*Attorneys, Appellate Staff
Civil Division, Room 7245
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-8849*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

To the government's knowledge, the following persons and entities have an interest in the outcome of this appeal:

Aimonetti, Justin W.

Altman, Stephen D.

Altman Dispute Resolution

Andersen, J. Carter

Anion Technologies, LLC

Anti-Fraud Coalition

Arias, Elizabeth A.

Auerbach, Marcella

Bentley, Arthur Lee III

* Better Health Group, LLC

Bock, Elizabeth M.

Boyd, Ginger

Boynton, Brian M.

Bradley Arant Boult Cummings LLP

* Additions to previous certificate marked with an asterisk.

Buffaloe, William T.

Bush Ross, PA

Chamber of Commerce of the United States of America

Clark, Havan M.

Deaton, David M.

Dechert LLP

DeMar, Jacklyn

Drake, Scott P.

* Durling, James

Elevance Health, Inc. (NYSE: ELV)

Engel, Steven A.

Estes, Jillian Levy

Florida Medical Associates, LLC, doing business as VIPcare

Flynn, Hon. Sean P.

Foley, Jack

Foley & Lardner LLP

Freedom Health, Inc.

Gerencir, Samantha Marie

Ghosh-Murthy, Priyanka

Giarratana, Giovanni P.

* Goodman, Anna J.

Grover, Steven F.

Gunster, Yoakley & Stewart P.A.

Handberg, Roger B.

Hanower, Patricia L.

Hartman, Anne Hayes

Holder, Harold Douglas III

Jonathan Kroner Law Office

Keefe, Sean P.

Koh, J. Jennifer

Kroner, Jonathan

Krueger, Matthew D.

Kulp, Brian A.

Lafferty, LaTour Rey

Lischak, Jonathan M.

* Mansour, George

Matthews, Michael P.

McDonnell, Kelly A.

McGinley, Michael H.

Mehta, Jason Paul

* Merryday, Hon. Stephen D.

* Metlitsky, Anton

* Miller-Gootnick, Benjamin M.

Mizelle, Hon. Kathryn Kimball

Morgan Verkamp LLC

Morrissey, Tara

Nagle, Catherine

Napora, Chandra

* Nealon, James

Nelson Mullins Riley & Scarborough LLP

Nolan, Kenneth J.

Nolan, Auerbach & White, LLP

O'Melveny & Myers LLP

Optimum Healthcare, Inc.

* Pagidipati, Siddhartha

* Paul, Weiss, Rifkind, Wharton & Garrison LLP

Physician Partners, LLC

Raab, Michael S.

Rabin, Adam T.

Rabin Kammerer Johnson

Santella, Amanda M.

Scarborough, Charles W.

* Shanmugam, Kannon K.

Singer, Benjamin D.

Singh, Tejinder

Sparacino PLLC

Steven F. Grover P.A.

Swanson, Joseph W.

U.S. Chamber Litigation Center

* U.S. Department of Justice

Valiente, Lauren Lisette

Varcoe, Andrew

Verkamp, Jennifer M.

VIPcare

* Wenthold, David

Winik, Daniel

Yavelberg, Jamie A.

Zafirov, Clarissa

*/s/ Daniel Winik*
Daniel Winik

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument. In conflict with the prior opinions of four courts of appeals, the district court held the qui tam provisions of the False Claims Act unconstitutional as applied in a case where the government had declined to intervene. Oral argument is warranted given the importance of the issue.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................iv

STATEMENT OF JURISDICTION ..................................................... 1

STATEMENT OF ISSUE....................................................................... 1

STATEMENT OF THE CASE ................................................................ 1

    A.    Statutory Background.........................................................1

    B.    This Action.........................................................................4

    C.    Standard of Review ............................................................6

SUMMARY OF ARGUMENT .............................................................. 6

ARGUMENT......................................................................................... 12

I.    Supreme Court Precedent Makes Clear That The False Claims Act's Qui Tam Provisions Comport With Article II ............................ 13

    A.    Relators Do Not Exercise Executive Power ...................13

    B.    The History Of Qui Tam Provisions Bolsters Their Constitutionality In The False Claims Act....................19

II.    The District Court Erred In Applying The Appointments Clause ................................................................................................ 21

    A.    The Appointments Clause Applies Only To Government Officeholders, Not To Private Citizens .........................22

    B.    Relators Do Not Exercise Significant Government Authority ..........................................................................24

C.     Relators Do Not Occupy A Continuing Position
       Established By Law ...........................................................31

D.     The District Court Erred In Dismissing Historical
       Evidence ............................................................................40

E.     This Case Does Not Present The Question Whether The
       Qui Tam Provisions Are Facially Unconstitutional ....................49

CONCLUSION ........................................................................................ 51

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Auffmordt v. Hedden*,
　137 U.S. 310 (1890) ................................................................. 32, 34

*Bowsher v. Synar*,
　478 U.S. 714 (1986) ........................................................................21

*Buckley v. Valeo*,
　424 U.S. 1 (1976) ...........................................................................25

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
　587 U.S. 262 (2019) ................................................................. 15, 22

*Collins v. Yellen*,
　594 U.S. 220 (2021) .......................................................................25

*Contracts With Members of Congress*,
　2 Op. Att'y Gen. 38 (1826)............................................................35

*Financial Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
　590 U.S. 448 (2020) .......................................................................41

*Freytag v. Commissioner*,
　501 U.S. 868 (1991) .......................................................................34

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
　528 U.S. 167 (2000) .......................................................................26

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
　520 U.S. 939 (1997) .......................................................................16

*Lucia v. SEC*,
　585 U.S. 237 (2018) ........................................................... 22, 25, 31

*Marsh v. Chambers,*
  463 U.S. 783 (1983) .................................................... 21, 40

*Marvin v. Trout,*
  199 U.S. 212 (1905) ..........................................................46

*Mistretta v. United States,*
  488 U.S. 361 (1989) .................................................... 21, 40

*Morrison v. Olson,*
  487 U.S. 654 (1988) ................................................ 25, 35, 38

*Mortgages, Inc. v. U.S. District Court for the District of Nevada (Las Vegas),*
  934 F.2d 209 (9th Cir. 1991)............................................16

*Officers of the United States Within the Meaning of the Appointments Clause,*
  31 Op. O.L.C. 73 (2007) ............................................... 36, 37

\* *Riley v. St. Luke's Episcopal Hospital,*
  252 F.3d 749 (5th Cir. 2001).................................... 12, 15, 20, 23, 42

*Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020) ..........................................................25

*Stanton v. Wilkeson,*
  22 F. Cas. 1074 (S.D.N.Y. 1876) .................................... 37, 38

*Texas Industries, Inc. v. Radcliff Materials, Inc.,*
  451 U.S. 630 (1981) ..........................................................26

*The Nassau,*
  71 U.S. (4 Wall.) 634 (1866) ............................................44

*The Sally,*
  12 U.S. (8 Cranch) 382 (1814)..........................................44

*United States v. Donziger,*
   38 F.4th 290 (2d Cir. 2022) .......................................................... 35, 38

*United States v. Germaine,*
   99 U.S. 508 (1879) ............................................................. 31, 31-32, 34

*United States v. Griswold,*
   24 F. 361 (D. Or. 1885) ................................................................ 15-16

*United States v. Hartwell,*
   73 U.S. (6 Wall.) 385 (1867) ............................................................31

*United States v. Maurice,*
   26 F. Cas. 1211 (C.C.D. Va. 1823) ......................................... 32, 36-37, 37

*United States v. Texas,*
   599 U.S. 670 (2023) ........................................................................27

*United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.,*
   997 F. Supp. 2d 1272 (M.D. Fla. 2014) .............................................12

*United States ex rel. Beattie v. Comsat Corp.,*
   2001 WL 35992080 (M.D. Fla. Apr. 18, 2001) .................................12

*United States ex rel. Butler v. Magellan Health Services, Inc.,*
   74 F. Supp. 2d 1201 (M.D. Fla. 1999) ...............................................12

*United States ex rel. Butler v. Shikara,*
   2024 WL 4354807 (S.D. Fla. Sept. 6, 2024).......................................12

* *United States ex rel. Kelly v. Boeing Co.,*
   9 F.3d 743 (9th Cir. 1993).................................................................12

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,*
   985 F.2d 1148 (2d Cir. 1993)............................................................12

*United States ex rel. Marcus v. Hess,*
    317 U.S. 537 (1943) .............................................................. 16, 19, 46

*United States ex rel. Polansky v. Executive Health Resources, Inc.,*
    599 U.S. 419 (2023) ........................................................ 4, 14, 17, 29

\* *United States ex rel. Stone v. Rockwell International Corp.,*
    282 F.3d 787 (10th Cir. 2002) ...................................................... 12, 23

\* *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,*
    41 F.3d 1032 (6th Cir. 1994) .................................................. 12, 14, 16

*United States ex rel. Wallace v. Exactech, Inc.,*
    703 F. Supp. 3d 1356 (N.D. Ala. 2023) ............................................12

*United States ex rel. Zafirov v. Florida Medical Associates, LLC,*
    2024 WL 4349242 (M.D. Fla. Sept. 30, 2024) ...................... 5, 6, 22, 23, 25, 26,
    27, 28, 31, 32, 33, 34, 35-36,
    37, 39, 40, 42, 43, 47, 48, 49, 50

\* *Vermont Agency of Natural Resources v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) ...................... 2, 7, 13, 14, 15, 19, 20, 23, 26, 27, 41, 42, 43

*Vidal v. Elster,*
    602 U.S. 286 (2024) ...........................................................................21

*West Virginia ex rel. Morrisey v. U.S. Department of the Treasury,*
    59 F.4th 1124 (11th Cir. 2023) .............................................................6

*Yates v. Pinellas Hematology & Oncology, P.A.,*
    21 F.4th 1288 (11th Cir. 2021) .................................................... 18, 44

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ...........................................................................21

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ...............................................................................41

**U.S. Constitution:**

Art. I, § 8, cl. 11 ...................................................................44

Art. II, § 1 ...........................................................................4

Art. II, § 2, cl. 2 ...............................................................5, 21

Art. II, § 3 ...........................................................................4

**Statutes:**

Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101 ................................... 19, 43

Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 ....................................19

Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131 ........................... 20, 43

Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137 ................................. 20, 44

Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199 ..................................20

Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232 ..................................20

Act of May 8, 1792, ch. 36, § 5, 1 Stat. 275 ....................................44

Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 329 ..................................20

Act of Mar. 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347 ..............................20

Act of Feb. 28, 1799, ch. 19, § 8, 1 Stat. 626 ..................................45

Act of Mar. 2, 1863, §§ 4, 6, 12 Stat. 696 .......................................2

Act of June 25, 1948, Pub. L. No. 773, 62 Stat. 869 ............................45

Civil Rights Act of 1964,
    42 U.S.C. § 2000e-5(f) ..........................................................................16
    42 U.S.C. § 2000e-5(f)(1) ....................................................................33

Clean Water Act,
    33 U.S.C. § 1365 ....................................................................................16

False Claims Act,
    31 U.S.C. § 3729 *et seq.* ......................................................................1
    31 U.S.C. § 3729(a) ................................................................................2
    31 U.S.C. § 3729(a)(1)(A) .....................................................................1
    31 U.S.C. § 3729(a)(1)(B) .....................................................................2
    31 U.S.C. § 3729(b)(2)(A)(i) .................................................................2
    31 U.S.C. § 3730(a) ................................................................................2
    31 U.S.C. § 3730(b) ...............................................................................
    31 U.S.C. § 3730(b)(1) ............................................................... 2, 3, 14
    31 U.S.C. § 3730(b)(2) ...........................................................................2
    31 U.S.C. § 3730(b)(2)-(4) ............................................................ 10, 28
    31 U.S.C. § 3730(b)(3) ................................................................... 2, 29
    31 U.S.C. § 3730(b)(4)(A) .....................................................................3
    31 U.S.C. § 3730(b)(4)(B) ............................................................. 3, 11
    31 U.S.C. § 3730(b)(5) ................................................................. 30, 38
    31 U.S.C. § 3730(c)(1) ................................................................... 3, 17
    31 U.S.C. § 3730(c)(2)(A) .......................................................... 4, 17, 29
    31 U.S.C. § 3730(c)(2)(B) ...................................................................29
    31 U.S.C. § 3730(c)(3) ............................................................................3
    31 U.S.C. § 3730(c)(4) ................................................................... 3, 17
    31 U.S.C. § 3730(c)(5) ................................................................... 3, 17
    31 U.S.C. § 3730(d) ...............................................................................4
    31 U.S.C. § 3730(d)(1) ..........................................................................34
    31 U.S.C. § 3730(d)(2) ..........................................................................34
    31 U.S.C. § 3730(e)(3) ..........................................................................31
    31 U.S.C. § 3730(e)(4)(A) .....................................................................30
    31 U.S.C. § 3730(e)(4)(B) .....................................................................30
    31 U.S.C. § 3730(f) .................................................................................4
    31 U.S.C. § 3731(b)(2) ..........................................................................15
    31 U.S.C. § 3731(c) .................................................................................3

15 U.S.C. § 15........................................................................16

18 U.S.C. § 208......................................................................34

18 U.S.C. § 287......................................................................28

28 U.S.C. § 823 (1946)..........................................................45

28 U.S.C. § 1291......................................................................1

28 U.S.C. § 1331......................................................................1

28 U.S.C. § 2403(a).................................................................5

42 U.S.C. § 1981a(b)(1)........................................................26

## Other Authorities:

James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in A Partisan World*, 92 Fordham L. Rev. 469 (2023).....................................................................47

U.S. Department of Justice, *Justice Manual* (last updated 2021) ...............17-18

1 William S. Hein & Co., *American State Papers, Class X, Miscellaneous* (1998), https://perma.cc/JGR5-8AQA .........................................................45

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this False Claims Act suit under 28 U.S.C. § 1331.  The district court entered final judgment in defendants' favor on September 30, 2024.  Dkt. 347.  The government and relator Clarissa Zafirov timely appealed on October 29, 2024.  Dkts. 349, 350; *see* Fed. R. App. P. 4(a)(1).  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUE

Whether the qui tam provisions of the False Claims Act, as applied where the government has declined to take over an action brought by a relator, are consistent with the Appointments Clause of Article II of the Constitution.

## STATEMENT OF THE CASE

### A.    Statutory Background

The False Claims Act, 31 U.S.C. § 3729 *et seq.*, imposes civil liability for a variety of deceptive practices involving government funds and property. The Act renders liable, for example, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," *id.* § 3729(a)(1)(A), and any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim," *id.* § 3729(a)(1)(B). The Act defines a "'claim'" to include "any request or demand … for money or property [that] … is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2)(A)(i). Violators are liable to the government for civil penalties plus three times the amount of the government's damages. *Id.* § 3729(a).

When Congress enacted the statute in 1863, it followed a "long tradition … in England and the American Colonies," *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768, 772-774 (2000), by incorporating qui tam provisions authorizing private persons to bring suit to redress frauds against the United States. Act of Mar. 2, 1863, §§ 4, 6, 12 Stat. 696, 698. The current version of the Act retains the basic structure of the qui tam mechanism. The Attorney General may bring a civil action to recover treble damages and civil penalties for a violation of the Act. *See* 31 U.S.C. § 3730(a). Alternatively, a private person known as a relator may bring suit, "for the person and for the United States Government," "in the name of the Government." *Id.* § 3730(b)(1). The relator's complaint must be filed under seal and served on the United States. *Id.* § 3730(b)(2). The government then has 60 days, subject to extension, to decide whether to intervene and take over the suit. *Id.* § 3730(b)(2), (3).

If the government intervenes — either before the complaint is unsealed or "at a later date upon a showing of good cause," 31 U.S.C. § 3730(c)(3) — then "the action shall be conducted by the Government," *id.* § 3730(b)(4)(A); *see id.* § 3730(c)(1) (government "shall have the primary responsibility for prosecuting the action"). The government may file its own complaint or may amend the relator's complaint to add or alter claims. *Id.* § 3731(c).

If the government declines to intervene, then "the person bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b)(4)(B). But the government retains considerable control over such actions. For example, the government is entitled to receive "copies of all pleadings filed in the action and … all deposition transcripts." *Id.* § 3730(c)(3). It may stay discovery to avoid "interfere[nce]" with a related governmental investigation or prosecution. *Id.* § 3730(c)(4). It may "elect to pursue its claim through any alternate remedy available to [it], including any administrative proceeding to determine a civil money penalty." *Id.* § 3730(c)(5). It may veto a relator's proposed dismissal or settlement of the action. *Id.* § 3730(b)(1). And on a showing of good cause, it may intervene in the action even after having

previously chosen not to do so, including for the purpose of seeking to dismiss the action over the relator's objection.  *Id.* § 3730(c)(2)(A), (B); *see United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023).

If a qui tam action results in any monetary recovery, an eligible relator is entitled to a share of the recovery.  31 U.S.C. § 3730(d).  The government is not liable for any expenses the relator has incurred in bringing suit.  *Id.* § 3730(f).

**B.    This Action**

1.    This is a qui tam action under the False Claims Act, brought in 2019 by relator Clarissa Zafirov.  Relator alleges that defendants violated the Act by misrepresenting to Medicare the medical conditions of certain patients.  The government declined to intervene, and the litigation proceeded for years.

In early 2024, defendants moved for judgment on the pleadings on the theory that the Act's qui tam provisions violate the Vesting, Take Care, and Appointments Clauses of Article II.  The Vesting and Take Care Clauses state, respectively, that "[t]he executive Power shall be vested in a President of the United States of America" and that "he shall take Care that the Laws be faithfully executed."  U.S. Const. art. II, §§ 1, 3.  The Appointments Clause

states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law," and that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* § 2, cl. 2.

After defendants moved for judgment on the pleadings, the government intervened under 28 U.S.C. § 2403(a) for the limited purpose of defending the constitutionality of the False Claims Act's qui tam provisions.

2.     The district court agreed with defendants' arguments under the Appointments Clause, without addressing the Take Care and Vesting Clauses. *United States ex rel. Zafirov v. Florida Med. Assocs., LLC*, 2024 WL 4349242, at *4 (M.D. Fla. Sept. 30, 2024). The court concluded that relators under the Act are officers of the United States, such that they must be appointed in a manner consistent with the Appointments Clause, because they "possess[] civil enforcement authority on behalf of the United States" and "occup[y] a continuing position" established by law. *Id.* at *6. The court

rejected the government's argument "that relators resemble ordinary private plaintiffs, who do not exercise significant authority when they seek relief under" statutes like Title VII. *Id.* at *10. And the court dismissed the relevance of "[t]he historical pedigree of qui tam provisions," reasoning that history cannot justify statutes that "directly contradict the Constitution." *Id.* at *15.

Because the relator was "the only litigant on her side of the enforcement action," given the government's choice not "to take over [the] action," the district court concluded that dismissal of the suit was the appropriate remedy for the constitutional violation it had identified. *Id.* at *19 & n.9.

## C.    Standard of Review

This Court reviews de novo a district court's "legal conclusions and a challenged statute's constitutionality." *West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1134 (11th Cir. 2023).

## SUMMARY OF ARGUMENT

Other than the district court here, every court to have addressed the constitutionality of the False Claims Act's qui tam provisions has upheld them. This Court should join that consensus and reverse the district court's outlier ruling.

I.      The Supreme Court's decision in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), which held that the False Claims Act's qui tam provisions are consistent with Article III, makes clear that relators do not exercise Executive power when they sue under the Act.  Rather, they are pursuing a private interest in the money they will obtain if their suit prevails.  As private litigants pursuing private interests, relators are not enforcing federal law in a manner inconsistent with the Vesting and Take Care Clauses and need not be appointed in the manner required by the Appointments Clause.

That analysis is not altered by the fact that a relator's suit may also vindicate a federal interest in remedying and deterring fraud on the United States.  Congress routinely allows private parties to sue under statutes that serve a public purpose and that the government itself can enforce, and such suits do not raise Article II concerns.  They are distinct from the government's enforcement efforts even though they can supplement those efforts.

The Supreme Court's emphasis in *Stevens* on the long history of qui tam statutes further supports the conclusion that the False Claims Act's qui

tam provisions are consistent with Article II.  Here as in other contexts, legislation passed by early Congresses is reliable evidence of the Founders' understanding of the Constitution.

II.    The district court erred in concluding that qui tam relators under the False Claims Act are officers of the United States who have not been appointed in a manner consistent with the Appointments Clause.

A.    The Appointments Clause applies only to members of the government's workforce, not to private citizens.  To the extent the district court's concern was that relators are private persons who have been authorized to perform functions that can only properly be performed by government officials, that concern would not implicate the Appointments Clause.  In order for the Appointments Clause to be relevant here, relators would need to be part of the government.  But the Supreme Court has repeatedly recognized that relators are private actors, and the district court identified no other case in which private individuals have been treated as part of the federal government, whether as officers or as employees.

B.    To the extent the criteria that courts have traditionally applied to distinguish between federal officers and federal employees could bear on the

antecedent determination whether a particular individual is part of the federal government at all, the district court misapplied those criteria. The court likened relators to members of the Federal Election Commission, independent counsels, and other government officials. But unlike those officials, relators do not exercise governmental power; the interest they are pursuing is a private interest in the portion of the government's monetary recovery that the False Claims Act assigns to them. Their role is functionally similar to that of private plaintiffs under statutes like Title VII, the antitrust laws, or the Clean Water Act. The district court distinguished those private rights of action on the ground that, unlike the qui tam provisions of the False Claims Act, they allow suit only by personally injured plaintiffs. But if that distinction mattered, it would matter under Article III, not Article II—and the Supreme Court made clear in *Stevens* that a relator under the False Claims Act has Article III standing as a partial assignee of the government's claim.

The district court also erred in suggesting that relators exercise Executive power because they set priorities in enforcing federal law. A qui tam action under the False Claims Act cannot move forward, or even be unsealed, until the government has had an opportunity to determine whether to "intervene and proceed with the action," intervene and move to dismiss

it, or allow the relator "to conduct the action" subject to ongoing government oversight. 31 U.S.C. § 3730(b)(2)-(4). This review ensures that qui tam actions proceed only when they are consistent with the government's priorities for the enforcement of federal law. The statute also places numerous constraints on qui tam suits that do not apply to False Claims Act suits by the government. And in emphasizing how a qui tam suit can adversely affect the government, the district court ignored the many mechanisms the statute provides for the government to avoid or mitigate those adverse effects if it perceives them to be present in a given case. Through those mechanisms, the government can ensure that qui tam actions are consistent with its own priorities for the enforcement of federal law.

C. The district court further erred in concluding that relators occupy a continuing position. A relator's role is limited in time and scope, confined to a particular case, and fundamentally personal in nature. In concluding that relators possess statutory duties, powers, and emoluments, the district court misunderstood each of those concepts. And the court misunderstood a handful of decisions treating the occupants of governmental roles as officers even though they acted for the government only in the context of a particular case. The roles at issue in those cases were "continuing" in the

sense that they were not specific to the individuals appointed to perform them; that is not true of the relator's role under the False Claims Act.

D.    The district court erred in dismissing the relevance of the long history of qui tam provisions.  The district court's insistence that the constitutional text is clear enough to preclude the relevance of history is difficult to square with the Supreme Court's extensive reliance on history in *Stevens*. So is the district court's conclusion that the historical record here is not probative because it fails to show that early qui tam statutes were regarded as consistent with the Constitution.  And even aside from its inconsistency with *Stevens*, the district court's analysis of the history significantly understated both the prevalence of early qui tam statutes and the body of evidence that such statutes were understood to be constitutional.

E.    Finally, although some language in the district court's opinion could be read to suggest that the qui tam provisions of the False Claims Act would be unconstitutional even in cases where the relator does not "conduct the action," 31 U.S.C. § 3730(b)(4)(B), that conclusion does not follow from the district court's reasoning.  It would be clearly incorrect.  And there is no occasion for this Court to address it because the government declined to take over this action.

# ARGUMENT

Every court of appeals to have addressed the question has held that the False Claims Act's qui tam provisions are consistent with Article II, including the Appointments Clause. *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-807 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753-758 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040-1042 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749-759 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (explaining, in rejecting an Article III challenge, that the qui tam "provisions do not usurp the executive branch's litigating function"). So has every other district court that has addressed the question, including in cases within this Circuit.[1] Those courts were correct, and this Court should join them.

---

[1] *See United States ex rel. Butler v. Shikara*, 2024 WL 4354807, at *10-13 (S.D. Fla. Sept. 6, 2024); *United States ex rel. Wallace v. Exactech, Inc.*, 703 F. Supp. 3d 1356, 1363-1366 (N.D. Ala. 2023); *United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278-1279 (M.D. Fla. 2014); *United States ex rel. Beattie v. Comsat Corp.*, 2001 WL 35992080, at *8 (M.D. Fla. Apr. 18, 2001); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212-1214 (M.D. Fla. 1999).

## I. Supreme Court Precedent Makes Clear That The False Claims Act's Qui Tam Provisions Comport With Article II

### A. Relators Do Not Exercise Executive Power

Defendants' challenge to the qui tam provisions rests on the premise that the provisions authorize relators to exercise Executive power in a manner not subject to control by the President. On that premise, defendants assert that the qui tam provisions conflict with the parts of Article II—the Vesting Clause, the Take Care Clause, and the Appointments Clause—that serve to ensure presidential control over all exercises of Executive power. But defendants' premise is incorrect: When relators sue under the False Claims Act, they are not exercising Executive power. They are pursuing a private interest in the money they will obtain if their suit prevails.

That is clear from the Supreme Court's decision in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000). The constitutional holding in that case was that qui tam relators have Article III standing to sue under the False Claims Act; the Court did not address whether the qui tam provisions comport with Article II. *See id.* at 778 n.8. But in addressing standing, the Court expressly declined to rely on the theory that a relator sues as an "agent of the United States"—a theory that, if

accepted, would have established the relator's standing as derivative of the government's standing to seek relief for frauds committed against it. *Id.* at 772. The Court instead reasoned that the False Claims Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. *Id.* at 773; *see United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425 (2023) (same). On that basis, the Court concluded that the relator's standing rests on "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Stevens*, 529 U.S. at 773.

The Supreme Court thus made clear that, when relators sue under the False Claims Act, they are not exercising Executive power; rather, they are pursuing a personal interest in the share of the government's recovery that the Act assigns to them. That a relator brings a qui tam suit "in the name of the Government," 31 U.S.C. § 3730(b)(1), does not alter the nature of the relator's interest in the suit. The Supreme Court confirmed as much later in its opinion, when—in holding that relators cannot pursue qui tam actions against States—it explained that actions pursued by relators are "private suit[s]" brought by "private parties." *Stevens*, 529 U.S. at 780 n.9, 786 n.17; *see also, e.g.*, *Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may

sue in the government's name, the relator is not vested with governmental power."). And the Supreme Court more recently emphasized the same point in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019). In holding that relators are not "official[s] of the United States" for purposes of the limitations period in 31 U.S.C. § 3731(b)(2), the Court explained that the statutory provision for qui tam actions to be brought "'for the [relator] and for the … Government,'" and "'in the name of the Government,' … does not make the relator anything other than a private person[.]" 587 U.S. at 272.

Nor does the fact that a qui tam action may vindicate a federal interest, by remedying and deterring fraud on the United States, make it any less a "private suit" brought by a "private part[y]," *Stevens*, 529 U.S. at 780 n.9, 786 n.17. As the en banc Fifth Circuit explained in rejecting a challenge like this one, Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of" protecting the government's interests. *Riley*, 252 F.3d at 753. Congress passed the False Claims Act "upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting … under the strong stimulus of personal ill will or the hope of gain." *United*

*States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) (quoted in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997)); *see also, e.g., Mortgages, Inc. v. U.S. Dist. Ct. for the Dist. of Nev. (Las Vegas)*, 934 F.2d 209, 213 (9th Cir. 1991) (per curiam) (False Claims Act's "qui tam provisions are based upon the idea of 'setting a rogue to catch a rogue'"). And the False Claims Act is far from unique in that respect. As the Sixth Circuit noted in another challenge to the constitutionality of the Act's qui tam provisions, the U.S. Code "includes many laws that authorize individuals to act as 'private attorneys-general,' bringing causes of action for the common weal." *Taxpayers Against Fraud*, 41 F.3d at 1041.

Qui tam suits under the False Claims Act are analogous for Article II purposes to private suits invoking such laws—for example, private suits under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f); the antitrust laws, 15 U.S.C. § 15; or the Clean Water Act, 33 U.S.C. § 1365. Like the qui tam provisions of the False Claims Act, these private rights of action serve to channel the pecuniary interest of private litigants toward the protection of the public interest. Such suits can supplement the government's

efforts to enforce the same statutory provisions; that is why Congress authorizes them. But they remain private suits brought by private parties, distinct from the government's own enforcement actions.

The government's means of controlling qui tam suits under the False Claims Act, even where it has declined to take over the suits, underscore that qui tam relators do not themselves exercise Executive power. As discussed above, the government can stay discovery to avoid "interfere[nce]" with a related governmental investigation or prosecution. 31 U.S.C. § 3730(c)(4). It can "elect to pursue its claim through any alternate remedy available to [it], including any administrative proceeding to determine a civil money penalty." *Id.* § 3730(c)(5). It can veto a relator's proposed dismissal or settlement of an action. *Id.* § 3730(c)(1). And it can intervene on a showing of good cause—even after having initially declined to do so—either to take control of the action or to seek to dismiss it, over the relator's objection, if it determines that continued litigation would be contrary to the government's interests. *Id.* § 3730(c)(2)(A), (B); *see Polansky*, 599 U.S. at 437 (explaining that government dismissal motions should be granted "in all but the most exceptional cases"); U.S. Dep't of Justice, *Justice Manual* § 4-4.111 (last updated

2021) (noting that the government's ability to dismiss qui tam actions "provide[s] an important tool to advance the government's interests, preserve limited resources, and avoid adverse precedent").

This Court has expressly "recognized and relied on the substantial control that the United States possesses over non-intervened … qui tam actions" and noted that other courts have recognized these control mechanisms in holding that the qui tam provisions do not violate Article II. *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1311-1312 (11th Cir. 2021). Taken together, the control mechanisms reflect Congress's efforts to ensure that qui tam suits function as a useful supplement and not as an impediment to governmental enforcement efforts.

By making clear that qui tam relators are pursuing private interests in the monetary recovery that the False Claims Act assigns to them, rather than exercising Executive power, *Stevens* establishes that the Act's qui tam provisions are consistent with Article II. As private litigants pursuing private interests, relators are not acting to enforce federal law in a manner inconsistent with the Vesting and Take Care Clauses. And for the same reason, they need not be appointed in the manner required by the Appointments Clause.

### B. The History Of Qui Tam Provisions Bolsters Their Constitutionality In The False Claims Act

*Stevens* also supports the constitutionality of the False Claims Act's qui tam provisions in a second respect:  The Supreme Court's emphasis on history, and in particular on the First Congress's enactment of other qui tam provisions, buttresses the inference that the qui tam provisions of the False Claims Act are consistent with the Framers' views on separation of powers.

Decades before *Stevens*, the Supreme Court observed that "'[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, ha[d] been in existence for hundreds of years in England, and in this country ever since the foundation of our government.'"  *Marcus*, 317 U.S. at 541 n.4.  In *Stevens*, the Court surveyed the "long tradition of" such statutes and the "considerable number" that the First Congress enacted, some of which—like the False Claims Act—"provided both a bounty and an express cause of action."  529 U.S. at 774, 776-777.[2]  And the Court found this evidence "well nigh conclusive with respect to the question … whether *qui tam* actions were cases and

---

[2] *See, e.g.*, Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (census); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129, 129 (extending census provisions to Rhode
*Continued on next page.*

controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Id.* (quotation marks omitted).

Justice Stevens's separate opinion in *Stevens*—which was a dissent as to the statutory question whether relators could sue States, but which agreed with the majority on the predicate issue of constitutional standing—observed that the history the majority found "well nigh conclusive" as to Article III, 529 U.S. at 777 (majority opinion), was just as "sufficient to resolve" any question whether the qui tam provisions were consistent with Article II, *id.* at 801 (Stevens, J., joined by Souter, J., dissenting). The en banc Fifth Circuit expressed the same view, finding it "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* … is similarly conclusive with respect to the Article II question." *Riley*, 252 F.3d at 752.

---

Island); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 131, 133 (regulation of seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 137-138 (trade with Indians); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (duties on liquor); *see also, e.g.*, Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (Second Congress, Post Office); Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 329, 331 (Second Congress, trade with Indians); Act of Mar. 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347, 349 (Third Congress, international slave trade).

That is for good reason. Legislation "'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, … is contemporaneous and weighty evidence of its true meaning.'" *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see Bowsher v. Synar*, 478 U.S. 714, 723-724 (1986) (giving weight to the First Congress's conclusion that the Legislative Branch should have no role in the removal of Executive officers); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (explaining that "'traditional ways of conducting government … give meaning' to the Constitution" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring))); *cf. Vidal v. Elster*, 602 U.S. 286, 299 (2024) (noting the "longstanding, harmonious relationship" between trademark law and the First Amendment).

## II. The District Court Erred In Applying The Appointments Clause

The district court nonetheless concluded that the False Claims Act's qui tam provisions are inconsistent with the Appointments Clause, which specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law." U.S. Const. art. II, § 2, cl. 2. That

conclusion is meritless for numerous reasons. This Court should reject it and

join the well-supported consensus among other courts of appeals.

## A. The Appointments Clause Applies Only To Government Officeholders, Not To Private Citizens

The district court appeared to believe that the Appointments Clause

issue in this case turns on the constitutional line between "'Officers of the

United States,'" whether "'[p]rincipal'" or "'inferior,'" and "the mere 'em-

ployees'" who "comprise 'the broad swath of "lesser functionaries" in the

Government's workforce.'" 2024 WL 4349242, at *5-6. To be considered an

"officer" as opposed to an employee, a person must "'exercis[e] significant

authority pursuant to the laws of the United States'" and "must occupy a

'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245

(2018). The district court concluded that qui tam relators under the False

Claims Act satisfy those criteria and thus that they are officers of the United

States who have not been appointed in a manner consistent with the Ap-

pointments Clause.

But the district court's analysis overlooked a basic point: The Appoint-

ments Clause applies only to the appointment of members of "'the Govern-

ment's workforce,'" 2024 WL 4349242, at *6. That is why the constitutional

line is drawn between federal officers and federal employees—because people who do not work for the federal government, whether as officers or as employees, need not be appointed in a manner consistent with the Appointments Clause. And relators plainly are not part of "'the Government's workforce,'" *id.* The Supreme Court has repeatedly characterized them as "private" actors. *Stevens*, 529 U.S. at 780 n.9; *Cochise*, 587 U.S. at 272. Indeed, as the Court noted in *Cochise*, *id.*, the provision of the False Claims Act that authorizes qui tam suits is entitled "Actions By Private Persons," 31 U.S.C. § 3730(b) (capitalization altered). Relators receive no "salary" or other "benefits" of government employment, *Stone*, 282 F.3d at 805; *Riley*, 252 F.3d at 757-758; they have no access to the government's internal files; their counsel have no attorney-client relationship with the defrauded government agency; and neither relators nor their counsel have any duty, in conducting qui tam litigation, to subordinate the relator's interest to that of the government if a conflict between those interests arises. The government's representatives in qui tam litigation are not relators or their counsel; they are the Justice Department attorneys who conduct the initial review of the complaint, deter-

mine whether to take over the litigation, supervise cases conducted by a relator to ensure the government's interests are protected, and file statements of interest and amicus briefs in such cases.

The district court's concern appeared to be that the False Claims Act improperly delegates to relators, as private citizens, functions that the district court believed only a government official could properly perform. But that concern does not implicate the Appointments Clause. It implicates other parts of Article II, and it is faulty for all the reasons discussed above. In order for the Appointments Clause to be relevant here, relators would need to be part of the government—yet the district court failed to identify any other case in which private individuals have been treated as part of the federal government, whether as officers or as employees. That should have sufficed for the district court to conclude that relators are not subject to the Appointments Clause.

## B. Relators Do Not Exercise Significant Government Authority

To the extent the criteria that courts have traditionally applied to distinguish between federal officers and federal employees could bear on the

antecedent determination whether a particular individual is part of the federal government at all, the district court misapplied those criteria here.

1. The district court determined that relators "'exercis[e] significant authority pursuant to the laws of the United States,'" *Lucia*, 585 U.S. at 245, because they "'conduct[] civil litigation in the courts of the United States for vindicating public rights,'" 2024 WL 4349242, at *7 (quoting *Buckley v. Valeo*, 424 U.S. 1, 140 (1976)). The court analogized relators to members of the Federal Election Commission, *Buckley*, 424 U.S. at 124-143; independent counsels with prosecutorial authority, *Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988); administrative law judges of the Securities and Exchange Commission, *Lucia*, 585 U.S. at 241, 244-251; and the directors of the Consumer Financial Protection Bureau, *Seila Law LLC v. CFPB*, 591 U.S. 197, 219-220 (2020), and the Federal Housing Finance Authority, *Collins v. Yellen*, 594 U.S. 220, 250-253 (2021).

Those analogies miss the fundamental point discussed above: Unlike the officials the district court identified as analogous, relators are not members of the government's workforce and do not exercise governmental authority. When a relator brings a qui tam suit under the False Claims Act, she is not, as the district court supposed, "initiat[ing] an enforcement action on

behalf of the United States," 2024 WL 4349242, at *7. She is bringing a "private suit," as a "private part[y]," seeking to obtain the monetary recovery to which she is personally entitled by virtue of the False Claims Act's "partial assignment" to her "of the Government's damages claim." *Stevens*, 529 U.S. at 773, 780 n.9, 786 n.17.

That is true even though the False Claims Act provides for the imposition of civil penalties and "essentially punitive" multiple damages, *Stevens*, 529 U.S. at 784-785, and even though the government itself obtains the majority of any monetary award in a qui tam suit. As noted above, Congress routinely creates private rights of action under federal laws that the government can itself enforce. And Congress routinely provides for punitive remedies in such actions. *See, e.g.*, 42 U.S.C. § 1981a(b)(1) (providing for punitive damages in private employment-discrimination suits under Title VII and the Americans with Disabilities Act); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 186 (2000) (recognizing private plaintiffs' standing to seek civil penalties, payable to the government, in actions under the Clean Water Act); *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (availability of treble damages in antitrust suits "reveals an intent to punish past, and to deter future, unlawful conduct"). Qui tam suits under

the False Claims Act are not meaningfully different for Article II purposes from private suits under these other statutes, which likewise give private persons a role in achieving Congress's policy goals.

The district court reasoned that, unlike plaintiffs invoking other private rights of action under federal law, relators under the False Claims Act need not have suffered "a personal injury" in order to bring suit. But the fact that relators need not have suffered a personal injury creates a constitutional question under Article III — not Article II — and the Supreme Court resolved that question in *Stevens* by holding that relators have the requisite personal stake in False Claims Act litigation by virtue of the "partial assignment" to them "of the Government's damages claim." 529 U.S. at 773. What matters for Article II purposes is the nature of the relator's role in the action, not the nature of the relator's injury.

2. The district court further erred in suggesting that relators "exercise[] core executive power by deciding 'how to prioritize and how to aggressively to pursue legal actions against defendants who violate the law.'" 2024 WL 4349242, at *8 (footnote omitted) (quoting *United States v. Texas*, 599 U.S. 670, 678 (2023)). The court likened the relator's "ability to initiate [a False Claims Act] enforcement action" to the Executive's ability to bring a criminal

prosecution. *Id.* But the False Claims Act provides that a qui tam action cannot proceed at all—indeed, it cannot even be unsealed—until the government has had an opportunity to determine whether to "intervene and proceed with the action," intervene and move to dismiss it, or allow the relator "to conduct the action" subject to ongoing government oversight. 31 U.S.C. § 3730(b)(2)-(4). This review ensures that qui tam actions proceed only when they are consistent with the government's priorities for the enforcement of federal law. A relator's filing of a qui tam suit, subject to this upfront review by the government, is thus nothing like the government's filing of a criminal indictment. Indeed, relators exercise less control over their suits than private plaintiffs under Title VII, the antitrust laws, or the Clean Water Act—statutes that do not afford the government such mechanisms of control. Congress's perception of the distinction between private civil causes of action (which are commonplace) and private criminal prosecutions (which are essentially unknown today) is underscored by the fact that the False Claims Act's own criminal provision, 18 U.S.C. § 287, cannot be enforced in a qui tam suit.

The district court's suggestion that the government's review of qui tam complaints itself "forces the Executive Branch to align its investigative priorities" with a relator's, 2024 WL 4349242, at *7, is likewise incorrect. The

relator has no role in directing the government's investigation of her allegations, and the 60-day timeline for that investigation can be extended under 31 U.S.C. § 3730(b)(3) for good cause—including where such extensions are necessary to accommodate the government's many competing priorities.

Even if the government declines to intervene at the outset, moreover, it has ample means of supervising the relator's conduct of the litigation. *See supra* pp. 17-18. It can move to intervene at any point—including for the purpose of seeking to dismiss the suit over the relator's objection—if it determines that the relator's continued pursuit of the litigation is no longer in the government's interests. 31 U.S.C. § 3730(c)(2)(A), (B); *see Polansky*, 599 U.S. at 437 (dismissal should be granted "in all but the most exceptional cases"). And the government can file statements of interest and amicus briefs to advise courts of how their decisions in qui tam suits could affect the government's enforcement interests.

At all stages, as noted above, the government's representatives in qui tam litigation are not the relators or their counsel; they are the Justice Department attorneys who review the complaint, determine whether to take

over the litigation, supervise cases conducted by a relator to ensure the government's interests are protected, and file statements of interest and amicus briefs in such cases.

Finally, relators are constrained in qui tam litigation in ways that the government is not. Relators lack access to government files, as noted above, and their suits are subject to numerous statutory restrictions that do not apply to False Claims Act suits brought by the government itself. For example, a relator is barred from suing on the basis of "allegations or transactions" that have already been "publicly disclosed"—whether in "the news media," in any "Federal criminal, civil, or administrative hearing in which the Government or its agent is a party," or "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"—unless she "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A); *see id.* § 3730(e)(4)(B) (defining "original source"). That bar may be lifted only if the government opposes the dismissal of the action—that is, if it exercises its own enforcement discretion to allow the claims in the relator's complaint to go forward. *Id.* § 3730(e)(4)(A). And a relator cannot bring a qui tam suit "based on the facts underlying" a "pending" qui tam suit, *id.* § 3730(b)(5), or "based upon allegations or transactions which are the

subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party," *id.* § 3730(e)(3).

## C. Relators Do Not Occupy A Continuing Position Established By Law

The district court further erred in applying the second element of the constitutional standard for distinguishing between federal officers from federal employees. Even assuming that standard is apposite here, relators under the False Claims Act do not "occupy a continuing position established by law," 2024 WL 4349242, at *11 (quotation marks omitted).

1. The requirement of a "'continuing' position established by law," *Lucia*, 585 U.S. at 245, stems from the Supreme Court's decision in *United States v. Germaine*, 99 U.S. 508 (1879), which "held that 'civil surgeons' (doctors hired to perform various physical exams) were mere employees because their duties were 'occasional or temporary' rather than 'continuing and permanent.'" *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 508, 511-512). As the Court explained in *Germaine*, and before that in *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867), the concept of an "officer" "embraces the ideas of tenure, duration, emolument, and duties." *Germaine*, 99 U.S. at

511-512; *see also Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (merchant appraiser did not hold an office where his position was "without tenure, duration, continuing emolument, or continuous duties, and he act[ed] only occasionally and temporarily"). A hallmark of an office is that its "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.).

The role of a relator under the False Claims Act satisfies none of those attributes. The role is limited in time and scope, confined to a particular case, and fundamentally personal in nature, stemming from the relator's pursuit of her personal interest in a monetary recovery as partially assigned by the government.

2. In nonetheless concluding that relators possess "statutorily defined duties, powers, and emoluments" of office, 2024 WL 4349242, at *11, the district court misunderstood each of those concepts.

A relator has no governmental "duties." The requirements that she "file the initial complaint in camera," "serve" the complaint and supporting evidence "on the government," and "wait at least sixty days" to allow the government to investigate "before serving the defendant," 2024 WL 4349242, at *11, are not "duties" akin to those of an officeholder. They are simply

procedures the relator is statutorily required to follow in order to initiate a qui tam action.  In much the same manner, Title VII specifies that a private litigant wishing to pursue a claim of employment discrimination in federal court must first file a grievance with the Equal Employment Opportunity Commission.  *See* 42 U.S.C. § 2000e-5(f)(1).  That does not mean filing a grievance with the Commission is a "duty" of someone holding the office of "Title VII plaintiff," as the district court's reasoning here would suggest.

The district court further misunderstood the concept of "powers."  If the government does not take over a qui tam action, a relator certainly can "choose which defendants to sue (and which not to sue, for reasons of her own), which theories to raise, which motions to file, and which evidence to obtain."  2024 WL 4349242, at *11.  But those are the powers of any civil litigant pursuing a private claim; they are equally possessed by a private plaintiff under Title VII, the antitrust laws, the Clean Water Act, or any other statute.  They are not powers statutorily conferred on relators under the False Claims Act.

Finally, the district court misunderstood the concept of "emoluments" for purposes of the Appointments Clause.  It is true that if a qui tam action "succeeds," then the False Claims Act "compensates a relator with" a share

of the government's recovery. 2024 WL 4349242, at *11.[3]  But if the action

does not succeed, the relator gets nothing.  The government is not aware of,

and the district court did not identify, any government office for which the

officeholder is paid only in certain circumstances and not others.  Indeed, 18

U.S.C. § 208 generally forbids government officials and employees from par-

ticipating in matters in which they have "a financial interest," whereas the

existence of a financial or other personal interest is the sine qua non of Article

III standing for civil plaintiffs (including False Claims Act relators).

3.     The district court further erred in determining that the position

of a relator is "continuing."

a.     As noted above, the Supreme Court has long held that a person

who acts for the government only in a "particular case" ordinarily is not an

officer and thus need not be chosen in accordance with the Appointments

Clause.  *Auffmordt*, 137 U.S. at 326-327; *see Germaine*, 99 U.S. at 512; *see also*

*Freytag v. Commissioner*, 501 U.S. 868, 881 (1991) ("special masters, who are

_____

[3] The district court misidentified the amount of the share:  In cases like this one, where the government has not taken over the litigation, the share is 25-30% rather than the 15-25% identified by the district court.  *Compare* 31 U.S.C. § 3730(d)(1) (intervened cases) *with id.* § 3730(d)(2) (non-intervened cases).

hired by Article III courts on a temporary, episodic basis," are not officers);
*Contracts With Members of Cong.*, 2 Op. Att'y Gen. 38, 40 (1826) ("an engage-
ment with a gentleman of the bar, whereby, for a valuable consideration, he
is to render his professional services in a given case, is a contract, a bargain,
an agreement" rather than an appointment to an office (emphasis omitted)).

The district court invoked the Supreme Court's decision in *Morrison v.*
*Olson*, which stated without analysis that the independent counsel in that
case was an officer, 487 U.S. at 671 n.12. But that independent counsel exer-
cised the "'full power'" of the Department of Justice to investigate, charge,
and prosecute a range of defendants for a wide variety of crimes in courts
throughout the United States; her role was not limited to the pursuit of a
single action in federal court. *Id.* at 662. The Second Circuit accordingly
erred in extending *Morrison* to hold that a special prosecutor appointed only
for a single case was an officer, *United States v. Donziger*, 38 F.4th 290, 296-
299 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 868 (2023). The district court also
relied heavily on a series of "[o]lder decisions discussing bank receivers,"
who "were officials charged with winding up a specific insolvent bank and
entrusted with 'statutory authority to bring suit, through a [United States]
Attorney and under the direction of the Solicitor of the Treasury.'" 2024 WL

4349242, at *12. It is unclear, however, whether those decisions can be squared with the Supreme Court's subsequent precedents.

b.     In any event, even if *Donziger* and the bank-receiver decisions were correct in their analysis of officer status—which the Court can assume without deciding—they would not support the district court's conclusion that a relator under the False Claims Act occupies a "continuing" position. That is because the bank receiverships and the role of the special prosecutor in *Donziger*, like that of the independent counsel in *Morrison*, were continuing in the crucial sense that the roles were not specific to the individuals appointed to perform them. That is not true of a relator's role.

There is "extensive practice and precedent" supporting this concept of "'continuance,'" as distinct from the concept of "'permanence,'" in Appointments Clause doctrine. *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 111 (2007) (*Officers of the United States*). The key early precedent is Chief Justice Marshall's opinion, while riding circuit, in *United States v. Maurice*—a case addressing whether an "agent of fortifications" in the Army was "an officer of the United States," 26 F. Cas. at 1214. Chief Justice Marshall recognized that "[a] man may certainly be employed under a contract … to … perform a service, without becoming an

officer." *Id.* "But if a duty be a continuing one," the Chief Justice explained—that is, "if those duties continue, though the person" performing them "be changed"—then "it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer." *Id.*

The temporary offices that the district court invoked as analogous were all continuing in this crucial sense: the "duties" of those offices would "continue" even "though the person" performing them "be changed," *Maurice*, 26 F. Cas. at 1214. The duties of a bank receiver, for example, were not limited to performance by a single individual. *See Officers of the United States*, 31 Op. O.L.C. at 110-111. If a given person appointed to act as a receiver became unable to perform his duties, that would not negate the need for a receivership; it would simply require the appointment of another receiver in place of the first. In *Stanton v. Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876), one of the bank-receiver cases on which the district court here relied, 2024 WL 4349242, at *12, then-Judge Blatchford made this point clear when he explained that "[v]acation of office by the comptroller" of the currency, who delegated authority to the receiver, would not "vacate the receivership." 22

F. Cas. at 1074-1075. (Judge Blatchford later became Justice Blatchford and authored the seminal opinion in *Auffmordt*.)

The same was true of the offices of the independent counsel in *Morrison* and the special prosecutors in *Donziger*. As the Supreme Court explained, Alexia Morrison was not even the first person to hold her office: The court that appointed her had initially appointed James McKay, who had resigned and been replaced by her. *Morrison*, 487 U.S. at 667. Ms. Morrison's role was thus clearly "continuing" even though it was not permanent. And in *Donziger*, the Second Circuit—citing *Maurice*—specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." 38 F.4th at 297.

The role of a relator is nothing like that. If a particular relator who has blown the whistle on a fraud by filing a qui tam action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator. The False Claims Act states expressly that "[w]hen a person brings an action under" the qui tam provisions, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

The district court nevertheless concluded that "the position of relator" is "'continuing'" on the theory that "any 'person' [can] bring [a False Claims Act] action—and thus … occupy the position of re[la]tor—if the person can allege the facts of a fraud."  2024 WL 4349242, at *13.  But the requirement that an office be "continuing" has nothing to do with whether multiple people can hold an office with that title (like Senator or Ambassador) at any given time; it has to do with whether the duties of the office continue from occupant to occupant.  As noted above, a qui tam action cannot continue from occupant to occupant of the so-called office of "relator," even if different relators might bring other qui tam actions.

The district court noted that "when a relator dies, his estate's personal representative may be substituted in the relator's place," and that "a relator may assign (at least in part) her interest in [a False Claims Act] action."  2024 WL 4349242, at *14.  But those features of a relator's role only underscore that a relator's interest in a qui tam action is simply a personal interest in her assigned share of the ultimate monetary recovery.  The duties of an actual office—for example, "an Attorney General, an Ambassador, or [a] Secretary

of the Treasury," *id.* at \*11—are not personal in that way. They are not inherited by the official's estate if she dies; nor can the official reassign her duties to, say, a trusted friend.

## D. The District Court Erred In Dismissing Historical Evidence

The district court further erred in its assessment of the historical record bolstering the constitutionality of the False Claims Act's qui tam provisions.

1. The district court's principal ground for rejecting the relevance of historical qui tam statutes was that "well-settled understandings of constitutional text" generally "prevail[] over" historical practice. 2024 WL 4349242, at \*15; *see id.* at \*18 ("When the Constitution is clear, no amount of countervailing history overcomes what the States ratified."). But that reasoning mistook the purpose for which history is relevant here: not to justify an "[e]xception" to Article II for qui tam relators, *id.* at \*15, but to shed light on whether the qui tam provisions should be understood to implicate Article II at all. Early congressional enactments supply "'contemporaneous and weighty evidence of [the Constitution's] true meaning,'" *Marsh*, 463 U.S. at 790, and "'traditional ways of conducting government'" likewise "'give meaning' to the Constitution," *Mistretta*, 488 U.S. at 401.

The district court's insistence that the constitutional text is "clear"—so clear as to preclude consideration of history—is particularly difficult to square with the Supreme Court's decision in *Stevens*. The text of Article III was no less clear than that of Article II, yet the Supreme Court relied heavily on "the long tradition of *qui tam* actions in England and the American Colonies" in examining whether qui tam relators have standing to sue under the False Claims Act. 529 U.S. at 774; *see id.* at 774-778. Indeed, the Court found the "history well nigh conclusive." *Id.* at 777. And although the Court relied partly on a rule specific to the context of Article III—the rule that "Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process,'" *id.* at 774—history is similarly relevant to the interpretation of Article II. *See, e.g.*, *Financial Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. 448, 458-459 (2020) (examining history bearing on Appointments Clause issue); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation-of-powers cases this Court has often 'put significant weight upon historical practice.'"). That is presumably why the Justices who addressed the Article II issue in *Stevens* found the history equally dispositive of that issue, as did the en banc Fifth

Circuit.  *See Stevens*, 529 U.S. at 801 (Stevens, J., joined by Souter, J., dissenting) (history was "sufficient to resolve" any question whether the qui tam provisions were consistent with Article II); *Riley*, 252 F.3d at 752 (finding it "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* … is similarly conclusive with respect to the Article II question").

The district court was therefore incorrect to dismiss the relevance of history on the ground that the constitutional text is too clear for history to matter.  If that were true here, it would have been equally true in *Stevens*.

2.    The district court further erred in assessing the merits of the historical evidence.  Although the court acknowledged that "early Congresses enacted at least some statutes containing an enforcement mechanism roughly analogous to the [False Claims Act]"—that is, statutes "'provid[ing] both a bounty and an express cause of action'"—the court found no basis to believe that actions under those early statutes "were accepted as compatible with the Constitution's separation of powers."  2024 WL 4349242, at *17. That analysis cannot be squared with the Supreme Court's heavy reliance on the same historical record in *Stevens*, and it significantly understates both the

prevalence of early qui tam statutes and the body of evidence that such statutes were understood to be constitutional.

As the Supreme Court explained in *Stevens*, qui tam actions in England dated back to the 13th century—first at common law, then under statutes enacted by Parliament. 529 U.S. at 774-775. They carried over to the American Colonies. *Id.* at 776 (citing statute "allowing informers to sue for, and receive share of, fine imposed upon officers who neglect their duty to pursue privateers and pirates"). And "the First Congress enacted a considerable number of" such statutes, including those of the type that the district court here identified as most relevant: statutes that "provided both a bounty and an express cause of action" for informers. *Id.* at 776-777, 777 n.6; *see* 2024 WL 4349242, at *17 (identifying such statutes as "'relevantly similar' for Article II purposes"). To cite just a few examples, one statute allowed "informer[s] to sue for, and receive half of [the] fine for, [a] failure to file [a] census return." *Stevens*, 529 U.S. at 777 n.6 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102). Another allowed "private individual[s] to sue for, and receive half of [the] fine for, carriage of seamen without contract or illegal harboring of runaway seamen." *Id.* (citing Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. at 131, 133). And another allowed "private individual[s] to sue for, and receive

half of [the] goods forfeited for, unlicensed trading with Indian tribes."  *Id.*

(citing Act of July 22, 1790, ch. 33, § 3, 1 Stat. at 137-138).  Surveying the history, this Court observed in *Yates* that "qui tam actions were viewed as a routine enforcement mechanism in the early Republic."  21 F.4th at 1313.[4]

If the profusion of these early qui tam statutes did not make clear that qui tam mechanisms were established features of federal law, that point was bolstered by the Second Congress's enactment of a provision generally governing the award of costs in such suits.  *See* Act of May 8, 1792, ch. 36, § 5, 1 Stat. 275, 277-278 (providing that "if any informer or plaintiff on a penal statute to whose benefit the penalty or any part thereof if recovered is directed

---

[4] Early Congresses also enacted the prize statutes, which invoked the power to "grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," U.S. Const. art. I, § 8, cl. 11, to authorize the President to commission private ships (privateers) to capture enemy vessels. Under the prize statutes, the captor could bring the captured vessel into the jurisdiction of the United States and file an in rem action against the ship in federal court.  If the vessel was condemned, the captor was entitled to the ship or its value.  *See, e.g.*, *The Sally*, 12 U.S. (8 Cranch) 382, 384 (1814); *The Nassau*, 71 U.S. (4 Wall.) 634, 640-642 (1866).  Like qui tam provisions, the prize statutes reflected the view that important national purposes could be furthered by enlisting the efforts of private persons through the offer of a reward or bounty.  An integral feature of both regimes, moreover, was the availability of a right of action in federal court to collect the statutory reward—a right that did not depend on proof that the plaintiff had himself been injured by the unlawful conduct at issue.

by law to accrue shall discontinue his suit or prosecution or shall be nonsuit in the same, or if upon trial a verdict shall pass for the defendant, the court [should] award to the defendant his costs," unless the plaintiff was an authorized federal official found by the court to have had "reasonable cause for commencing" the suit). Congress reenacted the substance of that provision in 1799, Act of Feb. 28, 1799, ch. 19, § 8, 1 Stat. 626, and carried it forward until the 1948 revision of Title 28, *see* 28 U.S.C. § 823 (1946); Act of June 25, 1948, Pub. L. No. 773, 62 Stat. 869.

The Executive Branch likewise accepted qui tam provisions as an established feature of early American law. In 1795, for example, Attorney General Bradford submitted to Congress a draft bill proposing fees to be awarded by the federal courts; the bill included the sort of cost-shifting provision for qui tam suits that Congress had previously enacted in 1792. *See* 1 William S. Hein & Co., *American State Papers, Class X, Miscellaneous* 117, 121 (1998) (provision for cost-shifting in suits brought by "any informer or plaintiff, on a penal statute, to whose benefit the penalty, or any part thereof, if recovered, is directed by law to accrue"), https://perma.cc/JGR5-8AQA. The inclusion of that provision in the Attorney General's proposal strongly

suggests that the early Executive Branch perceived no constitutional problem with qui tam suits.

That is equally true of the Supreme Court. In *Marvin v. Trout*, 199 U.S. 212 (1905), for example, the Court upheld the constitutionality of a state statute allowing a person to sue to recover an amount of money lost by another person in illegal gambling, if the person who had lost the money did not bring suit within six months. To hold that such a statute was unconstitutional, the Court explained, "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. And in *United States ex rel. Marcus v. Hess*, the Supreme Court held that the court of appeals had been wrong to construe the False Claims Act narrowly "on the premise that qui tam or informer actions 'have always been regarded with disfavor.'" 317 U.S. at 540-541. To the contrary, the Supreme Court observed that "[q]ui tam suits have been frequently permitted by legislative action" and that "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." *Id.* at 541-542.

The historical record thus suggests that all three branches of the early American government accepted qui tam statutes as an established feature of the legal system.

Aside from questioning the consensus as to the validity of the early qui tam statutes, the district court noted that "[a]ctual practice under the[] early statutes reveal[ed] a complicated relation between … relators and properly appointed officers." 2024 WL 4349242, at *16. "For example," the court observed, "district attorneys often represented relators in nominally private enforcement actions, which gave the government a potential gatekeeping mechanism and control over a relator's litigation decisions." *Id.* But as explained by the article on which the district court relied, "district attorneys" at the time did not "answer[] to the Attorney General," much less to the Department of Justice (which had yet to be created); they "worked part-time for the government and part-time for their own account." James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in A Partisan World*, 92 Fordham L. Rev. 469, 490 (2023). And in any event, even if the district court were correct that Founding-era qui tam statutes "gave the government a potential gatekeeping mechanism and control over a relator's litigation decisions," 2024 WL 4349242, at *16, that is equally true of the False

Claims Act: As discussed above, the government has extensive mechanisms to control relators' pursuit of qui tam actions even when the government has declined to intervene.

The district court was thus incorrect to question whether early qui tam statutes comparable to the False Claims Act "were accepted as compatible with the Constitution's separation of powers," 2024 WL 4349242, at *17. There is strong evidence that they were. It is true that there was no "challenge to the constitutionality of [False Claims Act]-like qui tam actions at the founding," *id.*, and no challenge to the constitutionality of the False Claims Act's qui tam provisions until the expansion in their use that followed the 1986 amendments to the statute, *see id.* at *18. But as discussed above, that is not because qui tam provisions somehow escaped the notice of the Congress that passed them, the Executive that signed them, the Judiciary that applied them, and the litigants who invoked them and were targeted by them. It is far more likely because, especially given their long history, the constitutionality of such provisions was not thought to be seriously in dispute.

In any event, this Court need not undertake an independent assessment of the history that the district court dismissed, because the Supreme

Court already made clear in *Stevens* that it regards the same historical record as highly probative. The district court did not attempt to explain why the Supreme Court would have relied so heavily on the history of the early qui tam provisions if that record held as little value as the district court believed.

### E.    This Case Does Not Present The Question Whether The Qui Tam Provisions Are Facially Unconstitutional

Finally, we note that some language in the district court's opinion could be read to suggest that the qui tam provisions of the False Claims Act are facially unconstitutional—that is, unconstitutional even in cases where the government has intervened to take over the action, or where the complaint has been filed but the government is still considering whether to intervene. For example, the district court described relator's "filing a complaint" as "ultra vires." 2024 WL 4349242, at *19.

But the actual basis of the judgment this Court is reviewing—the district court's dismissal of the action—was that relator was "the only litigant on her side of the enforcement action." 2024 WL 4349242, at *19. And in a footnote appended to that sentence, the court observed that the government had "shown no desire to intervene" for the purpose of "tak[ing] over" the action, as opposed to the limited purpose of defending the constitutionality

of the qui tam provisions.  *Id.* at *19 n.9.  The district court therefore did not address whether the Appointments Clause would have required the dismissal of this suit if the government had taken over the litigation or if the complaint had been filed but the government was still deciding whether to intervene.

Nothing in the district court's analysis would provide any basis for holding the qui tam provisions unconstitutional in those circumstances.  Before the government decides whether to intervene, a relator has no power to pursue litigation on her own; her only role is to bring information to the government and let the government determine how to proceed.  *See supra* pp. 27-28.  That is not an exercise of Executive power.  And if the government decides to intervene and take over a qui tam action, it fully controls the action and there can be no Article II objection to its continued litigation of the action.

Like the district court, this Court has no occasion to address whether the qui tam provisions would be constitutional if applied in a case where the government has intervened or is still considering whether to intervene.  If the Court affirms the district court's ruling, it should accordingly make clear that it is not answering that question.

# CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

ROGER B. HANDBERG
  *United States Attorney*

CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney General*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *daniel.l.winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,939 words. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

# ADDENDUM

# TABLE OF CONTENTS

31 U.S.C. § 3730 ................................................................. A1

31 U.S.C. § 3731 ................................................................. A6

**31 U.S.C. § 3730**

## § 3730. Civil actions for false claims

(a) Responsibilities of the Attorney General. — The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.

(b) Actions by private persons. —

(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government … . The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4) Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall —

(A) proceed with the action, in which case the action shall be conducted by the Government; or

(B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

(5) When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

(c) Rights of the parties to qui tam actions. —

(1) If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

(2) (A) The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

(B) The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

(C) Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, such as —

(i) limiting the number of witnesses the person may call;

(ii) limiting the length of the testimony of such witnesses;

(iii) limiting the person's cross-examination of witnesses; or

(iv) otherwise limiting the participation by the person in the litigation.

(D) Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue

burden or unnecessary expense, the court may limit the participation by the person in the litigation.

(3) If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

(4) Whether or not the Government proceeds with the action, upon a showing by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay such discovery for a period of not more than 60 days. Such a showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

(5) Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

(d) Award to qui tam plaintiff. —

(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(3) Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of

criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

(4) If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

(e) Certain Actions Barred. —

(1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

(2) (A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

(B) For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in paragraphs (1) through (8) of section 13103(f) of title 5.

(3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

(4) (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed —

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2)3 who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

(f) Government not liable for certain expenses. — The Government is not liable for expenses which a person incurs in bringing an action under this section.

…

## 31 U.S.C. § 3731

### § 3731. False claims procedure

…

(c) If the Government elects to intervene and proceed with an action brought under [section] 3730(b), the Government may file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief.  For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

…