No. 24-13581

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

UNITED STATES ex rel. CLARISSA ZAFIROV,
*Plaintiff-Appellant,* and

UNITED STATES OF AMERICA,
*Intervenor-Appellant,*

v.

FLORIDA MEDICAL ASSOCIATES, LLC, et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court for the Middle District of Florida
No. 8:19-cv-01236

---

### PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Jennifer M. Verkamp
Jillian L. Estes
MORGAN VERKAMP, LLC
4410 Carver Woods Dr.
Suite 200
Cincinnati, OH 45242
Tel. (513) 651-4400

Tejinder Singh
SPARACINO, PLLC
1920 L Street, NW
Suite 835
Washington, D.C. 20036
Tel. (202) 629-3530

*Attorneys for Plaintiff-Appellant Dr. Clarissa Zafirov*

**No. 24-13581**

*U.S. ex rel. Zafirov and United States v. Florida Medical Assoc., et al.*

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Eleventh Circuit Rule 26.1-1 and Fed. R. App. P. 26.1, counsel for Plaintiff-Appellant Clarissa Zafirov certifies that the following persons and entities may have an interest in the outcome of this appeal:

1.    * Aimonetti, Justin W.

2.    * Altman, Stephen D.

3.    * Altman Dispute Resolution

4.    * Andersen, J. Carter

5.    Anion Technologies, LLC

6.    Anthem, Inc. n/k/a Elevance Health, Inc. (NYSE: ELV)

7.    Arias, Elizabeth A.

8.    Auerbach, Marcela

9.    Bentley III, Arthur Lee

10.   Bock, Elizabeth M.

11.   Boyd, Ginger Barry

12.   Boynton, Brian M.

13.   Bradley Arant Boult Cummings LLP

14.   Buffaloe, William T.

15.   Bush Ross, P.A.

16. Clark, Havan M.

17. Deaton, David

18. Dechert, LLP

19. DeMar, Jacklyn

20. Drake, Scott P.

21. * Durling, James

22. Engel, Steven A.

23. Estes, Jillian L.

24. Florida Medical Associates, LLC d/b/a VIPcare

25. Flynn, The Honorable Sean P.

26. Foley & Lardner LLP

27. Foley, Jack

28. Freedom Health, Inc.

29. Gerencir, Samantha M.

30. Ghosh-Murthy, Priyanka

31. Giarratana, Giovanni P.

32. Goodman, Anna Jayne

33. Grover, Steven F.

34. * Gunster, Yoakley & Stewart P.A.

35. Handberg, Roger B.

36.   Hanower, Patricia L.

37.   Hartman, Anne H.

38.   Holder III, Harold D.

39.   Jonathan Kroner Law Office

40.   Keefe, Sean P.

41.   Koh, J. Jennifer

42.   Kroner, Jonathan

43.   Krueger, Matthew D.

44.   * Kulp, Brian A.

45.   * Lafferty, LaTour Rey

46.   * Leviss, David Jeffrey

47.   Lischak, Jonathan M.

48.   Mansour, George

49.   Matthews, Michael P.

50.   McDonnell, Kelly A.

51.   McGinley, Michael H.

52.   Mehta, Jason P.

53.   Merryday, The Honorable Stephen D.

54.   * Metlitsky, Anton

55.   * Miller-Gootnick, Benjamin

56.   Mizelle, The Honorable Kathryn K.

57.   Morgan Verkamp, LLC

58.   * Morrissey, Tara

59.   Nagle, Catherine

60.   Napora, Chandra

61.   * Nealon, James

62.   Nelson Mullins Riley & Scarborough LLP

63.   Nolan & Auerbach, PA

64.   Nolan, Kenneth J.

65.   O'Melveny & Myers, LLP

66.   Optimum Healthcare, Inc.

67.   Pagidipati, Siddhartha

68.   * Paul, Weiss, Rifkind, Wharton & Garrison LLP

69.   Physician Partners, LLC n/k/a Better Health Group, LLC

70.   Raab, Michael S.

71.   Rabin Kammerer Johnson, P.A.

72.   Rabin, Adam T.

73.   Santella, Amanda M.

74.   * Shanmugam, Kannon K.

75.   Scarborough, Charles W.

76.   Singer, Benjamin D.

77.   Singh, Tejinder

78.   Sparacino PLLC

79.   Steven F Grover PA

80.   Swanson, Joseph W.

81.   The Anti-Fraud Coalition

82.   The Chamber of Commerce of the United States of America

83.   * U.S. Chamber Litigation Center

84.   United States Department of Justice, Civil Division

85.   * United States Department of Justice, Appellate Division

86.   Valiente, Lauren L.

87.   Varcoe, Andrew

88.   Verkamp, Jennifer M.

89.   * Wenthold, David

90.   Winik, Daniel

91.   Yavelberg, Jamie A.

92.   Zafirov, Clarissa


* Additions to previous certificate marked with an asterisk.

Plaintiff-Appellant Clarissa Zafirov is an individual and not a corporate entity, and therefore has nothing to declare in a Corporate Disclosure Statement pursuant to Eleventh Circuit Rule 26.1.

Date: January 8, 2025          */s/ Jennifer M. Verkamp*
                              Jennifer M. Verkamp

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant respectfully requests oral argument because this case involves a matter of great public importance, *i.e.*, the constitutionality of the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. Oral argument may be helpful to the Court in evaluating the issues before it.

## **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CITATIONS ......................................................................... iv

JURISDICTIONAL STATEMENT ....................................................... xii

STATEMENT OF THE ISSUE..................................................................1

STATEMENT OF THE CASE...................................................................1

STANDARD OF REVIEW ......................................................................8

SUMMARY OF THE ARGUMENT ....................................................8

ARGUMENT .......................................................................................11

    I.  The False Claims Act's Qui Tam Provisions Comply with the
       Appointments Clause.......................................................................11

        A.    On-Point Precedent Weighs Heavily in Favor of Holding the
             Qui Tam Provisions Constitutional......................................11

        B.    History Establishes the Qui Tam Provisions' Constitutionality
             as a Matter of Originalist Constitutional Interpretation......................19

             1.    The Historical Record Shows That Qui Tam Plaintiffs Were
                  Never Regarded as Officers of the United States.....................22

             2.    The District Court Misconstrued and Erroneously
                  Disregarded Controlling History................................25

        C.    The Qui Tam Provisions Do Not Violate Modern Appointments
             Clause Precedents.................................................................34

             1.    Qui Tam Plaintiffs Do Not Occupy Any Government Position—
                  Let Alone a Continuing One .....................................36

a. The Appointments Clause Does Not Apply to Individuals Who Are Not Government Employees..........................36

b.  Any Position Held By Qui Tam Plaintiffs Is Not "Continuing."................................................................40

2.    Qui tam Plaintiffs Do Not Exercise Significant Powers Under the Laws of the United States .......................................48

II.  Defendants' Other Article II Arguments Fail.................................................54

CONCLUSION .....................................................................................55

## <u>TABLE OF CITATIONS</u>

**Cases**

*Adams v. Woods*,
  6 U.S. (2 Cranch) 336 (1805)..................................................................23

*Auffmordt v. Hedden*,
  137 U.S. 310 (1890) ......................................................... 34, 36, 40, 45

*Bowsher v. Synar*,
  478 U.S. 714 (1986) .................................................................... 8, 20

*Brown v. United States*,
  12 U.S. (8 Cranch) 110 (1814)...............................................................24

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ...................................... 7, 26, 34, 36, 49, 50, 51, 53

*C.F.P.B. v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ................................................................................20

*Cent. Va. Cmty. Coll. v. Katz*,
  546 U.S. 356 (2006) ................................................................................20

*\*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262 (2019) ................................................................ 18, 36

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ................................................................................20

*Edmond v. United States*,
  520 U.S. 651 (1997) ................................................................................34

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) ................................................................................28

*Evans v. Bollen*,
  4 U.S. (4 Dall.) 342 (1797) ...................................................................23

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC,*
  590 U.S. 448 (2020) ...................................................... 21, 26, 34

iv

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ..................................................................................37

*Frelinghuysen v. Baldwin,*
    12 F. 395 (D.N.J. 1882) ..........................................................................48

*Freytag v. Commissioner,*
    501 U.S. 868 (1991) ................................................................. 20, 26, 34

*Gamble v. United States,*
    587 U.S. 678 (2019) ..................................................................................18

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ..................................................................................19

*Humphrey v. Viacom, Inc.,*
    2007 U.S. Dist. LEXIS 44679 (D.N.J. June 19, 2007) ........................33

*Lebron v. Nat'l R.R. Passenger Corp.,*
    513 U.S. 374 (1995) ..................................................................................37

*Lucia v. SEC,*
    585 U.S. 237 (2018) ....................................... 7, 10, 34, 36, 37, 47, 52

*Marsh v. Chambers,*
    463 U.S. 783 (1983) ...................................................................... 20, 28

*Marvin v. Trout,*
    199 U.S. 212 (1905) ..................................................................................22

*Mistretta v. United States,*
    488 U.S. 361 (1989) ....................................................................................8

*Morrison v. Olson,*
    487 U.S. 654 (1988) ...................................................................... 41, 42

*Myers v. United States,*
    272 U.S. 52 (1926) ....................................................................................28

*Nat'l Horsemen's Benevolent & Prot. Ass'n. v. Black,*
    107 F.4th 415 (5th Cir. 2024) ..................................................................37

v

*Platt v. Beach*,
  19 F. Cas. 836 (E.D.N.Y. 1868)...........................................................47

*Price v. Abbott*,
  17 F. 506 (CCD. Mass. 1883) ..............................................................47

* *Riley v. St. Luke's Episcopal Hosp.*,
  252 F.3d 749 (5th Cir. 2001)..................................... 3, 12, 37, 40, 52, 54

*Rockwell Int'l Corp. v. United States*,
  548 U.S. 941 (2006) .................................................. 17, 37, 40, 52, 54

*Ruckh v. Salus Rehab., LLC*,
  963 F.3d 1089 (11th Cir. 2020) .........................................................46

*Shearman v. The Schooner Exchange*,
  (D.N.Y. 1803) ..................................................................................23

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008).........................................................................29

*Stalley v. Orlando Reg'l Healthcare Sys.*,
  524 F.3d 1229 (11th Cir. 2008) ........................................................52

*Stanton v. Wilkeson*,
  22 F. Cas. 1074 (S.D.N.Y. 1876).................................................. 47, 48

*Talbot v. The Ship Amelia*,
  4 U.S. (4 Dall.) 34 (1800) ................................................................23

*The Laura*,
  114 U.S. 411 (1885)........................................................................27

*United States ex rel. Adams v. Chattanooga Hamilton Cty. Hosp. Auth.*,
  2024 U.S. Dist. LEXIS 209546 (E.D. Tenn. Nov. 7, 2024) ................12

*United States ex rel. Amin v. George Washington Univ.*,
  26 F. Supp. 2d 162 (D.D.C. 1998) ....................................................13

*United States ex rel. Butler v. Magellan  Health Servs., Inc.*,
  74 F. Supp. 2d 1201 (M.D. Fla. 1999)...............................................13

*United States ex rel. Butler v. Shikara,*
  2024 U.S. Dist. LEXIS 181390 (S.D. Fla. Sep. 6, 2024) ....................................13

*United States ex rel. Chandler v. Hektoen Inst. for Med. Research,*
  35 F. Supp. 2d 1078 (N.D. Ill. 1999) ..................................................................13

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.,*
  970 F.3d 835 (7th Cir. 2020) ..............................................................................13

*United States ex rel. Eisenstein v. City of New York,*
  556 U.S. 928 (2009) ............................................................................................53

*United States ex rel. Fallon v. Accudyne Corp.,*
  921 F. Supp. 611 (W.D. Wis. 1995) ...................................................................13

\* *United States ex rel. Kelly v. Boeing Co.,*
  9 F.3d 743 (9th Cir. 1993) .............................................................. 12, 40, 53, 54

*United States ex rel. Marcus v. Hess,*
  317 U.S. 537 (1943) ........................................................... 14, 15, 16, 31

*United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.,*
  123 F. Supp. 2d 990 (W.D.N.C. 2000) ...............................................................13

*United States ex rel. Polansky v. Exec. Health Res., Inc.,*
  599 U.S. 419 (2023) ........................................................................ 1, 2, 18

*United States ex rel. Robinson v. Northrop Corp.,*
  824 F. Supp. 830 (N.D. Ill. 1993) ......................................................................13

\* *United States ex rel. Stone v. Rockwell Int'l Corp.,*
  282 F.3d 787 (10th Cir. 2002) .................................... 12, 37, 40, 53, 54

\* *United States ex rel. Taxpayers Against Fraud v. Gen. Elec.,*
  41 F.3d 1032 (6th Cir. 1994) ........................................................ 12, 54

*United States ex rel. Wallace v. Exactech, Inc.,*
  703 F. Supp. 3d 1356 (N.D. Ala. 2023) ..............................................................13

*United States ex rel. Williams v. Bell Helicopter Textron Inc.,*
  417 F.3d 450 (5th Cir. 2005) ..............................................................................53

*United States v. Donziger,*
  38 F.4th 290 (2d Cir. 2022)...................................................................... 41, 42, 46

*United States v. Germaine,*
  99 U.S. 508 (1879) ................................................... 7, 34, 35, 37, 40, 45

*United States v. Halifax Hosp. Med. Ctr.,*
  997 F. Supp. 2d 1272 (M.D. Fla. 2014) ...............................................13

*United States v. Hartwell,*
  73 U.S. 385 (1867) ...................................................................................36

*United States v. Maurice,*
  26 F. Cas. 1211 (CCD. Va. 1823) ................................................. 26, 36

*United States v. Simms,*
  5 U.S. (1 Cranch) 252 (1803)................................................................24

*United States v. Wright,*
  607 F.3d 708 (11th Cir. 2010) ...............................................................8

* *Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
  529 U.S. 765 (2000) ................................... 1, 16, 17, 21, 25, 31, 36, 39

*Walmsley v. FTC,*
  117 F.4th 1032 (8th Cir. 2024) ..............................................................37

* *Yates v. Pinellas Hematology & Oncology, P.A.,*
  21 F.4th 1288 (11th Cir. 2021) ..................................... 3, 13, 22, 25, 51

**U.S. Constitution**

Art. II, §§ 1, 2, 3...........................................................................................7

Art. II, § 2, cl. 2 ..........................................................................................11

**Statutes**

18 U.S.C. § 962 ...........................................................................................31

25 U.S.C. § 201 ...........................................................................................32

28 U.S.C. § 1291 ........................................................................................ xi

28 U.S.C. § 1331 ................................................................................... xi

28 U.S.C. § 2403(a) ................................................................................7

28 U.S.C. § 593(e) ................................................................................42

28 U.S.C. § 594 ....................................................................................41

31 U.S.C. § 3333 ..................................................................................48

31 U.S.C. § 3730(b) .......................................................... 1, 2, 35, 43-44,

31 U.S.C. § 3730(c) ....................................................... 2, 3, 43, 53

31 U.S.C. § 3730(d) ........................................................ 2, 43, 44

31 U.S.C. § 3730(e) ................................................................................43

31 U.S.C. § 3730(f) ........................................................ 3, 4, 43

31 U.S.C. § 3732(a) ................................................................................ xi

31 U.S.C. §§ 231-34 ..............................................................................14

35 U.S.C. § 392(b) ................................................................................32

740 Ill. Comp. Stat. Ann. 92/1 ...........................................................33

Cal. Ins. Code § 1871 ...........................................................................33

Act of April 20, 1818, ch. 91, § 3 ........................................................31

Act of April 30, 1810, ch. 37, § 4 ........................................................31

Act of August 4, 1790, ch. 35, § 55 .....................................................31

Act of August 29, 1842, ch. 263, § 5 ...................................................31

Act of August 30, 1852, ch. 106, § 41 .................................................31

Act of December 27, 1854, ch. 15, § 1 .................................................31

Act of July 22, 1813, ch. 16, § 3 ..........................................................31

Act of July 31, 1789, ch. 5, § 29 ..........................................................31

Act of July 4, 1864, ch. 249, § 9 ...................................................................31

Act of June 13, 1860, ch. 121, § 3 .................................................................31

Act of June 26, 1812, ch. 107, § 12 ...............................................................31

Act of March 3, 1797, ch. 20 .........................................................................31

Act of March 3, 1813, ch. 42, § 8 ..................................................................31

Act of March 3, 1825, ch. 64, § 33 ................................................................31

Act of March 3, 1845, ch. 69, § 4 ..................................................................31

Act of March 3, 1847, ch. 63, § 13 ................................................................31

Act of March 14, 1820, ch. 24, § 13 ..............................................................31

Act of March 30, 1822, ch. 13 § 12 ...............................................................31

Act of September 2, 1789, ch. 12, § 8 ............................................................31

**Other Authorities**

S. Rep. No. 99-345 (1986) ............................................................................16

S. Rep. No. 111-10 (2009) ............................................................................33

GAO, *Fraud Risk Management: 2018-2022 Data Show
    Federal Government Loses an Estimated $233 Billion to $521 Billion
    Annually to Fraud, Based on Various Risk Environments* (2024),
    https://www.gao.gov/assets/gao-24-105833.pdf.....................................4

Lemos, Margaret, *State Enforcement of Federal Law*,
    86 N.Y.U. L. Rev. 698 (2011) ................................................................39

Pfander, James, *Public Law Litigation in Eighteenth Century America:
    Diffuse Law Enforcement in A Partisan World*,
    92 Fordham L. Rev. 469 (2023)...................................................... 29, 30

Sylvia, Claire, *The False Claims Act: Fraud Against the Government,*
    Vol. 2, §§ 12.1, 12:23, 12:64-65 (2023 Ed.).........................................32

U.S. Dep't of Justice, *Fraud Statistics -- Overview* (2023),
https://www.justice.gov/opa/media/1339306/dl?inline ........................................4

U.S. Dep't of Justice, *Medicare Advantage Provider Independent Health
to Pay Up to $98M to Settle False Claims Act Suit* (2024),
https://www.justice.gov/opa/pr/medicare-advantage-provider-independent-
health-pay-98m-settle-false-claims-act-suit..........................................................5

Weaver, Christopher, et al., *Insurers Pocketed $50 Billion
from Medicare for Diseases No Doctor Treated*,
(July 8, 2024),
https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-
payments-b4d99a5d ...........................................................................................5

## <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a). The district court entered its order dismissing qui tam Plaintiff Zafirov's complaint and judgment in favor of Defendants on September 30, 2024.  Docs. 346, 347.  Plaintiff-Appellant Zafirov and the United States of America each timely filed Notices of Appeal on October 29, 2024. Docs. 349, 350. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred by holding that the qui tam provisions of the False Claims Act ("FCA")—which were enacted in 1863, have been invoked in over 15,000 cases, and have been universally upheld by other federal courts—violate the Appointments Clause of Article II of the Constitution.

## STATEMENT OF THE CASE

For over 160 years, the False Claims Act has enabled members of the public to bring civil actions to redress certain frauds on the Government and incentivized such private suits by awarding successful plaintiffs a share of the proceeds. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023) (describing statutory history). This mechanism, known as qui tam, has deep roots in American law: Similar statutes existed "immediately before and after the framing of the Constitution." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 776 (2000). When pursuing these actions, plaintiffs act as "partial assignee[s] of the United States," *id.* at 773 n.4 (emphasis omitted), combining their knowledge of wrongdoing with their own resources to help the Government combat fraud.

The modern False Claims Act gives the Government extensive control over private actions from their inception. Before any defendant is served or learns of the allegations, the qui tam plaintiff must file her complaint under seal and serve it only on the Government. 31 U.S.C. § 3730(b)(2). The Government then has exclusive

1

power to investigate—deciding who, what, and how to investigate, and what resources to devote to the investigation, all in its sole discretion. During this period, the plaintiff cannot advance the case, conduct discovery, or even disclose the lawsuit's existence to anyone.

After investigating, the Government alone controls the action's fate. It has three options. First, it can intervene and take over the case, conducting it with Government resources. 31 U.S.C. § 3730(b)(4), (c)(1). Second, it can dismiss the action—a power that is extremely broad, succeeding "in all but the most exceptional cases." *Polansky*, 599 U.S. at 437-38. Third, it can decline to intervene or dismiss, allowing the plaintiff to conduct the action with her own resources. 31 U.S.C. § 3730(b)(4)(B), (c)(3). Even then, the plaintiff cannot voluntarily dismiss the action without the Government's written consent. 31 U.S.C. § 3730(b)(1). Throughout the Government's decision-period, the case remains sealed, unserved, and static.

The Government's choices control every aspect of the litigation—from whether it proceeds at all, to who conducts it, to how resources are deployed, to how proceeds are distributed. 31 U.S.C. § 3730(c), (d). And this control is exclusively vested in the Department of Justice. The plaintiff, by contrast, has no corresponding power: She cannot file publicly, prevent Government intervention, or even voluntarily dismiss her own case. 31 U.S.C. § 3730(b)(1)-(2), (c)(2). This last

limitation gives the Government an effective veto over settlements, since defendants typically insist on dismissal as a condition of settling.

Even when, as here, the Government declines to intervene, the Government "retains a significant amount of control over the litigation." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1311 (11th Cir. 2021) (quoting *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc)). The Government can request copies of all pleadings and deposition transcripts, stay discovery if it would interfere with Government investigations or prosecutions, or even intervene later and assume control of the case (including for the purpose of dismissing or settling it over the plaintiff's objection). 31 U.S.C. § 3730(c)(3)-(4). These powers ensure that even "non-intervened" cases remain subject to executive branch oversight.

Even if the Government does not exercise these powers, a plaintiff conducting a non-intervened action has no greater power than any other private plaintiff. She cannot access Government subpoena powers, access Government data, deploy Government personnel, or use Government resources. The statute makes this crystal clear: "The Government is not liable for expenses which a person incurs in bringing an action." 31 U.S.C. § 3730(f).

The False Claims Act's civil remedy has proven remarkably effective at protecting taxpayer dollars. Born during the Civil War to combat rampant fraud

against the Union Army, the statute has since safeguarded countless Government programs. The numbers tell the story: Since 1986 alone, private plaintiffs have filed 15,964 qui tam actions recovering over $52 billion in settlements and judgments. U.S. Dep't of Justice, Fraud Statistics -- Overview, at 3 (2023), https://www.justice.gov/opa/media/1339306/dl?inline. The vast majority of these recoveries—over $43 billion—went directly to the Treasury, with plaintiffs receiving less than 18% of the total. *Id*. This track record of success spans both Republican and Democratic administrations, demonstrating the statute's value to executive branch enforcement regardless of political party.

Unfortunately, these billions in recoveries represent only a fraction of the fraud perpetrated against the United States. According to the Government Accountability Office, the Government loses between $233 billion and $521 billion to fraud *every year*. GAO, *Fraud Risk Management: 2018-2022 Data Show Federal Government Loses an Estimated $233 Billion to $521 Billion Annually to Fraud, Based on Various Risk Environments* (2024), https://www.gao.gov/assets/gao-24-105833.pdf. In other words, qui tam recoveries over nearly four decades amount to less than what fraudsters steal from taxpayers in a single year—highlighting both the statute's importance and the continuing need for private assistance in fraud detection and enforcement.

4

The Medicare Advantage program illustrates why qui tam actions are essential to combat modern fraud schemes. This rapidly expanding program—which pays private insurers to cover Medicare beneficiaries—now costs taxpayers approximately $450 billion annually and serves more than half of all Medicare beneficiaries. But the program creates perverse incentives for insurers to inflate reimbursements by exaggerating their patients' illnesses. A recent *Wall Street Journal* investigation found insurers collected $50 billion from Medicare for diseases that doctors never treated. Christopher Weaver, et al., *Insurers Pocketed $50 Billion from Medicare for Diseases No Doctor Treated*, (July 8, 2024), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d. Because this fraud occurs inside private companies, it is nearly impossible for Government investigators to detect without help. Qui tam plaintiffs have proven vital to exposing these schemes: Just weeks ago, insider information led to a $98 million settlement with one Medicare Advantage provider. U.S. Dep't of Justice, *Medicare Advantage Provider Independent Health to Pay Up to $98M to Settle False Claims Act Suit* (2024), https://www.justice.gov/opa/pr/medicare-advantage-provider-independent-health-pay-98m-settle-false-claims-act-suit.

The instant case exemplifies how qui tam actions expose Medicare Advantage fraud. Plaintiff Dr. Zafirov witnessed Defendants systematically inflating Medicare reimbursements by submitting false diagnosis codes. The fraud was brazen:

Defendants coded one of Dr. Zafirov's patients as having a traumatic foot amputation while her subsequent exam showed the patient plainly had both feet intact; Defendants claimed microcephaly (an abnormally small head) in a patient with clearly typical head circumference; and Defendants even diagnosed an 83-year-old with anencephaly—a fatal birth defect incompatible with survival past infancy. Doc. 86 at pp. 44, 105, 112-13. From her vantage point as a knowledgeable insider, Dr. Zafirov saw systemic deception that cost the Government millions of dollars and brought a private action to redress it.

Following the FCA's procedural requirements, Dr. Zafirov filed her complaint under seal in May 2019. Doc. 1. The Government investigated and chose not to intervene, instead allowing Dr. Zafirov to proceed while maintaining an oversight role. Doc. 40. The case survived Defendants' motion to dismiss (Doc. 124) and progressed through years of discovery, with the Government remaining actively engaged throughout—receiving all pleadings, filing statements of interest on crucial issues like the materiality of accurate diagnosis codes, opposing dismissal under the public disclosure bar, and preserving its right to intervene. *E.g.* Docs. 105, 120. At each step, the case illustrated how private qui tam actions and Government oversight work together.

After nearly five years of litigation, Defendants abruptly pivoted to a constitutional challenge, despite not having raised it as an affirmative defense when

6

answering the complaint years before. Their motion for judgment on the pleadings argued that the False Claims Act's qui tam provisions violate Article II's Appointments, Take Care, and Vesting Clauses. U.S. Const. art. II, §§ 1, 2, 3. The Government intervened under 28 U.S.C. § 2403(a) to defend the statute's constitutionality. Doc. 259.

The district court granted Defendants' motion. The court applied the Supreme Court's two-part framework for distinguishing Government employees from "Officers of the United States" subject to the Appointments Clause. Under this framework, an officer must both occupy a "'continuing' position established by law" and exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879), and *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)).

The district court found both elements satisfied. First, it held that qui tam plaintiffs exercise significant authority because they "conduct civil litigation in the courts of the United States for vindicating public rights." Doc. 346, Opinion ("Op.") at 17 (quoting *Buckley*, 424 U.S. at 126, 140). Second, it concluded that qui tam plaintiffs occupy a continuing position because Congress created "the office of an FCA relator" that exists independent of any particular plaintiff. Op. at 31. Drawing analogies to independent counsels, special prosecutors, and bank receivers, the court held that qui tam plaintiffs must be appointed as officers under Article II. Op. at 32-

35. Because no such appointment occurred here, the court dismissed Dr. Zafirov's action without reaching Defendants' other Article II arguments.

Dr. Zafirov and the United States both timely appealed.

## STANDARD OF REVIEW

This Court reviews "*de novo* the constitutionality of a statute because it is a question of law." *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010). A court should invalidate an act of Congress only "for the most compelling constitutional reasons." *Mistretta v. United States*, 488 U.S. 361, 384 (1989) (quoting *Bowsher v. Synar*, 478 U.S. 714, 736 (1986)). Such caution is particularly necessary where, as here, the statute in question reflects a "considered scheme for resolving [an] intractable dilemma." *Id*.

## SUMMARY OF THE ARGUMENT

This Court should reverse the judgment below. The district court's conclusion that the False Claims Act's qui tam provisions violate the Appointments Clause conflicts with unanimous precedent, the understanding of the Founding generation, and modern Appointments Clause jurisprudence.

First, every federal court that has squarely confronted Article II challenges to the qui tam provisions has rejected them, creating a wall of persuasive precedent from courts of appeals and district courts nationwide. These decisions rest on a fundamental recognition: Qui tam plaintiffs are private parties pursuing partially

8

assigned claims, not Government officers wielding executive power. The Supreme Court has reinforced this understanding, explicitly describing qui tam plaintiffs as "private persons" rather than Government officials, and has adjudicated qui tam cases for over a century—including thirteen cases since 2000—without a single majority opinion ever hinting at constitutional doubt.

Second, history definitively establishes that qui tam provisions align with Article II's requirements. Early Congresses—whose actions provide contemporaneous and weighty evidence of constitutional meaning—enacted numerous qui tam statutes that Presidents Washington, Adams, and Jefferson signed into law. These were not dormant provisions: They were actively enforced, sometimes in cases where Founders themselves served as counsel. Despite vigorous litigation and public debate over these statutes, no one during the Founding era even suggested they might violate Article II—a silence that speaks volumes about their constitutionality. The False Claims Act carries forward this venerable tradition, having been signed by President Lincoln and surviving 160 years of scrutiny. In that time, plaintiffs have filed over 15,000 qui tam actions, recovering more than $52 billion for taxpayers.

Third, qui tam plaintiffs fall outside the Supreme Court's test for identifying "Officers of the United States." For a Government employee to be an officer, the employee must both occupy a "continuing position established by law" and exercise

"significant authority pursuant to the laws of the United States." *Lucia*, 585 U.S. 237 at 245 (quotation marks omitted). Qui tam plaintiffs satisfy neither requirement—indeed, they are not even Government employees. They hold no federal position, draw no federal salary, and command no federal resources. Far from wielding Government power, they act as private plaintiffs pursuing claims assigned to them personally, with every significant litigation decision subject to executive branch oversight and control. The district court reached the opposite conclusion only by fundamentally misunderstanding both the nature of qui tam plaintiffs' role and the extensive mechanisms through which the Government maintains control over these actions—including its broad powers to intervene in, dismiss, or settle cases over plaintiffs' objections.

Finally, should Defendants again raise Take Care and Vesting Clause arguments, they fail for similar reasons and more. These arguments not only contradict precedent and history but fundamentally misunderstand how qui tam provisions strengthen executive power. Far from diminishing executive authority, the False Claims Act's qui tam provisions enhance it. They supply the executive branch with crucial intelligence about fraud that might otherwise go undetected, while creating a menu of enforcement options: The Government can intervene and take control, dismiss the action entirely, or allow private plaintiffs to proceed while maintaining supervisory authority. This framework has proven remarkably effective,

as evidenced by the executive branch's defense of the statute in this case and others. Accordingly, the qui tam provisions enhance—not undermine—the executive branch's faithful execution of the laws.

The judgment below should be reversed.

## **ARGUMENT**

## I.    **The False Claims Act's Qui Tam Provisions Comply with the Appointments Clause.**

The False Claims Act's qui tam provisions comply with the Appointments Clause because qui tam plaintiffs are not "Officers of the United States." Nothing in the Clause's text speaks to qui tam plaintiffs or suggests they must be appointed as officers. The Clause requires only that the President nominate and, with Senate consent, appoint "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States," while allowing Congress to vest appointment of "inferior Officers" in the President alone, courts, or department heads. U.S. Const. art. 2, § 2, cl. 2. Precedent, historical practice, logical analysis, and modern Appointments Clause doctrine all show that qui tam plaintiffs fall outside this framework.

### A.    **On-Point Precedent Weighs Heavily in Favor of Holding the Qui Tam Provisions Constitutional.**

The district court stands alone in finding the False Claims Act's qui tam provisions unconstitutional under Article II. Every other federal court to squarely

confront this question has upheld the provisions—creating an unbroken wall of precedent spanning multiple circuits and decades. The district court's isolation was highlighted just weeks after its decision, when another court described it as an "outlier" that relies "chiefly on selections of dissents, concurrences, and law review articles" while "whistl[ing] past precedent." *United States ex rel. Adams v. Chattanooga Hamilton Cty. Hosp. Auth.,* 2024 U.S. Dist. LEXIS 209546, at *7-9 (E.D. Tenn. Nov. 7, 2024). This critique captures a fundamental flaw in the decision below: It disregards binding and persuasive authority in favor of scattered dicta and academic speculation.

The circuit courts have spoken with one voice in upholding the qui tam provisions of the FCA against constitutional challenges. *See*, *e.g.*, *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-07 (10th Cir. 2002). The Fifth Circuit reached this conclusion sitting en banc (*Riley,* 252 F.3d at 757), and the Sixth and Ninth Circuits have likewise rejected Article II challenges (*United States ex rel. Taxpayers Against Fraud v. Gen. Elec.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993)). Most recently, the Seventh Circuit reinforced this consensus, observing that the "ancient pedigree" of qui tam actions, "together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of

unconstitutionally usurping the executive power." *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020).

District courts—including in this Circuit, as well as others not bound by circuit precedent—have consistently reached the same conclusion. *See, e.g.*, *United States ex rel. Wallace v. Exactech, Inc.*, 703 F. Supp. 3d 1356, 1366 (N.D. Ala. 2023); *United States ex rel. Butler v. Shikara*, 2024 U.S. Dist. LEXIS 181390, at *40-41 (S.D. Fla. Sep. 6, 2024); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278-79 (M.D. Fla. 2014); *United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.*, 123 F. Supp. 2d 990, 994 (W.D.N.C. 2000); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999); *United States ex rel. Chandler v. Hektoen Inst. for Med. Research*, 35 F. Supp. 2d 1078, 1081-82 (N.D. Ill. 1999); *United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 623-24 (W.D. Wis. 1995); *United States ex rel. Robinson v. Northrop Corp.*, 824 F. Supp. 830, 838 (N.D. Ill. 1993). Collectively, these cases compose a longstanding nationwide consensus that the False Claims Act's qui tam provisions do not violate Article II, including the Appointments Clause.

This Court recognized this consensus in *Yates*, 21 F.4th at 1312. Although Article II challenges were not directly before the Court in *Yates*, it emphasized two

crucial points: that "qui tam actions were viewed as a routine enforcement mechanism in the early Republic," and that modern "FCA qui tam actions serve the same enforcement purpose" as those Founding-era statutes. *Id*. at 1313.

The Supreme Court has not expressly decided the Appointments Clause question, but its precedents strongly signal that the qui tam provisions are constitutional. In *United States ex rel. Marcus v. Hess*, the Court examined the False Claims Act's qui tam provisions and emphatically confirmed Congress's power to authorize them, observing that such provisions "have been frequently permitted by legislative action, and have not been without defense by the courts." 317 U.S. 537, 541 (1943). Most tellingly, the Court declared that "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." *Id*. at 542.

*Marcus*'s treatment of executive-power arguments is particularly instructive. The version of the False Claims Act the Court considered in *Marcus* lacked the key features providing for executive branch supervision of qui tam cases today—including the requirement for the plaintiff to file under seal so that the Government can investigate, the Government's right to intervene or to dismiss the action, the Government's right to limit the plaintiff's participation, and other procedural protections, too. *See* 31 U.S.C. §§ 231-34 (1934). And the plaintiff in *Marcus* had brought an action that echoed the allegations in an indictment the Government had

already obtained, which prompted the Government to argue that the plaintiff did not contribute to the discovery of the violation and did not deserve to recover anything. *Marcus*, 317 U.S. at 545.

In opposition to the action in *Marcus*, the Government itself argued that qui tam actions could improperly interfere with executive authority, contending that "effective law enforcement requires that control of litigation be left to the Attorney General," that "divided control is against the public interest," that war interests might be compromised, and that outsiders might race to profit from government investigations. *Id*. at 547. These arguments—strikingly similar to Defendants' Article II challenges here—met a decisive response: They were "addressed to the wrong forum" and should be directed to Congress, not courts. *Id*. The Court emphasized that Congress's enactment of the statute showed it had already weighed and rejected such policy concerns. *Id*. Notably absent from the Court's extensive discussion, even with the limited controls in the 1943 version of the statute, was any suggestion that these executive-power arguments raised constitutional concerns. Indeed, had there been any serious constitutional infirmity with qui tam provisions, it surely would have surfaced in *Marcus*, where the Government sought to limit the statute's scope.

Congress's subsequent amendments to the False Claims Act further strengthened the statute's constitutional footing. The 1986 amendments expanded

15

qui tam provisions "to encourage more private enforcement suits," S. Rep. No. 99-345, at 23-24 (1986), but did so while adding robust safeguards for executive authority. These safeguards—including mandatory filing under seal, Government rights to intervene and dismiss, and broad settlement authority—directly addressed the executive-control concerns raised in *Marcus*. Indeed, Congress created a carefully calibrated system that promotes private enforcement while ensuring the executive branch retains ultimate control over every qui tam action. These structural protections, which address the very separation-of-powers concerns Defendants raise, make the modern statute even more constitutionally sound than the version enforced in *Marcus*.

Nearly six decades after *Marcus*, the Supreme Court's analysis in *Stevens*, while focused on Article III standing, powerfully supports qui tam provisions' compatibility with Article II. 529 U.S. 765. The Court held that qui tam plaintiffs have standing as "partial assignee[s] of the United States," a conclusion grounded in "the long tradition of qui tam actions in England and the American Colonies." *Id*. at 773 n.4, 774 (emphasis omitted). The Court's historical analysis was exhaustive and emphatic: Qui tam statutes were "ubiquitous" in England and the colonies, and "immediately after the framing, the First Congress enacted a considerable number of informer statutes." *Id*. at 776. The Court found this history "well nigh conclusive" on Article III standing, leaving "no room for doubt" on the question. *Id*. at 777-78.

While the Court did not reach Article II issues that had not been preserved, two Justices recognized the obvious implication: "[T]he historical evidence summarized by the Court ... is also sufficient to resolve the Article II question." *Id.* at 801 (Stevens, J., dissenting). This conclusion flows naturally from the Court's historical analysis. After all, if qui tam actions were constitutionally suspect under Article II, they could hardly have been "ubiquitous" at the Founding without drawing constitutional objection. And it equally strains credulity to hold that every "partial assignee" of the Government must first be appointed as an Officer.

The Supreme Court's repeated engagement with the False Claims Act since *Stevens* further confirms the statute's constitutionality. In thirteen decisions over the past twenty-four years, the Court has never questioned the Act's constitutionality—despite numerous opportunities to do so. Most tellingly, the Court has explicitly declined to review Article II challenges identical to those raised here. *See Rockwell Int'l Corp. v. United States*, 548 U.S. 941 (2006) (mem.) (granting certiorari on FCA's public disclosure bar while denying review of whether the qui tam provisions of the FCA violate Article II's Appointments and Take Care Clauses). This sustained pattern of Supreme Court decisions interpreting and applying the False Claims Act, while refusing to entertain constitutional challenges, powerfully suggests the Court sees no serious Article II concerns with qui tam provisions.

17

The Supreme Court most recently confirmed qui tam plaintiffs' private status in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019), explicitly rejecting the notion that they are Government officials. The Court's analysis was unequivocal:

> A relator is neither appointed as an officer of the United States, *see* U.S. Const., Art. II, § 2, cl. 2 nor employed by the United States. Indeed, the provision that authorizes qui tam suits is entitled "Actions by Private Persons." § 3730(b). Although that provision explains that the action is brought "for the person and for the United States Government" and "in the name of the Government," *ibid.*, it does not make the relator anything other than a private person ….

*Id.* at 272.

Justice Thomas's recent dissent posing constitutional questions about whether qui tam plaintiffs may "represent the interests of the United States in litigation," *Polansky*, 599 U.S. at 443 (Thomas, J., dissenting), paired with the suggestion of two Justices that such questions may warrant consideration (*id.* at 442 (Kavanaugh, J., concurring)), does not undermine this overwhelming precedential consensus. Mere musing in a dissent is hardly evidence of unconstitutionality—particularly where, as here, the other six Justices evidently did not share those concerns. Indeed, Justice Thomas himself has previously acknowledged when his constitutional skepticism proved unfounded after careful historical analysis. *See, e.g.*, *Gamble v. United States*, 587 U.S. 678, 710 (2019) (Thomas, J., concurring) ("I agree that the

historical record does not bear out my initial skepticism of the dual-sovereignty doctrine").

This body of judicial precedent marks an easy and well-worn path to reversal. The Court need not—and should not—break new ground when it can simply and straightforwardly adopt the reasoning of every other court that has considered this question.

**B.    History Establishes the Qui Tam Provisions' Constitutionality as a Matter of Originalist Constitutional Interpretation.**

The district court's decision also clashes with fundamental principles of originalist constitutional interpretation. There is no evidence that a single Framer, a single early president, nor a single member of the early Supreme Court ever questioned qui tam statutes' constitutionality under Article II, despite vigorous debates over their policy wisdom. Indeed, if the decision below is correct, then a litany of statutes drafted by members of the First Congress—many of whom participated in writing the Constitution itself—signed into law by Presidents Washington, Adams, and Jefferson, and repeatedly upheld by the Supreme Court (including Chief Justice Marshall) were all unconstitutional, yet somehow this constitutional defect escaped the notice of the entire Founding generation.

The Supreme Court has repeatedly made clear that "early congressional enactments 'provid[e] 'contemporaneous and weighty evidence' of the Constitution's meaning.'" *Haaland v. Brackeen*, 599 U.S. 255, 290 (2023) (quoting

19

*Bowsher*, 478 U.S. at 723). When evaluating constitutional challenges, the Court has consistently held that practices widely accepted by the Founding generation—particularly those enacted into law by Congress—comported with the original meaning of the Constitution. *See, e.g.*, *C.F.P.B. v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (upholding CFPB's funding structure because "[t]he practice of the First Congress" showed flexibility in funding arrangements); *Dep't of Commerce v. New York*, 588 U.S. 752, 769-70 (2019) (rejecting challenge to census questions about citizenship because historical practice showed Congress had long authorized collection of demographic information); *Marsh v. Chambers*, 463 U.S. 783, 788 (1983) (legislative prayer constitutional because "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment"). And, while enactment by the First Congress alone provides weighty evidence of constitutionality, repeated enactments by multiple early Congresses provide even stronger support. *See*, *e.g.*, *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 385-86 (2006) (Thomas, J., dissenting) (agreeing with majority "that the practice of the early Congresses can provide valuable insight into the Framers' understanding of the Constitution").

The Supreme Court has deemed historical evidence particularly compelling when interpreting the Appointments Clause. In *Freytag v. Commissioner*, the Court

held that "traditional ways of conducting government ... give meaning ... to the Constitution," including "the Appointments Clause." 501 U.S. 868, 890 (1991) (quotation marks omitted). Finding it dispositive that, in "the earliest days of the Republic," Congress authorized legislative courts to appoint inferior officers, the Court held that the Tax Court had the same power. *Id*. (quotation marks omitted). In *Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment, LLC*, the Court again emphasized that "the practice of the First Congress is strong evidence of the original meaning of the Constitution," and that "subsequent history similarly illuminates the text's meaning." 590 U.S. 448, 462 (2020). Applying this principle, the Court held that because early Congresses regularly "create[d] local offices filled in ways other than those specified in the Appointments Clause," the Clause did not apply to officers in Puerto Rico whose positions were created by federal law but who principally fulfilled local duties. *Id*. at 461. Justice Thomas concurred, explaining that he would give even "*more* weight and focus to the practices of the First Congress." *Id*. at 477 (Thomas, J., concurring) (emphasis added).

This same historical analysis definitively establishes that qui tam plaintiffs are not officers of the United States. As the Supreme Court observed in *Stevens*, qui tam statutes were ubiquitous in England and the Colonies before and during the Founding—and "[i]mmediately after the framing, the First Congress enacted a

21

considerable number of informer statutes," many of which "provided both a bounty and an express cause of action" for private plaintiffs. 529 U.S. at 776-77 & n.6; *see also Marvin v. Trout*, 199 U.S. 212, 225 (1905) (noting that qui tam statutes existed "for hundreds of years in England, and in this country ever since the foundation of our government"). This Court made the same observation in *Yates*, specifically referencing qui tam statutes enacted by the "First, Second, Third, and Fourth Congresses." 21 F.4th at 1313. Not a single one of these numerous early qui tam statutes required plaintiffs to be appointed using the methods prescribed in the Appointments Clause. Under binding Supreme Court precedent, this historical evidence is not merely persuasive—it is dispositive of the constitutional question before this Court.

>    1.    *The Historical Record Shows That Qui Tam Plaintiffs Were Never Regarded as Officers of the United States*.

Dr. Zafirov, the United States, and The Anti-Fraud Coalition presented extensive historical evidence in the district court establishing the constitutional foundations of qui tam actions. Docs. 260, 261, 264. While courts—including the Supreme Court and this Court—have relied favorably on citations to certain historical qui tam statutes and actions, the historical evidence shows that courts have actually understated the ubiquity of qui tam statutes and actions in the Founding era. This is understandable given the undertaking necessary to unearth a more than 200-year-old record. After engaging in as much of that feat as possible in the time

available for briefing at the district court, Dr. Zafirov's historical appendix catalogued 47 separate statutes enacted between 1789 and 1909 that authorized uninjured informers to bring qui tam actions. Doc. 264-6. Nine of these statutes were enacted by the First Congress alone. Thirty-five were enacted by the first nine Congresses. And many were subsequently re-enacted or strengthened through amendments. Doc. 264 at pp. 6-9. This systematic pattern of enactment and re-enactment by the earliest Congresses provides powerful evidence that the Founding generation understood qui tam provisions to be fully consistent with Article II.

The historical record shows that early qui tam statutes were actively enforced and not merely decorative. A review of historical cases shows many—including some that reached the Supreme Court—arising under early qui tam laws. *See* Doc, 264-10 (Zafirov Ex. 9, Chart), citing, *e.g.*, *Evans v. Bollen*, 4 U.S. (4 Dall.) 342 (1797) (action under the Slave Trade Act by "John Evans, who sues in this behalf, as well for the said United States as for himself"); *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 342 (1805) (Marshall, C.J.) (recognizing a cause of action under the Slave Trade Act by "him or her who shall sue for and prosecute the [violation]"); *Shearman v. The Schooner Exchange* (D.N.Y. 1803) (opinion at Doc. 264-11, a qui tam arising under the 1800 Slave Trade Act in which Hamilton represented the vessel owner); *Talbot v. The Ship Amelia*, 4 U.S. (4 Dall.) 34 (1800) (arising under qui tam statute permitting forfeiture of armed French vessels, with Alexander Hamilton

23

serving as counsel to the appellant, also publicized in the *Independent Gazetteer* on Sept, 2, 1800; Doc. 264-15); *United States v. Simms*, 5 U.S. (1 Cranch) 252 (1803) (Marshall, C.J.) ("it would seem to the court more proper to suppose the qui tam action … to be the remedy" regarding gambling house statute); *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814) (arising out of the 1812 Prize Act, with opinions by Chief Justice Marshall and Justice Story). These cases often involved the Founders themselves and were frequently decided by prominent jurists. And these reported decisions represent only a fraction of early enforcement activity. Many actions would not have generated written opinions, and those that did may be lost to history or unavailable in searchable form. Moreover, as with any enforcement scheme, the statutes' deterrent effect likely prevented countless violations that never required litigation. The historical record thus reveals a robust tradition of qui tam enforcement accepted by the Founding generation, from all three branches of government.

Dr. Zafirov expects that learned legal historians will file *amicus* briefs in this Court confirming each of the following points also made in the underlying record: (1) qui tam statutes were ubiquitous in early America at every level of government— colonial, state, and federal; (2) qui tam statutes were not reflexively imported from England, but deliberately enacted, re-enacted, and amended to serve needs identified by Congress; (3) private parties enforced these actions, bringing funds to the

Treasury; (4) these statutes were salient to high-profile members of the Founding generation, who variously signed them into law, presided over early cases, and sometimes served as counsel or even parties in qui tam actions; (5) while these statutes sparked policy debates, no one challenged their constitutionality under Article II; and (6) these statutes generated significant litigation, including Supreme Court cases, but their constitutionality was never questioned. While each of these points reinforces the constitutionality of qui tam provisions, Dr. Zafirov's position does not depend on all of them. The First Congress's repeated enactment of qui tam statutes, acknowledged in *Stevens* and *Yates*, suffices to establish their constitutionality.

2.    *The District Court Misconstrued and Erroneously Disregarded Controlling History.*

The district court acknowledged that "early Congresses enacted ... statutes containing an enforcement mechanism roughly analogous to the FCA," and that "those provisions were deployed ... by individuals roughly analogous to Zafirov," Op. at 46, but then disregarded this dispositive historical evidence based on three fundamentally flawed premises. First, the court incorrectly claimed that the constitutional text was so clear that historical evidence was irrelevant. Second, it wrongly suggested that the absence of constitutional challenges to early qui tam statutes undermined their significance. Third, it imposed an improperly high burden for historical evidence by demanding an "unambiguous and unbroken history" of qui

25

tam enforcement. Op. at 40. Each of these premises is wrong, and together they led the district court to an erroneous conclusion that contradicts binding precedent.

The court first suggested that the history of qui tam statutes is irrelevant because the False Claims Act contravenes the clear text of the Appointments Clause. Op. at 39-40. But the text is nowhere near clear enough to prohibit qui tam actions. Chief Justice Marshall himself observed that "some ambiguity of expression has found its way into this clause." *United States v. Maurice*, 26 F. Cas. 1211, 1213 (CCD. Va. 1823). *Buckley* acknowledged that the text "could, of course, be read as merely dealing with etiquette or protocol." 424 U.S. at 125. And the Supreme Court has repeatedly recognized ambiguities, interpreting the Appointments Clause in accordance with historical practice in both *Freytag* and *Aurelius Investment*. Tellingly, the district court never identified any words that clearly require the appointment of qui tam plaintiffs—because no such words exist. And indeed, in over 200 years of qui tam litigation, including 160 years of False Claims Act litigation, no court has ever held that the plain text of the Appointments Clause applies to qui tam plaintiffs.

The district court's next error was to suggest that the dearth of constitutional challenges during the Founding era undermines the significance of early qui tam statutes. Op. at 45. That inference is exactly backwards. The far more logical explanation is that qui tam statutes were not challenged as unconstitutional because

26

they were universally regarded as constitutional. Indeed, prominent members of the Founding generation, including John Adams and Alexander Hamilton, acted as defense counsel in early qui tam cases. Had there been a valid constitutional objection to these laws under Article II, these learned Framers surely would have raised it in zealous defense of their clients. The fact that they did not is strong evidence that no such defense was available. More broadly, historical qui tam statutes were debated on policy grounds. Had there been any serious constitutional concern in the early Republic, it surely would have surfaced during those conversations. Against that backdrop of robust debate, the complete absence of any Article II objection powerfully suggests that no such objection is valid.

The Supreme Court has expressly endorsed this view of historical silence. In *The Laura*, 114 U.S. 411 (1885), the Court confronted a constitutional challenge to a statute allowing the Secretary of the Treasury to remit penalties imposed in qui tam cases. The informer argued that the statute unconstitutionally infringed on the President's exclusive pardon power. The Court disagreed, explaining that "[f]rom the adoption of the Constitution to the present moment, Congress has asserted its right, by statute," to permit such remissions. *Id*. at 414. "And in none of the cases ... involving the operation or effect of such warrants of remission, was it ever suggested or intimated that the legislation was an encroachment upon the President's power of pardon." *Id*. at 415. The Court concluded that "the practice and acquiescence under

27

it, commencing with the organization of the judicial system ... has, indeed, fixed the construction" of the Constitution. *Id*. at 416 (internal quotation marks omitted). When acts of early Congresses have "not been disputed during a period of nearly a century," the inference of their validity is "conclusive." *Id*. (quotation marks omitted). Indeed, the Supreme Court "has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given [the Constitution's] provisions." *Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) (quoting *Myers v. United States*, 272 U.S. 52, 175 (1926)).

The district court ignored these precepts and instead imposed an improperly high bar by requiring an "unambiguous and unbroken history" of enforcement of qui tam statutes analogous to the False Claims Act. Op. at 40 (quoting *Marsh*, 463 U.S. at 792). This misreads *Marsh* by conflating what was *sufficient* to dispose of an Establishment Clause challenge with what is *necessary* to inform the meaning of the Appointments Clause. No Supreme Court decision has ever suggested that courts may disregard literally dozens of acts of early Congresses simply because the historical record fails to clear some arbitrary, judge-created hurdle. And even if proof of an "unambiguous and unbroken" history were required, that standard is met. The Chief Justice, as well as Justices Scalia, Thomas, and Alito, have expressly

recognized the "long and unbroken tradition of informer statutes that reached back to the 14th century and prevailed up to the period immediately before and after the framing of the Constitution." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 311 (2008) (Roberts, C.J., dissenting) (internal quotation marks omitted). That tradition continued in the United States—and no such statute, nor court, has ever required a qui tam plaintiff to be appointed pursuant to the Appointments Clause.

The district court also downplayed the significance of the enactment of early qui tam statutes. Op. at 42. The court observed that in many Founding-era cases, informers were represented by district attorneys (the historical equivalent of today's U.S. Attorneys), who were permitted to represent private clients alongside their public service. According to the district court, "[t]his blurring of public and private enforcement undermines the idea that founding-era enactments alone show a constitutional settlement reconciling the qui tam device with Article II" because the district attorneys could give "the government a potential gatekeeping mechanism and control over a relator's litigation decisions." Op. at 42-43.

The district court's analysis misreads both historical practice and its implications. The court relied on an article about the Slave Trade Act of 1794, which permitted private informers to sue for the forfeiture of ships used in the slave trade. James Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law*

29

*Enforcement in A Partisan World*, 92 Fordham L. Rev. 469, 491 (2023). But that article directly undermines the district court's conclusion. Indeed, the author says so expressly, concluding that "[a]ntislavery law enforcement in the early republic casts serious doubt on the claim that Article II was understood at the time to vest the executive with an exclusive enforcement discretion that forecloses Congress from relying on private informers to play a supplemental or independent role in law enforcement." *Id.* at 491. To the district court's point, the author explains that while some district attorneys maintained private practices alongside their federal service, they acted in their personal capacities when representing private parties (including informers and defendants). *Id.* at 489-90. Moreover, even when acting as Government lawyers, these attorneys "did not answer to higher-ups in a department of justice," nor "to the Attorney General of the United States." *Id.* Thus, the historical evidence refutes any suggestion that early qui tam statutes gave the Government exceptional control over private lawsuits. If anything, the False Claims Act gives the Government *more* control than earlier qui tam statutes because the Government has complete discretion to intervene and take over any case and exceptionally broad discretion to dismiss cases it finds problematic.

The district court also erred in suggesting that Dr. Zafirov's historical analysis overstated the number of analogous statutes by "lumping" qui tam statutes together with bounty-only statutes. Op. at 43-45. Not so. Dr. Zafirov carefully limited her

analysis to statutes containing rights of action. She documented 40 statutes where the informer's right to sue appears in the statutory text (five of which were identified in *Stevens*, 529 U.S. at 777 n.6). *See* Doc. 264-6 (Zafirov Ex. 5, Chart). Dr. Zafirov has since identified more than a dozen additional pre-FCA statutes with express rights of action for informers. *See, e.g.*, Act of April 30, 1810, ch. 37, § 4; Act of July 22, 1813, ch. 16, § 3; the Act of March 3, 1813, ch. 42, § 8 (all signed into law by President James Madison).[1]

Dr. Zafirov's original analysis also included seven statutes that early decisions, historians, or other learned sources determined provided qui tam causes of action—even though that conclusion was not obvious from the text. *See* Act of July 31, 1789, ch. 5, § 29 (original chart inadvertently referenced § 38); Act of September 2, 1789, ch. 12, § 8; Act of August 4, 1790, ch. 35, § 55; Act of March 3, 1797, ch. 20; Act of June 26, 1812, ch. 107, § 12; Act of July 4, 1864, ch. 249, § 9; 18 U.S.C. § 962. This is unsurprising. As the Supreme Court recognized in *Marcus*, early American courts understood that "[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to

---

[1] *See also* Act of April 20, 1818, ch. 91, § 3; Act of March 14, 1820, ch. 24, § 13; Act of March 30, 1822, ch. 13 § 12; Act of March 3, 1825, ch. 64, § 33; Act of August 29, 1842, ch. 263, § 5; Act of March 3, 1845, ch. 69, § 4; Act of March 3, 1847, ch. 63, § 13; Act of August 30, 1852, ch. 106, § 41; Act of December 27, 1854, ch. 15, § 1; Act of June 13, 1860, ch. 121, §3.

institute the action are construed to authorize him to sue." 317 U.S. at 541 n.4 (citing *Adams*, 6 U.S. (2 Cranch) at 341). These additional statutes illustrate that estimates of the number of qui tam statutes passed by early Congresses are likely underinclusive. At a minimum, early Congresses enacted *dozens* of laws expressly providing causes of action and more that did so implicitly.

The district court's emphasis on the repeal of many qui tam statutes and fluctuations in False Claims Act enforcement misses the constitutional point. Op. at 46-47. From an originalist perspective, what matters is that qui tam actions were ubiquitous when the Constitution was ratified and in the early Republic. That some statutes were later repealed is constitutionally irrelevant because no evidence suggests these repeals stemmed from Article II concerns. Indeed, many qui tam provisions remained on the books—and new ones were enacted. For example, the Indian Protection Act, still includes a qui tam provision today. 25 U.S.C. § 201. Until 2011, federal law also authorized qui tam actions for false patent marking. *See* 35 U.S.C. § 392(b) (2010). And at least twenty-nine states, the District of Columbia, Puerto Rico, and many local governments maintain qui tam statutes similar to the structure of the federal False Claims Act. *See* Claire Sylvia, *The False Claims Act: Fraud Against the Government*, Vol. 2, §§ 12.1, 12:23, 12:64-65 (2023 Ed.). Many states have also enacted other qui tam statutes, such as those allowing suits to recover losses by private insurers and statutes that allow third parties to recover gambling

losses. *E.g.*, Cal. Ins. Code § 1871 *et seq.*; 740 Ill. Comp. Stat. Ann. 92/1 *et seq.*; *Humphrey v. Viacom, Inc.*, 2007 U.S. Dist. LEXIS 44679, at *9 (D.N.J. June 19, 2007) (discussing gambling qui tam statutes of the District of Columbia, Georgia, Illinois, Kentucky, Massachusetts, New Jersey, Ohio and South Carolina). These modern qui tam provisions confirm that such actions remain a familiar feature of American law—not the constitutional anomaly the district court portrayed.

Changes to the False Claims Act similarly provide no support for the district court's position. Instead, they illustrate that Congress has periodically debated and adjusted the statute as a matter of policy—not constitutional concern. When issues have arisen (*e.g.*, in 1943 and 1986), Congress modified the False Claims Act to ensure its continued effectiveness while preventing abuse. Most recently, Congress again strengthened the statute, recognizing that the statute remains "[o]ne of the most successful tools for combating waste and abuse in Government spending." S. Rep. No. 111-10, at 10 (2009). These same considerations animated Congress's enactment of the False Claims Act in 1863 and parallel the justifications for many Founding-era qui tam statutes. The modern False Claims Act thus stands firmly rooted in American legal tradition, and that history establishes its constitutionality under originalist principles.

### C.    The Qui Tam Provisions Do Not Violate Modern Appointments Clause Precedents.

On-point precedent and history provide the most direct paths to the correct result. But if the Court also looks to modern Appointments Clause doctrine, it will reach the same destination. The Supreme Court has adopted a "basic framework for distinguishing between officers and employees." *Lucia*, 585 U.S. at 245. First, the appointee "must occupy a 'continuing' position established by law to qualify as an officer." *Id.* (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)). Second, he must exercise "'significant authority pursuant to the laws of the United States,'" an inquiry that focuses "on the extent of power an individual wields in carrying out his assigned functions." *Id*. (quoting *Buckley*, 424 U.S. at 126).

The Supreme Court has applied this framework to determine whether various government positions constitute offices requiring constitutional appointment. *See, e.g.*, *Aurelius Inv.*, 590 U.S. at 465 (members of Puerto Rico's Financial Oversight and Management Board are not officers); *Lucia*, 585 U.S. at 244-45 (SEC's administrative law judges are officers); *Edmond v. United States*, 520 U.S. 651, 666 (1997) (judges of Coast Guard Court of Appeals are inferior officers); *Freytag*, 501 U.S. at 881-82 (U.S. Tax Court's special trial judges are officers); *Buckley*, 424 U.S. at 125-26 (members of Federal Election Commission are officers); *Auffmordt v. Hedden*, 137 U.S. 310, 326-27 (1890) (expert appraiser selected by customs collector pursuant to statute to assist in individual cases was not an officer);

34

*Germaine*, 99 U.S. at 511 (surgeon appointed by Commissioner of Pensions was not an officer).

This case is more straightforward than all of those because qui tam plaintiffs are not even Government employees, let alone officers. They have no Government position, draw no Government salary, and exercise no Government powers. Instead, qui tam plaintiffs are simply private persons litigating a cause of action created by Congress. In creating this cause of action, Congress did not, as the district court held, create an "office of relator" (Op. at 1), any more than it created an "office of antitrust plaintiff" or "office of securities plaintiff" when it authorized private lawsuits to enforce those laws. Nor did Congress appoint any person to be a plaintiff, nor grant plaintiffs the right to make policy or exercise the Government's power. Instead, it merely provided that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). The provision does not grant plaintiffs any Government power. On the contrary, Congress gave qui tam plaintiffs *less* power than other private plaintiffs, while empowering Government officials to ensure that private False Claims Act cases do not interfere with Government policy.

1.  *Qui Tam Plaintiffs Do Not Occupy Any Government Position—Let Alone a Continuing One.*

   a.  *The Appointments Clause Does Not Apply to Individuals Who Are Not Government Employees.*

Qui tam plaintiffs do not occupy a "continuing position" because they do not occupy any Government position at all. Instead, qui tam plaintiffs are private individuals who remain outside the Government, suing "as a partial assignee of the United States." *Stevens*, 529 U.S. at 773 n.4. This assignment "does not make the relator anything other than a private person, much less 'the official of the United States.'" *Cochise Consultancy*, 587 U.S. at 272.

Supreme Court precedent consistently confirms that Government employment is a prerequisite to officer status. An "office" requires "employment ... conferred by the appointment of government." *United States v. Hartwell*, 73 U.S. 385, 393 (1867). A temporary appraiser is not an officer because he has no "employment which has any duration." *Auffmordt*, 137 U.S. at 327. The Court's "officer versus employee" framework presupposes employment (*Lucia*, 585 U.S. at 245), and its test for "significant authority" applies to "appointees," not private parties (*Buckley*, 424 U.S. at 126). Chief Justice Marshall put it plainly: An office requires one to be "employed on the part of the United States." *Maurice*, 26 F. Cas.

36

at 1214. The Court has never wavered from this foundation: Without Government employment or appointment, one cannot be an officer.[2]

The courts of appeals have found qui tam plaintiffs' private status dispositive in rejecting Appointments Clause challenges. Qui tam plaintiffs lack "a continuing and formalized relationship of employment with the United States Government" required for officer status. *Riley*, 252 F.3d at 757-58. Moreover, "[t]here is no legislatively created office of informer or relator under the FCA," and "[r]elators are not entitled to the benefits of officeholders, such as drawing a government salary," nor "subject to the requirement … that the definition of an officer 'embraces the ideas of tenure, duration, emolument, and duties'." *Stone*, 282 F.3d at 805 (quoting *Germaine*, 99 U.S. at 511-12).

---

[2] Not applicable here, but supportive of Dr. Zafirov's argument, is the additional precept that certain Government-created corporations are considered "part of the Government." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995). Applying this narrow exception, the Supreme Court recognized that members of the Public Company Accounting Oversight Board were officers under the Appointments Clause. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* 561 U.S. 477, 486 (2010). However, courts have refused to expand this exception beyond Government-created corporations and have further held that when the exception does not apply, the Appointments Clause does not apply to private persons. *See Walmsley v. FTC*, 117 F.4th 1032, 1041 (8th Cir. 2024) (holding that *Lucia* does not apply to employees of a private self-regulatory nonprofit entity); *Nat'l Horsemen's Benevolent & Prot. Ass'n. v. Black*, 107 F.4th 415, 439 (5th Cir. 2024) (holding that *Lucia* and *Buckley* apply only to determine "whether individuals *already part* of the government should be considered 'Officers'"). The *Lebron* exception does not apply to Dr. Zafirov, who was not employed by a Government-created corporation, and she therefore cannot be an officer under these precedents.

Following this precedent, this Court should hold that qui tam plaintiffs are not subject to the Appointments Clause because they are not—and have never been—Government employees or appointees. Extending the Clause to reach private parties who finance and conduct litigation at their own expense would constitute an unprecedented expansion without foundation in the Constitution's text, structure, or history.

Indeed, such a holding would open multiple cans of worms. First, holding that qui tam plaintiffs must be appointed as officers would risk compelling the same treatment vis-à-vis other plaintiffs enforcing other laws that protect public welfare. Just as the False Claims Act can be enforced either by the Government or by private plaintiffs, so too can a litany of federal laws—including the antitrust statutes, the securities laws, employment discrimination laws, labor laws, anti-racketeering laws, anti-terrorism laws, consumer protection statutes, and environmental laws, among others. Private actions under those statutes invariably advance or hinder the Government's interests, *e.g.*, by creating favorable or unfavorable precedents, by exposing wrongdoing relating to matters of public concern, by providing or compromising relief for the Government's constituents, by producing injunctions or liability that cause substantial changes in industry behavior, or by otherwise advancing Congress's policy objectives. A holding requiring the appointment of qui tam plaintiffs would naturally threaten these other causes of action, too. The

38

reflexive answer to this argument is to say that private plaintiffs are different from qui tam plaintiffs because they are injured parties with Article III standing. That is no answer, however, both because qui tam plaintiffs unambiguously also have standing under *Stevens* and because injury is not an Article II concern in any event. Nor can it be dispositive that qui tam plaintiffs bring actions in the name of the United States. If that were what mattered, then any constitutional problem could be resolved simply by severing the portion of the statute telling such plaintiffs how to caption their claims.

Second, requiring qui tam plaintiffs to be appointed as officers would disrupt cooperative federalism. Many federal statutes authorize state officials to enforce federal mandates in areas ranging from environmental protection to antitrust. *See* Margaret H. Lemos, *State Enforcement of Federal Law*, 86 N.Y.U. L. Rev. 698, 708-09 (2011). A holding requiring qui tam plaintiffs to be appointed as officers would naturally also require the appointment of state officials as federal officers, undermining both States' interests and federal law enforcement.

Third, a holding in Defendants' favor would require treating many federal contractors as officers that must be appointed pursuant to the Appointments Clause. Today, private contractors perform many core Government functions including fighting alongside our military, securing our borders, collecting and parsing sensitive intelligence, supplying mission-critical technology, building and maintaining

infrastructure, administering the Medicare program, and other functions that are easily as fundamental to executive power as bringing civil lawsuits to redress fraud. Indeed, contractors handle far more federal resources, and exercise far more federal authority, than qui tam plaintiffs. If qui tam plaintiffs must be appointed as officers, then these contractors—who exercise real Government power using Government funds—would seem to require appointment as well. Such a holding would throw much of modern governance into chaos.

The Court can avoid those undesirable outcomes by holding that the Appointments Clause does not apply to persons who are not employed or appointed by the Government. Such a rule would track Supreme Court and Circuit precedent and set an administrable bright line.

> b.  *Any Position Held By Qui Tam Plaintiffs Is Not "Continuing."*

Even assuming that a qui tam plaintiff's role is a "position established by law," it is not a "continuing" one. Instead, that role is temporary, personal, and limited. It manifests when the plaintiff files her case, and it ends with the case. Thus, like the surgeon in *Germaine*, who examined pensioners "in some special case" (99 U.S. at 512), and the appraiser in *Auffmordt*, also active in a "particular case" (137 U.S. at 327), the qui tam plaintiff has no continuing role. *See, e.g.*, *Riley*, 252 F.3d at 757; *Stone*, 282 F.3d at 805; *Kelly*, 9 F.3d at 758 n.21.

The district court's analogies to the independent prosecutor in *Morrison v. Olson*, 487 U.S. 654 (1988), the special prosecutor in *United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022), and historical bank receivers miss the mark. These cases establish that in certain circumstances, a temporary position can be regarded as "continuing" if it transcends any individual appointee and includes broad Government powers. But those precedents highlight how qui tam plaintiffs differ from Government officers. First, courts and agency heads formally appointed special prosecutors and receivers to positions created by statute, whereas qui tam plaintiffs simply file lawsuits. Second, when prosecutors and receivers left office, the Government could and did appoint replacements to continue their work—but qui tam plaintiffs' rights to litigate are personal and non-transferable. Third, prosecutors and receivers wielded actual Government power, which qui tam plaintiffs do not.

*Morrison* provides no support for treating qui tam plaintiffs as officers. First, although the Court concluded that an independent counsel was an officer, it did not analyze whether the position was "continuing." Instead, the conclusion that the counsel was an officer, and not a mere employee, came in a footnote. *See* 487 U.S. at 671 n.12. Indeed, the matter was conceded. *Id.* at 715 (Scalia, J., dissenting). More important, independent counsels differ fundamentally from qui tam plaintiffs. The Ethics in Government Act created the Office of the Independent Counsel by statute, established its powers and duties, provided Government funding and resources, and

41

specified appointment procedures. *See* 28 U.S.C. § 594 (1982). And the office was not limited to a single case: Independent counsels had "full power and independent authority to exercise all investigative and prosecutorial functions" of the Department of Justice within a jurisdiction set by a special court. *Morrison*, 487 U.S. at 662 (quoting 28 U.S.C. § 594). Thus, when an independent counsel resigned, the Government appointed a replacement to continue the work. *Id.* at 667; 28 U.S.C. § 593(e). That essential feature—absent here—is what arguably made the office a "continuing" one.

*Donziger* further illustrates why qui tam plaintiffs do not occupy a "continuing position." There, the Second Circuit held that a special prosecutor appointed under Federal Rule of Criminal Procedure 42(a)(2) was an officer based on three factors: "(1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." 38 F.4th at 297. The court found these factors satisfied because "individuals appointed as special prosecutors could be replaced without the duties of the positions terminating," and because special prosecutors' duties "encompass a wide array of assignments, such as executing search warrants, issuing subpoenas, granting immunity, entering into plea bargains, and representing the government in court both at trial and on appeal." *Id*. at 297-99. Special prosecutors could even "employ the full machinery of the state to vindicate the authority of the judiciary, which may

42

include the awesome responsibility of depriving an individual of his liberty." *Id.* at 299 (quotation marks omitted). None of these factors supports treating qui tam plaintiffs as officers.

First, special counsels are appointed by a federal court. By appointing a specific person to the task, the Government thus establishes the position. This differs from qui tam plaintiffs, who merely file a lawsuit on their own initiative.

Second, while the Government can appoint a new special counsel to continue an investigation when the prior appointee departs, the False Claims Act vests "the right to conduct the action" solely in "the person who initiated the action." 31 U.S.C. § 3730(c)(3). Only Dr. Zafirov can pursue this case. Indeed, in providing for "Actions by private persons" (31 U.S.C. § 3730(b)), the False Claims Act specifically provides that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." *Id*. § 3730(b)(5). If the Government chooses to pursue an alternate remedy, the statute grants "the person initiating the action … the same rights in such proceeding as such person would have had if the action had continued under this section." *Id*. § 3730(c)(5). When the plaintiff receives an award, the amount may be based, in part, on "the extent to which the person substantially contributed to the prosecution of the action" (*id*. § 3730(d)(1)), and may be reduced if "the action was brought by a person who planned and initiated

43

the violation" (*id*. § 3730(d)(3)). And in other circumstances, the personal characteristics of the person bringing the action—including whether the person is a current or former member of the armed forces, or an original source of the information in her complaint—are dispositive. *Id*. § 3730(e)(1), (e)(4)(B). Moreover, the plaintiff is personally liable for the expenses of bringing an action (*id*. § 3730(f)) and may be liable for the defendant's expenses if the claim was "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment" (*id*. § 3730(d)(4)). All of these provisions are personal to the specific plaintiff who initiated the action—and nobody else.

To put it another way, qui tam plaintiffs are not interchangeable. If Dr. Zafirov ceased pursuing this action, the Government could not appoint a different qui tam plaintiff to pick up the case from where it was left off. Similarly, Dr. Zafirov cannot step into any other currently pending qui tam action simply because she is the qui tam plaintiff in this one, because the statute expressly reserves the right to pursue those actions to the people who brought them. 31 U.S.C. § 3730(b)(5). Because any position Dr. Zafirov occupies is personal to her, it falls outside the definition of a "continuing" position.

The district court's answer to this argument was unpersuasive. The court opined that because the False Claims Act permits any person to bring an action, the action is not personal. Op. at 34-36. Here, the district court focused on the wrong

timeframe. The question, under controlling precedent, is not whether a position was generally available *ex ante*; it is whether the powers and responsibilities of the position, once taken on by a specific person, were entrusted to that specific person, or were instead enshrined within an established office that another person could occupy. After all, any appraiser could have been chosen in *Auffmordt*; any surgeon could have been chosen in *Germaine*; and any eligible contractor can receive a federal contract. But none of those jobs is a continuing office under controlling law—and neither is Dr. Zafirov's role as a qui tam plaintiff. Because the right to conduct *this* action lies solely with Dr. Zafirov, it is a personal right, and not an impersonal office.

The district court's other attempts to characterize qui tam actions as impersonal also fail. The court pointed to two features of qui tam claims: that they survive a plaintiff's death; and that plaintiffs can pledge portions of their recovery to litigation funders. Op. at 36. But these features actually confirm that qui tam plaintiffs are not officers. After all, what other Government office is ever filled by the legal representative of the estate of its deceased former holder? None! If the Attorney General dies, the administrator of her estate does not get to run the Department of Justice; if an independent counsel dies, her estate does not take over her investigation. Thus, the fact that an estate can succeed a qui tam plaintiff proves that a qui tam plaintiff is not a Government officer, but is instead just like any other

45

civil plaintiff pursuing a remedial action. And while plaintiffs can pledge portions of their recovery to litigation funders, they cannot transfer control of the litigation itself. As this Court has held, such funding arrangements do not implicate the plaintiff's standing because "the relator retains sole authority over the litigation and [the funder] has no power to control or influence it." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1101 (11th Cir. 2020). In any event, the reason qui tam plaintiffs frequently need litigation funding is that they receive no money—no salary, stipend, or any other payout—from the Government during the pendency of their litigation, and they frequently lose their actual employment, too. This economic reality vividly illustrates that qui tam plaintiffs are not Government officers.

Third, qui tam plaintiffs lack the governmental powers that made special prosecutors qualify as officers in *Donziger*. Special prosecutors can "execute[] search warrants, issu[e] subpoenas, grant[] immunity, enter[] into plea bargains, and represent[] the government in court," and can "employ the full machinery of the state to vindicate the authority of the judiciary, which may include the awesome responsibility of depriving an individual of his liberty." *Donziger*, 38 F.4th at 299 (internal quotation marks omitted). Qui tam plaintiffs have none of these powers. Their role is purely incidental to Government operations: They generate benefits for the Treasury only as a byproduct of pursuing their own claims through ordinary civil litigation, using their own resources.

The district court's analogy to historical bank receivers is equally flawed. Unlike qui tam plaintiffs, receivers were formally appointed by the Comptroller of the Currency (with Treasury Secretary approval) to positions created by statute. *See Price v. Abbott*, 17 F. 506, 507 (CCD. Mass. 1883). They wielded real Government power: They could take possession of bank property and records, sell assets with court approval, and sue to recover all of a bank's debts. *Id*. They also had access to Government resources, including mandatory representation in court by United States Attorneys under supervision of the Solicitor of the Treasury. *See Platt v. Beach*, 19 F. Cas. 836, 841 (E.D.N.Y. 1868). And their role was impersonal—if a receiver resigned, the Government could appoint a replacement to continue the work. *See Stanton v. Wilkeson*, 22 F. Cas. 1074, 1075 (S.D.N.Y. 1876). These features confirm that bank receivers, like special prosecutors, occupied a fundamentally different role from qui tam plaintiffs.

Indeed, the historical cases treating bank receivers as officers provide no support for the district court's position. Those courts did not apply anything like the modern *Lucia* test. Instead, most simply reasoned that bank receivers were officers because they were required, by statute, to be appointed using Appointments Clause procedures. *See, e.g.*, *Platt*, 19 F. Cas. at 840-41. Or they reasoned by analogy, concluding that because court-appointed receivers were historically understood as officers of the court, Government-appointed receivers must be officers of the

47

Government. *See id.* at 841; *see also Frelinghuysen v. Baldwin*, 12 F. 395, 396 (D.N.J. 1882). Only one district court addressed whether receivers occupied a continuing position, holding that a receiver was an officer because he was "in the public service of the United States," "appointed pursuant to law," and had "continuing and permanent" duties because the receivership over the bank does not end with a change of officeholders. *Stanton*, 22 F. Cas. at 1075. All of these features distinguish receivers from qui tam plaintiffs: no qui tam statute has ever required plaintiffs to be appointed using Appointments Clause procedures; plaintiffs historically have not been understood to be officers; they are not in Government service; they are not appointed by any official; and their role is neither continuing nor permanent because it starts and ends with their personal lawsuit.

### 2. *Qui tam Plaintiffs Do Not Exercise Significant Powers Under the Laws of the United States.*

For all the reasons already discussed, qui tam plaintiffs exercise no significant federal authority. They wield no governmental powers and command no public resources. Unlike federal officers, they cannot issue civil investigative demands, 31 U.S.C. § 3333, obtain search warrants, or even require agency personnel to answer basic questions. Instead, they must investigate and litigate cases entirely with personal resources. Their power is no greater than any other private civil plaintiff— and indeed is narrower because qui tam actions are subject to extensive governmental controls that do not constrain other private litigation.

48

In support of the contrary position, the district court argued that the exercise of prosecutorial discretion is a core executive function, such that the right to initiate and conduct a lawsuit to vindicate public rights is core executive power. In support, the Court relied principally on *Buckley*, which held that the Commissioners of the Federal Election Commission are officers. But the facts of *Buckley* show the flaws in the district court's argument. The Commissioners had "direct and wide ranging" "enforcement power," including the power to institute civil actions for violations of the Federal Elections Act. 424 U.S. at 111. After cataloguing the many potential enforcement actions the Commission could take, the Supreme Court observed that "[i]n no respect do the foregoing civil actions require the concurrence of or participation by the Attorney General; conversely, the decision not to seek judicial relief in the above respects would appear to rest solely with the Commission." *Id*. The Court then found that "[t]he Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress." *Id*. at 138. Such power was entrusted to the executive branch, not the legislative—and the Court was wary "that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches." *Id*. at 129. The Court thus explained that "the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the case might

49

be different if the additional duties were devolved upon an appointee of the executive." *Id*. at 139-40 (quotation marks omitted). Accordingly, the Court held that "these provisions of the Act, vesting in the Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights, violate Art. II, § 2, cl. 2, of the Constitution." *Id*. at 140.

The district court's analogy to *Buckley* is unpersuasive for multiple reasons. First, *Buckley* was plainly not about qui tam plaintiffs, and says essentially nothing about them. Indeed, *Buckley* was not about whether private parties must be treated as officers at all. Instead, the case was about determining whether FEC Commissioners—who were obviously employed by the Government to permanent, statutorily created offices—were *legislative* officers or *executive* officers. The Court correctly concluded that they were executive officers because of their broad enforcement powers, which directly displaced the executive branch's powers to enforce the law. None of these separation-of-powers concerns applies here because qui tam plaintiffs do not transfer executive power to the Legislature, or to anybody else.

Second, when the Commissioners in *Buckley* brought civil actions to enforce the law, they did so using Government resources—not their own private ones. This crucial fact alone distinguishes the Commissioners from private qui tam plaintiffs.

50

Third, unlike qui tam actions under the False Claims Act, the actions brought by the Commissioners in *Buckley* were not subject to any oversight or even input from the Attorney General. In every single qui tam case, the plaintiff must file under seal and serve the complaint and all material evidence only on the Government. The Government then has complete control over what happens next: It can (1) take over the action; (2) dismiss the action; or (3) permit the private plaintiff to proceed by declining to intervene. Thus, no qui tam action enters litigation without an affirmative decision by the executive branch that the case can continue, either in Government hands or private ones. That level of executive control is nothing like the actions in *Buckley*.

This Court acknowledged this point in *Yates*, explaining that "[a]t the beginning of a non-intervened qui tam action, the United States possesses significant procedural rights that allow it to decide whether to intervene." 21 F.4th at 1310. These include the right to evaluate the allegations in secret, conduct an investigation, and obtain more information from the plaintiff. *Id.* The Government has exclusive control over both the investigation and its intervention decision.

In non-intervened actions, "the relator has primary responsibility to assert the rights of the United States only because the latter allows it to do so by declining to intervene." *Id.* And even then, "there are a number of control mechanisms present in the qui tam provisions of the FCA so that the Executive nonetheless retains a

51

significant amount of control over the litigation." *Id*. at 1310-11 (quoting *Riley*, 252 F.3d at 753). The Court described these control mechanisms in detail, concluding that the United States exercises "substantial control over FCA qui tam actions." *Id*. at 1312; *see also Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229, 1234 (11th Cir. 2008) (describing the Government's "significant procedural controls").

The district court's answer to this argument is limited to a single conclusory paragraph asserting that "back-end executive supervision … does not diminish the significance of an FCA relator's front-end power to bring an enforcement action against a private party in federal court on behalf of the United States." Op. at 27. But the Government's control is not "back-end"—it begins before a defendant is even served with the complaint and continues throughout the litigation. And the Government's powers are extremely broad: It can dismiss an action before the defendant knows it exists, or it can take over and litigate it directly. The district court never explains how the power to terminate or assume control of an action is mere "back-end supervision," nor how a plaintiff's authority remains "significant" when it is so circumscribed. More tellingly, neither the district court nor Defendants identified any other context where a private plaintiff subject to such extensive Government control was deemed to exercise significant authority under *Buckley* or *Lucia*. Courts of appeals analyzing the question have uniformly decided that this system of vigorous executive branch oversight defeats any analogy to FEC

Commissioners' enforcement discretion in *Buckley*. *See Stone*, 282 F.3d at 805; *Kelly*, 9 F.3d at 758-59.

Finally, the district court's assertion that qui tam plaintiffs can "bind" the United States is flawed. The court cited no authority for this proposition—because none exists. The False Claims Act expressly provides that when the Government intervenes, it "shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). In non-intervened cases, qui tam plaintiffs cannot bind the Government in the sense of speaking for it or preventing it from taking contrary positions. The Government remains free to express its views at any time through statements of interest or *amicus* briefs, or by intervening for good cause. Although a final judgment may later bind the United States under ordinary preclusion principles, *see United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 936 (2009), being bound by a judgment is different from being bound by a plaintiff's actions—and in any event, the Government has ample opportunity to intervene or be heard before any judgment issues. Moreover, many judgments—like dismissals for pleading deficiencies—do not bind the Government. *See, e.g.*, *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 455 (5th Cir. 2005). Indeed, courts routinely grant Government requests that dismissals of qui tam actions not bind the United States. Even here, the district court only dismissed this case with prejudice as to Dr. Zafirov. Doc. 347.

53

In sum, qui tam plaintiffs neither hold a continuing position established by law nor exercise significant power under the law, and therefore need not be appointed as officers.

## II.    Defendants' Other Article II Arguments Fail.

The district court did not reach Defendants' arguments under the Vesting and Take Care Clauses, but those arguments fail for many of the same reasons as the Appointments Clause arguments. Every court of appeals that has considered these arguments has rejected them. *See Riley*, 252 F.3d at 753; *Stone*, 282 F.3d at 805-07; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 751. Like the Appointments Clause challenge, these arguments cannot be squared with the historical record, the private nature of qui tam claims, or the Government's supervisory powers. And like the Appointments Clause argument, accepting these contentions would raise thorny questions over the constitutionality of other federal private rights of action, State enforcement of federal law, government contracting, and other mechanisms that currently enable the federal Government to function.

Most fundamentally, these arguments rest on a false premise: that the False Claims Act's qui tam provisions somehow diminish the power of the Executive. In fact, they enhance it. Without qui tam provisions, when an insider reports fraud, the executive branch would face a stark choice: either commit Government resources to resolving the misconduct, or allow it to continue. The False Claims Act adds a third

option: The Executive can permit a knowledgeable private plaintiff to pursue the action using private resources, subject to continuing Government oversight. The statute thus gives the executive branch more enforcement options, more sources of information about fraud, and more resources to combat it. Indeed, the executive branch's vigorous defense of the statute in this case and others demonstrates that qui tam provisions strengthen rather than impair its ability to ensure faithful execution of the laws. Defendants' Article II arguments would transform a statute that aids executive enforcement into an unconstitutional impediment—a position that neither text, history, precedent, nor logic supports.

## <u>CONCLUSION</u>

For these reasons, as well as those stated by the Government in its opening brief, this Court should reverse the judgment below.

Date: January 8, 2025                    Respectfully submitted,

                                         */s/ Jennifer M. Verkamp*
                                         Jennifer M. Verkamp
                                         Jillian L. Estes
                                         MORGAN VERKAMP, LLC
                                         4410 Carver Woods Dr., Suite 200
                                         Cincinnati, OH 45242
                                         Tel. (513) 651-4400
                                         jennifer.verkamp@morganverkamp.com
                                         jillian.estes@morganverkamp.com

                                         Tejinder Singh
                                         SPARACINO, PLLC
                                         1920 L Street, NW
                                         Suite 835
                                         Washington, D.C. 20036
                                         Tel. (202) 629-3530
                                         tejinder.singh@sparacinopllc.com

                                         *Attorneys for Appellant Clarissa Zafirov*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,912 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in Times New Roman, font size 14.


Date: January 8, 2025        */s/ Jennifer M. Verkamp*
                                    Jennifer M. Verkamp

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Opening Brief for Plaintiff-Appellant with the Clerk of the Court for the United States District Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on January 8, 2025. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Date: January 8, 2025                 */s/ Jennifer M. Verkamp*
                                      Jennifer M. Verkamp