# In the United States Court of Appeals for the Eleventh Circuit

UNITED STATES OF AMERICA
*ex rel.* DR. CLARISSA ZAFIROV,

*Plaintiff-Appellant*, and

UNITED STATES OF AMERICA,

*Intervenor-Appellant*,

v.

FLORIDA MEDICAL ASSOCIATES, LLC, *et al.*,

*Appellees.*

*On Appeal from the United States District Court
for the Middle District of Florida, No. 8:19-cv-01236*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

I also hereby certify that I am aware of no persons or entities, in addition to those listed in the party and *amicus* briefs filed in this case, that have a financial interest in the outcome of this litigation. Further, I am aware of no persons with any interest in the outcome of this litigation other than the signatory to this brief and its counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: January 15, 2025                              */s/ Brianne J. Gorod*
                                                 Brianne J. Gorod

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF *AMICUS CURIAE* .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ............................................................................... 5

    I.     The Framers Drafted the Appointments Clause to Address Which Branch of Government Should Choose Public Officers, and Their Debates Were Exclusively Focused on Members of the Government Workforce ...................................................... 5

    II.    Qui Tam Relators Do Not Implicate the Appointments Clause Because They Do Not Hold Public Office ............................. 11

CONCLUSION ............................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................ 21

*\*Auffmordt v. Hedden*,
    137 U.S. 310 (1890) .......................................................... 4, 17

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ................................................................ 14

*\*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................ 3, 4, 6, 15, 16, 18-20

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936) ................................................................ 21

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
    587 U.S. 262 (2019) ................................................................ 13

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986) ................................................................ 21

*Currin v. Wallace*,
    306 U.S. 1 (1939) ................................................................ 21

*Edmond v. United States*,
    520 U.S. 651 (1997) ........................................................ 1, 3, 11

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
    590 U.S. 448 (2020) ................................................................ 16

*\*Freytag v. Comm'r*,
    501 U.S. 868 (1991) ................................................ 1, 5, 6, 8, 11, 20

*Lucia v. SEC*,
    585 U.S. 237 (2018) .......................................................... 2, 4, 20, 21

**Page(s)**

*Morrison v. Olson*,
  487 U.S. 654 (1988) ................................................................ 2, 14

*Riley v. St. Luke's Episcopal Hosp.*,
  252 F.3d 749 (5th Cir. 2001) ................................................. 20

*Springer v. Gov't of Philippine Islands*,
  277 U.S. 189 (1928) ................................................................ 19

*Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) ................................................................ 21

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) ................................................................ 21

*\*United States v. Germaine*,
  99 U.S. 508 (1878) ................................................................ 4-6, 17

*\*United States v. Hartwell*,
  73 U.S. (6 Wall.) 385 (1867) ................................................ 2, 3, 17

*United States ex rel. Kelly v. Boeing Co.*,
  9 F.3d 743 (9th Cir. 1993) ..................................................... 14

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002) ............................................... 13, 18

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
  41 F.3d 1032 (6th Cir. 1994) ................................................. 13

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
  529 U.S. 765 (2000) ................................................................ 2, 3

*Weiss v. United States*,
  510 U.S. 163 (1994) ................................................................ 6, 8

**Page(s)**

Constitutional Provision

U.S. Const. art. II, § 2, cl. 2 .......................................................... 1, 3, 5, 10, 12, 13


Books, Articles, and Other Authorities

Akhil Reed Amar, *America's Constitution: A Biograph*y (2005) .............. 6

Richard A. Bales, *A Constitutional Defense of Qui Tam*,
  2001 Wis. L. Rev. 381 (2001) ................................................. 14

Evan Caminker, *The Constitutionality of Qui Tam Actions*,
  99 Yale L.J. 341 (1989) .......................................................... 19

*The Const. Separation of Powers Between the President & Cong.*,
  20 Op. O.L.C. (1996) .............................................................. 14

*Documentary History of the First Federal Congress of the United States*
  *of America, 4 March 1789 – 3 March 1791* (William Charles di
  Giacomantonio et al. eds., 1995) ............................................. 13

Entry of John Adams (Apr. 20, 1771), *in* 2 *The Adams Papers: Diary &*
  *Autobiography of John Adams* (L.H. Butterfield ed.) ........................... 7

*The Federalist No. 76* (Alexander Hamilton) (Clinton Rossiter ed.,
  1961) ................................................................................. 7, 12

*The Federalist No. 77* (Alexander Hamilton) (Clinton Rossiter ed.,
  1961) ................................................................................. 12, 13

Michael J. Gerhardt, *The Federal Appointments Process:*
  *A Constitutional and Historical Analysis* (2003) ................................ 11

Neil Kinkopf, *Of Devolution, Privatization, and Globalization: Separation of Powers Limits on Congressional Authority to Assign Federal Power to Non-Federal Actors*,
50 Rutgers L. Rev. 331 (1998)................................................................ 15, 18, 21

*Letter from Roger Sherman to John Adams* (July 20, 1789),
https://founders.archives.gov/documents/Adams/06-20-02-0061 ......... 7

*Madison's Observations on Jefferson's Draft of a Constitution for Virginia, reprinted in* 6 *Papers of Thomas Jefferson* (J. Boyd ed., 1952)..................................................................................................... 8

Jennifer L. Mascott, *Who Are "Officers of the United States"?*,
70 Stan. L. Rev. 443 (2018) .................................................................... 21

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911).................................................................................................... 3, 7-10

Gordon Wood, *The Creation of the American Republic 1776 – 1787* (2011 ed.) ............................................................................................... 6, 8

# INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case and the questions it raises about the scope and meaning of the Appointments Clause.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Appointments Clause of Article II is among the most "significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). It guards against "the danger of one branch's aggrandizing its power at the expense of another branch," and ensures "accountab[ility] to political force and the will of the people" by providing the exclusive means for appointing "Officers of the United States," and requiring the consent of two separate branches for appointment of the most powerful of those "Officers." *Freytag v. Comm'r*, 501 U.S. 868, 878, 884 (1991); *see* U.S. Const. art. II, § 2, cl. 2.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. All parties have consented to the filing of this brief.

But "the Appointments Clause cares not a whit" about individuals who do not hold public office. *Lucia v. SEC*, 585 U.S. 237, 245 (2018). That Clause simply is not the constitutional mechanism for placing a check on private individuals who hold no government position, draw no federal salary, have no formal duties, and serve no specified term. Rather, the term "Officer" "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell,* 73 U.S. (6 Wall.) 385, 393 (1867). To be an "Officer," and therefore subject to the Appointments Clause, one must, at a minimum, occupy "a public station, or employment, conferred by the appointment of government." *Id.*

It is thus unsurprising that although qui tam actions were "prevalent" in "the period immediately before and after the framing of the Constitution," *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 776 (2000), they never came up during the Founding-era debates regarding the Appointments Clause. Instead, "[t]hroughout most of the process of drafting the Constitution, the Convention was concentrated on the problem of who should have the authority to appoint judges"— government officials who occupy established public positions with life tenure supported by the public fisc. *Morrison v. Olson*, 487 U.S. 654, 674 (1988).

The chief question during the debates was whether that authority was best vested in a sole executive officer who could be held politically accountable, or in a multimember body representing diverse viewpoints. Eventually, the Framers

decided that lodging the power to appoint the most powerful government officials in any one branch of government would risk "a[n] incautious or corrupt nomination." 2 *The Records of the Federal Convention of 1787*, at 43 (Max Farrand ed., 1911) (James Madison) [hereinafter *Farrand's Records*]. At the same time, they recognized the need to afford Congress sufficient flexibility to shape the federal government, and thus authorized it to prescribe a less "cumbersome procedure only with respect to the appointment of 'inferior Officers.'" *Edmond*, 520 U.S. at 660. While all this transpired, the discourse in Philadelphia never once touched on private individuals who litigate to vindicate their own "concrete private interest[s]" in alignment with those of the United States, *Vt. Agency*, 529 U.S. at 772, but are not appointed to any government role.

In invalidating the qui tam provision of the False Claims Act (FCA) under the Appointments Clause, the district court misunderstood the threshold appointment requirement. Rather than first assessing whether an appointment to public office in fact exists, it began its analysis with the question of whether relators exercise "significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). Concluding that they do, the court treated that conclusion as functionally dispositive of relators' status as "Officers of the United States," U.S. Const. art. II, § 2, cl. 2. Though the court later purported to conduct an inquiry into the factors of "tenure, duration, emolument, and duties," *Hartwell*, 73

U.S. (6 Wall.) at 393, that analysis was wholly driven by the court's prior conclusions that "a relator enjoys unfettered freedom to prosecute the action as she determines best" and may "bind[] the federal government," Doc. 346, Opinion ("Op.") at 30-31. The court failed to acknowledge that relators collect no federal salary, hold no public office, and litigate only until the case ends—using their own resources.

Along the way, the court also misconstrued a number of Supreme Court precedents, most significantly *Buckley v. Valeo*, that apply the "significant authority" inquiry only *after* concluding that an appointment to public office in fact exists. *See, e.g.*, *Buckley*, 424 U.S. at 126 (per curiam); *United States v. Germaine*, 99 U.S. 508, 509 (1878); *Auffmordt v. Hedden*, 137 U.S. 310, 326-28 (1890). *Buckley* never suggested that significant authority to vindicate the United States' interests *on its own* creates an appointment or renders a private citizen an "Officer" within the meaning of the Appointments Clause. *Cf. Lucia*, 585 U.S. at 255 (Thomas, J., joined by Gorsuch, J., concurring) (arguing that the "significance of [an officer's] statutory duties" should not even be part of the Appointments Clause inquiry at all). Rather *Buckley*, like cases before and after it, attempted to ascertain whether the litigation authority of *appointees*—government officials with established public offices—rendered them more akin to executive officials than

legislative officials, making their appointment by Congress invalid under the Appointments Clause.

Thus, "[t]he principle of separation of powers is embedded in the Appointments Clause" to address a very specific problem like the one in *Buckley*: who wields the power of appointment to government offices. *Freytag*, 501 U.S. at 882. The Clause responds to the risk of Congress taking that power for itself or improperly diffusing it across a wide range of government officials. *Id.* at 878, 885-86. Such a role is vital, but it simply does not apply to private individuals litigating qui tam actions. Because qui tam relators are not "Officers" in any sense of that term as understood at the Founding, they do not pose the concerns at the heart of the Appointments Clause, and this Court should reverse.

## ARGUMENT

### I. The Framers Drafted the Appointments Clause to Address Which Branch of Government Should Choose Public Officers, and Their Debates Were Exclusively Focused on Members of the Government Workforce.

The Appointments Clause provides the exclusive means for appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. The Clause "for purposes of appointment very clearly divides all its officers into two classes." *Germaine*, 99 U.S. at 509. Principal officers must be appointed by the President "with the Advice and Consent of the Senate," and inferior officers may be appointed by the President alone, by the heads of departments, or by the Judiciary. U.S. Const.

art. II, § 2, cl. 2.  As the Supreme Court has put it, "[t]hat all persons who can be said to *hold an office under the government* about to be established under the Constitution were intended to be included within one or the other of these modes of appointment there can be but little doubt."  *Germaine*, 99 U.S. at 510 (emphasis added).  The Court has often explained that these modes of appointment further "[t]he principle of separation of powers" that "was woven into the document [the Framers] drafted in Philadelphia in the summer of 1787."  *Buckley*, 424 U.S. at 124 (per curiam).  Specifically, the Clause "focuses on the danger of one branch's aggrandizing its power at the expense of another branch," and prevents "the diffusion of the appointment power" across a wide swath of government officials, preserving transparency with respect to who in government is responsible for an appointment.  *Freytag*, 501 U.S. at 878, 885-86.

**A.**  When drafting the Appointments Clause, "delegates to the Philadelphia Convention could draw on their experiences with two flawed methods of appointment."  *Weiss v. United States*, 510 U.S. 163, 184 (1994) (Souter, J., concurring).  First, the Framers remembered vividly the "unilateral authority" of the King of England to "name all officers."  Akhil Reed Amar, *America's Constitution: A Biograph*y 189-90 (2005).  The King's appointment power was one of "the most insidious and powerful weapon[s] of eighteenth century despotism," *Freytag*, 501 U.S. at 883-84 (internal quotations omitted), which the King used to appoint

"'miniature infinitesimal Deities'" to spread the "weeds of tyranny" across the colonies.  Gordon Wood, *The Creation of the American Republic 1776 – 1787*, at 79, 143 (2011 ed.) (quoting Entry of John Adams (Apr. 20, 1771), *in* 2 *The Adams Papers: Diary & Autobiography of John Adams*, at 7 (L.H. Butterfield ed.)).

The Framers thus feared that giving the President the "sole disposition of offices" would result in a Cabinet "governed much more by his private inclinations and interests" than by the public good, and could result in the appointment of officers who had "no other merit than that of . . . possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure."  *The Federalist No. 76*, at 457-58 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see Letter from Roger Sherman to John Adams* (July 20, 1789), https://founders.archives.gov/ documents/Adams/06-20-02-0061 ("Where ever the chief Magistrate may appoint to offices without control, his government, may become absolute or at least oppressive."); 1 *Farrand's Records*, *supra*, at 119 ("Mr. [Rutledge] was by no means disposed to grant so great a power to any single person," as "[t]he people will think we are leaning too much towards Monarchy."); 2 *id*. at 43 ("Mr. Bedford thought there were solid reasons agst. leaving the appointment to the Executive."); 2 *id*. at 81 (Oliver Ellsworth) ("The Executive will . . . be more open to caresses & intrigues than the Senate."); 2 *id*. at 83 (George Mason) ("He considered the appointment by the Executive as a dangerous prerogative.").

Yet at the same time, the Framers were aware of significant abuses by state legislatures, several of which had been given sole appointment power after the Declaration of Independence as an "overcorrection" in reaction to the perceived appointment abuses of the King. *Weiss*, 510 U.S. at 184 (Souter, J., concurring). The Framers' "experience with post revolutionary self-government had taught them that combining the power to create offices with the power to appoint officers was a recipe for legislative corruption." *Freytag*, 501 U.S. at 904 (Scalia, J., concurring in part and concurring in the judgment). The initial concern was "that legislators would create offices with the expectancy of occupying them themselves," but the drafters of the Appointments Clause also worried that legislators "would be inclined to appoint their friends and supporters," and that such a power would go largely unchecked. *Id.*; *see, e.g.*, *Madison's Observations on Jefferson's Draft of a Constitution for Virginia*, *reprinted in* 6 *Papers of Thomas Jefferson* 308, 311 (J. Boyd ed., 1952) ("The power of the Legislature to appoint any other than their own officers departs too far from the Theory which requires a separation of the great Departments of Government."); Wood, *supra*, at 407 ("The appointing authority which in most constitutions had been granted to the assemblies had become the principal source of division and faction in the states.").

With these dueling concerns in mind, the Framers initially bestowed unlimited appointment power on the executive branch. Early in the Constitutional Convention,

they provided that this (still undefined) branch would "appoint to offices in cases not otherwise provided for." 1 *Farrand's Records*, *supra*, at 63, 67. But as the structure of the executive branch took shape, proposals for appointing its officers evolved in tandem with proposals for appointing federal judges—who, for most of the Convention, were intended to be appointed by the Senate, not the executive. *See* 1 *id*. at 232-33. That idea had originated with James Madison, who "was not satisfied with referring the appointment to the Executive," 1 *id*. at 120, and who argued that Senators—unlike the individual person serving as the executive—would be "sufficiently numerous to justify such a confidence in them," 1 *id*. at 233. Other delegates agreed. *See* 2 *id*. at 81 (Charles Pinckney "was for placing the appointmt. in the [Senate] exclusively."); 2 *id*. at 41 (Luther Martin opined that the Senate would be "most capable of making a fit choice."); 2 *id*. at 43 (Roger Sherman "was clearly for an election by the Senate," for "[i]t would be less easy for candidates to intrigue with them, than with the Executive Magistrate.").

Some delegates, however, were concerned that a multimember body like the Senate was ill-suited to choose judges, in part because responsibility for the selections would be too diffuse. *See, e.g.*, 2 *id*. at 41. Alexander Hamilton thus suggested, 1 *id*. at 292, and Nathaniel Gorham formally proposed, 2 *id*. at 41, a system in which the executive would make appointments with the approval of the Senate. Madison approved, arguing that Senate involvement "would unite the

advantage of responsibility in the Executive with the security afforded in the [Senate] agst. any incautious or corrupt nomination by the Executive," thus preventing "flagrant partiality or error, in the nomination" and appointments based on "selfish motives." 2 *id.* at 42-43, 80.

This compromise ultimately prevailed, and the advice-and-consent requirement was extended to include all principal officers in the executive branch. *See* 2 *id*. at 498-99, 539-40. Echoing Madison's earlier explanation, Gouverneur Morris "said that as the President was to nominate, there would be responsibility, and as the Senate was to concur, there would be security." 2 *id*. at 539.

**B.** The record of the debates was much sparser with respect to the appointment of "inferior Officers," for whom Congress could vest the appointment power "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Gouverneur Morris moved to add the clause addressing "inferior Officers," commonly known as the Excepting Clause, on the last day of the Convention shortly after "Consuls" were added to the list of principal officers. *See* 2 *Farrand's Records*, *supra*, at 539, 599, 627-68. Madison, who made the only recorded comment on the motion, felt the Clause did not "go far enough" because it did not permit Congress to vest appointment powers in "Superior Officers below Heads of Departments." 2 *id.* at 627.

The first vote on the Excepting Clause ended in a tie, but it was put forward again on the premise that it was "too necessary[] to be omitted." 2 *id.* at 627-28. On the second vote, it passed. 2 *id.* at 628. The Supreme Court has declared the "obvious purpose" of the Excepting Clause to be "administrative convenience"—a convenience deemed critical to allow Congress the flexibility to do its job, but appropriate only for individuals supervised by principal officers. *Edmond*, 520 U.S. at 660. At the same time, the "Clause bespeaks a principle of limitation . . . [e]ven with respect to 'inferior Officers'" because the Framers "allow[ed] Congress only limited authority to devolve appointment power on the President, his heads of departments, and the courts of law." *Freytag*, 501 U.S. at 884.

## II. Qui Tam Relators Do Not Implicate the Appointments Clause Because They Do Not Hold Public Office.

**A.** Two aspects of this constitutional history are especially relevant here. *First*, the debates focused on safeguarding separation-of-powers principles with respect to which branch of government would wield the appointment power. This was reflected in the Framers' almost single-minded focus on "whether the power should be vested in the entire legislature, as proposed in the original Virginia Plan; in the Senate alone, in the president alone; or in the president with the advice and consent of the Senate—the plan that was adopted in the closing days of the constitutional convention." Michael J. Gerhardt, *The Federal Appointments Process: A Constitutional and Historical Analysis* 16-17 (2003).

In adopting that plan, the Framers determined that just as the President's power to nominate principal officers would avoid legislative aggrandizement and self-dealing, the Clause's requirement of advice and consent from the Senate would provide an "excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity." *The Federalist No. 76*, *supra*, at 457 (Hamilton). Explicitly prescribing the mode of appointment for all officers, principal and inferior, would also further transparency—that is, ensuring the individual or entity responsible for the appointment to any high-ranking government position would be known to the public. As Hamilton put it, "the circumstances attending an appointment, from the mode of conducting it, would naturally become matters of notoriety; and the public would be at no loss to determine what part had been performed by the different actors." *The Federalist No. 77*, *supra*, at 461.

*Second*, at no point did the Founding-era debates on the Appointments Clause touch on restrictions for private actors, even those who might be vested with important statutory responsibilities to work in tandem with the federal government to pursue its interests. Instead, the Framers chiefly focused on judges in discussions about the appointment power—individuals who occupy established positions with a fixed tenure and government salaries. The only individuals other than judges named

explicitly in the Clause were "Ambassadors" and "other public Ministers and Consuls." U.S. Const. art. II, § 2, cl. 2. Moreover, contemporaneous writings often used the phrase "officers of the government" interchangeably with "Officers of the United States," indicating that an "Officer of the United States" was a person appointed by and employed by the federal government. *See, e.g.*, *The Federalist No. 77*, *supra*, at 459-60 (Hamilton) ("officers of the government" and "officers of the proposed government"); 14 *Documentary History of the First Federal Congress of the United States of America, 4 March 1789 – 3 March 1791*, at 120-21 (William Charles di Giacomantonio et al. eds., 1995) (Rep. Roger Sherman) ("officers of the Federal government"). In sum, when delineating the federal government's power to "appoint," U.S. Const. art. II, § 2, cl. 2, the Framers did not contemplate that an individual not appointed by government at all would be subject to the Clause's strictures.

These two aspects of the constitutional history strongly support the conclusion that the Appointments Clause is not a constitutional mechanism for placing a check on private individuals who draw no federal salary, hold no established position, have no formal duties, and serve no specified term—even if they litigate in the name of the United States. Qui tam relators are not appointed by any government official. *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) (a relator is a "private person" who is not even "employed by the United

States"); *accord United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002) ("There is no legislatively created office of informer or relator under the FCA."); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) ("[T]he relator is not vested with governmental power."). Thus, their mode of appointment cannot possibly raise transparency concerns or risk aggrandizement of legislative power at the expense of the executive branch, or vice versa. *Accord United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993) ("concerns about congressional aggrandizement simply are not implicated [by qui tam relators]"); *cf. Morrison*, 487 U.S. at 693-94 (no Appointments Clause violation where "Congress retained for itself no powers of control or supervision over an independent counsel," and therefore the statute "simply [did] not pose a 'dange[r] of congressional usurpation of Executive Branch functions'" (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 (1986))).

It is thus simply "incorrect[]" to characterize the "delegation to private persons or non-federal government officials of federal-law authority" "as raising Appointments Clause questions," even if such delegation could, in certain circumstances, conceivably "raise genuine questions under other constitutional doctrines." *The Const. Separation of Powers Between the President & Cong.*, 20 Op. O.L.C. 145 & n. 60 (1996). As one scholar has put it, "if there is no position, there need be no appointment." Richard A. Bales, *A Constitutional Defense of Qui*

*Tam*, 2001 Wis. L. Rev. 381, 433 (2001). Rather, the "better view" is that "the Appointments Clause performs an extremely important function within its sphere—defining the roles of, and procedures to be followed by, the President and Congress in filling the most important positions within the federal government—but that sphere is limited and does not encompass assignments of authority to nonfederal actors." Neil Kinkopf, *Of Devolution, Privatization, and Globalization: Separation of Powers Limits on Congressional Authority to Assign Federal Power to Non-Federal Actors*, 50 Rutgers L. Rev. 331, 374 (1998).

    **B.** In concluding otherwise, the district court erroneously treated the "significant federal authority" that it deemed qui tam relators to exercise as dispositive of the Appointments Clause inquiry. Op. at 30. Though the court purported to conduct an analysis of whether "an FCA relator occupies a continuing position established by law," it reduced that analysis to a cursory inquiry into whether the FCA delineates the extent of a relator's statutory authority. *Id.* Finding (of course) that it does, and repeatedly characterizing that delegated authority as "significant," "unfettered," and "empowered," the court created a public office where none exists, in contravention of the Appointments Clause's text and history. *Id.* at 30-34.

    The district court's conclusion that anyone who exercises significant authority must be an "Officer of the United States" within the meaning of the Appointments

Clause rests primarily on its misreading of *Buckley v. Valeo*. In *Buckley*, the Supreme Court considered whether Congress could retain for itself the power to appoint members of the Federal Election Commission under the Federal Election Campaign Act (FECA). *Buckley*, 424 U.S. at 119 (per curiam). Concluding that Federal Election Commissioners were executive and not legislative officers in large part due to their litigation and enforcement authority, the Court held that they were "Officers of the United States" who must be appointed in accordance with the Appointments Clause. *Id.* at 140.

In reaching this conclusion, the *Buckley* Court made two statements that the district court fundamentally misconstrued. First, the Court stated that under Article II, "*any appointee* exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by [the Appointments Clause]." *Id.* at 126 (emphasis added). The key word in that phrase is "any appointee." *Id.* The Court did not say that a private person becomes an Officer of the United States subject to the Appointments Clause's restrictions simply because he or she exercises "significant authority pursuant to the laws of the United States." *Id.* Rather, a person who has been appointed to a government position *and* exercises significant authority in that position is subject to the Appointments Clause.

The question of whether a person had been appointed to a government position was, of course, not at issue in *Buckley*.  *Cf. Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. 448, 468 (2020) (rejecting importation of Appointments Clause test from cases that did not present the "critical legal [question]" at stake).  That issue was, however, foregrounded in several prior Supreme Court cases that *Buckley* cited favorably, *see* 424 U.S. at 125-26 & n.162 (per curiam): *United States v. Hartwell*, 73 U.S. (6 Wall) 385 (1867); *United States v. Germaine*, 99 U.S. 508 (1879); and *Auffmordt v. Hedden*, 137 U.S. 310 (1890). In each of those cases, the Supreme Court explained that an office exists for purposes of the Appointments Clause only where there is "tenure, duration, continuing emolument, [and] continuous duties."  *Auffmordt*, 137 U.S. at 327 (citing *Hartwell* and *Germaine*); *see also Hartwell*, 73 U.S. (6 Wall) at 393 ("An office is a public station, or employment, conferred by the appointment of government.").  Thus, a treasury clerk was an "Officer of the United States" pursuant to these factors, *see Hartwell*, 73 U.S. (6 Wall) at 393, but a private surgeon appointed by the United States Commissioner of Pensions was not because of the "occasional" and "intermittent" nature of his employment, *Germaine*, 99 U.S. at 512.  Similarly, in *Auffmordt*, a private merchant appraiser appointed by a Customs Collector to reappraise imported goods was not an "Officer of the United States" because his

"position [was] without tenure, duration, continuing emolument, or continuous duties, and he act[ed] only occasionally and temporarily." 137 U.S. at 327.

Notably, even in *Germaine* and *Auffmordt*, where the private individual was not deemed an "Officer" for Appointments Clause purposes, the person was at least appointed by another government official to perform a limited government service, unlike a qui tam relator. Thus, in *Germaine and Auffmordt*, there was at least *some* appointment process conducted by a government official that plausibly could have infringed on another branch's territory. No such risk exists when a private individual files suit under the FCA.

But more to the point, *Buckley*—which expressly relied on *Hartwell*, *Germaine*, and *Auffmordt*—did not silently overrule the multifactor threshold analysis set forth in those cases. *See, e.g.*, Kinkopf, *supra*, at 372 (describing it as "implausible" that *Buckley* overruled these precedents). By recognizing a "significant authority" requirement for "Officer" status under the Appointments Clause, the *Buckley* Court neither silently removed the appointment to public office requirement nor treated the exercise of significant authority as dispositive of that requirement. *See, e.g.*, *Stone*, 282 F.3d at 805 (*Buckley* "was clear" that its "definition of an officer of the United States should be construed in conformity with [the Court's] prior *Germaine* and *Auffmordt* opinions, which the *Buckley* Court extensively quoted with approval").

The court below also erroneously read out-of-context *Buckley*'s statement that FECA's provisions "vesting in the Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights[] violate Art. II, § 2, cl. 2, of the Constitution" because "[s]uch functions may be discharged only by persons who are 'Officers of the United States.'" *Buckley*, 424 U.S. at 140 (per curiam). That statement was not meant to convey that *anyone* who "conduct[s] civil litigation in the courts for vindicating public rights" is automatically an "Officer of the United States." *Id.* Rather, the Court in *Buckley* was focused on the litigation and enforcement authority of the Federal Election Commissioners because such authority rendered their roles more executive than legislative in nature, meaning they could not be appointed by Congress alone (as FECA had prescribed). The distinction between legislative and executive functions is discussed throughout the *Buckley* opinion, as the Court repeatedly expresses disdain for Congress's intrusion on the appointment power. *See, e.g.*, *id.* at 139 ("Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot ingraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection." (quoting *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928)); *id.* at 138 ("The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the

legislative function of Congress.").  As discussed earlier, that risk of congressional self-aggrandizement, by seizing a role in the enforcement of federal law through the appointment of a civil litigator, was a core concern of the Framers when they wrote the Appointments Clause, but that risk is simply not present in the context of qui tam litigation.  *Accord* Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. 341, 376 (1989) ("The Court's primary concern in *Buckley* was the avoidance of congressional aggrandizement of power, . . . [b]ut this concern is not triggered here; qui tam plaintiffs are neither appointed by, removable by, nor beholden in any way to Congress.").

It is thus no surprise that cases since *Buckley* have repeatedly characterized the inquiry under the Appointments Clause as focused on drawing the line between "Officers of the United States" and government "employees."  *See, e.g.*, *Freytag*, 501 U.S. at 882 (holding that special trial judges are "inferior Officers" and not "mere employees"); *Lucia*, 585 U.S. at 244 ("The sole question here is whether the Commission's ALJs are 'Officers of the United States' or simply employees of the Federal Government."); *accord Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001) (en banc) (citing *Auffmordt* and *Germaine* for the principle that "the constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized relationship of employment with the United States Government").  Even *Buckley* itself recognized this dichotomy, distinguishing

between "Officers of the United States" and "[e]mployees," who are "lesser functionaries subordinate to officers of the United States." 424 U.S. at 126 n.162 (per curiam). The Supreme Court has never suggested that a person who is not *even* an employee may be an "Officer of the United States" subject to the strictures of Article II's Appointments Clause. That is because that is simply not what the Appointments Clause is about.[2]

Even recent separate writings by Justice Thomas, joined by Justice Gorsuch, that urge an *expansion* of the application of the Appointments Clause's requirements do not read *Buckley* to hold that all private individuals who exercise significant authority are "Officers" within the meaning of the Appointments Clause. Rather, Justice Thomas has written that "[t]he Founders likely understood the term 'Officers of the United States' to encompass all federal civil officials who perform an ongoing, statutory duty—no matter how important or significant the duty." *See Lucia*, 585

---

[2] One scholar has catalogued a slew of Supreme Court cases decided before and after *Buckley* that address assignments of authority to nonfederal actors without "even consider[ing] the Appointments Clause as a possible basis for deciding [them]." Kinkopf, *supra,* at 373-74 (citing, among other cases, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 540-41 (1935) (striking down delegation of authority to private actors); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (same); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939) (upholding assignment of authority to private party); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 387-88 (1940) (same); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 594 (1985) (same)). The absence of discussion of the Appointments Clause in these cases is "particularly telling" evidence that they did not implicate the Clause at all. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 857 (1986).

U.S. at 254 (Thomas, J., joined by Gorsuch, J., concurring) (citing Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443, 454 (2018)); *Aurelius*, 590 U.S. at 473 (Thomas, J., concurring in the judgment) (similar).  This is the direct inverse of what the district court did here: Justices Thomas and Gorsuch argue for *eliminating* the "significant authority" requirement for "Officers," rather than letting it entirely subsume the analysis of whether an appointment to an office exists in the first place.

* * *

In sum, the Appointments Clause provides a critical check on both the executive and legislative branches with respect to choosing government officials who exercise substantial authority.  But a private individual who is not a government official does not become subject to the Clause simply by exercising substantial authority.  Thus, the Appointments Clause provides no basis for invalidating the qui tam provision of the FCA.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Respectfully submitted,

Dated: January 15, 2025

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,295 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: January 15, 2025

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: January 15, 2025

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*
