# United States Court of Appeals for the Eleventh Circuit

UNITED STATES EX REL. CLARISSA ZAFIROV,

*Plaintiff-Appellant, and*

UNITED STATES OF AMERICA,

*Intervenor-Appellant,*

V.

FLORIDA MEDICAL ASSOCIATES, LLC, ET AL.,

*Defendants-Appellees.*

―――――――――――――――

On Appeal from the United States District Court
for the Middle District of Florida

―――――――――――――――

**BRIEF OF AMICUS CURIAE RANDY BECK IN SUPPORT OF
PLAINTIFF-APPELLANT AND INTERVENOR-APPELLANT**

―――――――――――――――

Daniel Woofter
  *Counsel of Record*
RUSSELL & WOOFTER LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, amicus curiae Randy Beck adopts the Certificate of Interested Persons submitted in Plaintiff-Appellant's Opening Brief (filed January 8, 2025), and amicus curiae adds the following attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this case:

- BECK, Randy: Amicus Curiae

- RUSSELL & WOOFTER LLC: Counsel for Amicus Curiae Randy Beck.

- WOOFTER, Daniel: Counsel for Amicus Curiae Randy Beck.

January 15, 2025                    /s/ Daniel Woofter
                                   *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................... 1

TABLE OF AUTHORITIES ........................................................... ii

INTEREST OF AMICUS CURIAE ............................................... 1

STATEMENT OF THE ISSUE ..................................................... 2

SUMMARY OF ARGUMENT ..................................................... 2

ARGUMENT .................................................................................. 5

   I.   The historical understanding of qui tam actions ............................ 5

      A. Qui tam actions were understood as private rather than governmental litigation. ................................................... 5

         1. Blackstone's framework of "popular actions" ........................ 5

         2. William Bradford's simultaneous service as Attorney General and counsel for private qui tam enforcers ............... 7

         3. Broader context of citizen participation .............................. 10

      B. This understanding was reflected in Framing-era state constitutional practice. .............................................. 11

      C. The First Congress extensively and strategically enacted qui tam provisions that President Washington signed into law. ................................................................................. 22

  II.  This historical evidence resolves both constitutional objections. ......................................................................... 29

CONCLUSION .................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Buckley v. Valeo*,
424 U.S. 1 (1976) (per curiam) ...................................................... 29, 31

*Burrow-Giles Lithographic Co. v. Sarcony*,
111 U.S. 53 (1884) ............................................................................ 21

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................................................................... 12

*Duncan v. Louisiana*,
391 U.S. 145 (1968) ......................................................................... 12

*Marsh v. Chambers*,
463 U.S. 783 (1983) .................................................................... 22, 29

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ......................................................................... 11

*Printz v. United States*,
521 U.S. 898 (1997) .................................................................... 23, 29

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................................................... 32

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ............................................................... 4, 31, 32

## Statutes

An Act to Regulate the Collection of the Duties Imposed by Law
on the Tonnage of Ships or Vessels, and on Goods, Wares and
Merchandises Imported into the United States,
ch. 5, 38, 1 Stat. 29 (1789) ............................................................. 23

An Act to Establish the Treasury Department,
ch. 12, 1 Stat. 65 (1789) ............................................................ 24, 26

An Act Providing for the Enumeration of the Inhabitants of the
United States,
ch. II, 1 Stat. 101 (1790) ........................................................... 24, 26

An Act to Provide More Effectually for the Collection of the Duties Imposed by Law on Goods, Wares and Merchandise Imported into the United States, and on the Tonnage of Ships or Vessels,
ch. 35, 1 Stat. 145 (1790) .......................................................24

An Act to Incorporate the Subscribers to the Bank of the United States,
ch. 10, 1 Stat. 191 (1791) .......................................................27

An Act to Establish the Post-Office and Post Roads Within the United States,
ch. 7, 1 Stat. 232 (1792) ...................................................24, 27

Act to Regulate Trade and Intercourse with Indian Tribes,
ch. 19, 1 Stat. 329 (1793) .......................................................27

NY Laws, 1st Sess., ch. 10 (Mar. 14, 1778) ...............................18

NY Laws, 1st Sess., chs. 16, 34, 36 (Mar. 27, 1778)..................17

NY Laws, 1st Sess., Preamble & chs. 34, 74 (Apr. 3, 1778) ..................18

NY Laws, 2d Sess., ch. 17 (Mar. 2, 1779) ..................................18

NY Laws, 3d Sess., ch. 21 (Oct. 20, 1779) .................................18

NY Laws, 3d Sess., ch. 40 (Feb. 21, 1780) .................................18

NY Laws, 3d Sess., ch. 41 (Feb. 26, 1780) .................................18

NY Laws, 4th Sess., ch. 27 (Mar. 14, 1781)................................18

NY Laws, 4th Sess., ch. 39 (Mar. 26, 1781)................................18

NY Laws, 6th Sess., ch. 9 (July 22, 1782) .................................19

NY Laws, 7th Sess., ch. 10 (Mar. 22, 1784)................................18

NY Laws, 8th Sess., ch. 46 (Mar. 31, 1785)................................18

NY Laws, 8th Sess., ch. 54 (Apr. 4, 1785) .................................18

NY Laws, 8th Sess., ch. 7 (Nov. 18, 1784) .................................18

NY Laws, 10th Sess., ch. 13 (Feb. 8, 1787) ...............................18

NY Laws, 10th Sess., ch. 81 (Apr. 11, 1787) .............................18

PA Laws, 1st General Assembly, ch. 22 (June 14, 1777).............13

PA Laws, 1st General Assembly, ch. 28 (Sept. 18, 1777) ....................... 14

PA Laws, 1st General Assembly, ch. 4 (Feb. 5, 1777)............................ 13

PA Laws, 2d General Assembly, ch. 61 (Apr. 1, 1778)........................... 14

PA Laws, 6th General Assembly, ch. 3 (Dec. 28, 1781) ......................... 14

PA Laws, 8th General Assembly, ch. 147 (Apr. 18, 1784) ..................... 15

PA Laws, 8th General Assembly, ch. 147 (Apr. 18, 1784) ..................... 15

PA Laws, 8th General Assembly, ch. 158 (Sept. 15, 1784).................... 14

PA Laws, 11th General Assembly, ch. 362 (Sept. 22, 1787).................. 15

PA Laws, 12th General Assembly, ch. 421 (Oct. 4, 1788) ..................... 15

Laws of Vermont Passed During the Session of the General
 Assembly February 11—February 26, 1779 .................................. 19, 20

## Other Authorities

Randy Beck, *Qui Tam Legislation and Article II: State
 Constitutional Precursors to the "Take Care" Clause*
 (unpublished manuscript) (forthcoming), *available at*
 https://tinyurl.com/bdzjabnc . 8, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 30

Randy Beck, *Qui Tam Litigation Against Government Officials:
 Constitutional Implications of a Neglected History*,
 93 Notre Dame L. Rev. 1235 (2018) ... 2, 5, 10, 23, 24, 25, 26, 28, 30, 32

Randy Beck, TransUnion*, Vermont Agency*, *and Statutory
 Damages Under Article III*,
 77 Florida L. Rev. ____ (forthcoming 2025), *available at*
 https://ssrn.com/abstract=4549914 .............................. 5, 6, 7, 22, 23, 30

3 William Blackstone,
 Commentaries on the Laws of England (1768)............................ 5, 6, 11

*Correspondence of Attorney General William Bradford and the
 President in Council*, The Pennsylvania Packet, And Daily
 Advertiser (Jan. 16, 1788) ...................................................................... 9

Jenny E. Carroll, *Nullification as Law*,
 102 Geo. L.J. 579 (2014) ...................................................................... 10

Journal of the Second Session of the Council of Censors 134ff
  (Aug. 30, 1784) ...................................................................16

Journal of the Second Session of the Council of Censors 165ff
  (Sept. 18, 1784)..................................................................16

Jason Mazzone, *The Commandeerer in Chief*,
  83 Notre Dame L. Rev. 265 (2007) .....................................10

Nicholas Parrillo, *The De-Privatization of American Warfare:
  How the U.S. Government Used, Regulated, and Ultimately
  Abandoned Privateering in the Nineteenth Century*,
  19 Yale J.L. & Human. 1 (2007).........................................10

Report of the Secretary of the Treasury (April 23, 1790),
  *in* 4 Documentary History of the First Federal Congress of the
  United States of America 4 March 1789–3 March 1791 (Johns
  Hopkins Press 2004) ...........................................................26

## Constitutional Provisions

The Constitution of the Commonwealth of Pennsylvania (1776) ....12, 16

The Constitution of the State of New York (1777)..................................13

Constitution of the State of Vermont (1777) .........................................13

Constitution of the State of Vermont (1786) .........................................20

U.S. Const. amend. X .............................................................................7

U.S. Const. art. I, § 8 ............................................................................10

U.S. Const. art. II, § 2, cl. 2....................................................2, 29, 30, 32

U.S. Const. art. II, § 3, cl. 5.........................................3, 12, 21, 28, 29, 30

## INTEREST OF AMICUS CURIAE[1]

Randy Beck is the Justice Thomas O. Marshall Chair of Constitutional Law at the University of Georgia School of Law. He is a legal scholar and professor widely regarded as having expertise in the history and application of qui tam statutes in the United States. His research and academic work have focused on the evolution of these statutes from their origins in English law to their implementation and interpretation in American jurisprudence.

Professor Beck has authored numerous scholarly articles on statutory enforcement mechanisms, whistleblower protections, and the interplay between private litigants and public enforcement interests in the context of qui tam actions. As an independent legal scholar, he has significant interest in ensuring that the historical and legal foundations of qui tam statutes are accurately represented. He offers his research and views to assist the Court in its deliberations.

---

[1] No person other than amicus or his counsel contributed money intended to fund preparing or submitting this brief. No party or party's counsel authored the brief in whole or in part, and all parties have consented to its filing.

## STATEMENT OF THE ISSUE

Whether the qui tam provisions of the False Claims Act, as applied where the government has declined to take over an action brought by a relator, are consistent with the Appointments Clause of Article II of the Constitution.

## SUMMARY OF ARGUMENT

The District Court erred in holding that qui tam suits violate Article II of the U.S. Constitution. History resolves both constitutional objections raised below. "From the fourteenth through the eighteenth centuries, qui tam litigation by uninjured common informers was one of three extremely common methods of statutory enforcement, alongside suits by public officials and suits by injured parties." Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of a Neglected History*, 93 Notre Dame L. Rev. 1235, 1254 (2018) ("Beck, *Neglected History*"). Three strands of historical evidence demonstrate that the Founders understood qui tam litigation as private enforcement fully compatible with executive power.

First, Founding-era legal theory and practice establish that qui tam suits were viewed as distinct from the exercise of governmental power.

*Infra* I.A. As Blackstone explained, qui tam suits were "popular actions" belonging to the people at large, not exercises of executive authority. This understanding was illustrated by William Bradford's simultaneous service as Pennsylvania Attorney General and counsel for private qui tam enforcers—a dual role that leading jurists of the day saw as unproblematic. The considered acceptance of Bradford's concurrent public and private roles shows that qui tam enforcement was understood as something different from the exercise of governmental power.

Second, state constitutional practice in the decade before the federal Convention confirms this understanding. *Infra* I.B. Three states—Pennsylvania, New York, and Vermont—operated under constitutions requiring faithful execution of the laws, provisions that served as models for the federal Take Care Clause. Far from viewing qui tam legislation as constitutionally suspect, these States deployed qui tam provisions extensively across diverse contexts. This consistent state practice is powerful evidence that the federal Take Care Clause, modeled on these state provisions, was also understood not to preclude qui tam enforcement.

Third, the First Congress strategically enacted extensive qui tam legislation that President Washington signed into law. *Infra* I.C. For example, the First Congress authorized qui tam suits against federal officers in contexts where centralized presidential oversight would prove impractical, such as monitoring customs officials in distant ports or detecting census fraud in remote areas. This careful deployment of qui tam provisions by a Congress intimately familiar with the Constitution's requirements, coupled with the Executive Branch's ready acceptance of such measures, should resolve any constitutional doubt.

The District Court's contrary conclusion rests on an ahistorical understanding of executive power that would have been foreign to the Founders. *Infra* II. This Court should instead follow the clear historical evidence: Qui tam litigation was understood as private enforcement authorized by statute, not an exercise of governmental power requiring constitutional appointment. That understanding, maintained through two centuries of American practice, compels reversal. *See, e.g.*, *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 777-78 (2000) (qui tam relators have Article III standing based on historical evidence).

**ARGUMENT**

# I. The Historical Understanding Of Qui Tam Actions

The historical record provides compelling evidence that the founding generation viewed qui tam litigation as distinct from the exercise of governmental power. This understanding, crucial to the constitutional analysis, emerges clearly from both legal theory and official practice in the Framing Era.

## A. Qui Tam Actions Were Understood As Private Rather Than Governmental Litigation.

### 1. Blackstone's Framework Of "Popular Actions"

As Blackstone explained, qui tam statutes were understood at the time of the Founding to be "*popular* actions, because they are given to the people in general." Beck, *Neglected History*, *supra*, at 1254 (quoting 3 William Blackstone, Commentaries on the Laws of England *160 (1768)). The very term "popular action" emphasized that these suits belonged to the people at large, not to the government's executive apparatus. Randy Beck, TransUnion*,* Vermont Agency*, and Statutory Damages Under Article III*, 77 Fla. L. Rev. ___, at 24 & n.163 (forthcoming 2025) ("Beck,

*TransUnion, Vermont Agency*").[2] This legal understanding helps explain why early Americans saw no conflict between qui tam enforcement and constitutional provisions vesting executive power in government officials. The qui tam informer, like a plaintiff who suffered an individualized injury, was viewed as pursuing private litigation rather than exercising governmental authority. *See ibid.*

Indeed, the framing generation, committed to popular sovereignty, took a favorable view of empowering the People, given the colonial experience under English rule. Acts that did so would not have been regarded as at odds with the U.S. Constitution. The Constitution "was adopted when governments were far smaller and less powerful than they are today," and popular enforcement worked alongside devices like "the militia, the community posse (*posse comitatus*), and the privateer," through "which members of the public were authorized to assist in the projection of communal force and the enforcement of communal law." Beck, *TransUnion, Vermont Agency*, *supra*, at 56 & nn.382-83. The text of the Tenth Amendment confirms that, in addition to the powers

_____

[2] *Available at* https://ssrn.com/abstract=4549914 (quoting 3 Blackstone *160).

delegated to federal and state governments, some powers are reserved "to the people." *See* U.S. Const. amend. X. Perhaps for this reason, the Supreme Court has traditionally treated concerns about qui tam enforcement as policy questions for Congress to resolve rather than constitutional issues for the courts to decide. *See* Beck, *TransUnion, Vermont Agency*, *supra*, at 55-56 & nn.370-76 (explaining that in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 545-47 (1943), the Supreme Court rejected DOJ's concerns over qui tam suits based on allegations in earlier criminal indictments as "addressed to the wrong forum," after which DOJ persuaded Congress to amend the FCA).

2. *William Bradford's Simultaneous Service As Attorney General And Counsel For Private Qui Tam Enforcers*

Blackstone's distinction between private qui tam actions and executive enforcement is highlighted by the career of William Bradford, who served as Pennsylvania's Attorney General before becoming the second Attorney General of the United States.

In 1788, Bradford published a letter, supported by several Justices of the Pennsylvania Supreme Court, addressing his concurrent roles as both the Commonwealth's chief law enforcement officer and a private attorney representing qui tam informers. Randy Beck, *Qui Tam*

*Legislation and Article II: State Constitutional Precursors to the "Take Care" Clause* [manuscript at 36-37 & nn.315-21] (unpublished manuscript) (forthcoming) ("Beck, *Article II*").[3] Bradford and the justices perceived no tension or incompatibility between his governmental duty to prosecute criminal cases and his simultaneous private representation of qui tam plaintiffs:

> That my official duty does not call upon me to assist in the prosecution of any *qui tam* information, will appear from the opinion which I have the honor to inclose. It is subscribed by all the Judges of the Supreme Court, who are at present in town. These suits may be, and generally are, instituted without authority from the Council, or the knowledge of the Attorney General. They are conducted at the private risque of the informer, and by such counsel as he chuses to employ. He alone is answerable for all costs and expenses, and liable for all damages to the party injured, in case he should fail. Till the sentence of condemnation passes, he fights the battle alone, unaided by the State, which has never in a single instance bourne any part of the expense incurred on an unsuccessful information. Whenever I happen to be retained in these causes, I appear as council for the informer; I receive my recompence from him, and not from the State; and whether a proportionable part of this and the other expenses shall be bourne by the commonwealth, is a matter in which I am not at all interested.

---

[3] *Available at* https://tinyurl.com/bdzjabnc.

*Correspondence of Attorney General William Bradford and the President in Council*, The Pennsylvania Packet, And Daily Advertiser, at 3 (Jan. 16, 1788). Bradford explained that the reason there was no conflict was that the qui tam informer was engaging in "private exertions," at private risk, rather than acting on behalf of the State:

> Hitherto, indeed, it has been considered as reasonable, that the informer, who runs all the hazard, and encounters all the difficulties and unmerited reproach attendant on the prosecution, should receive his legal proportion out of the neat product of the forfeiture; the expenses of the prosecution being first deducted, and the residue divided as the law directs. Whatever the State thus receives it acquires by the private exertions of the individual who prosecutes, without any risque or expence on the part of the public; and as such forfeitures are established for the great purposes of punishment and example, not of immediate revenue, these ends would be answered, and the commonwealth effectively benefited, even if the whole forfeiture had been given by the act to the informer.

*Ibid.*

That Bradford could simultaneously serve as the State's chief prosecutor while representing private qui tam informers—with the approval of the State's highest judicial officers—is powerful evidence that qui tam litigation was understood as something distinct from the exercise of governmental power.

### 3. *Broader Context Of Citizen Participation*

This understanding of qui tam litigation as private rather than governmental action gains additional force when viewed in the broader context of founding-era law enforcement institutions. The founding generation routinely asked citizens to participate in law enforcement and the projection of public force through multiple mechanisms:

- The grand jury system, which empowered citizen jurors to authorize prosecutions, and the petit jury, which allowed citizens to render verdicts about the legality of a defendant's conduct;[4]

- The citizen militia, which could be called on both to protect the community and also to "execute the Laws of the Union";[5]

- The system of "privateers," through which Congress could license private vessels to supplement government naval forces;[6]

---

[4] Beck, *Neglected History*, *supra*, at 1315 & n.518 (citing U.S. Const. art. III, § 2; U.S. Const. amends. V–VII).

[5] *Id.* at 1315 & n.519 (quoting U.S. Const. art. I, § 8; citing Jason Mazzone, *The Commandeerer in Chief*, 83 Notre Dame L. Rev. 265, 306 (2007)).

[6] *Id.* at 1315 & nn.520-21 (quoting U.S. Const. art. I, § 8; Jenny E. Carroll, *Nullification as Law*, 102 Geo. L.J. 579, 587 (2014); Nicholas Parrillo, *The De-Privatization of American Warfare: How the U.S. Government Used, Regulated, and Ultimately Abandoned Privateering in the Nineteenth Century*, 19 Yale J.L. & Human. 1, 8-11 (2007)).

- Popular actions against public officials, through which citizens could enforce legal duties even when government prosecutors declined to act.[7]

These institutions reflected a sophisticated Founding-era understanding that citizen participation in law enforcement could serve not only to extend the government's enforcement reach beyond its practical ability, but also as a check on governmental power. The Founders recognized that effective law enforcement often required supplementing official resources with private initiative. At the same time, they understood that empowering citizens to participate in law enforcement could help prevent official abuse or neglect of duty.

## B.  This Understanding Was Reflected In Framing-Era State Constitutional Practice.

The treatment of qui tam legislation under state constitutions in the decade before the federal Convention is further compelling evidence that early Americans understood qui tam enforcement as compatible with executive authority. *McDonald v. City of Chicago*, 561 U.S. 742, 768-77 (2010) (considering state practices and historical context to determine

---

[7] *See id.* at 1314-15 & nn.514-15 (quoting 3 Blackstone *160).

incorporation of the Second Amendment through the Fourteenth Amendment); *District of Columbia v. Heller*, 554 U.S. 570, 592-95 (2008) (examining historical practices of individual States before and after the adoption of the Constitution to interpret the scope of the Second Amendment); *Duncan v. Louisiana*, 391 U.S. 145, 152-55 (1968) (relying on historical practices of States to determine incorporation of the Sixth Amendment right to a jury trial).

Three states—Pennsylvania, New York, and Vermont—had constitutional provisions requiring executive officials to "take care" to ensure faithful execution of the laws, provisions that served as models for the federal Constitution's Take Care Clause. *See* Beck, *Article II*, *supra*, at 10, 20, 27. Pennsylvania's Constitution of 1776 vested "supreme executive power" in "a president and council," and instructed them to "take care that the laws be faithfully executed." *Id.* at 10-11 & nn.76, 88.[8] Similarly, New York's Constitution of 1777 vested "supreme executive power, and authority" in "a governor" and required him "to take care that

_____

[8] The Constitution of the Commonwealth of Pennsylvania (1776), ch. II, §§ 3, 20.

the laws are faithfully executed." *Id.* at 20 & nn.162, 170.[9] Vermont followed Pennsylvania's model in its 1777 Constitution, directing the Governor and Council "to take care that the laws be faithfully executed." *Id.* at 28 & n.240.[10]

Notwithstanding these constitutional directives, the Pennsylvania General Assembly enacted numerous qui tam statutes in the decade before the federal Convention. One early statute authorized qui tam suits against "overseers of the poor" who failed to properly advertise elections of justices of the peace, reflecting a legislative judgment that popular enforcement was appropriate for monitoring election-related duties in remote areas. Beck, *Article II*, *supra*, at 11 & n.90.[11] A few months later, the Pennsylvania legislature authorized qui tam actions against election judges, inspectors, and other officials who neglected their duties in General Assembly elections. *Id.* at 12 & nn.98-99.[12] Pennsylvania also employed qui tam enforcement to protect veterans, allowing informers to sue anyone who contracted to take an assignment of pension benefits

_____

[9] The Constitution of the State of New York, §§ 17, 19 (1777).
[10] Constitution of the State of Vermont, ch. II, § 18 (1777).
[11] PA Laws, 1st General Assembly, ch. 4, § 6, at 16-17 (Feb. 5, 1777).
[12] PA Laws, 1st General Assembly, ch. 22, § 21 (June 14, 1777).

awarded to injured Revolutionary War soldiers and sailors. *Id.* at 12-13 & nn.102-03.[13] Another wartime statute permitted qui tam suits against individuals who refused constitutionally required loyalty oaths or traveled without authorization to areas under British control. *Id.* at 13 & nn.106-08.[14]

Beyond the election-related provisions and wartime measures discussed above, the Pennsylvania General Assembly enacted numerous qui tam statutes regulating commercial activities vital to the new State's economy. For instance, to ensure the quality of exported flour and bread—key commodities for interstate and foreign trade—the legislature imposed qui tam forfeitures on public inspectors who sought to sell or trade in the goods they were responsible for regulating. Beck, *Article II*, *supra*, at 13-14 & n.112.[15] The Pennsylvania legislature similarly authorized qui tam actions against "corders of wood" who attempted to

---

[13] PA Laws, 1st General Assembly, ch. 28, at 84 (Sept. 18, 1777).

[14] PA Laws, 2d General Assembly, ch. 61, §§ 3, 5-6 (Apr. 1, 1778).

[15] PA Laws, 6th General Assembly, ch. 3, § 3 (Dec. 28, 1781). A subsequent law appeared to allow common informers to work alongside public officials to enforce rules against misbranding flour for export. Beck, *Article II*, *supra*, at 14 & n.112 (citing PA Laws, 8th General Assembly, ch. 158, § 3 (Sept. 15, 1784)).

purchase firewood for resale while serving as regulatory officials. *Id.* at 14 & n.119.[16]

The legislature also used qui tam provisions to enforce laws relating to the operation of Philadelphia's port facilities. A ship's master who continued to occupy a public wharf more than 24 hours after being asked to vacate faced a £100 forfeiture, "half to him who will sue for the same." Beck, *Article II*, *supra*, at 14 & n.113.[17] The lighthouse keeper for Cape Henlopen near Philadelphia could be sued for up to £250 for neglect of duty, with half the recovery going to the informer. *Id.* at 14 & n.115.[18] When authorizing construction of a toll bridge in Lancaster County, the Assembly included qui tam enforcement of restrictions on toll rates. *Id.* at 14 & n.114.[19]

The widespread authorization of qui tam actions was viewed as entirely consistent with the shared separation of powers principles of the Pennsylvania and U.S. Constitutions. Pennsylvania's Council of Censors, specifically charged with investigating "whether the constitution has

---

[16] PA Laws, 8th General Assembly, ch. 147, § 7 (Apr. 18, 1784).
[17] PA Laws, 8th General Assembly, ch. 147, § 10 (Apr. 18, 1784).
[18] PA Laws, 12th General Assembly, ch. 421, § 33 (Oct. 4, 1788).
[19] PA Laws, 11th General Assembly, ch. 362, § 4 (Sept. 22, 1787).

been preserved inviolate in every part" and "whether the legislative and executive branches of government have performed their duty as guardians of the people," issued comprehensive reports identifying numerous separation of powers violations by the legislative and executive branches. Beck, *Article II*, *supra*, at 17 & nn.134-35.[20] Despite this searching review, the Council never questioned the frequent enactment of qui tam provisions just described. This silence speaks volumes given the Council's willingness to condemn even minor deviations from proper separation of powers among the governmental branches. *See id.* at 17-18 & nn.139-41 (noting the Council's criticism of legislature for addressing land titles and dissolving marriages as intrusions upon the judiciary, and for recommending pardons and ordering the release of a prisoner as intrusions on the executive function).

New York's practice under its Take Care Clause evinces the same understanding. In 1778, less than a year after adopting its constitution vesting "supreme executive power" in the Governor and requiring him to

---

[20] The Constitution of the Commonwealth of Pennsylvania (1776), ch. II, § 47; Journal of the Second Session of the Council of Censors 134ff (Aug. 30, 1784) (legislative branch); *id*. at 165ff (Sept. 18, 1784) (executive branch).

ensure faithful execution of the laws, New York enacted election legislation expressly authorizing qui tam suits against election officials without requiring the Attorney General's consent. Beck, *Article II*, *supra*, at 21 & nn.171-74.[21] This provision allowing informers to bypass the State's chief law enforcement officer would have squarely presented any constitutional tension between qui tam enforcement and executive authority. Yet there is no evidence that Governor George Clinton, who could review legislation as part of the Council of Revision, raised any constitutional objection. *Id.* at 21.

The New York legislature later enacted extensive qui tam legislation regulating commercial activities, public health and safety measures, and the conduct of government officials. Beck, *Article II*, *supra*, at 21-27 & nn.177-226. Like Pennsylvania's practice, New York's extensive qui tam legislation belies any notion that such provisions were viewed as constitutionally suspect. The New York legislature deployed qui tam enforcement as a central mechanism for implementing commercial regulations, including an ambitious system of wage and price

---

[21] NY Laws, 1st Sess., chs. 16, 34, 36 (Mar. 27, 1778).

controls adopted in 1778. *Id.* at 22 & nn.180-83.[22] Informers could collect forfeitures from tavernkeepers and innholders who charged excessive prices for food, lodging, and liquor; from unlicensed liquor retailers; and from innkeepers who failed to maintain statutorily required accommodations for travelers. *Id.* at 23 & nn.187-89.[23]

The New York legislature also authorized qui tam suits against those who exported grain or flour without a license, constructed substandard flour casks, or worked as hawkers and peddlers. Beck, *Article II*, *supra*, at 23 & nn.190-92.[24] Qui tam provisions enforced duties on imports, regulated ferry operations between specific counties, and policed interest-rate restrictions. *Id.* at 23 & nn.194-96.[25] Particularly notable was legislation declaring goods from British ships "contraband"

---

[22] NY Laws, 1st Sess., Preamble & chs. 34, 74 (Apr. 3, 1778).

[23] NY Laws, 2d Sess., ch. 17, at 111 (Mar. 2, 1779); NY Laws, 3d Sess., ch. 40, at 207 (Feb. 21, 1780); *see also* NY Laws, 4th Sess., ch. 27, at 344 (Mar. 14, 1781).

[24] NY Laws, 3d Sess., ch. 21, at 166 (Oct. 20, 1779); NY Laws, 1st Sess., ch. 10, at 19 (Mar. 14, 1778); NY Laws, 3d Sess., ch. 41, § VII (Feb. 26, 1780); NY Laws, 4th Sess., ch. 39 (Mar. 26, 1781); NY Laws, 8th Sess., ch. 54 (Apr. 4, 1785).

[25] NY Laws, 7th Sess., ch. 10, at 604 (Mar. 22, 1784); NY Laws, 8th Sess., ch. 7, at 16 (Nov. 18, 1784); NY Laws, 10th Sess., ch. 81, at 517-18 (Apr. 11, 1787); NY Laws, 8th Sess., ch. 46, at 92-93 (Mar. 31, 1785); NY Laws, 10th Sess., ch. 13, at 365-66 (Feb. 8, 1787).

and authorizing "any person or persons whatsoever" to seize such goods—a dramatic example of enlisting private citizens to enforce public policy. *Id.* at 24 & nn.202-03.[26]

Vermont's General Assembly likewise made extensive use of qui tam legislation while operating under a constitution requiring faithful execution of the laws. In a single month in 1779, Vermont enacted over a dozen different qui tam statutes regulating matters ranging from charitable solicitations to gaming. Beck, *Article II*, *supra*, at 28-29 & nn.241-56. These included forfeitures enforceable by common informers against those who: hindered county surveyors in performing their duties;[27] charged excessive ferry rates;[28] used unauthorized currency;[29] killed deer outside hunting season;[30] obstructed fish migration;[31]

---

[26] NY Laws, 6th Sess., ch. 9, at 509 (July 22, 1782).
[27] Laws of Vermont Passed During the Session of the General Assembly February 11—February 26, 1779, at 80-81 (Feb. 17, 1779).
[28] *Id.* at 88-89 (Feb. 20, 1779).
[29] *Id.* at 93, 95-96 (Feb. 20, 1779).
[30] *Id.* at 109 (Feb. 20, 1779).
[31] *Id.* at 127-28 (Feb. 23, 1779).

operated lotteries;[32] and served as clerk at a proprietors' meeting but neglected statutory duties.[33]

Vermont's experience is particularly probative, because in 1786, the State adopted a new constitution that not only maintained its Take Care Clause but added an explicit separation-of-powers provision declaring that "[t]he legislative, executive and judiciary departments shall be separate and distinct, so that neither exercise the powers properly belonging to the other." Beck, *Article II*, *supra*, at 32 & n.278.[34] If qui tam legislation represented an unconstitutional transfer of executive power to private parties, this new provision should have restricted such statutes. Instead, Vermont's legislature continued to enact qui tam provisions at a vigorous pace—passing over a dozen additional qui tam statutes in February and March 1787 alone. *Id.* at 33-34 & nn.287-303.

These consistent practices in States operating under conditional Take Care Clauses are particularly significant because they represent the "construction placed upon the constitution by [those] who were

_____

[32] *Id.* at 153 (Feb. 15, 1779).
[33] *Id.* at 122-23 (Feb. 23, 1779).
[34] Constitution of the State of Vermont, ch. II, § 6 (1786).

contemporary with its formation, many of whom were members of the convention which framed it," which "is itself entitled to very great weight." Beck, *Article II*, *supra*, at 3 n.25 (quoting *Burrow-Giles Lithographic Co. v. Sarcony*, 111 U.S. 53, 57 (1884)). When "the rights thus established" by contemporaneous construction "have not been disputed during a period of nearly a century, it is almost conclusive." *Sarcony*, 111 U.S. at 57.

The breadth of qui tam legislation enacted by these States powerfully demonstrates that early Americans saw popular enforcement as fully compatible with constitutional provisions requiring faithful execution of the laws. Rather than viewing qui tam statutes as a threat to executive authority, state legislatures deployed them as valuable tools for ensuring compliance with legal requirements across diverse contexts. This consistent practice across multiple States—including States that were particularly attentive to separation-of-powers principles—provides compelling evidence that the federal Take Care Clause was not understood to preclude qui tam legislation.

Indeed, given that many members of the First Congress had participated in state government under these very constitutional

provisions, their ready embrace of federal qui tam legislation is unsurprising. They understood from direct experience that qui tam enforcement complemented rather than conflicted with the executive authority provided in early state constitutions and adopted in the U.S. Constitution, as further explained below.

### C. The First Congress Extensively And Strategically Enacted Qui Tam Provisions That President Washington Signed Into Law.

The extensive and strategic use of qui tam legislation by the First Congress provides compelling evidence that the Founders did not understand Article II to preclude popular enforcement through qui tam actions. As further explained below, for example, "[p]rovision for popular enforcement was common when Congress sought to regulate decentralized activity … that might take place in remote areas outside the view or reach of federal officials." *See* Beck, *TransUnion, Vermont Agency*, *supra*, at 29.

The actions of "the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, is contemporaneous and weighty evidence of its true meaning." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (cleaned up); *see*

*Printz v. United States*, 521 U.S. 898, 905 (1997) (same). Members of the First Congress knew well how to raise and debate constitutional questions, yet "[s]o far as we know, the [Founding-era qui tam] statutes were signed without objection by early Presidents and applied in judicial proceedings without anyone raising a constitutional issue under Article II." Beck, *TransUnion, Vermont Agency*, *supra*, at 58-59. Congress repeatedly authorized qui tam suits against federal officers without requiring appointment of the informers, and the bills were signed into law by President Washington.

The Collection Act of 1789 authorized qui tam actions against customs officers who failed to take required oaths or post accurate fee schedules. Beck, *Neglected History*, *supra*, at 1294 & nn.384-87.[35] The statute placed enforcement power directly in the hands of any private informer, without appointment or supervision by the Executive. When Congress overhauled the customs system the following year, imposing

_____

[35] An Act to Regulate the Collection of the Duties Imposed by Law on the Tonnage of Ships or Vessels, and on Goods, Wares and Merchandises Imported into the United States, ch. 5, §§ 8, 29, 38, 1 Stat. 29 (1789).

new duties on domestic products, it *expanded* qui tam authority against revenue officials. *Id.* at 1295-96 & nn.393-96.[36]

Similarly, the 1790 census legislation authorized qui tam suits against federal marshals and their assistants for failing to perform census duties—again without any appointment requirement. Beck, *Neglected History*, *supra*, at 1298-1300 & nn.412-16.[37] The Treasury Act subjected federal fiscal officers to qui tam enforcement. *Id.* at 1300-02 & nn.418-22.[38] And in legislation debated in the First Congress and passed by the Second, postal workers faced qui tam actions for mishandling mail, again without any suggestion that informers needed appointment. *Id.* at 1302-04 & nn.440-49.[39]

These early qui tam provisions complimented rather than undermined executive enforcement. The First Congress's use of qui tam

---

[36] An Act to Provide More Effectually for the Collection of the Duties Imposed by Law on Goods, Wares and Merchandise Imported into the United States, and on the Tonnage of Ships or Vessels, ch. 35, §§ 1, 5, 55, 1 Stat. 145 (1790).

[37] An Act Providing for the Enumeration of the Inhabitants of the United States, ch. II, §§ 1-3, 1 Stat. 101 (1790).

[38] An Act to Establish the Treasury Department, ch. 12, §§ 1, 8, 1 Stat. 65 (1789).

[39] An Act to Establish the Post-Office and Post Roads Within the United States, ch. 7, 1 Stat. 232 (1792).

legislation was far from haphazard. Rather, the First Congress evaluated where popular enforcement would most effectively ensure compliance with federal law, particularly in contexts where exclusive reliance on centralized presidential oversight would prove impractical or inadequate.

The Collection Act of 1789 exemplifies this strategic approach. In establishing the customs service, Congress faced the challenge of ensuring legal compliance by officers scattered throughout the nation's ports. While the Act generally relied on public enforcement against private parties, Congress authorized qui tam actions to enforce two crucial requirements for customs officers: taking required oaths of office and posting accurate lists of fees. Beck, *Neglected History*, *supra*, at 1291-92. This selective deployment of qui tam enforcement reflected Congress's judgment about effective oversight mechanisms, confirmed by Treasury Secretary Alexander Hamilton's later observation that "[d]istance, and the multiplicity of avocations," made it impossible for central authorities to adequately monitor these widely dispersed officials. *Id.* at 1294 & n.390.[40]

---

[40] Report of the Secretary of the Treasury (April 23, 1790), *in* 4 Documentary History of the First Federal Congress of the United States

The challenges of monitoring geographically distributed federal activities also explain Congress's decision to include qui tam provisions in the 1790 census legislation. Beck, *Neglected History*, *supra*, at 1299-1300. The law authorized informers to collect forfeitures from federal marshals who failed to file census returns and from census assistants who made false returns. *Id.* at 1300 & n.416.[41] Given the nationwide scope of the census and the difficulty of detecting violations through centralized oversight, qui tam enforcement provided a crucial supplement to presidential supervision.

The First Congress displayed similar strategic judgment in regulating Treasury officials. As noted above, the initial statute organizing the Treasury Department authorized informer suits to enforce conflict-of-interest restrictions and prevent misuse of public funds. Beck, *Neglected History*, *supra*, at 1301 & n.418-21.[42] Later legislation establishing the First Bank of the United States likewise included qui

––––––––––––––––––

of America 4 March 1789–3 March 1791, at 456 (Johns Hopkins Press 2004).

[41] An Act Providing for the Enumeration of the Inhabitants of the United States, ch. II, § 3, 1 Stat. 101 (1790).

[42] An Act to Establish the Treasury Department, ch. 12, §§ 1, 8, 1 Stat. 65 (1789).

tam provisions to enforce limitations on lending to the government. *Id.* at 1301-02 & nn.425-28.[43] While these Treasury officials operated from the seat of government rather than dispersed locations, qui tam enforcement helped counter the unique conflicts of interest that could arise in handling public funds.

Throughout these statutes, we see the First Congress making nuanced judgments about where qui tam enforcement would most effectively supplement presidential oversight.[44] Congress authorized qui tam suits where:

---

[43] An Act to Incorporate the Subscribers to the Bank of the United States, ch. 10, §§ 8-9, 1 Stat. 191 (1791).

[44] The regulation of trade with Native American tribes and of postal workers by the Second Congress further demonstrates Congress's careful deployment of qui tam provisions during the Founding Era. The Second Congress's Act to Regulate Trade and Intercourse with Indian Tribes, ch. 19, 1 Stat. 329 (1793), authorized qui tam suits against federal agents who had conflicts of interest in trading with tribes, *id.* § 12. And as noted *supra* p.24, the Second Congress's Act to Establish the Post-Office and Post Roads Within the United States, ch. 7, 1 Stat. 232 (1792), authorized qui tam suits against postal employees for a range of misconduct, including demanding unauthorized fees, mishandling letters, and embezzlement.

- official duties were performed far from central oversight, as with customs officers and census workers, Beck, *Neglected History*, *supra*, at 1291-1300;

- the regulated conduct was inherently difficult to detect through ordinary supervision, *id.* at 1302-04;

- public confidence required assurance that the law would be enforced, as with Treasury officials handling public funds, *id.* at 1300-02; and

- private monitoring could counter conflicts of interest and prevent self-dealing, as with officials managing trade with Native American tribes, *id.* at 1304-05.

This pattern of legislative judgment, carefully selecting contexts where qui tam enforcement would be most valuable, strongly suggests the First Congress did not view the Take Care Clause as imposing any constitutional barrier to qui tam legislation. Instead, Congress saw qui tam provisions as one of several tools available to ensure faithful execution of the laws—a tool particularly useful where exclusive reliance on presidential oversight would prove inadequate. President Washington's acceptance of these measures, coupled with Treasury

Secretary Hamilton's recognition of the need to extend oversight beyond direct presidential supervision, confirms that the founding generation viewed qui tam enforcement as enhancing rather than undermining the Executive's ability to ensure faithful execution of the laws. As explained by Appellants, Congress enacted and amended the FCA to recover defrauded funds for the same strategic reasons.

## II. This Historical Evidence Resolves Both Constitutional Objections.

The historical evidence settles any question that qui tam suits violate the Take Care Clause or Appointments Clause of Article II. As explained, the Supreme Court has recognized that the practices of the First Congress provide "contemporaneous and weighty evidence of the Constitution's meaning." *Printz v. United States*, 521 U.S. 898, 905 (1997) (cleaned up); *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (same). Here, that evidence points in one direction: The Founders understood qui tam suits as fully compatible with the President's Article II duty to faithfully execute the laws. The historical understanding of qui tam litigation equally disposes of any suggestion that qui tam relators must be appointed as federal officers under Article II. *Contra* Doc. 346, at 16 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)). Again,

the evidence from the Framing Era speaks with one voice: Qui tam informers were understood to exercise a private right rather than executive power, placing them beyond the scope of the Appointments Clause.

This understanding flows naturally from how early Americans conceived of qui tam litigation. When the First Congress authorized qui tam suits, it was not seen as delegating executive power but creating a private right of action—conceptually analogous to when it authorizes suit by parties who suffer individualized injuries. *See generally* Beck, *TransUnion, Vermont Agency*, *supra*. Thus, when the First Congress authorized this form of private action several times over, no Framing-era authority suggested any contemporaneous view that doing so was inconsistent with the Take Care Clause or Appointments Clause of Article II. *See generally* Beck, *Article II*; Beck, *Neglected History*.

The District Court's decision collides with this historical record. If qui tam suits violated Article II, we would expect to find evidence of constitutional objections from the Founding Era. Instead, we find the opposite: Framing-era state constitutional conventions preserved qui tam authority while strengthening separation of powers; courts and legal

officials like William Bradford treated qui tam litigation as conceptually distinct from exercises of executive authority; and President Washington signed numerous early statutes authorizing qui tam enforcement.

The District Court's conclusion that qui tam relators exercise "significant" and "continuing" "authority" requiring appointment as federal officers imposes a modern theoretical framework that would have been foreign to the Founders. *See* Doc. 346, at 16 (quoting *Buckley*, 424 U.S. at 126). Nothing in the Constitution's text or structure compels that anachronistic result.

Instead, the District Court should have followed the Supreme Court's mode of analysis in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000). In *Vermont Agency*, the Supreme Court embraced the extensive historical evidence that qui tam actions were common at the Founding and considered unobjectionable as "nigh conclusive" that qui tam relators have Article III standing. *See Vermont Agency*, 529 U.S. at 776-78 ("*Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution. ... We think this history well nigh conclusive with respect to the question before us

here: whether *qui tam* actions were 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998))). While the Court reserved judgment on Article II issues, its analysis points toward the same conclusion here—qui tam legislation was compatible with the Appointments Clause as originally understood. *See* Beck, *Neglected History*, *supra*, at 1258-59 (quoting *Vermont Agency*, 529 U.S. at 773-74, 776-78 & nn.6-8).

## CONCLUSION

The District Court should be reversed and the case remanded for further proceedings.

January 15, 2025                    Respectfully submitted,

                                   */s/ Daniel Woofter*
                                   Daniel Woofter
                                     *Counsel of Record*
                                   RUSSELL & WOOFTER LLC
                                   1701 Pennsylvania Ave. NW
                                   Suite 200
                                   Washington, DC 20006
                                   (202) 240-8433

                                   *Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Fed. R. App. P. 29(a)(5). The brief is 6,035 words, excluding the portions exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 29-2. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6) because the brief has been prepared in a proportionally spaced typeface using Office 365 NewCenturySchlbk LT Std 14-point font.

January 15, 2025

/s/ Daniel Woofter
*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on January 15, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

January 15, 2025 /s/ Daniel Woofter
*Counsel for Amicus Curiae*