# In the United States Court of Appeals for the Eleventh Circuit

CLARRISA ZAFIROV,
*Plaintiff-Appellant,*

v.

FLORIDA MEDICAL ASSOCIATES, LLC,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:19-cv-01236-KKM-SPF (The Hon. Kathryn Kimball Mizelle)

## BRIEF OF AMERICAN ASSOCIATION FOR JUSTICE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT

LORI ANDRUS
*President*
JEFFREY R. WHITE
*Senior Associate General Counsel*
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street NW, #200
Washington, DC 20001
(202) 617-5620
*jeffrey.white@justice.org*

MATTHEW W.H. WESSLER
DEEPAK GUPTA
GABRIEL CHESS
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

January 15, 2025

*Counsel for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26(b) and Eleventh Circuit Rule 26.1, *amicus curiae* the American Association for Justice states it is a non-profit organization. It has no parent corporation or publicly owned corporation that owns 10% or more of its stock.

Pursuant to 11th Cir. R. 26.1-3(b), counsel for amicus curiae, the American Association for Justice, certifies that, in addition to those set forth in Plaintiff-Appellant Clarissa Zafirov's brief and Intervenor-Appellant United States of America's brief, the following persons and entities may have an interest in the outcome of this appeal:

1. The American Association for Justice (AAJ);

2. Lori Andrus;

3. Jeffrey White;

4. Gupta Wessler LLP;

5. Matthew W.H. Wessler;

6. Deepak Gupta;

7. and Gabriel Chess.


Dated: January 15, 2025

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

# TABLE OF CONTENTS

Certificate of interested persons and corporate disclosure statement ........................ i

Table of citations ................................................................................................. iii

Interest of amicus curiae ....................................................................................... 1

Introduction & summary of argument .................................................................. 1

Statement of the issue ........................................................................................... 5

Argument .............................................................................................................. 5

Conclusion ........................................................................................................... 14

# TABLE OF CITATIONS

## Cases

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)............................................................... 4

*Cooper Industries v. Leatherman Tool Group,*
    532 U.S. 424 (2001) ............................................................. 3

*Davis v. Passman,*
    442 U.S. 228 (1979) ........................................................ 8, 10

*Department of Revenue of Montana v. Kurth Ranch,*
    511 U.S. 767 (1994) ............................................................ 13

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
    528 U.S. 167 (2000) ..................................................... 3, 13, 14

*Graham v. Florida,*
    560 U.S. 48 (2010)............................................................. 11

*Grogan v. Garner,*
    498 U.S. 279 (1991) ........................................................... 13

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983)........................................................... 13

*In re Enron Corporation Securities, Derivative & "ERISA" Litigation,*
    2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ...........................2

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation,*
    2024 WL 1014159 (E.D.N.Y. March 8, 2024) ...........................2

*International Brotherhood of Elecrical Workers v. Foust,*
    442 U.S. 42 (1979) ........................................................ 11, 13

*Newman v. Piggie Park Enterprises, Inc.,*
    390 U.S. 400 (1968) .........................................................4, 9

*North Carolina Shellfish Growers Association v. Holly Ridge Associates, L.L.C.,*
    200 F. Supp. 2d 551 (E.D.N.C. 2001) ................................... 14

*Pacific Mutual Life Insurance Co. v. Haslip,*
   499 U.S. 1 (1991) ...........................................................12, 13

*S.E.C. v. Morgan Keegan & Co.,*
   678 F.3d 1233 (11th Cir. 2012) ....................................... 11

*SEC v. Jarkesy,*
   603 U.S. 109 (2024) ......................................................... 13

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020) ......................................................... 11

*Steel Co. v. Citizens for a Better Environment,*
   523 U.S. 83 (1998) ........................................................... 14

*Sullivan v. Louisiana,*
   508 U.S. 275 (1993) ......................................................... 13

*Tony & Susan Alamo Foundation v. Secretary of Labor,*
   471 U.S. 290 (1985) ........................................................... 4

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537 (1943) ........................................................... 6

*Vermont Agency of Natural Resources v. United States ex rel. Stevens,*
   529 U.S. 765 (2000) ..................................................3, 4, 14

## Statutes

11 U.S.C. § 362 .......................................................................12

12 U.S.C. § 3417.....................................................................12

15 U.S.C. § 15 ........................................................................10

15 U.S.C. § 168m....................................................................12

15 U.S.C. § 77t .......................................................................10

15 U.S.C. § 78u .......................................................................10

15 U.S.C. § 78u-4 ...................................................................10

15 U.S.C. § 80b-9....................................................................10

15 U.S.C. § 9 ...................................................................... 10

18 U.S.C. § 1964 ................................................................. 10

18 U.S.C. § 2333 ................................................................. 10

18 U.S.C. § 2339 ................................................................. 10

18 U.S.C. § 2520 ................................................................. 12

26 U.S.C § 7431 .................................................................. 12

28 U.S.C. § 1605A ............................................................... 12

31 U.S.C. § 3730 .............................................................. 9, 10

33 U.S.C. § 1365 ................................................................. 13

42 U.S.C. § 11046 ............................................................... 14

42 U.S.C. § 1981a ............................................................... 12

42 U.S.C. § 300aa-23 ........................................................... 12

42 U.S.C. § 3612 ................................................................. 12

42 U.S.C. § 3613 ................................................................. 12

42 U.S.C. § 7604 ................................................................. 14

49 U.S.C. § 20109 ............................................................... 12

## Other Authorities

Evan Caminker,
  Comment, *The Constitutionality of Qui Tam Actions*,
  99 Yale Law Journal 341 (1989)................................... 6, 7, 8

J. Maria Glover,
  *The Structural Role of Private Enforcement Mechanisms in Public Law*,
  53 William & Mary Law Rev. 1137 (2012)........................ 6, 9

Margaret H. Lemos,
  *Special Incentives to Sue*, 95 Minnesota Law Review 782 (2011)............................ 8, 9

Maryam Jamshidi,
  *The Private Enforcement of National Security*,
  108 Cornell Law Review 739 (2023) ................................................................. 6, 7

Michael Rustad & Thomas Koenig,
  *The Historical Continuity of Punitive Damages Awards: Reforming the Tort*
  *Reformers*, 42 American University Law Review 1269 (1993) ................................ 11

Stephen Burbank et al.,
  *Private Enforcement*, 17 Lewis & Clark Law Review 637 (2013) ........................... 7, 9

Zachary D. Clopton,
  *Redundant Public-Private Enforcement*, 69 Vanderbilt Law Review 285 (2016) ......... 10

## INTEREST OF AMICUS CURIAE[1]

The American Association for Justice is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions. In doing so, AAJ members regularly pursue remedies on behalf of their clients under statutory schemes through which Congress has enlisted private plaintiffs to supplement government enforcement efforts. Throughout its 78-year history, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct.

## INTRODUCTION & SUMMARY OF ARGUMENT

If upheld, the district court's erroneous interpretation of the Appointments Clause—and its unprecedented view that the False Claims Act is unconstitutional—could have potentially extraordinary consequences. The FCA is far from the only federal law that permits private plaintiffs to bring claims with, as the district court

---

[1] All parties consent to the filing of this brief, and no counsel for any party authored it in whole or in part. Apart from the amicus curiae, no person, party, or party's counsel contributed money intended to fund the brief's preparation and submission.

describes, "substantial consequences to members of the public." Dkt. 346 at 31. And those private plaintiffs regularly "prosecute [their] action[s] to final judgment however [they] choose[], including litigating appeals that can become binding precedent on the government." *Id.* at 20. Nor is the FCA unusual in granting private plaintiffs the power to "secure essentially punitive penalties." *Id.* at 21.[2]

Instead, the U.S. Code includes many statutes that work in just this way. Congress routinely creates private rights of action and encourages private plaintiffs to "supplement" executive enforcement efforts by bringing claims. U.S. Br. 7. And there are countless federal laws authorizing private plaintiffs to seek punitive damages or civil penalties, two categories of damages that are not compensatory, but instead are "essentially punitive." Dkt. 346 at 21. Indeed, laws with either or both of these features have long been used to address issues of huge public importance— from the Enron scandal, to Visa and Mastercard's anticompetitive swipe fees, and more. *See In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008); *In re Payment Card Interch. Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159 (E.D.N.Y. March 8, 2024).

The FCA's qui tam scheme is in keeping with these ordinary enforcement mechanisms deployed by Congress to ensure compliance with federal law. Indeed,

---

[2] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout.

the authorization of qui tam actions has a "long tradition" as one of the quintessential methods available to Congress. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000); Zafirov Br. 21–25 (documenting historical tradition). The ordinary nature of the qui tam action is one reason why no court, to our knowledge, has in the more than 160 years since Congress enacted the FCA held that it violates Article II of the Constitution.

Qui tam lawsuits share several characteristics with other unremarkable enforcement tools deployed by Congress. *First*, qui tam suits have much in common with every other kind of suit in which private plaintiffs avail themselves of a private right of action to address ongoing violations of federal law. Those lawsuits, like qui tam actions, complement executive branch enforcement. *Second*, Congress regularly authorizes private plaintiffs to seek punitive damages. These damages "operate as private fines," and plaintiffs who seek them aid the executive branch in "punish[ing] reprehensible conduct" and "deter[ring] its future occurrence." *Cooper Indus. v. Leatherman Tool Grp.*, 532 U.S. 424, 432 (2001). *Third*, Congress has authorized private plaintiffs to seek civil penalties that, if recovered, must be paid to the United States Treasury. In those statutory schemes, like in the FCA, private plaintiffs help to "deter future violations" of federal law. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

The district court, however, dismissed the relevance of these analogous enforcement schemes, reasoning that, unlike plaintiffs "seeking reparation for private harms," FCA plaintiffs "seek to redress a wrong to the public as a whole." Dkt. 346 at 28. But the Supreme Court has already explained that FCA plaintiffs *do* have an interest in bringing qui tam actions—that's why they have Article III standing. *See Stevens*, 529 U.S. at 772–73, 777–78. And private plaintiffs who bring claims under these analogous enforcement schemes likewise often "seek to redress [] wrong[s] to the public as a whole." *Contra* Dkt. 346 at 28. For instance, those who bring claims under the Civil Rights Act of 1964 "vindicat[e] a policy that Congress considered of the highest priority" and "advance the public interest," *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402 (1968); those who sue under the Securities and Exchange Act of 1934 aid Congress in its aim to "implement[] a philosophy of full disclosure" that ensures functioning stock markets, *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988); and those who seek to enforce the Fair Labor Standards Act help ameliorate "a general downward pressure on wages in competing businesses" that results if any one employer fails to comply with the Act. *Tony & Susan Alamo Found. v. Sec. of Lab.*, 471 U.S. 290, 302 (1985).

Because the district court's distinctions between the FCA and these other statutory schemes don't hold up, its reasoning would threaten all three of these common enforcement devices. But it simply is not the case that—unbeknownst to

everyone—vast swaths of the U.S. Code violate the Appointments Clause. Just the opposite. None of these enforcement schemes implicate that constitutional provision because private plaintiffs are not government officers, do not exercise significant government authority, and do not occupy a continuing position established by law. *See* U.S. Br. 22–32; Zafirov Br. 36–41. Because the same is true of FCA relators, the view of every other court to address the question is the right one: the FCA does not violate the Appointments Clause.

## STATEMENT OF THE ISSUE

Whether the district court erred by holding that the qui tam provisions of the False Claims Act—which were enacted in 1863, have been invoked in over 15,000 cases, and have been universally upheld by other federal courts—violate the Appointments Clause of Article II of the Constitution.

## ARGUMENT

As Dr. Zafirov and the government both point out, the district court's decision has potentially wide-reaching implications. *See* Zafirov Br. 38–40; U.S. Br. 16–17. That's because the FCA's qui tam provision has much in common with run-of-the-mill enforcement schemes regularly enacted by Congress. Congress frequently enacts laws that: (1) include private rights of action and encourage citizen suits; (2) authorize private plaintiffs to seek punitive damages; or (3) grant private plaintiffs the authority to seek civil penalties payable to the United States Treasury. None of those

enforcement schemes violate the Appointments Clause. And the FCA's similarity to each of these recurring statutory enforcement tools confirms that the FCA doesn't violate the Appointments Clause, either.

**1. *Citizen suits.*** The American legal system has always relied on private enforcement as a crucial method of securing compliance with public laws. *See* J. Maria Glover, *The Structural Role of Private Enforcement Mechanisms in Public Law*, 53 Wm. & Mary L. Rev. 1137, 1145–53 (2012) (collecting literature documenting the "history of the role of private enforcement in the American regulatory state"). "In the nineteenth century, for example, private parties often brought civil suits on behalf of the federal government and even pursued criminal prosecutions as 'private prosecutors.'" Maryam Jamshidi, *The Private Enforcement of National Security*, 108 Cornell L. Rev. 739, 750–51 (2023). In the twentieth century, Congress regularly sought the assistance of private enforcement by passing laws that include private rights of action. *See id.* at 751.

Congress has used various means when deploying private citizens to "supplement[] executive branch enforcement of Federal statutes." Evan Caminker, Comment, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. 341, 342 (1989). One is the qui tam action. "[Q]ui tam actions were routinely authorized by the First and subsequent early Congresses." *Id.*; *see also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943) ("Statutes providing for actions by a common informer, who

himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government."). Another is the authorization of "citizen suits" by way of statutory private rights of action. *See* Caminker, *supra*, at 342–43.

Between 1947 and 2002, around one quarter of the "enforcement regimes" passed by Congress authorized these private lawsuits. Stephen Burbank et al., *Private Enforcement*, 17 Lewis & Clark L. Rev. 637, 685–86 (2013).[3] Congress has made use of these private enforcement regimes across "a virtually limitless array of policy areas, from areas such as anti-discrimination law (employment, housing, education, access to public facilities, etc.) through banking regulation, consumer protection, environmental protection, labor relations, occupational safety, and public health." *Id.* at 685. Congress has even relied on private lawsuits to enforce vital national security laws. *See* Jamshidi, *supra*, at 743–44. And the Supreme Court has blessed these run-of-the-mill statutes, explaining that "[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these

---

[3] This article includes empirical research on Congress' reliance on private enforcement. The authors reviewed laws passed in the relevant period that included "regulatory provisions (defined broadly to mean mandatory commands/prohibitions)," and then further classified laws based on their distinctive "enforcement regimes"—defined as "distinct sets of regulatory commands within the law governed by distinct enforcement provisions." Burbank et al., *supra*, at 686–87.

rights and obligations, to determine in addition, who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 240 (1979).

The "citizen suits" Congress authorizes when it enacts private rights of action share key characteristics with the qui tam actions authorized by the FCA. These similarities are unsurprising: "From Congress' perspective, qui tam statutes and the more familiar citizens' suit provisions serve the same purpose: Both are designed to encourage private citizens to help the executive branch deter and redress violations of Federal law." Caminker, *supra*, at 344. It therefore makes sense that Congress would deploy similar design features to achieve that common end. Consider a few of the commonalities:

**a.** ***Fee-shifting provisions*:** Merely authorizing private enforcement does not guarantee that private plaintiffs will bring claims. *See* Margaret H. Lemos, *Special Incentives to Sue*, 95 Minn. L. Rev. 782, 789–90 (2011). "[F]ew individuals can sue successfully without the help of an attorney, and few can afford to pay an attorney out of pocket." *Id.* at 790. When authorizing private enforcement, Congress has therefore regularly "carved out exceptions from the American rule for attorney's fees so that successful plaintiffs need not dig into their winnings in order to fund their representation." *Id.* at 790–91.

Between 1887 and 2004, Congress enacted 275 statutes containing these sorts of fee-shifting provisions. *Id.* at 791. Nearly three-quarters of the federal laws authorizing

private enforcement include these provisions. *See* Burbank et al., *supra*, at 686. The FCA likewise awards prevailing qui tam relators reasonable attorneys' fees. *See* 31 U.S.C. § 3730(d)(1)–(2). The fee-shifting provisions common to all of these actions reflect Congress' judgment that private enforcement is needed "to promote compliance with federal law." Lemos, *supra*, at 793; *see, e.g.*, *Newman*, 390 U.S. at 401-02 (explaining that Congress enacted a fee-shifting provision in the Civil Rights Act of 1964 because a plaintiff bringing an action under the Act "vindicat[es] a policy that Congress considered of the highest priority").

These fee-shifting provisions, alongside other "enforcement incentives," Glover, *supra*, at 1151, have worked in encouraging private enforcement. For instance, between 2000 and 2010, private parties brought 98-percent of employment discrimination suits. *See id.* at 1149–50. Contrary to the district court's suggestion, then, there's nothing noteworthy about the fact that "most FCA actions" are filed by private plaintiffs. Dkt. 346 at 26.

**b. *Concurrent public and private enforcement responsibilities*:** Congress regularly invites private plaintiffs to work alongside the executive branch in enforcing federal law. Indeed, nearly all of the federal laws passed between 1947 and 2002 that include private enforcement mechanisms *also* authorize "government suits and/or administrative sanctions." Burbank et al., *supra*, at 685–87. For instance, the executive branch and private plaintiffs both enforce the Racketeer Influenced

and Corrupt Organizations Act (RICO). *See* 18 U.S.C. § 1964. So too with the antitrust laws, anti-terrorism laws, and securities laws. *See* 15 U.S.C. §§ 9, 15 (Sherman Act); 18 U.S.C. §§ 2333(a), 2339 (Antiterrorism Act); 15 U.S.C. §§ 77t, 78u, 78u-4, 80b-9 (Securities Act of 1933 and Securities Exchange Act of 1934). In reality, "[r]edundant public-private enforcement, in which public and private actors have overlapping authority to enforce the law, is ubiquitous." Zachary D. Clopton, *Redundant Public-Private Enforcement*, 69 Vand. L. Rev. 285, 285 (2016); *see id.* at 291–99 (surveying examples). As the Supreme Court has explained, "statutory rights and obligations are often embedded in complex regulatory schemes, so that if they are not enforced through private causes of action, they may nevertheless be enforced through alternative mechanisms, such as criminal prosecutions or other public causes of actions." *Davis*, 442 U.S. at 241.

The FCA's grant of overlapping enforcement authority to the federal government and private parties falls comfortably within this unremarkable mold. *See* 31 U.S.C. § 3730(a)–(b). The ubiquity of concurrent public and private enforcement authority also sharply undermines the district court's conclusion that the FCA is constitutionally problematic because private plaintiffs litigate cases that result in precedential appellate decisions, "thereby shaping the broader legal landscape for the federal government." Dkt. 346 at 5. That is true of all enforcement regimes that authorize private enforcement. *See, e.g., S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233,

1245 (11th Cir. 2012) (applying the test developed "in a series of *private actions* in which [] plaintiff investors" brought securities fraud claims to an SEC enforcement action).

**2. *Punitive damages.*** "Punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 48 (1979). The availability of punitive damages "provides incentive for plaintiffs to sue in instances where conduct has caused widespread harm." Michael Rustad & Thomas Koenig, *The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers*, 42 Am. U. L. Rev. 1269, 1322–24 (1993) (discussing historical and contemporary functions of punitive damages). When Congress authorizes plaintiffs to seek these damages, it solicits their help in enforcing the law. *See id.* (punitive damages encourage private plaintiffs to serve as "a backup" to government enforcement). And it allows them to seek a remedy that has nothing to do with compensating them for their injuries and everything to do with punishment and deterrence—two paradigmatic functions of executive branch enforcement. *See, e.g.*, *Graham v. Florida*, 560 U.S. 48, 71 (2010) (noting that the "goals of penal sanctions" include "retribution" and "deterrence"); *Seila Law LLC v. CFPB*, 591 U.S. 197, 219 (2020) (describing the power "to initiate criminal investigations and prosecutions" as a "core executive power").

Congress regularly allows plaintiffs to seek punitive damages and perform just this function. *See* U.S. Br. 26 ("Congress routinely provides for punitive remedies."). A handful of examples include the:

- Fair Housing Act, 42 U.S.C. §§ 3612(o)(3), 3613(c);

- Americans with Disabilities Act, 42 U.S.C. § 1981a(a)(2);

- Terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c);

- Fair Credit Reporting Act, 15 U.S.C. § 1681n(a)(2);

- Requirement that the federal government keep tax returns confidential, 26 U.S.C § 7431(c)(1)(B)(ii);

- Automatic stay provision of the bankruptcy code, 11 U.S.C. § 362(k)(1);

- Right to Financial Privacy Act, 12 U.S.C. § 3417(a)(3);

- Wiretap Act, 18 U.S.C. § 2520(b)(2);

- National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-23(d);

- Federal Railroad Safety Act, 49 U.S.C. § 20109(e)(3).

No one thinks Congress violated Article II of the Constitution when it invited private plaintiffs to seek these "quasi-criminal" damages for the purposes of "retribution and deterrence." *Pacific Mut. Life Ins. v. Haslip*, 499 U.S. 1, 19 (1991). The district court, though, reasoned that when private plaintiffs seek "essentially punitive penalties" in qui tam actions they "perform[] a traditional, exclusive function of the

government that is integral to the administration and enforcement of the public law," and therefore are exercising significant executive authority. Dkt. 346 at 21. But if Congress can give private plaintiffs a role in deterring and punishing lawbreaking through punitive damages—damages that "are not compensation for injury," *Foust*, 442 U.S. at 48—it's difficult to see why Congress can't give them the same role via qui tam provisions.[4]

**3. *Civil penalties.*** Civil penalties "generate government revenues … and deter certain behavior." *Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 778 (1994). They are not "designed … solely to restore the status quo," but instead "to punish or deter the wrongdoer." *SEC v. Jarkesy*, 603 U.S. 109, 123 (2024). Nevertheless, several federal laws authorize private plaintiffs to seek these penalties. Citizens enforcing the Clean Water Act, for example, can seek civil penalties. 33 U.S.C. § 1365(a). If imposed, those penalties are payable to the United States Treasury. *See Laidlaw*, 528 U.S. at 175. The same enforcement mechanisms exist in the Clean Air Act and

---

[4] Recognizing that Congress can authorize private plaintiffs to seek punitive damages for the purposes of "retribution and deterrence," *Haslip*, 499 U.S. at 19, does *not* require concluding that Congress could invite private plaintiffs to prosecute criminal cases. The Supreme Court has long delineated between civil cases—even ones involving "severe civil sanctions"—and criminal actions. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90 (1983). That's why the preponderance standard is regularly applied in actions where civil penalties are at stake, but the "beyond a reasonable doubt" standard is constitutionally required in criminal cases. *Compare Grogan v. Garner*, 498 U.S. 279, 288–89 (1991) (collecting civil cases where preponderance standard applies), *with Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (discussing beyond-a-reasonable-doubt requirement).

the Emergency Planning and Community Right-To-Know Act of 1986. 42 U.S.C. § 7604(a), (g); § 11046(c).

In each of these schemes, Congress has tasked private plaintiffs with seeking penalties whose imposition aids the government in securing "faithful execution" of the law. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998). The Supreme Court has held that private plaintiffs who have Article III standing may seek this remedy. *Laidlaw*, 528 U.S. at 185–86.[5] Because the Supreme Court has already held that relators bringing FCA claims have Article III standing, *Stevens*, 529 U.S. at 778, there's therefore nothing remarkable about them seeking civil penalties.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
DEEPAK GUPTA
GABRIEL E. CHESS
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

---

[5] Defendants have occasionally challenged environmental laws authorizing civil penalties on Article II grounds. Courts have consistently rejected these challenges. *See N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs.*, 200 F. Supp. 2d 551, 556 (E.D.N.C. 2001) (collecting cases).

Lori Andrus
Jeffrey R. White
American Association for Justice
777 6th Street NW, #200
Washington, DC 20001
(202) 617-5620
*jeffrey.white@justice.org*

January 15, 2025

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 3,237 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

January 15, 2025

_/s/ Matthew W.H. Wessler_
Matthew W.H. Wessler

**CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler