## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

UNITED STATES ex rel. CLARISSA ZAFIROV,
Plaintiff-Appellant, and

UNITED STATES OF AMERICA,
Intervenor-Appellant,

v.

FLORIDA MEDICAL ASSOCIATES, LLC, et al.,
Defendants-Appellees.

On Appeal from the United States District Court for the Middle District of Florida
No. 8:19-cv-01236

### BRIEF OF SENATOR CHARLES E. GRASSLEY AS AMICUS CURIAE IN SUPPORT OF APPELLANTS

Eric Havian
WHISTLEBLOWER PARTNERS LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 707-6855
eric@whistleblower.law

Mike Ronickher (admitted *pro hac vice*)
Max Voldman (admitted *pro hac vice*)
WHISTLEBLOWER PARTNERS LLP
1101 Connecticut Avenue NW, Suite 450
Washington, DC 20036
Tel: (202) 935-6076
mike@whistleblower.law
max@whistleblower.law

*Attorneys for Amicus Curiae*
*Senator Charles E. Grassley*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1 and Fed. R. App. P. 26.1,

undersigned counsel for Amicus Curiae Senator Charles E. Grassley hereby

certifies that no party to this brief is a publicly held corporation, issues stock, or

has a parent corporation. No persons or entities, in addition to those listed in the

party and amicus briefs filed in this case, are known to have a financial interest in

the outcome of this litigation. Further, no persons or entities are known to have any

interest in the outcome of this litigation other than the signatory to this brief and its

counsel, and those identified in the party and amicus briefs filed in this case.

Date: January 15, 2025

/s/ Eric Havian
Eric Havian

*Attorney for Amicus Curiae*
*Senator Charles E. Grassley*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................................. i

INTEREST OF AMICUS CURIAE ........................................................ 1

I. Summary of Argument ............................................................ 2

II. *Qui Tam* Statutes Are Deeply Rooted in History ...................... 4

III. Courts Consistently Find the FCA Constitutional................... 13

IV. The FCA Is an Effective—and Cost-Effective—Leveraging of Private Knowledge and Resources ..................................... 17

V. Conclusion ........................................................................ 24

CERTIFICATE OF COMPLIANCE .................................................... 25

CERTIFICATE OF SERVICE ............................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Adams v. Woods*,
   6 U.S. 336 (1805)........................................................................................5

*Allison Engine Co. Inc. v. United States ex rel. Sanders*,
   553 U.S. 662 (2008)......................................................................................9

*Bowsher v. Synar*,
   478 U.S. 714 (1986)......................................................................................8

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
   587 U.S. 262 (2019)....................................................................................15

*Cook Cnty., Ill. v. United States ex rel. Chandler*,
   538 U.S. 119 (2003)....................................................................................12

*Marvin v. Trout*,
   199 U.S. 212 (1905)......................................................................................5

*Mistretta v. United States*,
   488 U.S. 361 (1989)......................................................................................9

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001)................................................................ 4, 12, 14

*United States ex rel. Beattie v. Comsat Corp.*,
   No. 8:96-cv-00966, 2001 WL 35992080 (M.D. Fla. Apr. 18, 2001).................15

*United States ex rel. Butler v. Magellan Health Servs., Inc.*,
   74 F. Supp. 2d 1201 (M.D. Fla. 1999).............................................................16

*United States ex rel. Butler v. Shikara*,
   No. 9:20-cv-80483, 2024 WL 4354807 (S.D. Fla. Sept. 6, 2024).....................15

*United States ex rel. Doe v. Staples, Inc.*,
   773 F.3d 83 (D.C. Cir. 2014) ...........................................................................7

*United States ex rel. Kelly v. Boeing Co.*,
   9 F.3d 743 (9th Cir. 1993)..............................................................................14

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   985 F.2d 1148 (2d Cir. 1993) .........................................................................14

*United States ex rel. Newsham v. Lockheed Missiles and Space Co., Inc.*,
   722 F. Supp. 607 (N.D. Cal. 1989) ..................................................................6

*United States ex rel. Schutte v. SuperValu Inc.*,
  598 U.S. 739 (2023)..................................................................................9

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002)................................................... 14, 15

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
  41 F.3d 1032 (6th Cir. 1994)................................................................14

*United States ex rel. Wallace v. Exactech, Inc.*,
  703 F. Supp. 3d 1356 (N.D. Ala. 2023) ..........................................15

*United States ex rel. Zafirov v. Florida Med. Assocs., LLC*,
  No. 8:19-cv-01236, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024) .......... passim

*United States v. Chattanooga Hamilton Cnty. Hosp. Auth.*,
  No. 1:21-cv-00084, 2024 WL 4784372 (E.D. Tenn. Nov. 7, 2024) ...................16

*United States v. Germaine*,
  99 U.S. 508 (1878)................................................................................14

*United States v. Halifax Hosp. Med. Ctr.*,
  997 F. Supp. 2d 1272 (M.D. Fla. 2014) ..........................................14

*United States v. Maurice*,
  26 F. Cas. 1211 (C.C.D. Va. 1823)....................................................16

*United States v. UCB, Inc.*,
  970 F.3d 835 (7th Cir. 2020)................................................................5

*Universal Health Servs. Inc., v. United States ex rel. Escobar*,
  579 U.S. 176 (2016)..............................................................................9

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000)..................................................................... passim

*Yates v. Pinellas Hematology & Oncology, P.A.*,
  21 F.4th 1288 (11th Cir. 2021)............................................................6

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015)..................................................................................8

**Statutes**

31 U.S.C. § 3730..........................................................................................15

**Other Authorities**

132 Cong. Rec. S28570 (daily ed. Oct. 3, 1986) ........................................7

144 Cong. Rec. S7675 (daily ed. July 8, 1998) .......................................... 6, 17, 18

Civil Div., U.S. Dept. of Justice, *Fraud Statistics – Overview* (Oct. 1, 1986 – Sept. 30, 2023), https://www.justice.gov/opa/media/1339306/dl?inline. 3, 18, 19

Civil Div., U.S. Dept. of Justice, *FY 2024 Budget Request* (2024), https://www.justice.gov/jmd/media/1279701/dl?inline ..................................... 21

Cong. Globe, 37th Cong., 3d Sess. 955 (1863) ........................................ 6

Congressional Research Service, *Qui Tam: The False Claims Act and Related Federal Statutes* (updated April 26, 2021), https://crsreports.congress.gov/product/pdf/R/R40785 .............................. 4, 5, 6

Deborah Lynn Blumberg, *Tax whistleblower laws boost state revenue: Study*, Phys.org (Nov. 12, 2024), https://phys.org/news/2024-11-tax-whistleblower-laws-boost-state.html ................................................................ 23

GAO, *Fraud Risk Management: 2018-2022 Data Show Federal Government Loses an Estimated $233 Billion to $521 Billion Annually to Fraud, Based on Various Risk Environments*, GAO-24-105833 (Apr. 16, 2024), https://www.gao.gov/products/gao-24-105833 .................................................. 23

Jack A. Meyer, Health Management Associates, *Fighting Medicare & Medicaid Fraud: The Return on Investment from False Claims Act Partnerships* (Oct. 2013), https://www.taf.org/wp-content/uploads/2022/06/TAF-ROI-report-October-2013.pdf .......................... 22

Memorandum Opinion and Order, *United States ex rel. Flanagan v. Baptist Health Sys., Inc.*, No. 2:97-cv-03070 (N.D. Ala. Mar. 30, 2001) ....................... 16

Press Release, Senator Grassley, False Claims Act Is Our Most Important Tool To Fight Fraud Against Taxpayers (Apr. 28, 2016), https://www.grassley.senate.gov/news/news-releases/grassley-false-claims-act-our-most-important-tool-fight-fraud-against-taxpayers ................................. 3

Press Release, Senator Grassley, Whistleblowers Deserve Our Profound Gratitude (July 30, 2018), https://www.grassley.senate.gov/news/news-releases/grassley-whistleblowers-deserve-our-profound-gratitude ................... 19

Press Release, U.S. Attorney's Office for the Eastern District of Washington, Providence Health & Services Agrees to Pay $22.7 Million to Resolve Liability From Medically Unnecessary Neurosurgery Procedures at Providence St. Mary's Medical Center (Apr. 12, 2022), https://www.justice.gov/usao-edwa/pr/providence-health-services-agrees-pay-227-million-resolve-liability-medically ..................................................... 20

Press Release, U.S. Dept. of Justice, False Claims Act Settlements and Judgments Exceed $2.68 Billion in Fiscal Year 2023 (Feb. 22, 2024), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-268-billion-fiscal-year-2023 .................................................................21

Press Release, U.S. Dept. of Justice, Oakland County Doctor and Owner of Michigan Hemotology and Oncology Centers Charged in $35 Million Medicare Fraud Scheme (Aug. 6, 2013), https://www.justice.gov/opa/pr/oakland-county-doctor-and-owner-michigan-hemotology-and-oncology-centers-charged-35-million....................20

S. Rep. 99-345 (1986) ..........................................................................................8

S. Rep. No. 111-10 (2009) ...................................................................................18

Staci Spanos, *Whistleblower lawsuit stops dangerous doctor*, NEWS 4 JAX (July 27, 2015), https://www.news4jax.com/news/2015/07/28/whistleblower-lawsuit-stops-dangerous-doctor/ .......................................................................20

U.S. Attorneys', *FY 2024 Budget Request* (2024), https://www.justice.gov/jmd/media/1279646/dl?inline .....................................22

Yoojin Lee et al., *The Deterrence Effects of Tax Whistleblower Laws: Evidence from New York's False Claims Acts*, MANAGEMENT SCIENCE (2024), https://doi.org/10.1287/mnsc.2023.02999 .......................................................23

# INTEREST OF AMICUS CURIAE[1]

Senator Charles E. Grassley was the principal author in the Senate of the False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153, which modernized the False Claims Act ("FCA") and made it a more effective weapon against government fraud. Senator Grassley was also one of the Senate sponsors of the Fraud Enforcement & Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1617, which further strengthened the FCA as a weapon against fraud affecting federal programs. In addition to serving as Senate sponsor, Senator Grassley has remained active in Congress in defending the legislation. Senator Grassley thus has a strong interest in ensuring that this Court interprets the FCA in accordance with Congress's language and intent, as well as the nation's history. Senator Grassley urges the Court to reverse the District Court and affirm the law's long-recognized constitutionality.

All parties have consented to the filing of this Amicus Brief.

---

[1] Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, Amicus states that: (i) there is no party or counsel for a party in the pending appeal who authored the Amicus Brief in whole or in part; (ii) there is no party or counsel for a party in the pending appeal who contributed money that was intended to fund preparing or submitting the Brief; and (iii) no person or entity contributed money that was intended to fund preparing or submitting the Brief, other than Amicus.

## I.    Summary of Argument

For 162 years, the FCA has provided an avenue for private citizens to help the government root out fraud and recover funds that are unjustly taken from it. When it was passed in 1863, to deter and punish war profiteers who defrauded the Union Army during the Civil War, it joined a long line of *qui tam* statutes that stretched back to the founding of our nation and beyond. Since then, what came to be known as Lincoln's Law has become a critical tool in the government's efforts to stop and deter fraud.

The law is so effective that it has faced countless legal challenges from those caught cheating the government, but courts have uniformly upheld its core provisions. That includes the *qui tam* mechanism that is central to incentivizing private individuals to come forward. Not only is it constitutionally sound on the merits, but that soundness is underscored by the long tradition of similar statutes. *Qui tam* laws have existed in Britain for over a thousand years, and in the United States, numerous *qui tam* provisions were enacted during the First Congress—by the very people who authored the Constitution. Their understanding of the separation of powers principles they themselves had developed is a powerful indicator of the propriety of the *qui tam* mechanism. These provisions are deeply embedded in our nation's constitutional and legal history. Courts have recognized

this about the FCA for decades, creating a mass of precedent demonstrating that the statute is constitutionally sound.

It is also extremely effective. What Senator Grassley has described as the "basic, essential purpose of the Act, which is to empower private citizens to help the government fight fraud," is crucial to the law's success. Press Release, Senator Grassley, False Claims Act Is Our Most Important Tool To Fight Fraud Against Taxpayers (Apr. 28, 2016), https://www.grassley.senate.gov/news/news-releases/grassley-false-claims-act-our-most-important-tool-fight-fraud-against-taxpayers. As the Senator has noted, "History shows that the government simply cannot do so on its own." Working with private individuals who come forward with information, however, the government has been remarkably successful. Since the enactment of Senator Grassley's 1986 reforms, cases brought by private citizens under the FCA have returned over $50 billion to taxpayers that was unjustly taken from the public, and deterred billions more in fraud. Civil Div., U.S. Dept. of Justice, *Fraud Statistics – Overview* (Oct. 1, 1986 – Sept. 30, 2023), https://www.justice.gov/opa/media/1339306/dl?inline. They do so with limited drain on government resources. No other government program is so cost-effective.

The FCA is the flagship anti-fraud statute, standing for over a century and a half. There is no reason, legal or otherwise, to undo it now.

## II. *Qui Tam* Statutes Are Deeply Rooted in History

In *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000), the Supreme Court surveyed the "long tradition of" *qui tam* statutes and the "considerable number" that the First Congress enacted, some of which—like the False Claims Act—"provided both a bounty and an express cause of action." 529 U.S. at 774, 776-777. The Court found this historic evidence "well nigh conclusive with respect to the question . . . whether *qui tam* actions were cases and controversies [under Article III] of the sort traditionally amenable to, and resolved by, the judicial process." *Id.* (quotation marks omitted). Such historic evidence cannot be near-dispositive on the Article III question addressed by the *Stevens* Court, yet cavalierly swept aside in the Article II analysis of the same statute, as the District Court did below. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 752 (5th Cir. 2001) (en banc) (it is "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* . . . is similarly conclusive with respect to the Article II question.").

*Qui tam* statutes have been implemented for nearly 1,500 years. The earliest example dates back to the 7th century, in the Kingdom of Kent. *See* Congressional Research Service ("CRS"), *Qui Tam: The False Claims Act and Related Federal Statutes* (updated April 26, 2021), https://crsreports.congress.gov/product/pdf/R/R40785, at 2. *Qui tam* provisions

continued to be relatively common in 14th, 15th, and 16th century England, offering awards for reporting wrongdoing in everything from customs on imported wine in the reign of Edward II to revealing perjury in the reign of Henry VIII. *Id.* at 2 n.13; *Stevens*, 529 U.S. at 774 ("*Qui tam* actions appear to have originated around the end of the 13th century"). Drawing on this tradition, American Colonial legislatures, including those of Massachusetts, Connecticut, New York, Virginia, and South Carolina, passed *qui tam* statutes of their own. CRS at 3 n.19; *Stevens*, 529 U.S. at 776 ("*Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution.").

The tradition of *qui tam* continued: "immediately after the framing, the First Congress enacted a considerable number of informer statutes." *Id. See also Marvin v. Trout*, 199 U.S. 212, 225 (1905) ("[qui tam statutes] have been in existence for hundreds of years in England, and in this country ever since the foundation of our government"); *Adams v. Woods*, 6 U.S. 336, 338 (1805) (discussing *qui tam* statutes); *United States v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020) (*qui tam* actions' "ancient pedigree, however, together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power."); *United States ex rel. Newsham v. Lockheed Missiles and Space Co., Inc.*, 722 F. Supp. 607, 609 (N.D.

Cal. 1989) ("Following an embedded English tradition of relying on *qui tam* actions to supplement the sovereign legal enforcement mechanisms, the First Congress authorized *qui tam* suits in at least 10 of the first 14 statutes imposing penalties."); CRS at 4 n.22 (collecting *qui tam* statutes passed by the First Congress). As this Court observed, "qui tam actions were viewed as a routine enforcement mechanism in the early Republic." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1313 (11th Cir. 2021).

Congress enacted the FCA in 1863, at the height of the Civil War. The law was "fathered by President Abraham Lincoln. Lincoln had become frustrated by the widespread fraud against the Union Army by defense contracts during the Civil War. Contractors would sell the same horses twice to the Army; they would sell sand instead of gun powder; and sawdust instead of muskets." 144 Cong. Rec. S7675, S7676 (1998) (quoting Senator Grassley). At the time, the lawmakers were comfortable with the *qui tam* mechanism, with one Senator noting they should face "no serious objection." Cong. Globe, 37th Cong., 3d Sess. 955 (1863).

Since that original version of the statute in 1863, the FCA has included *qui tam* provisions, following a "long tradition of [such] actions in England and the American Colonies." *Stevens*, 529 U.S. at 774. These provisions allow private individuals, known as relators, to bring suit "for the person and for the United States Government" against "[a]ny person" who defrauds the government. *Id*. at

6

769 (quoting 31 U.S.C. §§ 3729(a), 3730(b)(1)). The FCA has become "the government's 'primary litigative tool for combatting fraud,'" with the FCA's *qui tam* provisions serving "as a critical supplement to government enforcement." *United States ex rel. Doe v. Staples, Inc*., 773 F.3d 83, 84 (D.C. Cir. 2014) (quoting S. Rep. No. 99-345 (1986), at 2, 4).

In 1986, Senator Grassley led an effort to modernize and revamp the FCA in response to rampant fraud against the government. The reasoning for the updates, as well as the expanded *qui tam* provisions, was simple: to better utilize private citizens to help the government root out fraud against the state, a legal concept over 1,000 years old.

> This bill substantially rewrites a statute originally signed into law by President Abraham Lincoln and its provisions are intended to restore the overall intent of that Civil War-era tool against fraud. Primary in the original "Lincoln Law" as well as this legislation is the concept of private citizen assistance in guarding taxpayer dollars. The expanded qui tam provisions in this bill will serve to establish a solid partnership between public law enforcers and private taxpayers in the fight against fraud.

132 Cong. Rec. S28570, S28580 (daily ed. Oct. 3, 1986) (quoting Senator Grassley). The Committee Report on what was to become the modern FCA had the role of relators squarely in mind:

> The proposed legislation seeks not only to provide the Government's law enforcers with more effective tools, but to encourage any individual knowing of Government fraud to bring that information forward. In the face of sophisticated and widespread fraud, the Committee believes only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds.

7

S. Rep. 99-345 (1986), at 2. To coordinate this effort, the revised statute balanced increasing the financial incentives for relators with giving the government greater control over the conduct of the case, creating the right to intervene, settle, or dismiss cases brought by relators. The executive branch endorsed the proposed improvements to the statute. S. Rep. No. 99-345, at 10-13.

The First Congress that enacted numerous statutes that featured *qui tam* provisions made clear that, at the time of the founding, the legislature believed that the limited rights granted relators fell within the Constitutional separation of powers many of them had personally fashioned. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation-of-powers cases this Court has often 'put significant weight upon historical practice.'"); *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986) (acts of the First Congress "provide[] contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument") (quoting *Marsh v. Chambers*, 463 U.S. 783, 790 (1983)). Yet the post-1986 version of the statute provides even greater control by the Executive Branch over such actions than some of the laws passed by that First Congress. While the 1986 amendments to the FCA that Senator Grassley principally authored strengthened the *qui tam* provisions "to encourage more private enforcement suits," S. Rep. No. 99-345, at 23-24, Congress simultaneously added robust safeguards to guard against undue

encroachment on executive authority. These safeguards—including mandatory filing under seal, government rights to intervene and dismiss, and broad settlement authority—surpassed any that were part of the early *qui tam* statutes enacted by the First Congress.

The long tradition of *qui tam* actions in the United States after the founding provides "additional evidence that the doctrine of separated powers does not prohibit" this unique practice, given that "'traditional ways of conducting government . . . give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring))[2].

The District Court's cavalier dismissal of this history could not be more myopic. As Appellant Zafirov has painstakingly documented, the early Congresses enacted scores of *qui tam* statutes. Brief of Appellant Clarissa Zafirov at 30-32 ("At a minimum, early Congresses enacted *dozens* of laws expressly providing

---

[2] Additionally, the Supreme Court has a long history of allowing *qui tam* actions to proceed. *See, e.g., United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023) (vacating granting of summary judgment in two *qui tams*); *Universal Health Servs. Inc., v. United States ex rel. Escobar*, 579 U.S. 176 (2016) (vacating dismissal of relators' suit); *Allison Engine Co. Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008) (remanding suit brought by a relator for further proceedings); *Stevens*, 529 U.S. 765 (holding that relators have Article III standing to pursue actions under the FCA); *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (affirming district court judgment in favor of relator and noting the long history of *qui tam* statutes).

causes of action and more that did so implicitly"). Yet the District Court postulated that the very same persons who drafted the Constitution somehow only a short time thereafter voted to enact numerous statutes that plainly violated the very Article they had only recently drafted and promulgated, all without a word of dissent, uncertainty, or even acknowledgement by them or other legal scholars. That distorted historical perspective is unsupportable.

Here, rather than take on the weight of historical precedent supporting the Constitutionality of *qui tam* statutes, the District Court largely side-stepped the issue.

First, in an attempt to wave away the relevance of the commonality of *qui tam* provisions at the time of the founding, the District Court noted "As anyone familiar with *Marbury* knows, 'enactment by the First Congress [is not] a guarantee of a statute's constitutionality.'" *United States ex rel. Zafirov v. Florida Med. Assocs., LLC*, No. 8:19-cv-01236, 2024 WL 4349242, at *16 (M.D. Fla. Sept. 30, 2024) (quoting *United States ex rel. Polansky v. Exec. Health Res. Inc.*, 599 U.S. 419, 450 (2023) (Thomas, J., dissenting)). That is, of course, true, but the long history of *qui tam* provisions, dating back over 1,000 years before the founding, is indicative of the Framers' knowledge of the laws, and their adoption of these provisions is indicative of how they fit in the constitutional order they had created. The fact that a single statute, the Judiciary Act of 1789, was found unconstitutional

in *Marbury* has little bearing on the constitutionality of the FCA's *qui tam*

provisions, variations of which were enacted dozens of times over two centuries

without dissent. The Supreme Court's "well nigh conclusive" observation about the

pedigree of *qui tam* statutes in the context of Article III starkly contrasts with the

District Court's discordant no "guarantee" comment.

Second, the District Court attempts to lessen the weight of evidence by

claiming that historical discussion of *qui tam* provisions should be divided into

three categories of statutes: those that "'provided both a bounty and an express

cause of action,' those that 'provided a bounty only,' and those 'that allowed

injured parties to sue in vindication of their own interests (as well as the

Crown's).'" *Zafirov*, 2024 WL 4349242, at *16 (quoting *Stevens*, 529 U.S. at 775-

77). The District Court then avers that only the first of these is analogous to the

FCA, even though all involve similar incentives and rights. And the District Court

was mistaken at least as to the third category, actions where a private citizen could

remedy their own injury in addition to recovering for the Crown. In such cases, as

in *qui tam* actions, the encroachment on executive power is the same. And even if

the District Court's subdivision of historical examples were relevant, there is still

ample historical precedent, dating back to the Founding, for specific *qui tam*

provisions like those in the FCA. *Stevens*, 529 U.S. at 777 ("[T]he First Congress

enacted a considerable number of informer statutes. Like their English

counterparts, some of them provided both a bounty and an express cause of action"). *See also* Brief for Appellant United States of America at 19 n.2 (collecting statutes that provided for both).

Third, seeming to acknowledge this shortcoming of its own reasoning, the District Court expressly concedes "that early Congresses enacted at least some statutes containing an enforcement mechanism roughly analogous to the FCA." *Zafirov*, 2024 WL 4349242, at *17. But it then goes on to dismiss these historical roots of the FCA as unable to "buttress its constitutionality," on the spurious ground that the law was allegedly relatively rarely utilized prior to the 1986 amendments. *Id.* at *18. The level at which a law is utilized, of course, is hardly persuasive on its constitutionality. Moreover, the lack of utilization of the *qui tam* provisions, paired with rampant fraud against the government, was the precise catalyst for Senator Grassley to author the 1986 amendments, "to make the FCA a 'more useful tool against fraud in modern times." *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 133 (2003) (quoting S. Rep. No. 99-345 (1986), at 2).

"[T]he Supreme Court in *Stevens* gave due credence to the important historical role that qui tam lawsuits have played on both sides of the Atlantic as a means to root out corruption against national governments." *Riley*, 252 F.3d at 752.

This Court should do the same, given the well nigh conclusive historical record in support of *qui tam* laws.

## III. Courts Consistently Find the FCA Constitutional

Defendants below are hardly the first to try to avoid liability for their alleged frauds by attacking the constitutionality of the *qui tam* mechanism. They should meet the same fate as the rest, who ran into courts that uniformly upheld the FCA as a proper partial assignment of the government's claim. Courts have reached such a conclusion based not only on the long history of *qui tam* statutes, but on the well-known limitations on a private relator's rights to that partial assignment, which make clear that no "office" is created.

In that vein, the District Court's ultimate basis for rejecting the historic pedigree of *qui tam* statutes bears special scrutiny: "When the Constitution is clear, no amount of countervailing history overcomes what the States ratified." *Zafirov*, 2024 WL 4349242, at *18. The purported clarity the District Court found in Article II, however, must have eluded not only the First Congress and all subsequent Congresses that enacted and amended the FCA (including the Congresses of which Senator Grassley was a member), but also every court to consider the constitutionality of the False Claims Act. Every court to have addressed the issue has concluded that the *qui tam* provision is in accordance with the Constitutional separation of powers. *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d

787 (10th Cir. 2002) (intervened); *Riley*, 252 F.3d at 749 (en banc) (non-intervened); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994) (intervened); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994) (non-intervened); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993) (non-intervened).

Although this Court has not reached the issue, the precedent from other Circuits is consistent and persuasive. A District Court in this Circuit found *Rockwell* especially instructive, noting that its opinion is founded on longstanding Supreme Court precedent about the conditions under which one is an officer. *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014). In *United States v. Germaine*, 99 U.S. 508, 511-12 (1878), the Supreme Court explained that an officer has "tenure, duration, emolument, and duties, and that the latter were continuing and permanent, not occasional or temporary." Because the temporary role of *qui tam* relators does not meet any of these requirements, the *Rockwell* court determined they were not officers, and the requirements of the Appointments Clause did not pertain. *Rockwell Int'l Corp.*, 282

F.3d 787. Notably, the *Germaine* precedent was already nearly a hundred years old when Senator Grassley drafted the modernization of the FCA.[3]

Numerous other lower courts in the Eleventh Circuit have reached the same conclusion: the FCA is constitutional. Most recently, a Florida District Court considered the historical context of its passage, concluding that "it would be difficult to justify reaching the opposite conclusion from the very Framers themselves." *United States ex rel. Butler v. Shikara*, No. 9:20-cv-80483, 2024 WL 4354807, at *11 (S.D. Fla. Sept. 6, 2024). Similarly, in *United States ex rel. Wallace v. Exactech, Inc.*, the District Court concluded that relators were not officers: "Their positions are temporary and exist only for the duration of a particular lawsuit; by no means can that constitute a permanent position." 703 F. Supp. 3d 1356, 1364 (N.D. Ala. 2023). Prior District Court opinions in this Circuit agree. *See United States ex rel. Beattie v. Comsat Corp.*, No. 8:96-cv-00966, 2001 WL 35992080 (M.D. Fla. Apr. 18, 2001); Memorandum Opinion and Order,

---

[3] The Supreme Court more recently took this same view when considering the phrase "official of the United States" elsewhere in the statute, finding that it did not reference the relator:

> Although that provision explains that the action is brought "for the person and for the United States Government" and "in the name of the Government," *ibid.*, it does not make the relator anything other than a private person, much less "the official of the United States" referenced by the statute.

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019).

*United States ex rel. Flanagan v. Baptist Health Sys., Inc.*, No. 2:97-cv-03070

(N.D. Ala. Mar. 30, 2001); *United States ex rel. Butler v. Magellan Health Servs.,*

*Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999). These cases implicitly recognize

that, unlike persons who occupy an "office" of government and can readily be

replaced, one relator cannot replace another. *See* 31 U.S.C. § 3730(b)(5) ("[w]hen a

person brings an action under" the *qui tam* provisions, "no person other than the

Government may intervene or bring a related action based on the facts underlying

the pending action."); *compare United States v. Maurice*, 26 F. Cas. 1211, 1214

(C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.) (a government office's "duties

continue, though the person" occupying it "be changed."). Outside this Circuit, the

only District Court to consider the issue since the holding below has also

concluded that the FCA is constitutional. *United States v. Chattanooga Hamilton*

*Cnty. Hosp. Auth.*, No. 1:21-cv-00084, 2024 WL 4784372, at *2-3 (E.D. Tenn.

Nov. 7, 2024).

      This unbroken string of precedent fatally undermines the District Court's

conclusion that courts may ignore the compelling history of *qui tam* statutes

because the text is purportedly "clear" that the Appointments Clause should apply

to the FCA. The lack of clarity is further demonstrated by the District Court's

citation of dubious precedents involving bank receivers, independent counsels, and

special prosecutors. As Appellants United States and Zafirov demonstrate, such

officers are not remotely analogous to relators in terms of their continuity or exercise of unfettered executive authority. And none even arguably has the historic pedigree of *qui tam* relators. But the District Court, with no real precedent for support, had to argue repeatedly from such tendentious and unpersuasive Article II analogies. In sum, the conclusion that the Appointments Clause applies to relators is anything but "clear."

Senator Grassley and his fellow legislators were well aware of the constitutional precedent when they drafted the 1986 Act. Indeed, reflecting on it in a subsequent Congressional Record entry, Senator Grassley noted that the drafters of the FCA "know the value of inside information, and the role it plays in our constitutional system of checks and balances." 144 Cong. Rec. S7676. The legal developments since that time have only underscored the consistent (and correct) finding that the FCA is in line with Constitutional principles.

## IV. The FCA Is an Effective—and Cost-Effective—Leveraging of Private Knowledge and Resources

The District Court, while grudgingly conceding that *qui tam* actions generate "increased revenue" for the government, asserted without evidence that "non-intervened qui tam actions require the DOJ and federal agencies to 'devote significant resources to monitoring them' . . . ." *Zafirov*, 2024 WL 4349242, at *3. The District Court's equivocation about the net financial benefit of the FCA whistleblower provisions was wildly off the mark.

Since Senator Grassley led the modernization of the FCA in 1986, both the government and relators have used the provisions to prodigious effect. Senator Grassley has long highlighted the successful role of the FCA in recovering purloined government funds, and in particular the assistance of whistleblowers using the *qui tam* mechanism. As he explained to Congress, "[t]he most effective way to catch fraud or other wrongdoing is to have 'insider' information." 144 Cong. Rec. S7676.

And the FCA *is* a resounding success, as Congress and the Executive Branch have both acknowledged. When it strengthened the FCA once again in 2009, Congress observed that the statute remains "[o]ne of the most successful tools for combating waste and abuse in Government spending . . . ." S. Rep. No. 111-10 (2009), at 10. That assessment cannot seriously be disputed. Cases under the statute have recovered over $75 billion in taxpayer funds improperly purloined from the public fisc—and they have had an even greater deterrent effect. Of the roughly 22,000 suits filed under the FCA in the nearly forty years since its modernization, roughly 72% of those have been *qui tam* cases. Civil Div., U.S. Dept. of Justice, *Fraud Statistics – Overview* (Oct. 1, 1986 – Sept. 30, 2023), https://www.justice.gov/opa/media/1339306/dl?inline. Almost $53 billion of the recoveries under the statute have been because of relator-initiated suits using the

*qui tam* provision. *Id.* That is over $50 billion in taxpayer money that would not have been returned to the Treasury without the efforts of private citizens.

These recoveries stem from frauds across a wide array of industries and government programs, including healthcare, defense contracts, crop insurance, and federal student aid. More recently, there have been more cases identifying customs evasion fraudsters and frauds on the COVID relief programs, such as the Paycheck Protection Program.

The cases not only recoup money for taxpayers, but they protect the public, and public servants, from harm. For example, Dr. Aaron Westrick blew the whistle on body armor manufacturers who sold allegedly defective vests to federal, state, and local law enforcement officers. In 2003, two police officers were critically wounded (one dying) when vests made by these companies failed. This whistleblower's case resulted in the products being pulled from the market, saving thousands of law enforcement officers from potential injury. Along the way, the government recovered more than $67 million in lost funds and damages. *See* Press Release, Senator Grassley, Whistleblowers Deserve Our Profound Gratitude (July 30, 2018), https://www.grassley.senate.gov/news/news-releases/grassley-whistleblowers-deserve-our-profound-gratitude.

In healthcare, by far the largest area of FCA enforcement, whistleblowers have similarly prevented harm to the public. In 2022, a hospital system resolved

allegations brought to light by a whistleblower that it was billing the government for medically unnecessary neurosurgeries that put patients' safety and lives at risk. Press Release, U.S. Attorney's Office for the Eastern District of Washington, Providence Health & Services Agrees to Pay $22.7 Million to Resolve Liability From Medically Unnecessary Neurosurgery Procedures at Providence St. Mary's Medical Center (Apr. 12, 2022), https://www.justice.gov/usao-edwa/pr/providence-health-services-agrees-pay-227-million-resolve-liability-medically. In another recent case, in Michigan, a whistleblower put a stop to a doctor who was falsely diagnosing patients with cancer so that he could bill for the chemotherapy he prescribed. Press Release, U.S. Dept. of Justice, Oakland County Doctor and Owner of Michigan Hemotology and Oncology Centers Charged in $35 Million Medicare Fraud Scheme (Aug. 6, 2013), https://www.justice.gov/opa/pr/oakland-county-doctor-and-owner-michigan-hemotology-and-oncology-centers-charged-35-million; Staci Spanos, *Whistleblower lawsuit stops dangerous doctor*, NEWS 4 JAX (July 27, 2015), https://www.news4jax.com/news/2015/07/28/whistleblower-lawsuit-stops-dangerous-doctor/. Not only have these *qui tam* relators helped recoup taxpayer funds claimed by these fraudsters for unnecessary or insufficient medical care, but they helped hold them to account, shining a light on bad behavior and deterring others from endangering public safety.

Relators also bring fraud to the attention of the government that it would not otherwise know of. Relators should be incentivized to come forward by being rewarded for providing information to the government that leads to a successful recovery of taxpayer funds. This arrangement is a bargain. From the recoveries in those cases, the government paid out just under $9 billion in relator's shares—a small fraction of the funds that it would not have otherwise recovered, leaving a net gain to the government of $44 billion. Civil Div., U.S. Dept. of Justice, Fraud Statistics – Overview (Oct. 1, 1986 – Sept. 30, 2023), https://www.justice.gov/opa/media/1339306/dl?inline. Relative to the massive recoveries, the government spends little on investigating, litigating, and overseeing these cases. For example, in fiscal year 2023, recoveries under the FCA were $2.3 billion, well above the combined total of the $374.6 million budget for the entire DOJ Civil Division, of which the Frauds section that oversees FCA cases is just a small part, and the $620 million for the civil litigation functions of all U.S. Attorney's Offices, which again handle far more than just FCA work. Press Release, U.S. Dept. of Justice, False Claims Act Settlements and Judgments Exceed $2.68 Billion in Fiscal Year 2023 (Feb. 22, 2024), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-268-billion-fiscal-year-2023; Civil Div., U.S. Dept. of Justice, *FY 2024 Budget Request* (2024), https://www.justice.gov/jmd/media/1279701/dl?inline;

U.S. Attorneys', *FY 2024 Budget Request* (2024),

https://www.justice.gov/jmd/media/1279646/dl?inline. Even using this high, over-

inclusive measure of the cost to the government, the investment in these cases

returns more than double to the public. With more refined budgetary estimates, the

multiple is undoubtedly much higher. For example, one study determined that from

2008 to 2012, the government spent about $575 million to recover over $9 billion

in federal civil health care fraud resolutions—a return-on-investment of over

sixteen to one. Jack A. Meyer, Health Management Associates, *Fighting Medicare*

*& Medicaid Fraud: The Return on Investment from False Claims Act Partnerships*

(Oct. 2013), https://www.taf.org/wp-content/uploads/2022/06/TAF-ROI-report-

October-2013.pdf.

Additionally, an incalculable but astronomical amount of taxpayer money is

saved via the deterrent effect of the whistleblower provisions. Would-be fraudsters

are well aware that it is increasingly difficult to hide wrongdoing, and they are

making better decisions to play fair. They are also more apt to come into

compliance when they know that if they do not, someone in the room could assist

the government in undoing their fraud.

Measuring that deterrent effect is difficult, but a study of the New York State

*qui tam* provision found an enormous impact. By comparing the tax compliance

behavior of companies before and after the state permitted private citizens to file

*qui tam* actions involving tax fraud, one academic study found that the provision increased state tax revenue by an extra 7.7%, amounting to $281 million per year. Yoojin Lee et al., *The Deterrence Effects of Tax Whistleblower Laws: Evidence from New York's False Claims Acts*, MANAGEMENT SCIENCE (2024), https://doi.org/10.1287/mnsc.2023.02999. When that deterrent impact was compared to the state's costs of enforcement, the return on investment was over 3000%. As one of the study's authors concluded, "[t]hese whistleblower laws do work, and they're reasonably inexpensive from a government perspective." Deborah Lynn Blumberg, *Tax whistleblower laws boost state revenue: Study*, PHYS.ORG (Nov. 12, 2024), https://phys.org/news/2024-11-tax-whistleblower-laws-boost-state.html. That impact was visible in just one category of potential claims in one state's *qui tam* statute. Given that even with whistleblower provisions, the GAO estimates the federal government loses between $233 billion and $521 billion annually to fraud, the deterrent effect on the national scale, if measured, would be staggering. GAO, *Fraud Risk Management: 2018-2022 Data Show Federal Government Loses an Estimated $233 Billion to $521 Billion Annually to Fraud, Based on Various Risk Environments*, GAO-24-105833 (Apr. 16, 2024), https://www.gao.gov/products/gao-24-105833.

In short, the District Court's focus on the costs of *qui tam* cases myopically ignores the vastly greater financial and other benefits that result. Those benefits would be lost if the District Court's ruling were allowed to stand.

## V.    Conclusion

For all the foregoing reasons, the order of the District Court dismissing the action should be reversed.

 Date: January 15, 2025                  Respectfully submitted,

                                         /s/ Eric Havian
                                         Eric Havian
                                         WHISTLEBLOWER PARTNERS LLP
                                         4 Embarcadero Center, Suite 1400
                                         San Francisco, CA 94111
                                         Tel: (415) 707-6855
                                         eric@whistleblower.law

                                         Mike Ronickher (admitted *pro hac vice*)
                                         Max Voldman (admitted *pro hac vice*)
                                         WHISTLEBLOWER PARTNERS LLP
                                         1101 Connecticut Avenue NW, Suite 450
                                         Washington, DC 20036
                                         Tel: (202) 935-6076
                                         mike@whistleblower.law
                                         max@whistleblower.law

                                         *Attorneys for Amicus Curiae*
                                         *Senator Charles E. Grassley*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5421 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Times New Roman font.

Date: January 15, 2025          /s/ Eric Havian
                                             Eric Havian

                                             *Attorney for Amicus Curiae*
                                             *Senator Charles E. Grassley*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Senator Charles E. Grassley as Amicus Curiae in Support of Appellants by using the Court's CM/ECF system on January 15, 2025. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Date: January 15, 2025

/s/ Eric Havian
Eric Havian

*Attorney for Amicus Curiae*
*Senator Charles E. Grassley*