Case No. 24-13581

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

UNITED STATES ex rel. CLARISSA ZAFIROV,
*Plaintiff-Appellant*, and

UNITED STATES OF AMERICA,
*Intervenor-Appellant*,

v.

FLORIDA MEDICAL ASSOCIATES, *et al.*,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Middle District of Florida,
No. 8:19-cv-01236-KKM

---

**Brief of Legal History Scholars James Pfander, Diego Zambrano,
and Jared Lucky as Amici Curiae in Support of Neither Party**

---

Jared Lucky
jlucky@edelson.com
Edelson PC
150 California Street,
18th Floor
San Francisco, CA 94111
(415) 212-9300

*Counsel for Amici Curiae*

**CERTIFICATE OF INTERESTED PARTIES**

Pursuant to Eleventh Circuit Rule 26.1-1 and Fed. R. App. P. 26.1,

Amici Curiae certify that the following persons and entities may have

an interest in the outcome of this appeal:

1. Edelson PC

2. Lucky, Jared

3. Pfander, James

4. Zambrano, Diego

Taken together with the earlier filed Certificates of Interested

Persons by all parties, this constitutes a correct and complete list of

those persons that may have an interest in the outcome of this appeal.

Dated: January 15, 2025      Respectfully submitted,

By: /s/ Jared Lucky

Jared T. Lucky
jlucky@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco
Tel: 415.907.6645

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* are natural persons, with no parent company and no publicly traded stock.

Dated: January 15, 2025      Respectfully submitted,

By: /s/ Jared Lucky

Jared T. Lucky
jlucky@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco
Tel: 415.907.6645

*Counsel for Amici Curiae*

*TABLE OF CONTENTS*

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ....................................................... ii

INTEREST OF AMICI CURIAE ............................................. 1

STATEMENT OF THE ISSUE .................................................. 5

SUMMARY OF ARGUMENT ...................................................... 6

ARGUMENT OF AMICI CURIAE ............................................ 8

I.    *Qui tam* litigation was ubiquitous in the Founding Era. ...... 8

II.   *Qui tam* litigants did not wield "executive Power" in the Founding Era, and were not subject to control by executive officials. ................................................................................... 13

III.  *Although qui tam* statutes were extensively debated in the Founding Era, they were never challenged on separation of powers grounds. .................................................................. 21

      A.    In the late 1780s, state legislatures reformed penal statutes, but chose to preserve the traditional independence of *qui tam* informers from executive control. .............................................................. 22

      B.    In 1791, Washington and Hamilton determined that the President lacked the power to pardon defendants for penalties owed to private *qui tam* relators. ............ 25

      C.    The high-profile *qui tam* provisions of the Slave Trade Act of 1794 never drew an Article II objection. ............. 28

CONCLUSION ............................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*Commonwealth v. Churchill,*
    5 Mass. 174, 4 Tyng 174 (1809) ................................................. 18,19

*Morrison v. Olson,*
    487 U.S. 654 (1988) ........................................................................ 2, 3

*State v. Matthews,*
    2 Brev. 82, 4 S.C.L. 82 (S.C. 1806) ........................................... 16,17

*Stretton and Taylor's Case,*
    74 Eng. Rep. 111 (K.B. 1588) ........................................................ 16

*United States v. Rahimi,*
    602 U.S. 680 (2024) ..................................................................... 3,32

*United States v. 1960 Bags of Coffee,*
    12 U.S. (8 Cranch) 398 (1814) ...................................................... 27

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ........................................................................... 27

**U.S. Constitution**

Art. I ................................................................................................ 13

Art. II, § 1 ................................................................................ *passim*

Art. II, § 2 .......................................................................................... 5

Art. II, § 3 .......................................................................................... 8

**State Constitutions**

Mass Const. pt. I, art. XXX (1780) ............................................... 18

N.Y. Const., art. XVII (1777) ...........................................24

S.C. Const. art. II (1790)...................................................16

Va. Const. (1776).............................................................24

**Federal Statutes**

Act of Feb. 6, 1788, ch. 9.................................................24

Act of June 19, 1788, ch. 12 ...........................................24

Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124 ..................13

Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199.................13

Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232.................13

Act of Feb. 21, 1793, ch. 11, § 5, 1 Stat. 318.................13

Act of Mar. 22, 1794, ch. 11, § 2, 1 Stat. 347...................7,13,28,31

Act of May 19, 1796, ch. 30, § 18 ...................................13

Fed. R. App. P. 29(a)(4)(E) ..............................................1

18 U.S.C. § 286.................................................................9

1 Stat. 177, § 69 (1790) ...................................................26

**State Statutes**

An Act for Suppressing Mountebanks, Rope-Dancers, Tumblers, &c.,
  1798 *Acts and Laws of the State of Connecticut May Session*
  487..............................................................................11

An Act Regulating the Inspection of Beef, Pork, pickled Fish and Tobacco, and for other Purposes therein mentioned,
> 1790 *Rhode Island General Assembly: September Session* 16 ........11

An Act to explain and amend an act entitled, "An Act for the gradual abolition of slavery,"
> 1788 *Acts of the General Assembly of Pennsylvania* 589..................11

An Act to prevent the introduction and communication of contagious diseases,
> 1793 *North Carolina Regular Session* 37 ...........................................11

An Act to regulate the Fisheries, and to prevent the Obstruction of the Navigation in the River Delaware,
> 1784 *Acts of the Ninth General Assembly of the State of New Jersey* 180 ..................................................................................11

An Act to Regulate Marriages,
> 2 *Laws of the State of Delaware* 976 (1790) ........................................11

An Act to regulate the General Elections in this State, so far as to impose a fine on persons voting out of the County wherein they reside,
> 1801 *Acts of the General Assembly of the State of Georgia* 11 ........11

An Act to restrain surveyors, to regulate certain proceedings in the land-office, and to compel the attendance of witnesses on surveys under the authority of the chancery, general and county courts,
> 1789 *Maryland General Acts & Laws November Session* xli-xlii..........................................................................................................11

12 Hening's Statutes at Large 354..................................................................11

Fish Act,
> 1788 *New Hampshire Acts December Session* 480 ...........................11

# Other Authorities

"Acts and Resolves,"
State Library of Massachusetts Digital Collections,
https://hdl.handle.net/2452/2 ........................................................... 11,24

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*,
17 Suffolk U. L. Rev. 881 (1983) ........................................................... 18

A. Scalia, *The Rule of Law as a Law of Rules*,
56 U. Chi. L. Rev. 1175 (1989) .............................................................. 32

Caleb Nelson, *The Constitutionality of Civil Forfeiture*,
125 Yale L.J. 2446 (2016)) .................................................................... 27

Charles Davenant, *An Essay Upon the Probable Methods of Making a People Gainers in the Balance of Trade* (1699) ................................. 14

*Debates and Proceedings of the Convention of the Commonwealth of Massachusetts, held in the year 1788*,
(Peirce ed., 1856) ................................................................................ 19

Elizabeth Gaspar Brown, *British Statutes in American Law, 1776-1836*,
(1964) ...................................................................................................... 10

Giles Jacob, *A Review of the Statutes, Both Ancient and Modern*,
(1715) .................................................................................................... 9,23

Giles Jacob, "Information,"
*A New Law Dictionary* (1729) ............................................................. 9

J.M. Beattie, *Crime and the Courts in England: 1660-1800*,
(1986) ...................................................................................................... 16

Lawrence M. Friedman, *A History of American Law*,
(3d ed. 2005) ......................................................................................... 10

Nitisha Baronia, Jared Lucky, & Diego Zambrano, *Private Enforcement and Article II*,
(draft publication May 8, 2024), *available at*
http://dx.doi.org/10.2139/ssrn.4821934 ................................................1

*Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*,
92 Fordham L. Rev. 469 (2023)..............................................*passim*

Randy Beck, *Popular Enforcement of Controversial Legislation*,
57 Wake Forest L. Rev. 553 (2022)...................................................9

*Result of the Convention of Delegates Holden at Ipswich in the County of Essex Who Were Disputed to Take Into Consideration*,
(Mycall ed., 1778) ...........................................................................19

The Federalist No. 21
(Alexander Hamilton) (Clinton Rossiter ed., 1961) .......................12

T. Robert Moseley, A History of the New-York Manumission Society, *1785–1849* (1963) (Ph.D. dissertation,
New York University) ................................................................29,30

William Baude, *Constitutional Liquidation*,
71 Stan. L. Rev. 1 (2019)..............................................................21

William Blackstone, *Commentaries on the Laws of England*,
(Wilfrid Prest ed., Oxford Univ. Press, 2016) (1768).................9,10

1 James Fitzjames Stephens, *A History of the Criminal Law of England*,
496 (1st ed. 1883) ........................................................................16

1 Joseph Chitty, *A Practical Treatise on the Criminal Law*,
(1816) ..........................................................................................22

2 *Papers of Thomas Jefferson*,
(Julian P. Boyd ed., 1950)...........................................................23

2 William Hawkins, *A Treatise of the Pleas of the Crown*,
(6th ed. 1787) ...............................................................9,10

4 *Papers of Alexander Hamilton*,
(Harold C. Syrett ed., 1962) ...........................................12

7 *Papers of George Washington*,
(Jack D. Warren, Jr. ed., 1988)..................................25,26

8 *Papers of Alexander Hamilton*,
(Harold Syrett ed., 1965) ................................................26

8 *Papers of James Madison*,
(Rutland & Rachal eds., 1973)........................................12

## INTEREST OF AMICI CURIAE[1]

Amicus James Pfander is the Owen L. Coon Professor of Law at Northwestern University Pritzker School of Law. Professor Pfander is an authority on the history of litigation in the Founding Era, and a co-author of leading casebooks on Civil Procedure and Federal Courts. He has published extensively on the original meaning of Article II and Article III. The district court cited his article, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469 (2023).

Amicus Diego Zambrano is a Professor of Law at Stanford Law School. Professor Zambrano is an expert in complex litigation and private enforcement, has published voluminously in top law reviews, and is the co-author of a prominent Civil Procedure casebook. He is the co-author of "Private Enforcement at the Founding and Article II," a draft law review article cited in the district court's order.[2]

---

[1]    All parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for *amici curiae* states that no counsel for any party to this appeal authored this brief in whole or in part, and no person, other than *amici curiae*, made any monetary contribution to its preparation or submission.

[2]    *See* Nitisha Baronia, Jared Lucky, & Diego Zambrano, *Private Enforcement and Article II,* (draft publication May 8, 2024), *available at*

Amicus Jared Lucky is a PhD candidate in History at Yale University, as well as an attorney at the firm Edelson PC. He is writing a dissertation on the origins of American consumer protection law and the development of private enforcement in the Founding Era. His research forms the basis for the historical arguments in "Private Enforcement at the Founding and Article II," a draft version of which was cited by the district court in this case.

Amici have no direct interest in the outcome of this case, and write in support of neither party. They respectfully submit this brief for two reasons. First, Amici seek to provide the historical context necessary to interpret Article II of the Constitution as applied to *qui tam* practice. Article II's Vesting and Take Care clauses are a classic example of "general constitutional language" whose concrete meaning must be derived in part from history. *Morrison v. Olson*, 487 U.S. 654, 690, n.29 (1988); *see* U.S. Const. art. I, § 1, 3 ("The executive Power

---

http://dx.doi.org/10.2139/ssrn.4821934. Amici Lucky and Zambrano posted a draft version of their article online in 2024 to solicit feedback from other scholars, where it was apparently accessed by the parties and the district court. Because the article has not yet been published, this brief will cite directly to the primary and secondary sources upon which the article's conclusions are based.

shall be vested in a President" who "shall take Care that the laws be faithfully executed, and shall Commission all the Officers of the United States.") Mere speculative "extrapolation" from these open-ended directives "is more than the text can bear." *Morrison,* 487 U.S. 690, n.29.

The "historical approach" to interpreting such broad provisions "examines the laws, practices, and understandings from before and after ratification that may help the interpreter discern the meaning of the constitutional text and the principles embodied in that text." *United States v. Rahimi*, 602 U.S. 680, 717 (2024) (Kavanaugh, J. concurring). Amici's scholarly work undertakes precisely this kind of investigation and offers the Court an account of the historical backdrop not covered in the briefing to date.

Second, Amici submit this brief because their work was conspicuously cited in the district court's order below. Judge Mizelle apparently regarded the historical claims in Amici Lucky and Zambrano's draft article as the "centerpiece of Zafirov's Article II structural argument." (Dkt. 346 at 29.) The district court similarly described Amicus Pfander's article as "the only close study of analogous

founding-era enforcement." *Id.* at 43. To the extent the order below relied on Amici's research, Amici submit this brief to correct the district court's misstatement of the historical record and mischaracterization of their work.

Judge Mizelle held that because *qui tam* relators like Zafirov pursue "daunting monetary penalties for alleged harms to the public fisc[,]" they exercise a "core executive power" vested in the Executive Branch by Article II. *Id.* at 1-2. Accordingly, they must be subject to the appointment (and presumably, control) of the President. *Id.* at 51. In reaching that conclusion, the order ascribed to Amici Lucky and Zambrano's article the view that "if any private delegation of enforcement authority is unconstitutional, it is probably the FCA's *qui tam* provision." *Id.* at 29. Judge Mizelle also invoked Amicus Pfander's article to support the proposition that the "blurring of public and private enforcement" in Founding-Era *qui tam* practice suggests the absence of "a constitutional settlement reconciling the qui tam device with Article II." *Id.* at 43.

To the contrary, Amici's scholarship demonstrates that the early federal government embraced *qui tam* as a traditional and

constitutionally appropriate tool of legislative regulation. To Amici's knowledge, no one—including prominent Framers who drafted *qui tam* laws as state and federal legislators—perceived *qui tam* actions as an unconstitutional infringement on the executive power vested in the President by Article II. Much less do any historical sources from the Founding Era indicate that *qui tam* relators were ever subject to executive control, or considered "officers" of the United States in a constitutional sense. In fact, as Amici's research shows, substantial debates about *qui tam*'s place in pre- and post-ratification America never reflected the rigid view of executive power adopted by the district court.

## STATEMENT OF THE ISSUE

Whether *qui tam* relators exercise the "executive Power" which Article II of the Constitution vests in the President, and as such constitute officers of the United States subject to the requirements of the Appointments Clause.

## SUMMARY OF ARGUMENT

The district court's opinion disregards compelling historical evidence of the importance (and contemporary understanding) of *qui tam* as a regulatory tool in the Founding Era. Eighteenth-century legislatures relied heavily on private litigants to vindicate public rights. The British Parliament, American colonial and state assemblies, and Congress routinely passed statutes that prohibited socially undesirable conduct with forfeitures or monetary penalties. Those penalties were awarded—in part or in whole—to any person who could successfully prove a case against the offender in court. These "penal statutes" most commonly took the form of *qui tam* proceedings, in which the private plaintiff sued nominally on behalf of the sovereign and split any recovery with the state. In the decades before and after the adoption of the Constitution, Kings, governors, and Presidents signed thousands of *qui tam* provisions into law in various Anglo-American jurisdictions.

Of course, *qui tam* plaintiffs did "execute" or enforce regulatory law in some sense. But contemporary jurists simply regarded the plaintiff's interest in a *qui tam* penalty as a type of conditional private property right, which vested upon commencement of the suit—not an

exercise of executive authority. Although executive officials had essentially no control over *qui tam* litigants, the jurists, legislators, and constitutional theorists of the Founding Era did not regard penal statutes as an affront to the separation of powers.

That was not for lack of opportunity. American jurists at both the state and federal level thought carefully about how *qui tam* statutes should be applied in the new constitutional order. Amici's research highlights several arenas in which this debate played out: controversies over *qui tam* in state courts and legislatures in the 1780s; the Washington administration's questions about the President's ability to pardon penalties owed to private relators; and the enforcement of the federal Slave Trade Act of 1794 by societies of abolitionists who privately investigated, financed, litigated, and compromised their *qui tam* claims with complete independence from federal executive officers. If the district court's reading of Article II bore any relation to its original public meaning, these episodes would surely have called forth the argument that the President—as the exclusive repository of federal law enforcement discretion—must have the power to control or extinguish private *qui tam* claims. They did not.

The vitality of *qui tam* as a regulatory tool in the Founding Era, and the extensive debates it occasioned, make clear that conventional *qui tam* enforcement is compatible with Article II as originally understood. Whatever the merits of penal statutes as a policy matter, Founding-Era Americans clearly saw no conflict between the Vesting and Take Care clauses and *qui tam* practice. Much less should *qui tam* relators be glossed as "officers" subject to the Appointments Clause, when (as Slave Trade Act illustrates) the very point of *qui tam* legislation was often to extend enforcement beyond the federal bureaucracy. The Americans who drafted and ratified the Constitution would have been shocked to discover such disruptive hidden meanings lurking in Article II. The district court's interpretation is supported by neither text or history, and the dismissal order should be vacated.

## ARGUMENT OF AMICI CURIAE

## I.     *Qui tam* litigation was ubiquitous in the Founding Era.

While the *qui tam* provisions of the False Claims Act may seem "idiosyncratic" today, (dkt. 346 at 1), there was nothing unusual about that mode of enforcement in the Founding Era. For centuries, Parliament encouraged the enforcement of regulatory law through

"penal statutes"—so-called because they permitted informers to bring cases against violators in return for a portion of the statutory *penalty*, not because they were inherently criminal. *See, e.g.*, Giles Jacob, "Information," in *A New Law Dictionary* (1729) (noting that a private plaintiff may proceed "upon the Breach of some Penal Law or Statute, wherein a Penalty is given to the Party that will sue for the same"). Suits brought under penal statutes were often known as "informer's actions" or "popular actions," because any person could pursue them. Randy Beck, *Popular Enforcement of Controversial Legislation*, 57 Wake Forest L. Rev. 553, 556-57 (2022). Most penal statutes required informers to proceed *qui tam pro domino rege quam pro se ipso in hac parte sequitur*—that is, "on the king's behalf as well as on his own"— and split the award with the state. *Id.*

By the 1760s, William Blackstone noted that the vast number of penal statutes "with which the subject is at present encumbered" would be too "tedious" to enumerate. 2 William Blackstone, *Commentaries on the Laws of England* *420 (Wilfrid Prest ed., Oxford Univ. Press, 2016) (1768). Compilations by other eighteenth-century English jurists ran into the hundreds. *See, e.g.*, 2 William Hawkins, *A Treatise of the Pleas*

*of the Crown* ch. 26, § 64 at 376-77 (6th ed. 1787) (discussing when an

"action on a statute" would lie, and how to bring one.) While some penal

statutes simply attached fines to "particular crimes and misdemeanors,"

the "greatest part" of them were regulatory, touching "matters of police

and public convenience." Blackstone, *supra*, at *420-21. These actions

spanned an "extraordinarily wide range of offenses," targeting

everything from tax dodging to price gouging and church skipping. Ruth

Paley, *Introduction* to 1 Blackstone, *supra*, at iii.

British colonists carried penal statutes with them to the Americas,

and apparently continued to bring actions under some long-standing

English statutes without re-enactment. *See* Elizabeth Gaspar Brown,

*British Statutes in American Law, 1776-1836*, 1-22 (1964). But colonial

assemblies also passed reams of new *qui tam* laws for local regulatory

purposes—a trend that continued unabated after the American

Revolution. *See, e.g.*, Lawrence Friedman, *A History of American Law*

39 (3d ed. 2005). For example, approximately ten percent of all public

acts passed in Massachusetts between 1692 and 1820 contained at least

one provision authorizing enforcement by an informer.[3] Massachusetts

was not an outlier. Every state in the union enacted *qui tam* legislation

in the twenty-five years following the Constitutional Convention.[4]

Notably, a sweeping modernization of Virginia's statutes, proposed by

---

[3] This figure is based on a review of the session laws of the colonial and state legislatures of Massachusetts, which have been digitized by the state library. *See* "Acts and Resolves," State Library of Massachusetts Digital Collections, https://hdl.handle.net/2452/2 (last accessed Jan. 13, 2025).

[4] Examples from Massachusetts, New York, and South Carolina are cited elsewhere in this brief. Examples from all other ratifying states include: An Act to Regulate Marriages, 2 *Laws of the State of Delaware* 976 (1790) (dividing recovery of statutory penalties between government and informer); An Act to explain and amend an act entitled, "An Act for the gradual abolition of slavery," 1788 *Acts of the General Assembly of Pennsylvania* 589 (same); An Act to regulate the Fisheries, and to prevent the Obstruction of the Navigation in the River Delaware, 1784 *Acts of the Ninth General Assembly of the State of New Jersey* 180 (same); An Act to regulate the General Elections in this State, so far as to impose a fine on persons voting out of the County wherein they reside, 1801 *Acts of the General Assembly of the State of Georgia* 11 (same); An Act for Suppressing Mountebanks, Rope-Dancers, Tumblers, &c., 1798 *Acts and Laws of the State of Connecticut May Session* 487 (same); An Act to restrain surveyors, to regulate certain proceedings in the land-office, and to compel the attendance of witnesses on surveys under the authority of the chancery, general and county courts, 1789 *Maryland General Acts & Laws November Session* xli-xlii (same); Fish Act, 1788 *New Hampshire Acts December Session* 480; An Act to prevent the introduction and communication of contagious diseases, 1793 *North Carolina Regular Session* 37-38 (same); An Act Regulating the Inspection of Beef, Pork, pickled Fish and Tobacco, and for other Purposes therein mentioned, 1790 *Rhode Island General Assembly: September Session* 16 (same).

Thomas Jefferson in 1776 and later guided to passage by James Madison, included twelve informer's actions. 8 *Papers of James Madison* 391-99 (Rutland & Rachal eds., 1973) (reproducing Madison's manuscript list of Jefferson's proposed bills with editorial note).

Unsurprisingly, the Framers carried their familiarity with *qui tam* from colonial and state assemblies into the federal government. As Alexander Hamilton wrote in *The Federalist*, a fatal flaw of the Articles of Confederation was their failure to give the United States sufficient power to "punish disobedience to their resolutions . . . with pecuniary mulcts." *The Federalist* No. 21 at 138 (Clinton Rossiter ed., 1961). It was essential that the new Congress have the power to pass laws with a "penalty annexed to disobedience," (*id.*, No. 15, at 110) and Hamilton understood *qui tam* enforcement as one of the primary ways to impose a penalty. Just a few months after writing the Federalist Papers, Hamilton himself drafted a tax law enforceable by "any informer" as a Representative in the New York State Assembly.[5] He surely regarded

---

[5] Alexander Hamilton, Second Draft of an Act for Raising Certain Yearly Taxes Within This State (Feb. 9, 1787), *in* 4 *Papers of Alexander Hamilton*, 41-50 (Harold C. Syrett ed., 1962) [hereinafter "*Hamilton Papers"]* (reproducing draft bill in Hamilton's hand).

*qui tam* suits as one of the "necessary and proper" enforcement tools available to Congress under Article I.

That understanding tracks with the early federal legislative record. Between 1789 and 1820, Congress deployed informer's actions to implement nearly every one of its constitutionally enumerated powers: to make war; raise and support a military; grant copyrights and patents; regulate immigration; establish post offices; lay and collect taxes; coin money; and regulate commerce between the states and with Indian tribes.[6]

Far from a medieval relic or a legislative curiosity, *qui tam* was a foundational tool of governance which remained in heavy use after the Constitution was ratified.

---

[6]    *See, e.g.*, Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25 (permitting statutory damages for copyright infringement); Act of Feb. 21, 1793, ch. 11, § 5, 1 Stat. 318 (informer's action for infringing on patent); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (informer's action for import of liquor without paying duties); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (informer's action prohibiting trade with Indian tribes); Act. of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (informer's action for failure to comply with postal regulations); and Act of Mar. 22, 1794, ch. 11, § 2, 1 Stat. 347, 349 (informer's action against slave trade with foreign nations).

**II.** ***Qui tam*** **litigants did not wield "executive Power" in the Founding Era, and were not subject to control by executive officials.**

What makes the district court's holding truly implausible is not just the continuing existence of *qui tam*, but the way Founding-Era legal thinkers conceptualized it—namely, as the exercise of a statutory property right, rather than an act of executive discretion.

*Qui tam* relators obviously "executed" the law in some sense. As the English political economist Charles Davenant wrote in 1699, "Lawgivers have many times fortified their Laws with Penalties wherein Private Persons may have Profit, *thereby to stir up the People to put the Laws in Execution.*" Charles Davenant, *An Essay Upon the Probable Methods of Making a People Gainers in the Balance of Trade* 55 (1699) (emphasis added). But there is a difference between playing some role in a law's implementation and exercising "executive Power."

If Judge Mizelle were correct that relators usurped a "core executive power" in the constitutional sense, (dkt. 346 at 20-21), one would expect to find Founding-Era courts permitting executive officials to exercise some discretion over *qui tam* suits. After all, relators proceeded in the sovereign's name and—under a well-settled rule of

non-party preclusion—the conviction, acquittal or settlement of an informer's action would bar "any subsequent prosecution for the same offence," even by the government. Pfander, *supra*, at 489, n.3 (quoting Hawkins, *supra*, at 392).

Had Founding-Era jurists subscribed to the district court's view of executive power, they surely would have challenged *qui tam* proceedings that interfered with executive enforcement priorities. And yet the evidence shows the opposite: there was a broad consensus that *qui tam* suits were *not* subject to methods of control that executive officials traditionally exercised over enforcement actions.

The reason is simple. Even though penal statutes sought to achieve *public* regulatory ends, eighteenth-century and nineteenth-century jurists understood the statutory awards they conferred as a kind of private property. In Blackstone's evocative phrase, penalties given by the legislature to "any person that will sue for the same" are "placed as it were in a state of nature . . . open therefore to the first occupant, who declares his intention to possess them, by obtaining judgement to recover them." 2 Blackstone, *supra*, at *437.

In other types of English proceedings brought in the King's name—for example, criminal prosecutions initiated by private parties—the Attorney General could enter a writ of *nolle prosequi* ("unwilling to prosecute") to terminate the case. 1 James Fitzjames Stephens, *A History of the Criminal Law of England* 496 (1st ed. 1883). And the King could pardon convicted criminals and commute punishments. J.M. Beattie, *Crime and the Courts in England: 1660-1800* 430-39 (1986). But neither of these discretionary controls over public law litigation applied to *qui tam* actions. The executive was not at liberty to extinguish the *qui tam* litigant's property interest with a pardon. By commencing suit, the informer "made the popular action his own private action," and it was not "in the power of the crown, or of any thing but parliament, to release the informer's interest." Blackstone, *supra*, at 438. For the same reason, the common law courts determined as early as 1588 that the Attorney General could only enter a *nolle prosequi* for the Crown's portion of a *qui tam* action. *See Stretton and Taylor's Case*, 74 Eng. Rep. 111 (K.B. 1588).

American courts evidently retained that traditional view of *qui tam*, even post-ratification. In the 1806 case of *State v. Matthews*, 2

Brev. 82, 4 S.C.L. 82 (S.C. 1806), the South Carolina Constitutional Court explicitly reconciled the state's post-ratification constitution with *qui tam* (albeit in dicta). There, a 1784 statute permitted any informer to recover a *qui tam* penalty against the operator of an unlicensed billiards table. *Id.* at 82. But, like its federal counterpart, Article II of South Carolina's 1790 Constitution "invested" the governor with "the executive authority of this State." S.C. Const. art. II, § 1 (1790). The state went even further by declaring that "all prosecutions shall be carried on in the name and by the authority of the State of South Carolina." *Id.* art. III, § 2.

Nonetheless, the court observed that informers were still permitted to recover "the penalty by suit at law, or by information in nature of a qui tam action." *Matthews*, 4 S.C.L. at 84. Unlike a criminal indictment (which could only be carried on by the State) a *qui tam* action was "in truth but a civil remedy, to recover a particular sum, which the party from whom it is demanded, is bound by law to pay[.]" *Id.* Given this property interest, "if the Attorney General enters a nolle prosequi, the informer may, notwithstanding, proceed for his part." *Id.*

(As detailed further below in Section III.B, the Washington administration appears to have adopted the same view.)

American courts also continued to apply the traditional rules of *qui tam* preclusion, as the Massachusetts Supreme Court did in 1809 to a 1783 *qui tam* statute prohibiting usury. *Commonwealth v. Churchill*, 5 Mass. 174 (1809). There, a private relator sued to recover the penalty—potentially in a collusive suit encouraged by the defendant— but lost at trial. *Id.* at 175. The state's Solicitor General then brought a new action "for the same offence, and to recover the same penalty." *Id.* After carefully considering a bevy of English precedents, Chief Justice Theophilus Parsons held that the relator's suit (provided it had been properly pled) precluded the state's subsequent enforcement action. *Id.* at 181-82.

Parsons's opinion is notable for two reasons. First, the Massachusetts Constitution of 1780 expressly prohibited the "legislative department" and the "judicial [department]" from exercising "executive powers." Mass Const. pt. I, art. XXX (1780). (As Justice Scalia once observed, the federal Constitution merely captured the same principle with greater "economy of expression." Antonin Scalia, *The Doctrine of*

*Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 881 (1983).). Nonetheless, the court found that the state could not supplant a private suit duly authorized by statute. "Perhaps the positive rules of law furnish [the usurer] this screen[,]" Justice Sedgwick noted in concurrence. "If they do, it is for the *legislature only* to remedy the evil." *Churchill*, 5 Mass. at 183 (emphasis added).

Second, Parsons was a prominent defender of executive power. In 1778, he likely wrote the "Essex Result," an influential report criticizing the failed Massachusetts constitution of 1778, "because the supreme executive officer [was] not vested with proper authority" and "a due independence [was] not kept up between the supreme legislative, judicial, and executive powers." *Result of the Convention of Delegates Holden at Ipswich in the County of Essex* 5-6 (Mycall ed., 1778). He later defended the federal Constitution at the Massachusetts ratifying convention, and was even asked by his fellow delegates to "prepare an Address to the People, stating the principles of the said Constitution." *Debates and Proceedings of the Convention of the Commonwealth of Massachusetts* at 92 (Peirce ed., 1856) (1788).

If anyone in the Founding Era had embraced Judge Mizelle's maximalist and exclusive view of executive power, it would have been Parsons. But instead, he hewed to the longstanding consensus that *qui tam* litigants had considerable leeway to litigate their claims independently and bind the government—even over the policy objections of public prosecutors.

Judge Mizelle discounts the interpretive value of English and state sources because these jurisdictions were not subject to the separation of powers framework ultimately adopted in the federal constitution. (Dkt. 346 at 40, 41.) That critique misses the point here.

These background practices and understandings are perhaps the best evidence for the meaning the drafters and ratifiers of the Constitution assigned to the undefined category of "executive Power." The delegates of the Constitutional Convention and the state ratifying conventions gained their experience in colonial and state assemblies and courts. And many state constitutions delineated the executive, judicial, and legislative powers just as strictly as the federal constitution.

In short, like their English counterparts, American jurists embraced the property-right rationale for *qui tam*, and declined to give executive officers control over relators. This is a strong indication the drafters and ratifiers of Article II would not have understood *qui tam* litigants as exercising "executive Power," even when they brought claims vindicating some public interest.

III. **Although *qui tam* statutes were extensively debated in the Founding Era, they were never challenged on separation of powers grounds.**

The district court claimed that even though *qui tam* persisted into the Constitutional era, its "historical pedigree" is unavailing because the practice continued "without full examination & deliberation." (Dkt. 346 at 39, 40) (quoting William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 18 (2019)). On the contrary, Amici's research highlights multiple pre- and post-ratification debates about *qui tam*. The participants in these debates—especially the critics and targets of informers—would almost certainly have considered constitutional objections to *qui tam*, had the district court's maximalist interpretation of "executive Power" been current at the Founding. Instead, key figures drafting, debating and enforcing *qui tam* between roughly 1780 and

1805—including all three authors of the Federalist papers, and many delegates to the Constitutional Convention and state ratifying conventions—never seemed to have clocked this alleged separation of powers problem.

First, despite widespread reforms of penal statutes in state legislatures in the 1780s, lawmakers never treated *qui tam* as a threat to executive power. Second, the Washington administration carefully considered the President's authority over private *qui tam* relators, and determined that the Executive could not pardon penalties due to private relators. Third, the aggressive enforcement of *qui tam* provisions in the Slave Trade Act of 1794 by private abolitionist societies never attracted Article II criticism, even from well-organized mercantile interests supporting the defendants.

### A. In the late 1780s, state legislatures reformed penal statutes, but chose to preserve the traditional independence of *qui tam* informers from executive control.

First, there was a wide-ranging debate about the legitimacy of penal statutes in many state legislatures, contemporaneous with the drafting of the Constitution. Although *qui tam* relators were ubiquitous in the Founding Era, they were certainly not popular. By the eighteenth

century, "common informer" had become a mere "epithet" on par with "extortioner," "heretic," and "vagabond." 1 Joseph Chitty, *A Practical Treatise on the Criminal Law* 207 (1816). As early the reign of Queen Elizabeth, Parliament had imposed limitations on penal statutes to reduce the potential for abuse. *See, e.g.*, Giles Jacob, *A Review of the Statutes, Both Ancient and Modern* 8-9 (1715) (digesting these restraints).

As states sought to modernize their statute books to match their new republican constitutions in the 1780s, lawmakers revisited these longstanding concerns about informers. One of Jefferson's model bills for Virginia—which James Madison finally ushered through the legislature in 1786—provided that collusive private prosecutions of a penal statute would not bar recovery by a subsequent good faith plaintiff.[7] It also made any private prosecutor who settled or discontinued a *qui tam* action without leave of court liable for the whole

---

[7] Thomas Jefferson, "A Bill Providing That Actions Popular, Prosecuted by Collusion, Shall Be No Bar to Those Which Be Pursued with Good Faith," *in* 2 *Papers of Thomas Jefferson*, 626-27 (Julian P. Boyd ed., 1950) (reproducing Jefferson's manuscript copy). The Bill was enacted unchanged on Nov. 28, 1786. *See* 12 Hening's Statutes at Large 354-55.

penalty. In 1788, Massachusetts passed an Act for the Ease of the Citizens Concerning Actions Upon Penal Statutes which imposed a one-year statute of limitations, required the informer to bring his action in the county where the offense occurred, and permitted defendants to make a general denial. *See* Act of June 19, 1788, ch. 12, *in* 1788-89 *Acts and Resolves of Massachusetts* 19-20. New York's 1788 Act to Redress Disorders by Common Informers and to Prevent Malicious Informations imposed the same restrictions as Massachusetts, and copied the Virginia anti-collusion provisions. *See* Act of Feb. 6, 1788, ch. 9., *in* 1788 *Laws of the State of New York* 608-11.

Like Massachusetts, Virginia's constitution provided that "the legislative, executive, and judiciary department, shall be separate and distinct, so that neither exercise the powers properly belonging to the other[.]" Va. Const. (1776). New York's charter mirrored the language of Article II even more closely: "the supreme executive power and authority of this State shall be vested in a governor[.]" N.Y. Const., art. xvii (1777). If the lawmakers of the Founding generation subscribed to the view that private litigants enforcing regulatory law were encroaching on the law enforcement prerogatives of the Executive, this

would have surely been the moment to radically change *qui tam*. But that's not what happened. Instead, the thrust of these reforms was to make *qui tam* enforcement more effective and less onerous by imposing legislative safeguards familiar from English history.

Despite widespread antipathy to professional informers, the legislators of the 1780s declined to eliminate *qui tam* claims, or even subject them to the control of executive officers.

### B. In 1791, Washington and Hamilton determined that the President lacked the power to pardon defendants for penalties owed to private *qui tam* relators.

Second, even the Washington Administration decided agreed that the traditional limitations on executive control over *qui tam* proceedings still applied to the President. Samuel Dodge, a customs inspector in New York, violated a provision of the 1790 customs act by permitting a vessel to unload several hogsheads of molasses in the dark. 7 *Papers of George Washington* 493–95, n.1 (Jack D. Warren, Jr. ed., 1988) [hereinafter "*Washington Papers*"] (editorial note). After being indicted by an informer suing in the name of the United States, Dodge appealed to George Washington for a pardon. *Id.* His petition was compelling. The grand jury found that Dodge had no intent to defraud the treasury,

and he "maintained that he had been entirely ignorant of the regulation forbidding unlading after seven o'clock in the evening, which had gone into effect only a few days before the incident." *Id.* The sticking point, however, was that the Act awarded half of the $400 fine to the United States, and divided the other half between the private informer and local treasury officials. *See* 1 Stat. 145, 177, § 69 (1790).

When Washington requested Hamilton's advice, Hamilton turned to Richard Harrison, a respected lawyer and the Auditor of the Treasury Department, for his take on how the distribution of the penalty among between the United States and a private person would impact the pardon power. 8 *Hamilton Papers* 312-14 (letter from Hamilton to Harrison of 26 Apr. 1791). While acknowledging the difficulty of these "untried points," Harrison gave a clear answer the following month: Washington could remit only the United States' portion of the fine, and the other criminal punishments in the Act (like a ban on federal officeholding). *Id.* at 352-54 (letter from Harrison to Hamilton of 24 May 1791). With regard to the portions of the penalty awarded to private individuals, the pardon would be a "mere nullity." *Id.* Washington ultimately pardoned Dodge—but with the caveat

suggested by Harrison, making his pardon conditional on his satisfaction of the penalty owed to the informers. 7 *Washington Papers* 493–95, n.1.

Harrison's conclusion reflected the Founding-Era consensus that a civil forfeiture under a penal statute accrued at the moment of default. *See* Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 Yale L.J. 2446, 2479, n.169 (2016). Because "the commission of the offence marks the point of time on which the statutory transfer of right takes place[,]" *United States v. 1960 Bags of Coffee*, 12 U.S. (8 Cranch) 398, 405 (1814), both the rights of the United States and the rights of the informer had already vested. Washington could release the former, but not the latter.

The Dodge affair reveals that *qui tam* was carefully reconciled with Article II, and not just reflexively carried over from pre-Constitutional practice. *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 40 (2015) (Thomas, J. concurring) (looking to "the practices of the Washington administration" to ascertain the meaning of the Article II's Vesting Clause). Washington and Hamilton decided that the Executive had no power to displace a private *qui tam* penalty, even

though the relator proceeded in the name of the United States. The informer's action was an egregious impingement on prosecutorial discretion; Dodge's violation was purely technical, and a public prosecutor would likely not have proceeded against him. Nevertheless, in the Administration's view, the only remedy lay with Congress.

### C. The high-profile *qui tam* provisions of the Slave Trade Act of 1794 never drew an Article II objection.

Third, the federal Slave Trade Act of 1794 "reflects a remarkable consensus as to the legitimacy of no-injury informer litigation." Pfander, *supra*, at 481. After state law measures to curb the slave trade proved ineffectual, Quaker groups petitioned the federal government for a more effective ban. *Id.* at 480. Congress responded with the 1794 Slave Trade Act, imposing stiff *qui tam* penalties on the owners and operators of slave ships: forfeiture of the vessel, a $2,000 penalty on any person fitting out a ship for the slave trade, and an additional $200 penalty for each person boarded for the purpose of "selling them as slaves." Act of March 22, 1794, § 1, 3 Stat. 347, 347. One half of the recovery would go to the United States, and the other to the "use of him or her who shall sue for and prosecute the same." *Id.*

The Providence Society, a private association of antislavery activists from Rhode Island, brought the first successful suit under this statute against a slave trader in 1797. Pfander, *supra*, at 482. A few years later, the New-York Manumission Society sought $30,000 in *qui tam* penalties against slave ship captain Phillip Topham and ultimately obtained a $16,000 judgement in federal court, *id.* at 483-84, obviously a "daunting" sum for the time. Both Societies investigated alleged slavers, chose which ones to sue, picked their own legal theories, and selectively compromised cases on their own initiative. *Id.* at 482-83. They financed their cases with charitable contributions and membership dues. *Id.* at 477; *see also* T. Robert Moseley, *A History of the New-York Manumission Society, 1785–1849* 48-50 (1963) (Ph.D. dissertation, New York University) (on file with author).

By the district court's account, *qui tam* litigants who exercise this kind of "unfettered discretion" violate Article II. (Dkt. 346 at 5.) But John Jay and Alexander Hamilton apparently disagreed, since both men were founding members and later presidents of the New York Manumission Society. *See* Moseley, *supra*, at 36-40, 352. Similarly, the district court noted with consternation that outside funders sometimes

back *qui tam* suits today. (Dkt. 346 at 8.) The district court was apparently unaware that two authors of the Federalist Papers "played active and decisive roles in" the organization which procured the third-party litigation funding for the most audacious *qui tam* suit of the Early Republic. Moseley, *supra*, at 352.

Puzzlingly, Judge Mizelle cited Amicus Pfander's article only to point out that *qui tam* relators sometimes engaged federal district attorneys (in their capacity as private lawyers) to bring their cases. (Dkt. 346 at 42-43) (citing Pfander, *supra*, at 488-89). That is true, and unsurprising—because district attorneys were not salaried, they worked "part-time for the government and part-time for their own account." Pfander, *supra*, at 489. But nothing in Amicus Pfander's article suggests that this arrangement provided the federal government with a "potential gatekeeping mechanism and control over a relator's litigation decisions." (Dkt. 346 at 42.) There's no reason to think that the President had any control over a district attorney's private law practice.

In any case, district attorneys in the Early Republic "did not answer to higher ups in a department of justice" or even the "Attorney

General." Pfander, *supra*, at 491. Indeed, "claims about unitary executive control" (like Judge Mizelle's) fail to address the "comparative independence of early republic informers and district attorneys." *Id.*

The district court notably failed to mention the other findings of Amicus Pfander's article: No Article II objection arose in the Congressional debates about the Slave Trade Act. *Id.* No defendant proffered a separation of powers defense in any of the high profile and hotly contested trials carried out under the Act. *Id.* And even the Jefferson administration, when petitioned by Topham for a pardon, expressed no constitutional "qualms about the public or private enforcement of the 1794 Act." *Id.* at 485. Like Washington in the Dodge case, Jefferson concluded that he "could release Topham from prison and remit any penalty the government had collected, but a presidential pardon did not reach the private property rights of third parties." *Id.*

In short, "[a]ntislavery law enforcement in the early republic casts serious doubt on the claim that Article II was understood at the time to vest the executive with an exclusive enforcement discretion that forecloses Congress from relying on private informers to play a supplemental or independent role in law enforcement." *Id.* at 491.

* * *

In these three formative moments, both government officials and the broader public had to grapple with *qui tam*'s place in America's separation-of-powers regime. But even those actors with the greatest incentive to tamp down *qui tam*—executive branch officials and defendants—never claimed that relators were unconstitutionally exercising executive power. On all sides of the debate, leading figures appear to have regarded *qui tam* enforcement as one entirely constitutional measure that Congress could deploy to supplement the effective enforcement of federal regulations.

## CONCLUSION

"When properly applied, history helps ensure that judges do not simply create constitutional meaning 'out of whole cloth.'" *Rahimi*, 602 U.S. 680, 717 (Kavanaugh J., concurring) (quoting A. Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1183 (1989)). The meaning the district court discovered in Article II is cut from a different cloth altogether.

In essence, the dismissal order defined "Executive Power" by reference to present-day features of executive governance, and then

asked whether history can justify "an exception" to that understanding for *qui tam*. (Dkt. 346 at 39.) That gets the interpretative task exactly backwards. The key question is what the historical evidence can tell us about the meaning of Article II's language when it was adopted. That is a broad inquiry, which must take account of the Founding-Era legal practices included (or not included) under the heading of "executive Power."

Those practices—and the way the Framing generation debated and conceptualized them—leave no doubt that *qui tam* was compatible with Article II as understood at the Founding. The district court's cursory citations to Amici's work do not engage with this broader historical backdrop. Amici respectfully ask that the Court take this context into account when interpreting Article II.

Dated: January 15, 2025      Respectfully submitted,

**JAMES PFANDER, DIEGO ZAMBRANO, and JARED LUCKY**

By: /s/ Jared Lucky

Jared T. Lucky
jlucky@edelson.com
EDELSON PC

150 California Street, 18th Floor
San Francisco
Tel: 415.907.6645

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(g)(1) because it contains 6,496 words, excluding the parts of the document excepted by Fed. R. App. P. 32(f). This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 Business in 14-point Century Schoolbook font.

Dated: January 15, 2025   /s/ Jared Lucky
            Jared Lucky

            *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of January 2025, I electronically filed the foregoing Brief of *Amicus Curiae* with the clerk of this Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

/s/ Jared Lucky
Jared Lucky

*Counsel for Amici Curiae*