Nos. 24-13581 & 24-13583

# In the United States Court of Appeals for the Eleventh Circuit

UNITED STATES EX REL. CLARISSA ZAFIROV,
PLAINTIFF-APPELLANT

UNITED STATES OF AMERICA,
MOVANT-APPELLANT

*v.*

FLORIDA MEDICAL ASSOCIATES, LLC, D/B/A VIPCARE;
PHYSICIAN PARTNERS, LLC; ANION TECHNOLOGIES, LLC;
FREEDOM HEALTH, INC.; OPTIMUM HEALTHCARE INC.,
DEFENDANTS-APPELLEES

PHYSICIAN PARTNERS SPECIALITY SERVICES, LLC, ET AL.,
DEFENDANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA (CIV. NO. 19-1236)
(THE HONORABLE KATHRYN KIMBALL MIZELLE, J.)*

## BRIEF OF DEFENDANTS-APPELLEES

ANTON METLITSKY
O'MELVENY & MYERS LLP
  *1301 Avenue of the Americas
  New York, NY 10019*

AMANDA M. SANTELLA
O'MELVENY & MYERS LLP
  *1625 I Street, N.W.
  Washington, DC 20006*

KANNON K. SHANMUGAM
JAMES DURLING
ANNA J. GOODMAN
BENJAMIN M. MILLER-GOOTNICK
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300
  kshanmugam@paulweiss.com*

*(additional counsel on inside cover)*

EVAN HINDMAN
O'MELVENY & MYERS LLP
  *Two Embarcadero Center*
  *San Francisco, CA 94111*

MATTHEW D. KRUEGER
GERALD S. KERSKA
DAVID J. WENTHOLD
FOLEY & LARDNER LLP
  *777 East Wisconsin Avenue*
  *Milwaukee, WI 53202*

JASON MEHTA
MICHAEL P. MATTHEWS
FOLEY & LARDNER LLP
  *100 North Tampa Street*
  *Tampa, FL 53202*

PRIYANKA GHOSH-MURTHY
LAW OFFICE OF PRIYANKA GHOSH-MURTHY
  *1010 North Florida Avenue*
  *Tampa, FL 33602*

Nos. 24-13581 & 24-13583

*U.S. ex rel. Zafirov and United States* v. *Florida Medical Associates, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, defendants-appellees Florida Medical Associates, LLC, d/b/a VipCare; Physician Partners, LLC; Anion Technologies, LLC; Freedom Health, Inc.; and Optimum Healthcare, Inc., certify that the Certificates of Interested Persons filed in the opening briefs of plaintiff-appellant Clarissa Zafirov and movant-appellant United States, along with those provided by amici, are together complete, except for the omission of the following interested persons:

1.  Evan Hindman

2.  Gerald S. Kerska

3.  Law Office of Priyanka Ghosh-Murthy

Defendants-appellees Florida Medical Associates, LLC, d/b/a VipCare, and Anion Technologies, LLC, have no parent corporation, and no publicly held company owns 10% or more of their stock. Defendant-appellee Physician Partners, LLC, is a wholly owned indirect subsidiary of Better Health Group, LLC. Better Health Group, LLC, has no parent corporation, and no publicly held company owns 10% or more of its stock.

Defendants-appellees Freedom Health, Inc., and Optimum Healthcare, Inc. are indirect subsidiaries of Elevance Health, Inc. (ELV). Elevance Health, Inc., has no parent corporation, and no publicly held company owns 10% or more of its stock.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-appellees Florida Medical Associates, LLC, d/b/a VipCare; Physician Partners, LLC; Anion Technologies, LLC; Freedom Health, Inc.; and Optimum Healthcare, Inc., respectfully submit that oral argument would be beneficial because this case presents novel and important questions regarding the constitutionality of a federal statute.

# TABLE OF CONTENTS

Page

Statement of the issues ........................................................1

Introduction.........................................................................1

Statement of the case .........................................................4

    A.    Legal background ......................................................4

    B.    Factual background and proceedings below...................8

Standard of review..............................................................11

Summary of argument ........................................................11

Argument.............................................................................14

    I.    The False Claims Act's *qui tam* provisions violate Article II........................................................................14

        A.    FCA relators exercise core executive power.....................14

        B.    The FCA's *qui tam* provisions violate the Appointments Clause ..........................................19

            1.    Relators exercise significant authority.....................19

            2.    Relators occupy continuing positions.......................21

        C.    The FCA's *qui tam* provisions violate the Vesting and Take Care Clauses ........................................27

            1.    The FCA impermissibly vests executive power in private individuals...................................28

            2.    The FCA does not provide for meaningful supervision or removal authority..............................29

    II.    Relator's and the government's arguments lack merit ..............34

Page

Table of contents—continued:

    A.    FCA relators are not merely private litigants enforcing their private interests ...........................................34

    B.    The FCA's *qui tam* provisions are indefensible under existing constitutional doctrine ...........................................39

        1.    Relators are inconsistent with the Appointments Clause ...................................................39

        2.    Relators are inconsistent with the Take Care and Vesting Clauses ...................................................47

    C.    History does not support the constitutionality of the FCA's *qui tam* provisions .........................................48

    D.    The FCA's *qui tam* provisions are facially unconstitutional..............................................................55

Conclusion.............................................................................56

## TABLE OF CITATIONS

### CASES

*Adams* v. *Woods*, 6 U.S. (2 Cranch) 336 (1805) .............................................52, 53

*Aiken County, In re*, 725 F.3d 255 (D.C. Cir. 2013) .............................16, 40, 48

*Alexander* v. *Sandoval*, 532 U.S. 275 (2001).............................................53

*Alpine Securities Corp.* v. *FINRA*, 121 F.4th 1314 (D.C. Cir. 2024) .............................................39

*Auffmordt* v. *Hedden*, 137 U.S. 310 (1890) .............................................24

*Bauer* v. *Marmara*, 774 F.3d 1026 (D.C. Cir. 2014) .............................................53

Page

Cases—continued:

*Buckley* v. *Valeo*, 424 U.S. 1 (1976)............................................15, 19, 20, 21, 42

*Collins* v. *Yellen*, 594 U.S. 220 (2021) ................................................................32

*Consumers' Research, Cause Based Commerce, Inc.* v. *FCC*,
    88 F.4th 917 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 2629
    (2024) ..............................................................................................................28

*Cummings* v. *Missouri*, 71 U.S. (4 Wall.) 277 (1867) ........................................37

*Department of Transportation* v. *Association of American
    Railroads*, 575 U.S. 43 (2015)........................................................................29

*Edmond* v. *United States*, 520 U.S. 651 (1997) ..................................................19

*EEOC* v. *Pemco Aeroplex, Inc.*, 383 F.3d 1280 (11th Cir. 2004) ...............36, 43

*Free Enterprise Fund* v. *Public Company Accounting
    Oversight Board*, 561 U.S. 477 (2010).....................................15, 29, 30, 31, 34

*Friends of the Earth, Inc.* v. *Laidlaw Environmental Services
    (TOC), Inc.*, 528 U.S. 167 (2000).....................................................................36

*Grand Jury Investigation, In re*, 916 F.3d 1047 (D.C. Cir. 2019) ...................22

*Heckler* v. *Chaney*, 470 U.S. 821 (1985).............................................................16

*Hudson* v. *United States*, 522 U.S. 93 (1997).......................................................8

*Hughes Aircraft Co.* v. *United States ex rel. Schumer*,
    520 U.S. 939 (1997).........................................................................................33

*Kellogg Brown & Root Services, Inc.* v. *United States ex rel.
    Carter*, 575 U.S. 650 (2015) .....................................................................25, 45

*Laufer* v. *Arpan LLC*, 29 F.4th 1268 (11th Cir. 2022),
    *vacated on other grounds*, 77 F.4th 1366 (2023) ...........................................16

*Lucia* v. *SEC*, 585 U.S. 237 (2018) .......................................................19, 21, 41

Page

Cases—continued:

*Marsh* v. *Chambers*, 463 U.S. 783 (1983) ............................................49, 50, 51, 55

*Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304 (1816)................................29

*Morrison* v. *Olson*, 487 U.S. 654 (1988).............21, 22, 24, 30, 31, 32, 33, 44, 46

*PDVSA United States Litigation Trust* v. *LukOil Pan Americas LLC*, 65 F.4th 556 (11th Cir. 2023) ....................................................27

*Printz* v. *United States*, 521 U.S. 898 (1997) ......................................48

*Riley* v. *St. Luke's Episcopal Hospital*,
252 F.3d 749 (5th Cir. 2001) (en banc).......................................31, 50

*Rosell* v. *VMSB, LLC*, 67 F.4th 1141 (11th Cir. 2023)...............................32

*Ruckh* v. *Salus Rehabilitation, LLC*,
963 F.3d 1089 (11th Cir. 2020)....................................................43

*Samara* v. *Taylor*, 48 F.4th 141 (11th Cir. 2022) ...............................11

*Seila Law LLC* v. *CFPB*,
591 U.S. 197 (2020)..........................14, 15, 20, 21, 29, 30, 31, 42, 43

*Sierra* v. *City of Hallandale Beach*,
996 F.3d 1110 (11th Cir. 2021)................................................15, 55

*Stanton* v. *Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876)......................................23

*United States ex rel. Atkins* v. *McInteer*,
470 F.3d 1350 (11th Cir. 2006)........................................................7

*United States ex rel. Day* v. *Boeing*,
Civ. No. 23-371, 2024 WL 2978469 (E.D. Va. June 13, 2024).......................32

*United States ex rel. Eisenstein* v. *City of New York*,
556 U.S. 928 (2009).........................................................7, 17, 18, 43

Page

Cases—continued:

*United States ex rel. Kelly* v. *Boeing Co.*,
    9 F.3d 743 (9th Cir. 1993)................................................28

*United States ex rel. Lusby* v. *Rolls-Royce Corp.*,
    570 F.3d 849 (7th Cir. 2009)............................................17

*United States ex rel. Marcus* v. *Hess*, 317 U.S. 537 (1943)..........................4, 52

*\*United States ex rel. Polansky* v. *Executive Health Resources,
    Inc.*, 599 U.S. 419 (2023)....................................3, 4, 6, 7, 31, 32, 35, 40, 50, 55

*United States ex rel. Spicer* v. *Westbrook*,
    751 F.3d 354 (5th Cir. 2014)............................................25

*United States* v. *AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019) ....................6

*United States* v. *Donziger*, 38 F.4th 290 (2d Cir. 2022)........................22, 24, 26

*United States* v. *East Baton Rouge Parish School Board*,
    594 F.2d 56 (5th Cir. 1979)..............................................43

*United States* v. *Germaine*, 99 U.S. 508 (1878)................................23

*United States* v. *Griswold*, 26 F. Cas. 42 (D. Or. 1877) ....................54

*United States* v. *Halper*, 490 U.S. 435 (1989) ........................................8

*United States* v. *Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) ..........................37

*United States* v. *NEC Corp.*, 11 F.3d 136 (11th Cir. 1993)..............................25

*United States* v. *Nixon*, 418 U.S. 683 (1974) ........................................55

*United States* v. *Rahimi*, 602 U.S. 680 (2024) ....................................49

*United States* v. *Texas*, 599 U.S. 670 (2023) ....................................14, 17

*The Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1868)........................................28

Page

Cases—continued:

*Timson* v. *Sampson*, 518 F.3d 870 (11th Cir. 2008) ...........................................18

*TransUnion LLC* v. *Ramirez*, 594 U.S. 413 (2021) ...........................................15

*\*Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765 (2000) ................ 3, 4, 8, 17, 18, 22, 35, 36, 39, 43, 51, 52

*Webster* v. *Fall*, 266 U.S. 507 (1925) ...................................................51

*Wisconsin Bell, Inc.* v. *United States ex rel. Heath*, 145 S. Ct. 498 (2025) ...........................................................3

*Yates* v. *Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. 2021) ...........................................18, 35, 39

## CONSTITUTION, STATUTES, AND REGULATIONS

*U.S. Const. Art. II, § 1, cl. 1...............................................................14

*U.S. Const. Art. II, § 2, cl. 2...............................................................15

*U.S. Const. Art. II, § 3 ....................................................................15

Act for the Punishment of Certain Crimes Against the United States, ch. 9, 1 Stat. 112 (1790)........................................................55

Act to Prevent and Punish Frauds upon the Government of the United States, ch. 67, 12 Stat. 696 (1863)......................................4, 54

*False Claims Act, 31 U.S.C. §§ 3729-3733:

31 U.S.C. § 3729(a)........................................................................8

31 U.S.C. § 3729(a)(1)....................................................................35

31 U.S.C. § 3730(b) ......................................................................22

31 U.S.C. § 3730(b)(1)...................................................18, 20, 35, 40, 47

Page

Statutes and regulations—continued:

31 U.S.C. § 3730(b)(2) .................................................6, 17, 35, 40, 47

31 U.S.C. § 3730(b)(3) ...........................................................6, 17, 47

31 U.S.C. § 3730(b)(4)(B) ................................................................46

31 U.S.C. § 3730(b)(5) ....................................................................45

31 U.S.C. § 3730(c) ...................................................................18, 22

31 U.S.C. § 3730(c)(1) .....................................................................7

31 U.S.C. § 3730(c)(2) .....................................................................7

31 U.S.C. § 3730(c)(2)(A) ................................................................32

31 U.S.C. § 3730(c)(2)(B) .................................................................8

31 U.S.C. § 3730(c)(2)(C) .................................................................7

31 U.S.C. § 3730(c)(2)(D) .................................................................7

31 U.S.C. § 3730(c)(3) .............................................................6, 17, 33

31 U.S.C. § 3730(c)(4) ..................................................................6, 33

31 U.S.C. § 3730(d) ..................................................................8, 22, 47

42 U.S.C. § 1395w-22 ......................................................................9

42 U.S.C. § 1395w-23 ......................................................................9

42 U.S.C. § 1395w-23(a) ...................................................................9

42 U.S.C. § 1395w-23(a)(1)(C)(i) ...........................................................9

42 U.S.C. § 1395w-27 ......................................................................9

28 C.F.R. § 85.5(a) ........................................................................8

Page

Regulations—continued:

28 C.F.R. § 85.5(d) ...................................................................8

42 C.F.R. § 422.308(c) ..............................................................9

## OTHER AUTHORITIES

J. Randy Beck, *The False Claims Act and the English
Eradication of Qui Tam Legislation*,
8 N.C. L. Rev. 539 (2000) ...............................................5, 50

John T. Boese & Douglas W. Baruch, *Civil False Claims and
Qui Tam Actions* (5th ed. 2023)..............................5, 6, 28

Christine Kexel Chabot, *The Founders' Purse*,
110 Va. L. Rev. 1027 (2024)...................................................47

Cong. Globe, 37th Cong., 3d Sess. 954 (1863) ........................4

Constitutionality of the Qui Tam Provisions of the False Claims
Act, 13 Op. O.L.C. 207 (1989)................................................5

Charles Doyle, Congressional Research Service, R40785,
*Qui Tam: The False Claims Act and Related Federal Statutes*
(Apr. 26, 2021) .......................................................................50

Officers of the United States Within the Meaning of the Appoint-
ments Clause, 31 Op. O.L.C. 73 (2007).............................23, 38, 44

Michael Rich, *Prosecutorial Indiscretion: Encouraging the
Department of Justice to Rein in Out-of-Control Qui Tam
Litigation Under the Civil False Claims Act*,
76 U. Cin. L. Rev. 1233 (2008) .............................................8

S. Rep. No. 99-345 (1986) ........................................................5

The Test for Determining "Officer" Status Under the Appoint-
ments Clause, 49 Op. O.L.C. __ (Jan. 16, 2025)................38

Page

Other authorities—continued:

U.S. Department of Justice, Civil Div. Dir. No. 1-15, 80 Fed. Reg.
31,998 (June 5, 2015)..........................................................................33

U.S. Department of Justice, *Fraud Statistics—Overview (Octo-*
*ber 1, 1986-September 30, 2024)* <tinyurl.com/dojfraudstats> ...................5

U.S. Department of Justice, Justice Manual § 4.4.110.....................................33

Ann Woolhandler & Caleb Nelson, *Does History Defeat*
*Standing Doctrine?*, 102 Mich. L. Rev. 689 (2004).......................................49

## STATEMENT OF THE ISSUES

1.     Whether the False Claims Act's *qui tam* provisions violate the Appointments Clause of the United States Constitution.

2.     Whether the False Claims Act's *qui tam* provisions violate the Vesting and Take Care Clauses of the United States Constitution.

## INTRODUCTION

This case presents one of the most important open questions in American constitutional law: whether the False Claims Act violates Article II of the Constitution by authorizing private parties to bring suit on behalf of the United States. Through the FCA's *qui tam* provisions, individuals can bring suit to vindicate injuries to the government's fisc and sovereignty, despite having suffered no injury of their own. Those individuals, known as relators, may initiate litigation in the government's name, shape the government's legal positions, and bind the government through judgments, and their actions are backed by the threat of punitive treble damages and civil penalties. Yet relators are neither properly appointed nor meaningfully controlled by the Executive Branch.

As the district court correctly held, that anomalous scheme is inconsistent with the Constitution's separation of powers. The FCA's assignment of core executive power to unaccountable private parties conflicts with Article II of the Constitution for two related reasons.

*First*, the FCA's *qui tam* provisions violate the Appointments Clause. Relators wield one of the most significant forms of executive power: the power to litigate on the government's behalf. And they hold continuing positions that are a permanent fixture under the statute and can span years of litigation. But although relators function as officers of the United States, they are not appointed through the constitutionally prescribed process and therefore cannot exercise executive power consistent with the Appointments Clause.

*Second*, the FCA's *qui tam* provisions violate the Vesting and Take Care Clauses. The FCA vests core executive power in the hands of private parties by allowing them to litigate on behalf of the government. And relators exercise such power outside the supervision or control of the Executive Branch. Relators thus intrude on the President's authority to execute the laws and his duty to take care that the laws are faithfully executed.

Relator and the government have offered no valid defense of the FCA's *qui tam* scheme. They primarily claim that relators are merely private litigants enforcing private interests and thus do not exercise executive power. But that view is foreclosed by both the FCA's text and longstanding precedent, which make clear that relators sue to enforce only the government's injuries and thus unquestionably exercise the government's power.

Relator and the government also emphasize the FCA's purported mechanisms of government control and the history of *qui tam* statutes. But those

2

arguments reflect a contradiction at the heart of their defense, because those earlier statutes concededly lacked *any* mechanisms for Executive Branch control. Accordingly, relator and the government must either (1) defend the position that the allegedly significant controls contained in the modern FCA are irrelevant to its constitutionality, or (2) concede that the earlier statutes were constitutionally infirm. Either way, the FCA violates the Constitution.

Twenty-five years ago, the Supreme Court expressly reserved the question whether the FCA's *qui tam* provisions conflict with Article II. *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000). And two years ago, several members of the Supreme Court recognized that there are "substantial arguments" that the FCA's *qui tam* provisions are "inconsistent with Article II." *United States ex rel. Polansky* v. *Executive Health Resources, Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., joined by Barrett, J., concurring); *id.* at 449 (Thomas, J., dissenting); *see also Wisconsin Bell, Inc.* v. *United States ex rel. Heath*, 145 S. Ct. 498, 515 (2025) (Kavanaugh, J., joined by Thomas, J., concurring). The district court correctly held as much below, and its judgment should be affirmed.

## STATEMENT OF THE CASE

### A.    Legal Background

The False Claims Act (FCA) establishes an "unusual" regime under which private litigants—known as relators—initiate and prosecute civil litigation on the government's behalf through so-called *qui tam* actions. *See United States ex rel. Polansky* v. *Executive Health Resources, Inc.*, 599 U.S. 419, 423-424 (2023).  A relator sues solely as a partial assignee of the government's claim to vindicate an injury to the government's "sovereignty" and "proprietary [interests] resulting from the alleged fraud." *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 771, 773 (2000).

Enacted during the Civil War, the FCA targeted an apparent "unwillingness" by Executive Branch officials to "do their duty" and "vindicate the laws that already exist."  Cong. Globe, 37th Cong., 3d Sess. 954 (1863) (statement of Sen. Cowan); *see* Act to Prevent and Punish Frauds upon the Government of the United States (False Claims Act), ch. 67, 12 Stat. 696 (1863).  Congress "enjoined [the government] to be diligent in enforcement of [the FCA's] provisions," and it offered "large rewards . . . to stimulate actions by private parties should the prosecuting officers be tardy in bringing the suits." *United States ex rel. Marcus* v. *Hess*, 317 U.S. 537, 547 (1943).  By World War II, however, the Attorney General wrote to Congress that *qui tam* suits had become "mere parasitical actions," and each house of Congress voted at different

4

times to repeal the provision.  J. Randy Beck, *The False Claims Act and the English Eradication of Qui Tam Legislation*, 78 N.C. L. Rev. 539, 558 (2000) (citation omitted).  As a compromise, Congress ultimately enacted significant restrictions on such suits.  *See id.* at 559-561.  For those and other reasons, the FCA's *qui tam* provisions were "rarely" employed for much of their history.  *See* John T. Boese & Douglas W. Baruch, *Civil False Claims and Qui Tam Actions* §§ 1.01, 4.11 (5th ed. 2023) (Boese & Baruch).

All of that changed in 1986.  Based on its "generalized distrust of, and dissatisfaction with, the way the Executive Branch was carrying out its law enforcement responsibilities," Congress dramatically expanded the FCA by broadening the available claims and increasing the financial rewards for relators.  Boese & Baruch § 4.11 (citation omitted).  By doing so, Congress encouraged private relators to "act[] as a check" on what it deemed to be government underenforcement.  *See* S. Rep. No. 99-345, at 26 (1986).  Those amendments prompted then-Assistant Attorney General William Barr to issue a detailed memorandum explaining why the FCA's *qui tam* provisions were "patently unconstitutional."  Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. 207, 209 (1989).

Since 1986, *qui tam* litigation has exploded.  Relators have pursued over 16,000 actions and recovered over $55 billion in damages.  U.S. Department of Justice, *Fraud Statistics—Overview (October 1, 1986-September 30, 2024)*

<tinyurl.com/dojfraudstats>.  They now routinely sue under a "false certifi-cation" theory for alleged statutory and regulatory violations, *see* Boese & Ba-ruch § 2.03[B][1], including violations of complex provisions that are often "subject to multiple interpretations," *United States* v. *AseraCare, Inc.*, 938 F.3d 1278, 1284, 1299 (11th Cir. 2019).  Private parties are thus often advancing highly contested interpretations of ambiguous regulations without any regard for the government's views.

Under the post-1986 FCA, a relator can unilaterally file suit on the gov-ernment's behalf.  The relator must notify the government at the outset of the litigation, *see* 31 U.S.C. § 3730(b)(2)-(3), but the government cannot stop the relator from filing suit.  Upon filing, the case is sealed for 60 days while the government determines whether to "intervene" (or to seek an extension for "good cause").  *Id.*  If the government declines to intervene, the relator takes the "lead role" in the case.  *Polansky*, 599 U.S. at 423.

Unless the government intervenes, its role is largely that of a spectator. The government may request copies of pleadings and deposition transcripts, 31 U.S.C. § 3730(c)(3), or move to stay discovery temporarily if the relator's efforts "would interfere with the [g]overnment's investigation or prosecution of a criminal or civil matter arising out of the same facts," 31 U.S.C. § 3730(c)(4).  But the government cannot control the relator's pleadings, dis-

covery, or trial strategy. Although the government may seek to file a statement of interest, it cannot stop the relator from pressing legal arguments with which it disagrees; making specific factual allegations even if it thinks those allegations are irrelevant or untrue; or pursuing discovery, no matter the "enormous costs" or "disruption" involved. *United States ex rel. Atkins* v. *McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (citation omitted). Following the litigation, the relator's suit generally has preclusive effect on the government. *See United States ex rel. Eisenstein* v. *City of New York*, 556 U.S. 928, 936 (2009).

Even if the government intervenes—which occurs in only one of every five cases—the relator remains fully a party to the case, free to press legal arguments the government would rather avoid and to propound discovery the government might deem disproportionate. *See* 31 U.S.C. § 3730(c)(1); D. Ct. Dkt. 346, at 6. The government may limit a relator's "unrestricted participation" only by showing it would actively "interfere with or unduly delay the [g]overnment's prosecution of the case"; "be repetitious, irrelevant, or for purposes of harassment"; or "cause the defendant undue burden or unnecessary expense." 31 U.S.C. § 3730(c)(2)(C)-(D). The government cannot end the case unilaterally, either. It cannot dismiss the action without providing the relator an opportunity to be heard and showing that the "burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 438; *see* 31 U.S.C. § 3730

(c)(2).  Nor can the government settle the case over a relator's objection unless a court finds the settlement "fair, adequate, and reasonable under all the circumstances."  31 U.S.C. § 3730(c)(2)(B).

Finally, the FCA imposes severe damages that are "essentially punitive in nature."  *Stevens*, 529 U.S. at 784.  A defendant can face treble damages, plus statutory penalties of nearly $28,000 per infraction.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a), (d).  Since each "false claim" constitutes a separate infraction, those penalties can dwarf any actual damage to the government.  *See United States* v. *Halper*, 490 U.S. 435, 450-452 (1989), *overruled on other grounds by Hudson* v. *United States*, 522 U.S. 93 (1997).  The relator receives a specified percentage of any recovery, ranging from 15% to 30%, depending on whether the government has intervened.  *See* 31 U.S.C. § 3730(d).  And relator's attorneys can obtain statutory fees and costs, on top of their standard contingent fees, incentivizing lawyer-driven litigation.  *See* Michael Rich, *Prosecutorial Indiscretion: Encouraging the Department of Justice to Rein in Out-of-Control Qui Tam Litigation Under the Civil False Claims Act*, 76 U. Cin. L. Rev. 1233, 1251 & n.128, 1262 (2008).

## B.    Factual Background And Proceedings Below

1.    The underlying dispute in this case arises from the Medicare Advantage program.  Under that program, private health insurers, known as Medicare Advantage Organizations (MAOs), contract with the government to

insure Medicare-eligible beneficiaries. *See* 42 U.S.C. § 1395w-22. MAOs (such as defendants Freedom Health, Inc., and Optimum Healthcare, Inc.) provide benefits to their enrollees, who receive treatment through health-care providers affiliated with provider organizations (such as defendants Florida Medical Associates, LLC, and Physician Partners, LLC). *See* 42 U.S.C. §§ 1395w-22, 1395w-23, 1395w-27. The government reimburses MAOs based on the expected costs of caring for their enrollees over the course of a year. *See* 42 U.S.C. § 1395w-23(a). Those reimbursement calculations are complex; patient diagnosis codes sometimes form part of the bases for risk adjustment. *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i); 42 C.F.R. § 422.308(c).

On May 20, 2019, relator Clarissa Zafirov filed a sealed complaint in the United States District Court for the Middle District of Florida, alleging that defendants violated the FCA by submitting diagnosis codes that made their patients appear sicker than they were. *See* D. Ct. Dkt. 1. (Defendants vigorously dispute that contention.) The government initially received a six-month extension to decide whether to intervene. *See* D. Ct. Dkt. 4, 5, 6. It then sought an additional six-month extension, which the district court denied for lack of good cause. *See* D. Ct. Dkt. 11, at 2. The court unsealed the complaint, *see* D. Ct. Dkt. 17, and the government later formally declined to intervene, *see* D. Ct. Dkt. 40.

9

Over the ensuing years, relator sought expansive discovery that required defendants to "expend[] substantial resources." D. Ct. Dkt. 245. For example, defendants produced hundreds of thousands of pages of documents, and relator deposed eighteen witnesses. *See, e.g.*, D. Ct. Dkt. 292, at 2. The government did not participate, other than in response to requests for third-party information. During the litigation, relator moved to Canada and has continued prosecuting the case from there. *See* D. Ct. Dkt. 346, at 9.

2.    In 2024, defendants filed a motion for judgment on the pleadings or dismissal, arguing that the FCA's *qui tam* provisions violate Article II of the United States Constitution. Specifically, defendants contended that the provisions violate (1) the Vesting and Take Care Clauses, by permitting private relators to exercise executive power while unduly restricting the President's ability to supervise or remove them, and (2) the Appointments Clause, by permitting relators to wield significant authority on a continuing basis without being appointed as officers of the United States. *See* D. Ct. Dkt. 180. The parties, government, and amici submitted voluminous briefing, including supplemental briefing concerning "founding-era historical evidence regarding federal qui tam enforcement," D. Ct. Dkt. 240, at 1, and the district court heard nearly four hours of oral argument, *see* D. Ct. Dkt. 239. The government eventually intervened for the limited purpose of defending the constitutionality of the FCA's *qui tam* provisions. *See* D. Ct. Dkt. 259.

The district court granted the motion for judgment on the pleadings. *See* D. Ct. Dkt. 346. It held that FCA relators are officers of the United States not properly appointed under the Constitution. *See id.* at 13-49. Given that holding, the court did not reach defendants' alternative challenge under the Vesting and Take Care Clauses. *See id.* at 11. The court concluded that dismissal was the appropriate remedy. *See id.* at 50-53.

## STANDARD OF REVIEW

This Court reviews an order granting judgment on the pleadings de novo. *See Samara* v. *Taylor*, 48 F.4th 141, 149 (11th Cir. 2022).

## SUMMARY OF ARGUMENT

I.     Article II of the Constitution vests all executive power in the President and makes clear that such power may be exercised only by the President and those under his supervision. The FCA's *qui tam* provisions depart from that structure by delegating the authority to bring public enforcement actions to self-appointed and unaccountable private parties. Relators control whether and when to bring lawsuits, which defendants to target, what claims to pursue, and what legal theories to advance. In so doing, they not only displace the Executive Branch's enforcement discretion but also commandeer its investigative discretion. When the government does not intervene (as is usually the case), the relator controls the litigation, including through a final judgment that binds the government. And even when the government does intervene,

11

the relator retains various rights to litigate on the government's behalf, including the right to unrestricted participation in the case absent exceptional circumstances. That outsourcing of core executive power gives rise to two related constitutional violations.

*First*, the FCA's *qui tam* provisions violate the Appointments Clause. Relators must be appointed as officers of the United States because they exercise significant authority and occupy continuing positions established by law. Relators exercise significant authority by initiating and conducting lawsuits on the government's behalf. And the office of a relator is a continuing position because it is created and persists by operation of statute beyond any particular relator or case. But although relators function as officers, they are not appointed pursuant to the Appointments Clause, and thus their litigation on behalf of the United States violates the Constitution.

*Second*, the FCA's *qui tam* provisions violate the Vesting and Take Care Clauses. Once again, the Constitution vests all executive power in the President, and only the President and those he supervises may exercise such power. But the FCA purports to vest core executive power in private parties. And it does so without giving the Executive Branch meaningful ways to direct or remove them. That arrangement conflicts with the President's authority and with his duty to take care that the laws are faithfully executed.

II.    Relator's and the government's contrary arguments lack merit. Both the FCA's text and longstanding precedent make clear that relators are not merely private litigants enforcing private interests.  Instead, they litigate on the government's behalf to vindicate injuries to its fisc and sovereignty. Relators also fit squarely within precedents recognizing that individuals selected to address specific matters may qualify as officers.  They are nothing like informal employees or contractors who perform irregular duties.  Nor do the FCA's purported control mechanisms resolve its constitutional infirmities. Those procedures neither prevent relators from intruding on the Executive Branch's enforcement discretion nor enable the President to ensure that relators are faithfully exercising executive power.

Finally, the history of early *qui tam* statutes does not counsel a different result, because that unexplained and ambiguous history cannot justify an unconstitutional practice.  Many of the early statutes are nothing like the modern FCA, and the remaining statutes prove too much because they allowed private relators to file lawsuits—including under statutes with criminal penalties—on the government's behalf without *any* Executive Branch supervision or control. Unless relator and the government are willing to defend the constitutionality of that practice, they must concede that the history of *qui tam* statutes provides little guidance on the constitutional question here.  Instead, those

statutes appear to have been simply borrowed from British practice, without any consideration of the Constitution's unique system of separation of powers.

For the foregoing reasons, the district court correctly held that the FCA's *qui tam* provisions are facially unconstitutional. At a minimum, they are unconstitutional as applied to cases, like this one, where the government declines to intervene. Either way, this case was properly dismissed, and the district court's judgment should be affirmed.

## ARGUMENT

## I.   THE FALSE CLAIMS ACT'S *QUI TAM* PROVISIONS VIOLATE ARTICLE II

Under the FCA, private relators exercise core executive power, determining whether, when, and how to bring lawsuits on the government's behalf. That scheme violates both the Appointments Clause and the Vesting and Take Care Clauses.

### A.   FCA Relators Exercise Core Executive Power

1.     Article II sets the Executive Branch apart as the only branch in which power is centralized in a single person: the President. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law LLC* v. *CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, § 1, cl. 1). Article II gives the President broad powers, among the most important of which is the "authority to enforce federal law." *United States* v. *Texas*, 599 U.S. 670, 678 (2023). Because an enforcement action on behalf of the United

States is "the ultimate remedy for a breach of the law," *Buckley* v. *Valeo*, 424 U.S. 1, 138 (1976), the authority to initiate and litigate such actions is a "quintessentially executive power," *Seila Law*, 591 U.S. at 219; *see TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 429 (2021); *Sierra* v. *City of Hallandale Beach*, 996 F.3d 1110, 1133-1136 (11th Cir. 2021) (Newsom, J., concurring).

The Framers nonetheless recognized that "it would be impossible for one man to perform all the great business of the State." *Seila Law*, 591 U.S. at 213 (internal quotation marks, citation, and alteration omitted). The Constitution accordingly contemplates the appointment of "lesser executive officers" to "assist the supreme Magistrate in discharging the duties of his trust." *Id.* (citation omitted); *see* U.S. Const. Art. II, § 2, cl. 2. But those "lesser officers must remain accountable to the President, whose authority they wield," and only they may exercise executive power on the President's behalf. *Seila Law*, 591 U.S. at 213. Otherwise, "the President could not be held fully accountable" if he failed faithfully to execute the laws; "the buck would stop somewhere else." *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477, 514 (2010); *see* U.S. Const. Art. II, § 3.

2.    The FCA's *qui tam* provisions disregard that fundamental constitutional structure and delegate core law-enforcement power to self-appointed

15

relators. The FCA empowers unaccountable private parties, who have suffered no personal injury and sue only as partial assignees of the government's claim, to bring lawsuits on behalf of the United States.

The constitutional problems with this scheme are apparent from the start: the FCA authorizes private individuals to choose whether and when to file suit on the government's behalf and thus supplants the Executive Branch's discretion *not* to do so. "One of the greatest unilateral powers a President possesses . . . is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior." *In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013) (opinion of Kavanaugh, J.) (emphasis omitted); *see Laufer* v. *Arpan LLC*, 29 F.4th 1268, 1291-1294 (11th Cir. 2022) (Newsom, J., concurring), *vacated on other grounds,* 77 F.4th 1366 (2023). For that reason, the Supreme Court has long recognized that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985).

Under the FCA, however, a relator can usurp the Executive Branch's enforcement discretion. The relator decides whether to sue and what claims to pursue. And if the government declines to intervene, the relator controls the litigation going forward. *See* pp. 6-7, *supra*. That authority is particularly

16

important because a relator can seek significant treble damages and civil penalties for any injury to the government—an "essentially punitive" remedy. *Vermont Agency of National Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 784 (2000).

A relator likewise commandeers federal investigative discretion. Once a relator files suit, the government must investigate the claim and decide whether to intervene within 60 days or establish "good cause" for an extension. 31 U.S.C. § 3730(b)(2)-(3). The Executive Branch ordinarily has discretion to "prioritize its enforcement efforts." *Texas*, 599 U.S. at 679. But a relator can force the government to prioritize *the relator's* enforcement efforts or else give up meaningful involvement in the case.

Nor does a relator's authority end there. After filing, unless the government intervenes, the relator has the broad "right to conduct the action" on behalf of the United States. 31 U.S.C. § 3730(c)(3). Relators can litigate as they wish, making important strategic decisions such as pursuing certain theories and forfeiting others. Those decisions generally bind the United States upon entry of a final judgment. *See United States ex rel. Eisenstein* v. *City of New York*, 556 U.S. 928, 936 (2009); *United States ex rel. Lusby* v. *Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). And even when the government does intervene, the relator has the "right to continue" as an "unrestricted" party

17

unless the government makes certain specified showings, such as that the relator is using the litigation "for purposes of harassment." 31 U.S.C. § 3730(c).

Finally, but crucially, the relator exercises all those authorities "for" and "in the name of the [g]overnment." 31 U.S.C. § 3730(b)(1). The FCA delegates to the relator the power to assert the government's "proprietary [interests] resulting from the alleged fraud" and also the "injury to its sovereignty." *Stevens*, 529 U.S. at 771. Of course, a relator is literally a private party, but "the fact that the government delegates some portion of [its] power to private litigants does not change the governmental character of the power exercised." *Yates* v. *Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1310 (11th Cir. 2021) (citation omitted). Under the FCA, the United States is always a "real party in interest," *Eisenstein*, 556 U.S. at 934, and the relator is a "stand-in" or "avatar" for the government, *Yates*, 21 F.4th at 1309-1310 (citation omitted). That explains why a relator may not proceed *pro se*, because it would not ensure "adequate legal representation for the United States's interests." *Timson* v. *Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).

In short, both the FCA's text and longstanding precedent make clear that relators exercise broad enforcement authority on behalf of the government—a quintessential executive power. The question thus becomes whether relators may constitutionally do so. As we will now explain, they may not.

18

### B.    The FCA's *Qui Tam* Provisions Violate The Appointments Clause

The district court correctly held that the FCA's *qui tam* provisions violate the Appointments Clause, which is one of the most "significant structural safeguards of the constitutional scheme" because it helps ensure the "public accountability" of those who wield government power.  *Edmond* v. *United States*, 520 U.S. 651, 659-660 (1997).  Relators function as officers of the United States and thus are subject to the Appointments Clause because they (1) exercise significant authority pursuant to the laws of the United States and (2) occupy a continuing position established by law.  It is undisputed that relators are not appointed consistent with the Appointments Clause.  *See* D. Ct. Dkt. 346, at 48-49.  The FCA's *qui tam* provisions are therefore unconstitutional.

### 1.    *Relators Exercise Significant Authority*

To be an officer, an individual must exercise "significant authority pursuant to the laws of the United States."  *Buckley*, 424 U.S. at 126.  That requirement focuses on "the extent of power an individual wields in carrying out his assigned functions."  *Lucia* v. *SEC*, 585 U.S. 237, 245 (2018).

Relators exercise significant authority because they wield one of the most important forms of executive power:  the power to bring enforcement actions on behalf of the United States.  In *Buckley*, the Supreme Court held that members of the Federal Election Commission were officers because, first and foremost, they had the authority to "conduct[] civil litigation in the courts

19

of the United States for vindicating public rights." 424 U.S. at 140. Such authority could not "possibly be regarded as merely in aid of the legislative function of Congress," because a lawsuit on behalf of the United States "is the ultimate remedy for a breach of the law." *Id.* at 138. More recently, the Court reaffirmed that the authority to seek "daunting monetary penalties against private parties on behalf of the United States in federal court" is a "significant" and "quintessentially executive" power. *Seila Law*, 591 U.S. at 219, 224-225.

A relator exercises effectively identical authority "for" and "in the name of the [g]overnment." 31 U.S.C. § 3730(b)(1). As discussed above, the relator has unfettered discretion to decide whether and when to file suit, which defendants to target, what claims to pursue, and what legal theories to advance. The relator compels the government to alter *its* enforcement priorities to comply with the FCA's 60-day window. And the relator makes those decisions backed by the threat of treble damages and civil penalties. *See* pp. 6-8, 16-17, *supra*. That is significant authority under any understanding of the term.

Still more, where the government does not intervene, relators can conduct the litigation as they wish. A relator may deploy all of the ordinary tools of civil litigation in the name of the United States. And even where the government does intervene, the relator remains a party with significant rights and powers. *See* pp. 6-8, *supra*. Among other things, the government cannot fire

or replace the relator; at most, it can seek to dismiss the litigation wholesale. *See* p. 31, *infra*.

In some respects, a relator has even *greater* authority than other officials whose power has been deemed significant. Unlike the independent counsel in *Morrison* v. *Olson*, 487 U.S. 654 (1988), for example, a relator does not need his appointment to be authorized by an officer accountable to the President before suing and cannot be removed by such an officer. *See id*. at 660-661, 671. And whereas the independent counsel's jurisdiction was specifically defined, *see id*. at 672, a relator determines the limits of the complaint. Likewise, unlike the members of the Federal Election Commission in *Buckley*, relators face none of the institutional constraints of multimember boards: a relator has "no colleagues to persuade" and so may act "unilaterally." *Seila Law*, 591 U.S. at 225 (emphasis omitted). Since those officials exercised significant authority, relators plainly do too.

## 2. *Relators Occupy Continuing Positions*

Relators also occupy a "continuing position established by law." *Lucia*, 585 U.S. at 245 (internal quotation marks and citation omitted). That requirement "stress[es] ideas of tenure and duration" and asks whether the position is impersonal, durable, and statutory, rather than personal, transient, and discretionary. *Id*. (internal quotation marks, citation, and alteration omitted).

21

a.      Relators occupy "continuing positions" under any sensible understanding of that concept.  They bring suit in the impersonal name of the government, and they may be replaced in their duties by others.  *See Stevens*, 529 U.S. at 771-774; pp. 24-25, *infra*.  They perform functions that are expressly authorized and regulated by the FCA, rather than *ad hoc* duties only as assigned.  *See* 31 U.S.C. § 3730(b)-(c).  They receive statutorily defined compensation.  *See* 31 U.S.C. § 3730(d).  They initiate and prosecute actions that may span many years with lasting and preclusive effects.  And that regime "persists by operation of the FCA" beyond any particular relator or case:  the office of relator is "continuous even if it is not continually filled," and it is generally held at any given time by numerous private parties conducting litigation on behalf of the United States.  D. Ct. Dkt. 346, at 31.

In those respects, relators are materially identical to other officials whom courts have recognized as officers.  In *Morrison*, for example, the Court found it "clear" that an independent counsel was an officer, even though she was authorized to investigate and prosecute only a single individual.  *See* 487 U.S. at 666-668, 671 n.12, 672; *id*. at 715 (Scalia, J., dissenting).  Following *Morrison*, lower courts have repeatedly held that special prosecutors and similar individuals are officers, even though they act in only a single matter.  *See, e.g.*, *United States* v. *Donziger*, 38 F.4th 290, 296-299 (2d Cir. 2022); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019).

22

As the district court noted, another "helpful analogy" is to bank receivers. D. Ct. Dkt. 346, at 33. Throughout the nineteenth and early twentieth century, courts recognized that bank receivers were officers even though their duties lasted for only a single receivership. *See* Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 110-111 (2007) (2007 OLC Opinion) (collecting cases); *Stanton* v. *Wilkeson*, 22 F. Cas. 1074, 1075 (S.D.N.Y. 1876). As the district court explained, individuals "empowered to initiate litigation on behalf of the United States" hold continuing positions even if they address only a "specific problem." D. Ct. Dkt. 346, at 34.

The Supreme Court's decisions in *United States* v. *Germaine*, 99 U.S. 508 (1878), and *Auffmordt* v. *Hedden*, 137 U.S. 310 (1890), further illustrate the "continuing position" requirement. In *Germaine*, the Court held that civil surgeons were not officers, emphasizing that they did not act on a regular basis because the relevant statute empowered the Commissioner of Pensions "to appoint [them] at his discretion." 99 U.S. at 508 (citation omitted). Each surgeon acted only when "called on by the Commissioner . . . in some special case," making their duties "occasional and intermittent." *Id.* at 512. The role was not continuing under a statute; instead, it left each surgeon "but an agent of the [C]ommissioner, appointed by him, and removable by him at his pleasure." *Id.* The same was true of customs appraisers in *Auffmordt*, where a statute authorized officers to "select one discreet and experienced merchant"

23

to appraise particular goods. 137 U.S. at 312 (citation omitted). The appraiser had no functions that "extend[ed] over any case further than as he [was] selected to act in that particular case," and he had "no claim or right to be designated, or to act except as he may be designated." *Id.* at 327. In both cases, the positions were not continuing because the statutes did not authorize their permanent, ongoing existence. The FCA, by contrast, permanently authorizes relators to file suit on behalf of the government and gives them specific rights and duties. Such offices exist by operation of law, rather than being wholly contingent on executive discretion.

b. The district court also considered the Second Circuit's decision in *Donziger*, which used three factors to determine whether a position was continuing under the Appointments Clause: (1) whether it was "personal to a particular individual"; (2) whether it was "transient or fleeting"; and (3) whether its "duties" were "more than incidental to the regular operations of the government." 38 F.4th at 297. As the district court recognized, relators readily satisfy all three criteria. *See* D. Ct. Dkt. 346, at 34-37.

*First*, the position of relator is not personal to a particular individual. The FCA creates a role to which any qualified person may appoint himself. Just as the office of independent counsel in *Morrison* was not limited to any particular appointee, so too the office of relator exists independent of whoever brings a given action. For example, if a relator's complaint is dismissed on

24

procedural grounds, another relator may step into the role and raise the same claims. *See Kellogg Brown & Root Services, Inc.* v. *United States ex rel. Carter*, 575 U.S. 650, 662-664 (2015). And even within the context of the same case, one relator may be replaced by another, such as if the relator dies or becomes bankrupt. *See, e.g.*, *United States* v. *NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993); *United States ex rel. Spicer* v. *Westbrook*, 751 F.3d 354, 361-364 (5th Cir. 2014).

That remains so even though relators often pursue separate cases, just as independent counsels, special prosecutors, and bank receivers often handled discrete matters. *See* pp. 22-23, *supra*. The key point is that Congress created an ongoing *role*—conducting civil fraud litigation on behalf of the United States—that exists by operation of the statute and persists regardless of who occupies it.

*Second*, the position is not transient or fleeting. Congress viewed relators as an enduring part of the FCA enforcement mechanism and crafted a framework of overlapping procedures defining that role. As discussed above, the statute authorizes relators to initiate and litigate civil enforcement actions on the government's behalf, but it also requires relators to serve their sealed complaints on the government and gives the government some ability to intervene, monitor discovery, and pursue alternate remedies. *See* pp. 6-8. That

structured regime underscores that these provisions create a continuing governmental position, not just an *ad hoc* private cause of action.

Even taking each relator's work case by case, a *qui tam* action often lasts for years. This case is a prime example: it had been pending for over five years at the time of dismissal, and the parties had yet to complete discovery. *See* D. Ct. Dkt. 346, at 1; *Donziger*, 38 F.4th at 297. Such sustained duties are akin to those of independent counsels or special prosecutors and far from the one-off duties of customs inspectors or civil surgeons.

*Third*, the position involves duties that are more than incidental to the regular operations of the government. As explained above, relators exercise the core executive power of bringing litigation on the government's behalf. *See* pp. 15-18. Such authority cannot be viewed as merely "incidental" to regular government operations. As relator herself emphasizes (at 4), moreover, relators are far from incidental to the FCA as a practical matter. Relators have filed over 16,000 actions and recovered over $55 billion on behalf of the United States. *See* p. 5, *supra*. That is not merely incidental; it is a wholesale outsourcing of government enforcement to private actors.

Accordingly, the district court correctly held that relators are officers of the United States and that the FCA's unique self-appointment scheme violates the Appointments Clause.

26

## C.    The FCA's *Qui Tam* Provisions Violate The Vesting and Take Care Clauses

The FCA's *qui tam* provisions also conflict with the Vesting and Take Care Clauses.  Although the district court did not reach that challenge, this Court may affirm on any ground supported by the record.  *See, e.g.*, *PDVSA United States Litigation Trust* v. *LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023).  The parties thoroughly briefed the issue below, *see* D. Ct. Dkt. 180, at 5-13; D. Ct. Dkt. 217, at 6-15; D. Ct. Dkt. 218, at 9-13, and both relator and the government address it on appeal, without suggesting that the Court should decline to reach it—seemingly in recognition that the Article II challenges are intertwined.  *See* Relator Br. 54-55; U.S. Br. 13, 18.  Indeed, relator's and the government's view that relators are not officers but mere private parties only makes the constitutional problems under the Vesting and Take Care Clauses more glaring.  *See* pp. 28-29, *infra*.

The FCA's *qui tam* provisions assign to private parties core executive power—the authority to litigate on behalf of the United States.  But they do so without providing meaningful mechanisms for presidential supervision or removal.  That anomalous arrangement contravenes both the Vesting and Take Care Clauses.

### 1.    The FCA Impermissibly Vests Executive Power In Private Individuals

As discussed above, Article II vests "all" executive power in the President, who in turn may rely on his properly appointed and supervised subordinates to help him take care that the laws are faithfully executed. *See* pp. 15-18. Among the most important aspects of the President's executive power is the authority to bring lawsuits on behalf of the United States. That is why the "[s]ettled rule" has long been that "[c]ivil suits, in the name and for the benefit of the United States," must be brought by government attorneys "subject to the direction, and within the control of, the Attorney-General," who answers to the President. *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457-459 (1868).

The FCA departs from that framework by vesting private parties with powers equivalent to the Attorney General and her subordinates. Congress sought through the FCA to "disperse some quantum of executive authority amongst the general public," *United States ex rel. Kelly* v. *Boeing Co.*, 9 F.3d 743, 750 (9th Cir. 1993), because of its "generalized distrust of, and dissatisfaction with, the way the Executive Branch was carrying out its law enforcement responsibilities," Boese & Baruch § 4.11 (citation omitted). But the Constitution does not permit "dispersion" of the executive power among the general public, particularly where the President lacks meaningful control over those individuals. *See* pp. 29-34, *infra*; *Consumers' Research, Cause Based Com-*

28

*merce, Inc.* v. *FCC*, 88 F.4th 917, 933-938 (11th Cir. 2023) (Newsom, J., concurring), *cert. denied*, 144 S. Ct. 2629 (2024). Such a practice has long been viewed as "utterly inadmissible," *Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 330 (1816), and lacks "even a fig leaf of constitutional justification," *Department of Transportation* v. *Association of American Railroads*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). The FCA's *qui tam* provisions are unconstitutional for that fundamental reason.

### 2. *The FCA Does Not Provide For Meaningful Supervision Or Removal Authority*

The FCA's *qui tam* provisions also violate the Vesting and Take Care Clauses by failing to provide the President with any meaningful mechanism to supervise or remove relators. Even where a President has properly assigned executive power to a subordinate, the Constitution requires that the President retain the "ability to supervise and remove [those] who wield executive power in his stead." *Seila Law*, 591 U.S. at 238. Under the FCA, the President lacks sufficient authority to do either.

a. In recent years, the Supreme Court has repeatedly invalidated statutes that deprive the President of meaningful authority to supervise or remove executive officers. In *Free Enterprise Fund*, for example, the Court concluded that it was unconstitutional for the President to "be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer." 561 U.S. at 484. That structure was "contrary to

Article II's vesting of the executive power in the President" and "violate[d] the basic principle that the President cannot delegate ultimate responsibility or the active obligation to supervise that goes with it." *Id.* at 496 (internal quotation marks and citation omitted). The removal restrictions thus prevented the President from "ensur[ing] that the laws are faithfully executed" or from being "held responsible [for an executive officer's] breach of faith." *Id.*

Likewise, in *Seila Law*, the Court held that Congress could not limit the President's authority to remove the director of the Consumer Financial Protection Bureau only for "inefficiency, neglect, or malfeasance." 591 U.S. at 213. "If any power whatsoever is in its nature Executive," the Court explained, "it is the power of appointing, overseeing, and controlling those who execute the laws." *Id.* (citation and alteration omitted). And that power generally must include "the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their functions, obey." *Id.* at 213-214 (internal quotation marks, citation, and alteration omitted). Especially given the director's broad authorities—including the "quintessential[] executive power" of bringing enforcement actions against private citizens, *id.* at 219—the removal restrictions were unconstitutional.

By contrast, in *Morrison*, the Supreme Court described "the outermost constitutional limits of permissible restrictions on the President's removal

30

power" as relevant to this case. *Seila Law*, 591 U.S. at 218 (internal quotation marks and citation omitted). There, the governing statute authorized the appointment of independent counsels "to investigate and, if appropriate, prosecute certain high-ranking [g]overnment officials for violations of federal criminal laws." *Morrison*, 487 U.S. at 660. The Court concluded that the President retained "sufficient control over the independent counsel" because, "[m]ost importantly," the Attorney General (a principal officer accountable to the President) could still remove the independent counsel for good cause. *Id.* at 692-693, 696. In addition, the Attorney General could decide whether to authorize the appointment in the first place; helped to define the independent counsel's jurisdiction; and oversaw Department of Justice policy, which the independent counsel was generally required to follow. *See id.* at 661-662, 696; *Free Enterprise Fund*, 561 U.S. at 495.

b.    The FCA's *qui tam* provisions intrude further on the President's supervisory authority than even the statutes in *Free Enterprise Fund* and *Seila Law*—especially given that the President has no authority at all over the appointment of relators—and the FCA lacks the mechanisms of supervision and control present in *Morrison*. Most importantly, "[t]he Executive has no power to remove the relator from the litigation under any circumstances." *Riley* v. *St. Luke's Episcopal Hospital*, 252 F.3d 749, 763 & n.19 (5th Cir. 2001) (en banc) (Smith, J, dissenting). The government may only seek to dismiss the

31

suit in its entirety—and it cannot do even that without first intervening and participating in a hearing where it must show that dismissal is warranted.  *See* 31 U.S.C. § 3730(c)(2)(A); *Polansky*, 599 U.S. at 438; *Rosell* v. *VMSB, LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023).  In other words, the FCA does not permit the government to ensure that the litigation is conducted under presidential direction and oversight, and it thereby impedes the Executive Branch's ability to "accomplish[] its constitutionally assigned functions."  *Morrison*, 487 U.S. at 695 (citation omitted).  And even assuming that the government's ability to dismiss the entire case bears any resemblance to the authority to remove a relator, the government still lacks "unfettered discretion to dismiss," *Polansky*, 599 U.S. at 435; *see United States ex rel. Day* v. *Boeing*, Civ. No. 23-371, 2024 WL 2978469, at *5 (E.D. Va. June 13, 2024); *cf. Collins* v. *Yellen*, 594 U.S. 220, 255-256 (2021).

The FCA also lacks the other supervisory controls that saved the independent-counsel statute in *Morrison*.  The Attorney General had the "unreviewable discretion" to decide whether to authorize the appointment of an independent counsel and thus exercised "control over the power to initiate an investigation" and later prosecution.  487 U.S. at 696.  The Attorney General also helped define the independent counsel's jurisdiction by submitting facts with the authorization request.  *See id.* at 661, 696.  By contrast, a relator "authorizes" his own appointment and defines his own jurisdiction.

Nor does the Executive Branch acquire meaningfully more control after the relator commences the litigation. If the government does not intervene, it has only a minimal role in the case. For example, the government may receive case documents and seek a stay of discovery in limited circumstances. *See* 31 U.S.C. § 3730(c)(3)-(4). But the relator generally litigates the case outside the President's supervision and control. And even if the government intervenes, the relator remains an active party with independent litigating rights. *See* pp. 6-8, *supra*.

That authority is particularly notable because, unlike the independent counsel in *Morrison*, relators have no obligation to follow either general or FCA-specific Department of Justice policies. The Department has established detailed requirements to promote uniform FCA enforcement. *See, e.g.*, U.S. Department of Justice, Civil Div. Dir. No. 1-15, § 1(e)(1)(ii)-(iv), 80 Fed. Reg. 31,998, 31,999 (June 5, 2015). The Department's lawyers must also confer with the agencies responsible for the government programs affected by FCA litigation. *See* U.S. Department of Justice, Justice Manual § 4.4.110.

Relators are not subject to any of those requirements. They act based on the "prospects of monetary reward" and even "personal ill will," rather than "the public good." *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U.S. 939, 949 (1997) (citation omitted). That arrangement plainly prevents the President from fulfilling his "constitutional obligation to ensure the faithful

execution of the laws" and thus contravenes the Vesting and Take Care Clauses. *Free Enterprise Fund*, 561 U.S. at 484 (citation omitted).

*    *    *    *    *

The FCA's *qui tam* provisions authorize private parties to commence and litigate enforcement actions on behalf of the United States outside the supervision and control of the President. Whether analyzed under the Appointments Clause or the Vesting and Take Care Clauses, the outcome is the same: the *qui tam* provisions conflict with the President's constitutional authorities and duties, as well as the broader safeguards of our constitutional structure.

## II. RELATOR'S AND THE GOVERNMENT'S ARGUMENTS LACK MERIT

### A. FCA Relators Are Not Merely Private Litigants Enforcing Their Private Interests

Relator and the government claim that FCA relators are merely private parties litigating private interests and thus do not raise Article II concerns in the first place. That is incorrect.

1. The government broadly argues that the FCA's *qui tam* provisions do not even implicate Article II; in its view, "[w]hen relators sue under the [FCA], they are not exercising Executive power" but instead "pursuing a private interest in the money they will obtain if their suit prevails." Br. 13. But the government misconstrues both the FCA's text and longstanding precedent. The FCA makes clear that relators bring suit "in the name of the

34

[g]overnment." 31 U.S.C. § 3730(b)(1). The statute prohibits false claims to the government and authorizes recovery for only damages "the [g]overnment sustains." 31 U.S.C. § 3729(a)(1), (b)(2). The Supreme Court's decision in *Stevens* confirms that FCA relators bring suit only to redress the government's dual "injury to its sovereignty" and "proprietary injury resulting from the alleged fraud," 529 U.S. at 771; relators are merely a "stand-in" for the government, *see Yates*, 21 F.4th at 1309.

The FCA's elaborate procedures further confirm that relators are not merely enforcing their private interests. *See* pp. 6-8, *supra*. It would be a most peculiar regime in which the government could seek to dismiss a "private" lawsuit solely because "the burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 438. The government surprisingly invokes those same procedures in arguing that relators do not exercise executive power. *See* Br. 17-18 (citing *Yates*, 21 F.4th at 1311-1312). But in *Yates*, this Court considered the procedures as evidence that relators are effectively "government actor[s]" exercising "the government's power"—specifically, the President's executive power. *Id.* at 1308, 1310 (citation omitted).

Of course, relators are literally "private parties." *Stevens*, 529 U.S. at 786 n.17. But as explained, "the fact that the government delegates some portion of [its] power to private litigants does not change the governmental character of the power exercised." *Yates*, 21 F.4th at 1310 (citation omitted). A

relator's status as a private party does not resolve the constitutional problem; it creates it in the first place.

Relator and the government note that Congress has created various private rights of action that may further the "public interest." Relator Br. 38-39; U.S. Br. 16-17, 26-27. But under those statutes, private litigants bring suit on their own behalf to redress their personal injuries, not on the government's behalf to redress injuries to its "sovereignty" and "proprietary" interests. *Stevens*, 529 U.S. at 771; *see, e.g., Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181-184 (2000). Nor do other private suits generally bind the government upon entry of a final judgment. *See EEOC* v. *Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1290-1295 (11th Cir. 2004). Many private suits may incidentally serve the "public interest"—for example, product-liability or nuisance suits—but that does not make them exercises of executive power.

Relator and the government claim that those distinctions matter at most for purposes of Article III, not Article II. *See* Relator Br. 38-39; U.S. Br. 26-27. But that makes little sense. While plaintiffs who file lawsuits under citizen-suit provisions can be viewed as litigating only their private rights and interests, relators who file lawsuits under the FCA cannot. Relators sue on the government's behalf to vindicate an injury to the government's sovereignty. That is the exercise of executive power.

2.      Relator and the government more narrowly argue that relators do not implicate the Appointments Clause because they are "not part of 'the [g]overnment's workforce.'" U.S. Br. 22-24 (citation omitted); *see* Relator Br. 36-40. That argument rests on a mistaken premise: that the Appointments Clause applies only to individuals nominally "part of" the government. As the district court observed, that view would "create a constitutional loophole," allowing Congress to vest immense executive power outside the government. D. Ct. Dkt. 346, at 49 n.8 (citation omitted). It beggars belief that the Constitution prevents Congress from vesting executive power in unappointed government employees but allows it to vest the same power in unappointed private parties. After all, "[t]he Constitution deals with substance, not shadows." *Cummings* v. *Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867).

The government itself has recognized the Appointments Clause may apply to those who do not hold "government employment in the modern sense." 2007 OLC Opinion 121. In reaching that conclusion, the Office of Legal Counsel (OLC) considered Chief Justice Marshall's opinion in *United States* v. *Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823), which contemplated (in a passage the government itself quotes, *see* Br. 36-37) that a private contractor might hold an office under the Appointments Clause. *See Maurice*, 26 F. Cas. at 1214; 2007 OLC Opinion 98, 117-118, 121-122. That is why OLC concluded that a FCA relator "at least present[s] a question under the Appointments Clause,"

even though it ultimately (and incorrectly) concluded that relators do not hold continuing offices. 2007 OLC Op. 114; *see* pp. 21-26, *supra*. The government's newfound suggestion that the Appointments Clause does not apply to those nominally outside the government is simply erroneous.[1]

Relator suggests (at 38-40) that a contrary holding would render other non-federal actors subject to the Appointments Clause. But as just explained, plaintiffs who sue for personal injuries under the antitrust, securities, or employment-discrimination laws do not litigate on behalf of the United States. *See* p. 36. The same goes for state officials exercising state executive power. *See* 2007 OLC Opinion 99-100. And the vast majority of contractors presumably do not exercise significant authority or serve in continuing positions. *See id.* at 96, 113. In fact, it is relator's and the government's position that would cause perverse results by authorizing Congress to outsource broad swathes of executive power to private parties—for instance, allowing a private law firm entirely to take over civil litigation or even criminal prosecutions on behalf of the Department of Justice.

---

[1] Ten days after the government filed its opening brief—and four days before President Biden left office—OLC issued a new opinion stating that the Appointments Clause applies only to individuals who hold positions that are "part of the federal government for constitutional purposes" and thus does not apply to FCA relators. The Test for Determining "Officer" Status Under the Appointments Clause, 49 Op. O.LC. __, at *6-*7, *12 (Jan. 16, 2025). That unelaborated, made-for-this-litigation opinion should be disregarded.

Finally, even though the government claims that the Appointments Clause does not apply to private parties, it still acknowledges (at 24) that the FCA "implicates other parts of Article II." The better view is that the Appointments Clause itself prohibits "private actors" from exercising "significant executive authority." *Alpine Securities Corp.* v. *FINRA*, 121 F.4th 1314, 1341 & n.28 (D.C. Cir. 2024) (Walker, J., concurring in judgment in part and dissenting in part). But if it does not, the FCA's *qui tam* provisions still violate the Vesting and Take Care Clauses.

## B.    The FCA's *Qui Tam* Provisions Are Indefensible Under Existing Constitutional Doctrine

Relator and the government bury their arguments about current constitutional doctrine in the back of their briefs. That is unsurprising, because the FCA's *qui tam* provisions are plainly unconstitutional under existing law.[2]

### 1.    *Relators Are Inconsistent With The Appointments Clause*

a.    Relator and the government first argue that FCA relators do not exercise significant authority under the Appointments Clause. *See* Relator Br.

---

[2] Relator and the government emphasize decisions from other courts that have addressed Article II challenges to the FCA, as well as Supreme Court decisions that have opined more generally on the nature of *qui tam* suits. *See, e.g.*, Relator Br. 11-19; U.S. Br. 12. But both the Supreme Court and this Court have yet to address the issues presented in this appeal. *See Stevens*, 529 U.S. at 778 n.8; *Yates*, 21 F.4th at 1312. Nor does the fact that other courts have rejected Article II challenges weigh significantly in favor of the FCA's constitutionality, especially when most of those decisions are decades old and predate key Supreme Court precedents.

48-53; U.S. Br. 24-31. Many of their arguments simply repackage the just-discussed assertion that relators are private litigants enforcing their private interests. *See* pp. 34-39. Their remaining arguments fare no better.

Relator and the government claim that relators do not dictate federal law-enforcement priorities because the government may review their lawsuits at their outset. *See* Relator Br. 51; U.S. Br. 27-29. But that does not alter the facts that relators independently decide whether to commence litigation on behalf of the United States and can force the government to investigate and take action. *See* 31 U.S.C. § 3730(b)(1)-(2); pp. 16-17, *supra*.

When a relator files suit, he flips the enforcement baseline: the Executive Branch can *stop* the relator from proceeding only by investigating a relator's claim, intervening, moving to dismiss, and showing that "the burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 438. Practically speaking, then, a relator's power to sue makes it more difficult for the Executive Branch to determine the appropriate level of enforcement and thus frustrates one of the President's greatest powers. *See Aiken County*, 725 F.3d at 264 (opinion of Kavanaugh, J.). Indeed, Congress designed the FCA's *qui tam* provisions precisely *because* it believed the executive was underenforcing the FCA, *see* p. 5, *supra*, and on-the-ground practice shows that Congress achieved its objective of taking enforcement decisions away from the Executive Branch. Relators have filed over 16,000 enforcement actions under the

modern FCA regime, and the government has intervened in only 20% of them. *See* pp. 5, 7, *supra*.

Relator and the government further point out that the government can move to intervene and seek to dismiss the lawsuit. *See* Relator Br. 51-52; U.S. Br. 29. But as the district court explained, such "back-end supervision . . . does not diminish the significance of an FCA relator's front-end power to bring an enforcement action." D. Ct. Dkt. 346, at 27. In any event, the possibility that the government could intervene and persuade the court to dismiss the action does not undermine the proposition that relators exercise significant authority. In *Lucia*, the Supreme Court held that administrative law judges were officers even though the Securities and Exchange Commission could review their decisions in full, because the Commission could "decide against reviewing a [judge's] decision at all." 585 U.S. at 249. However the government proceeds, relators exercise significant authority under the Appointments Clause.

Relator and the government further attempt to downplay the significance of a relator's authority by pointing to other authorities they lack. *See, e.g.*, Relator Br. 48; U.S. Br. 30. But the fact that Congress could have granted relators more authority does not alter the significance of the authority they have. For similar reasons, the government is wrong to imply (at 30-31) that the various statutory limits on asserting a claim render a relator's authority

41

insignificant.  In that respect, a relator is no different from any other government actor whose authority is defined and constrained by law.

The government suggests (at 27-28) that relators lack significant authority because they cannot bring "private criminal prosecutions," which the government has recognized would raise "serious separation of powers questions." D. Ct. Dkt. 217, at 11.  But as the district court explained, the Supreme Court has "long rejected a constitutional distinction between civil and criminal cases when evaluating whether an individual exercises core executive power" or "significant authority."  D. Ct. Dkt. 346, at 24-25 (citing *Seila Law*, 591 U.S. at 219, and *Buckley*, 424 U.S. at 140).  What is more, the government conceded below that the FCA imposes significant "financial sanctions [that] 'may look worse' than fines imposed in a criminal prosecution for the same conduct."  D. Ct. Dkt. 346, at 25 (citation omitted).  And insofar as the government thinks that the history of *qui tam* statutes resolves the FCA's constitutionality, some of those statutes appear to have allowed private citizens to seek criminal penalties—a historical practice that no party in this case, at least so far, has attempted to defend as constitutional.  *See* p. 55, *infra*.

For her part, relator seeks to distinguish *Buckley* on the ground that FEC Commissioners used "[g]overnment resources," not "private ones."  Br. 50.  But the fact that relators are unconstrained by the appropriations pro-

cess—and instead may use private litigation funding, *see Ruckh* v. *Salus Rehabilitation, LLC*, 963 F.3d 1089, 1100-1103 (11th Cir. 2020)—only "aggravates" the separation-of-powers problem, *see Seila Law*, 591 U.S. at 226. In any event, relators *are* effectively using government resources when they bring litigation with the prospect of compensation from the "[g]overnment's damages claim." *Stevens*, 529 U.S. at 773.

Finally on this point, relator perplexingly claims (at 53) that relators cannot "bind" the United States. But the government is generally "bound by the judgment" in FCA cases "regardless of its participation." *Eisenstein*, 556 U.S. at 936. Relator asserts (at 53) that "being bound by a judgment is different from being bound by a plaintiff's actions." That is an insignificant distinction. Being bound by a judgment is no trifling matter, which is why the "well-established general principle [is] that the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests." *Pemco Aeroplex*, 383 F.3d at 1291 (citation omitted). "[A]ny contrary rule would impose an onerous and extensive burden upon the United States to monitor private litigation in order to ensure that possible mishandling of a claim by a private plaintiff could be corrected by intervention." *United States* v. *East Baton Rouge Parish School Board*, 594 F.2d 56, 58 (5th Cir. 1979). Yet the FCA imposes precisely that burden on the Executive Branch.

43

b.    Relator and the government also argue that FCA relators do not occupy a continuing position.  *See* Relator Br. 40-48; U.S. Br. 31-40.  Those arguments are likewise unpersuasive.

i.    Relator and the government primarily challenge the analogy between relators and other officials understood to occupy continuing positions. *See* Relator Br. 41-43, 46-48; U.S. Br. 35-38.  The government (and, to a lesser extent, relator) begins with the remarkable suggestion that the Supreme Court erred by unanimously concluding in *Morrison* that the independent counsel was an officer because it did so "without analysis."  U.S. Br. 35-36; *see* Relator Br. 41.  But both the parties and this Court are clearly bound by that holding regardless of what the government now thinks.

Relator and the government also claim that independent counsels, special prosecutors, and bank receivers are distinguishable on various grounds. For example, relator argues (at 41-43, 47) that those individuals were appointed by government officials to positions created by law.  But relators likewise hold a position created by law and satisfy the other criteria for being officers, even if they are improperly self-appointed.  *See* pp. 19-26, *supra*.  The government itself has rejected the circular notion that an individual's "method of appointment" dictates whether they are an officer under the Appointments Clause.  2007 OLC Opinion 115.

44

Relator and the government further seek to distinguish independent counsels, special prosecutors, and bank receivers on the ground that they could be replaced by others. *See* Relator Br. 41-44, 47; U.S. Br. 36-39. As explained above, however, the same is true of relators: for example, when a relator dies or goes into bankruptcy, another party takes his place. *See* pp. 24-25, *supra.* Relator and the government ask "what other [g]overnment office is ever filled by the legal representative of the estate of its deceased former holder?" Relator Br. 45; *see* U.S. Br. 39-40. But the real question is, what other major enforcement mechanism relies on *self*-appointed private parties to bring enforcement actions in the name of the United States? The answer is none.

Relator and the government likewise emphasize a provision of the FCA stating that "no person other than the [g]overnment may intervene or bring a related action based on the facts underlying [a] pending action" filed by a relator. 31 U.S.C. § 3730(b)(5). They claim that provision shows that, "[i]f a particular relator . . . decides she is no longer interested in pursuing the action, another person cannot simply take her place." U.S. Br. 38; *see* Relator Br. 44. But they ignore that the Supreme Court has interpreted that provision to allow one relator to dismiss a case and another to file an identical suit. *See Kellogg Brown & Root Services*, 575 U.S. at 662-664.

45

Relator and the government seek to distinguish *Morrison* on the ground that the independent counsel's authority was not specifically limited to a "single case." Relator Br. 42; U.S. Br. 35. But that disregards other decisions recognizing that even individuals who serve only for a single case may be officers, *see* pp. 22-23, *supra*, as well as the practical reality that a single relator can (and often does) file numerous cases. It also ignores that the independent counsel's jurisdiction was limited by a court, while a relator may define the scope of her own complaint. *See Morrison*, 487 U.S. at 661, 672. In any event, it is unclear why the *scope* of authority should dictate whether a position is "continuing"—especially when relators can litigate on behalf of the United States for years on end. *See* p. 26, *supra*.

ii.    The government separately argues (at 32-34) that relators are not officers because they do not have statutory "powers," "duties," and "emoluments." Even assuming that all three criteria are required in every instance, the government is incorrect. The FCA gives relators "powers" that ordinary civil litigants do not have: they can sue and conduct litigation in the government's name for an injury belonging solely to the United States. *See* 31 U.S.C. § 3730(b)(4)(B). Such powers are anything but "incidental to [g]overnment operations." Relator Br. 46; *see* p. 26, *supra*. The FCA also gives relators "duties" that ordinary private litigants do not have, including filing a complaint

46

under seal, submitting evidence to the government, and continuing to represent the United States until the government consents to dismissal.  *See* 31 U.S.C. § 3730(b)(1)-(3).

The FCA further gives relators substantial "emoluments" for their role in litigating cases.  *See* 31 U.S.C. § 3730(d).  The government asserts (at 34) it "is not aware of  .  .  .  any government office for which the officeholder is paid only in certain circumstances and not others."  But early in our country's history, "[b]y far the larger number of federal officials were compensated by fees for services rendered," including fees paid to government attorneys based "on the number of convictions won."  Christine Kexel Chabot, *The Founders' Purse*, 110 Va. L. Rev. 1027, 1088, 1093-1095 (2024) (citations omitted).  How are the emoluments paid to relators any different?  The government does not say.

### 2.    *Relators Are Inconsistent With The Take Care and Vesting Clauses*

Although relator and the government primarily dismiss the challenges under the Take Care and Vesting Clauses for the same reasons as under the Appointments Clause, *see* Relator Br. 54-55; U.S. Br. 13, 18, relator offers one discrete argument meriting response:  that the FCA's *qui tam* provisions do not "diminish the power of the Executive" but rather "enhance it," Relator Br. 54.  That claim displays a misunderstanding of both the FCA and Article II.

47

As for the FCA:  relator disregards how *qui tam* litigation intrudes on the traditional authorities of the President and his constitutionally selected subordinates.  From the filing of a complaint to the entering of a final judgment, a relator distorts the normal process by which the Executive Branch prioritizes and conducts litigation.  *See* pp. 15-18, *supra*.  And intentionally so: Congress adopted the current structure of the FCA specifically to "check" the Executive Branch.  *See* pp. 4-5, *supra*.  That hardly resembles a regime intended to "enhance" the President's authority.

As for Article II:  the Constitution does not seek to achieve *maximum* enforcement of federal law.  To the contrary, "under-enforcing federal statutes regulating private behavior" is "[o]ne of the greatest unilateral powers a President possesses" and one of the best guarantees of "individual liberty."  *Aiken County*, 725 F.3d at 264 (opinion of Kavanaugh, J.) (emphasis omitted).  What is more, enhancing *federal* power is not the same as enhancing *presidential* power.  Rather, "the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him."  *Printz* v. *United States*, 521 U.S. 898, 923 & n.12 (1997).

## C.    History Does Not Support The Constitutionality Of The FCA's *Qui Tam* Provisions

Relator and the government argue that "history definitively establishes that *qui tam* provisions align with Article II's requirements."  Relator Br. 9, 19-33; U.S. Br. 19-21; 40-49.  The district court correctly rejected that theory

of "historical exceptionalism," under which mere "historical existence equals constitutionality," and observed how such a view would eviscerate Article II. D. Ct. Dkt. 346, at 39.

1.    The Supreme Court has long explained that, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees" even if those patterns cover "our entire national existence and indeed predate[] it." *Marsh* v. *Chambers*, 463 U.S. 783, 790 (1983) (citation omitted).  Of course, history is often relevant to constitutional interpretation. But at the same time, past actions "taken thoughtlessly, by force of long tradition"—as opposed to those that were "considered carefully"—are entitled to little weight. *Id.* at 791.  That is particularly so when it comes to longstanding British practices that conflict with the Constitution's structure, because "American-style separation of powers had never been put into practical operation before the 1780s," and the founding generation "could not possibly have grasped all of the questions that it raised, let alone worked out coherent answers to them."  Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 727 (2004) (Woolhandler & Nelson); *see also United States* v. *Rahimi*, 602 U.S. 680, 722 n.3 (2024) (Kavanaugh, J., concurring).

The FCA's *qui tam* provisions contravene constitutional text, structure, and precedent for the reasons explained at length above.  In response, relator

and the government point to British practice, various early American *qui tam* statutes, and some examples of enforcement under those statutes. *See* Relator 23-24; U.S. Br. 19-20, 43-46; *see also* Beck Br. 5-29; Legal History Scholars Br. 8-33. But as relator and the government acknowledge, there is simply no evidence that the founding generation considered whether *qui tam* suits violate Article II. *See* Relator Br. 19, 27; U.S. Br. 48. Accordingly, that historical practice appears to reflect actions "taken thoughtlessly, by force of a long tradition"—or perhaps from "expediency"—rather than "from reasoned constitutional analysis." *Marsh*, 463 U.S. at 791; *Riley*, 252 F.3d at 773 (Smith, J., dissenting); *see Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). Nor does the checkered history of *qui tam* suits from the founding through 1986 amount to the type of "unambiguous and unbroken history" that shows that such suits have "become part of the fabric of our society." *Marsh*, 463 U.S. at 792; *see* Beck 541-542, 553-555; pp. 4-5, *supra*. To the contrary, federal *qui tam* provisions faded away as the Constitution's separation of powers took hold, leaving the FCA an anomaly today. *See* Charles Doyle, Congressional Research Service, R40785, *Qui Tam: The False Claims Act and Related Federal Statutes* 4 (Apr. 26, 2021).

Relator and the government contend that historical silence proves "the constitutionality of such provisions was not thought to be seriously in dispute."

U.S. Br. 48; *see* Relator Br. 27.  But any such historical silence cannot be dispositive, lest unexplained historical practices would *always* "justify contemporary violations of constitutional guarantees."  *Marsh*, 463 U.S. at 790.  There is no reason to think that the founding generation considered every potential constitutional question their actions raised.  *Cf. Webster* v. *Fall*, 266 U.S. 507, 511 (1925).

Finally, relator and the government suggest that the Supreme Court in *Stevens* established that the history of *qui tam* statutes essentially resolves their constitutionality.  *See* Relator Br. 16-17; U.S. Br. 19-20, 41, 48-49.  But in *Stevens*, the Court turned to history only *after* explaining that *qui tam* suits were consistent with Article III—merely to "confirm[]" its conclusion—and noted that such history was "particularly relevant" because "Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."  529 U.S. at 774 (internal quotation marks and citation omitted).  But while Article III *borrowed from* the British legal system, Article II departed from that system, so early American practice simply carried over from across the Atlantic warrants less weight.  *See* p. 49, *supra*.  Indeed, if the history of *qui tam* statutes were conclusive of their constitutionality for all purposes, there would have been no reason for the Court

51

in *Stevens* to have expressly reserved their constitutionality under Article II. *See* 529 U.S. at 778 n.8.

2.    Even assuming that the history of early *qui tam* statutes is relevant, relator and the government overstate the historical record, as defendants and their amicus explained at length below. *See generally* D. Ct. Dkt. 262, 266. Following *Stevens*, the district court properly sorted the founding-era "informer" statutes into three categories: (1) those that provided only a bounty; (2) those that allowed injured parties to sue; and (3) those that provided both a bounty and an express cause of action for non-injured parties to sue. *See* D. Ct. Dkt. 346, at 43 (citing *Stevens*, 529 U.S. at 775-777). At most, only the third category is "relevantly similar" to the modern FCA "for Article II purposes," *id.* at 44 (internal quotation marks and citation omitted), and many of the statutes cited by relator and the government fall into one of the first two categories, *see* D. Ct. Dkt. 266, at 5-8.

Relator (though not the government) argues that statutes providing only a bounty are analogous to the FCA because they include an *implied* cause of action. *See* Relator Br. 31-32. Relator cites a footnote in *United States ex rel. Marcus* v. *Hess*, 317 U.S. 537 (1943), suggesting that such statutes should be "construed to authorize [plaintiffs] to sue." *Id.* at 541 n.4 (citing *Adams* v. *Woods*, 6 U.S. (2 Cranch) 336, 341 (1805)). But that dictum itself relied on dictum from another decision, which did not clearly address the issue. *See*

*Adams*, 6 U.S. at 341; *Bauer* v. *Marmara*, 774 F.3d 1026, 1035 (D.C. Cir. 2014); Woolhandler & Nelson 728 n.183. And relator has provided no evidence that Congress assumed in the founding era that bounty-only statutes would be construed to contain causes of action, especially given that Congress enacted multiple *qui tam* statutes in that era with express causes of action. *Cf. Alexander* v. *Sandoval*, 532 U.S. 275, 286-287 (2001).

Relator and the government further argue that statutes that allowed suits by injured parties are relevantly similar to the FCA because "injury is not an Article II concern." Relator Br. 39; U.S. Br. 27. But as explained above, that argument misunderstands that true *qui tam* provisions allow non-injured private parties to sue on the government's behalf to vindicate purely sovereign injuries. *See* p. 36. By contrast, it is unclear how statutes involving injured parties were understood—and whether (and to what extent) the parties were viewed as litigating on behalf of the United States, as opposed to simply paying the government part of their recovery. *See* D. Ct. Dkt. 266, at 6.

3. Finally, the district court recognized that some founding-era statutes were "roughly analogous" to the FCA in that they expressly permitted uninjured parties to sue on behalf of the government. D. Ct. Dkt. 346, at 46. But those statutes simply confirm that *qui tam* provisions were thoughtlessly incorporated into the American legal system.

Critically, none of those statutes included the purported mechanisms of government control so emphasized by relator and the government. *See, e.g.*, pp. 40-41, *supra*. Indeed, relator and the government have both acknowledged that, for much of its history, the FCA itself lacked *any* mechanisms for the government to intervene or otherwise influence the litigation, other than by requiring relators to seek the government's consent before dismissing a case. *See* Act To Prevent and Punish Frauds upon the Government of the United States, ch. 67, § 4, 12 Stat. 696, 698 (1863); Relator Br. 14; U.S. Br. at 32-33, *Polansky*, *supra* (No. 21-1052). Their amici also report that "executive officials had essentially no control" over private litigants under earlier *qui tam* statutes. Legal History Scholars Br. 7.

That understanding is consistent with the limited case law addressing the issue, which has explained that "the rule of law is, and the practice always has been, that a *qui tam* action is the action of the party who brings it, and the sovereign, however much concerned in the result of it, has no right to interfere with the conduct of it, except as specially provided by statute." *United States* v. *Griswold*, 26 F. Cas. 42, 44 (D. Or. 1877). Accordingly, relator and the government must either (1) acknowledge that the modern FCA's purported mechanisms of control are constitutionally superfluous and thus defend *qui tam* litigation even in the absence of such controls, or (2) concede that the early *qui tam* statutes were unconstitutional and thus are irrelevant.

54

Relator and the government also conspicuously ignore the district court's observation that the early *qui tam* statutes "prove too much" because some authorized *criminal* penalties.  D. Ct. Dkt. 346, at 46.  For example, one statute authorized violators to be publicly whipped and imposed quadruple damages.  *See* Act for the Punishment of Certain Crimes Against the United States, ch. 9, § 16, 1 Stat. 112, 116 (1790).  Those statutes likewise appear to be plainly unconstitutional, because "few would suggest  .  .  .  that Congress could outsource the criminal-prosecution power to the plaintiffs' bar."  *City of Hallandale Beach*, 996 F.3d at 1133 (Newsom, J., concurring); *see, e.g.*, *United States* v. *Nixon*, 418 U.S. 683, 693 (1974); *see also* p. 42, *supra*.

Given those constitutional problems, the only plausible way to understand early *qui tam* statutes is that the founding generation adopted them "thoughtlessly, by force of long tradition."  *Marsh*, 463 U.S. at 791.  But such historical practice "cannot justify contemporary violations" of the Constitution's separation of powers.  *Id*. at 790.  There is no basis for creating a *qui tam* exception to Article II.

### D.    The FCA's *Qui Tam* Provisions Are Facially Unconstitutional

Finally, the government (though not relator) argues that the district court held only that the FCA's *qui tam* provisions were unconstitutional when the government has declined to intervene in the litigation.  *See* U.S. Br. 49-50.

That is incorrect. The district court broadly held that relators are officers under the Appointments Clause and analyzed the FCA's provisions in both intervened and non-intervened cases in doing so. *See, e.g.*, D. Ct. Dkt. 346, at 5-7, 20, 26-27, 51-52. The court's decision did not turn on the fact that the government had declined to intervene in this case, other than to determine that dismissal was the appropriate remedy. *Id.* at 50.

Regardless, this Court should hold that the FCA's *qui tam* provisions are facially unconstitutional, because intervention does not cure the statute's constitutional infirmities. As discussed above, even where the government intervenes, it lacks discretion to choose if and when to bring suit; it generally must share "unrestricted" litigating authority with the relator; it cannot end the case at will; and it has no mechanism to remove or otherwise directly supervise the relator. Those consistent features of the FCA violate the Appointments Clause, the Vesting Clause, and the Take Care Clause.

At a minimum, the FCA's *qui tam* provisions are unconstitutional as applied to this case and any others in which the government declines to intervene. Either way, the district court correctly dismissed this case.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Kannon K. Shanmugam

ANTON METLITSKY
O'MELVENY & MYERS LLP
  *1301 Avenue of the Americas*
  *New York, NY 10019*

AMANDA M. SANTELLA
O'MELVENY & MYERS LLP
  *1625 I Street, N.W.*
  *Washington, DC 20006*

EVAN HINDMAN
O'MELVENY & MYERS LLP
  *Two Embarcadero Center*
  *San Francisco, CA 94111*

*Counsel for appellees Freedom Health, Inc., and Optimum Healthcare, Inc.*

KANNON K. SHANMUGAM
JAMES DURLING
ANNA J. GOODMAN
BENJAMIN M. MILLER-GOOTNICK
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

MATTHEW D. KRUEGER
GERALD S. KERSKA
DAVID J. WENTHOLD
FOLEY & LARDNER LLP
  *777 East Wisconsin Avenue*
  *Milwaukee, WI 53202*

JASON MEHTA
MICHAEL P. MATTHEWS
FOLEY & LARDNER LLP
  *100 North Tampa Street*
  *Tampa, FL 33602*

PRIYANKA GHOSH-MURTHY
LAW OFFICE
  OF PRIYANKA GHOSH-MURTHY
  *1010 North Florida Avenue*
  *Tampa, FL 33602*

*Counsel for appellees Florida Medical Associates, LLC, d/b/a VipCare; Physician Partners, LLC; and Anion Technologies, LLC*

MARCH 10, 2025

57

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for appellees Florida Medical Associates, LLC d/b/a VipCare; Physician Partners, LLC; and Anion Technologies, LLC, hereby certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7), that the attached brief is proportionately spaced, has a typeface of 14 points or more, and contains 12,977 words.

MARCH 10, 2025

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM