IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

UNITED STATES EX REL. CLARISSA ZAFIROV,

Plaintiff – Appellant, and

UNITED STATES OF AMERICA,

Intervenor – Appellant,

v.

FLORIDA MEDICAL ASSOCIATES, LLC, et al.,

Defendants - Appellees.
_____

On Appeal from the United States District Court
for the Middle District of Florida
No. 8:19-cv-01236-KKM-SPF
_____

**BRIEF AMICUS CURIAE OF
PACIFIC LEGAL FOUNDATION IN SUPPORT OF
DEFENDANTS-APPELLEES URGING AFFIRMANCE**
_____

SEAN J. RADOMSKI
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
SRadomski@pacificlegal.org

*Counsel for Amicus Curiae Pacific Legal Foundation*

*United States ex rel. Clarissa Zafirov, et al. v.*
*Florida Medical Associates, LLC, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus Curiae Pacific Legal Foundation certifies that it has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock. Pursuant to Eleventh Circuit Rule 26.1-1, Amicus Curiae Pacific Legal Foundation certifies that Pacific Legal Foundation and its attorney Sean Radomski have an interest in the outcome of this case or appeal. Otherwise, to the best of its knowledge, the certificates of interested persons filed by Appellants, Appellees, and all other amici curiae, and contained in their briefs are complete.

/s/ Sean J. Radomski
SEAN J. RADOMSKI
*Counsel for Amicus Curiae*
*Pacific Legal Foundation*

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ..........................................C-1

TABLE OF AUTHORITIES .................................................................... ii

STATEMENT OF THE ISSUE..................................................................1

IDENTITY AND INTEREST OF AMICUS CURIAE...............................1

SUMMARY OF THE ARGUMENT .......................................................2

ARGUMENT ...........................................................................................5

    I.   Due to Differences in Constitutional Text and Structure,
        Pre-Ratification *Qui Tam* Statutes Do Not Justify the
        Modern FCA's *Qui Tam* Provision ............................................5

        A.   Article II's Executive Vesting Clause Represented a Break
              from the English System of Parliamentary Supremacy ..................5

        B.   Article II's Executive Vesting Clause Represented a Break
              from the Weak Executive Under the Articles of Confederation......7

        C.   Because the Framers Sought to Depart from State Constitutions
              that Created Weak Executives, the Existence of Pre-Ratification
              State-Level *Qui Tam* Statutes Is Irrelevant ......................................9

    II.  The FCA's *Qui Tam* Provision Fails Three Criteria Courts Consider
        When Evaluating if Congress Violated Article II....................................15

        A.   The FCA's *Qui Tam* Provision Threatens Liberty........................15

        B.   The FCA's *Qui Tam* Provision Undermines Accountability.........18

        C.   The FCA's *Qui Tam* Provision Prevents Certain Indirect
              Methods of Presidential Control ......................................................21

CONCLUSION.........................................................................................22

CERTIFICATE OF COMPLIANCE.......................................................23

CERTIFICATE OF SERVICE ................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Collins v. Yellen,*
    594 U.S. 220 (2021).................................................................15, 20

*Consumers' Rsch. v. FCC,*
    109 F.4th 743 (5th Cir. 2024), *cert. granted,* 145 S. Ct. 587 (2024) ................20

*Dep't of Transp. v. Ass'n of Am. R.R.s.,*
    575 U.S. 43 (2015)..........................................................6-7, 14-15, 19

*Donziger v. United States,*
    143 S. Ct. 868 (2023)......................................................................17

*Edmond v. United States,*
    520 U.S. 651 (1997).......................................................................21

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010).......................................................................22

*Gundy v. United States,*
    588 U.S. 128 (2019).........................................................................2

*Heckler v. Chaney,*
    470 U.S. 821 (1985)................................................................. 17-18

*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013)..................................................... 16-18

*Kisor v. Wilkie,*
    588 U.S. 558 (2019).........................................................................2

*Lucia v. SEC,*
    585 U.S. 237 (2018).........................................................................2

*Marsh v. Chambers,*
    463 U.S. 783 (1983).........................................................................9

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022)..................................................................... 12-13

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black,*
    53 F.4th 869 (5th Cir. 2022) .........................................................14, 20

*Sackett v. EPA*,
566 U.S. 120 (2012)...................................................................2

*Sackett v. EPA*,
598 U.S. 651 (2023)...................................................................1

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)........................................2, 10-15, 18, 21-22

*Sheetz v. Cnty. of El Dorado*,
601 U.S. 267 (2024)...................................................................1

*Sierra v. City of Hallandale Beach*,
996 F.3d 1110 (11th Cir. 2021) ............................................ 12-13

*Trump v. United States*,
603 U.S. 593 (2024).......................................................... 6, 16-17

*Tyler v. Hennepin Cnty.*,
598 U.S. 631 (2023)...................................................................1

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)...................................................................2

*United States v. Arthrex*,
594 U.S. 1 (2021)................................................................ 18, 20-21

*United States v. Rahimi*,
602 U.S. 680 (2024).................................................7-8, 10, 12-14

*United States v. Texas*,
599 U.S. 670 (2023).......................................................... 6, 16-18

*United States, ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)...............................................................5, 20

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018)................................................................... 1-2

*Wilkins v. United States*,
598 U.S. 152 (2023)...................................................................1

## Constitutions

U.S. Const. art. I, § 7, cl. 2 ....................................................................21

U.S. Const. art. II, § 3 .............................................................................21

Mass. Const. of 1780, pt. 1, art. XXX ....................................................14

N.Y. Const. of 1777, § 17 .......................................................................11

N.Y. Const. of 1777, § 35 .......................................................................11

Pa. Const. of 1776, ch. 2, § 3 ............................................................ 12-13

S.C. Const. of 1790, art. II, § 1 ..............................................................13

Va. Const. of 1776 ...................................................................................14

Vt. Const. of 1777, ch. 2, § 3 ............................................................ 12-13

## Statute

31 U.S.C. § 3730(b)(1)...............................................................................1

## Rule

Fed. R. App. P. 29(a) .................................................................................1

## Other Authorities

3 Blackstone, William, Commentaries .......................................................7

Articles of Confederation of 1781, art. IX, ¶ 5 ........................................8

*The Federalist No. 70* (J. Cooke ed. 1961) .......................................15, 18

*The Federalist No. 77* (J. Cooke ed. 1961) ...........................................20

Locke, John, *Second Treatise of Civil Government* (J. Gough ed. 1947) ......... 15-16

Prakash, Saikrishna, *The Essential Meaning of Executive Power*,
2003 U. Ill. L. Rev. 701 .................................................................. 6-15, 17

Woohandler, Ann & Nelson, Caleb, *Does History Defeat Standing Doctrine?*,
102 Mich. L. Rev. 689 (2004) .............................................................9

## STATEMENT OF THE ISSUE

Whether the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C.

§ 3730(b)(1), violates Article II of the U.S. Constitution, specifically the Executive

Vesting, Take Care, and Appointments Clauses.

## IDENTITY AND INTEREST OF AMICUS CURIAE

Pursuant to Federal Rule of Appellate Procedure 29(a), and with the parties'

consent, Pacific Legal Foundation ("PLF")[1] submits this amicus brief urging this

Court to affirm the District Court's grant of Appellees' Motion for Judgment on the

Pleadings. Founded in 1973, PLF is a nonprofit, tax-exempt corporation organized

under the laws of the State of California for the purpose of engaging in litigation in

matters affecting the public interest. PLF is the most experienced public-interest

legal organization advocating for private property rights and defending the

constitutional principle of separation of powers in administrative law. PLF attorneys

have served as counsel in numerous cases concerning administrative law, property

rights, and the separation of powers. *See, e.g.*, *Sheetz v. Cnty. of El Dorado*, 601 U.S.

267 (2024); *Sackett v. EPA*, 598 U.S. 651 (2023); *Tyler v. Hennepin Cnty.*, 598 U.S.

631 (2023); *Wilkins v. United States*, 598 U.S. 152 (2023); *Weyerhaeuser Co. v. U.S.*

---

[1] PLF affirms that no counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than PLF, its supporters, or its counsel made a monetary contribution to its preparation or submission.

1

*Fish & Wildlife Serv.*, 586 U.S. 9 (2018); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016); *Sackett v. EPA*, 566 U.S. 120 (2012).

Also, its attorneys have participated as counsel for amici in several cases involving the role of the Judiciary as an independent check on the Executive and Legislative Branches under the Constitution's separation of powers. *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020) (President's removal power); *Kisor v. Wilkie*, 588 U.S. 558 (2019) (*Auer* deference); *Gundy v. United States*, 588 U.S. 128 (2019) (nondelegation doctrine); *Lucia v. SEC*, 585 U.S. 237 (2018) (Appointments Clause). PLF is currently participating as amicus curiae in two Eleventh Circuit appeals: *The Glynn Environmental Coalition, Inc. v. Sea Island Acquisition, LLC*, No. 24-10710; and *Properties of the Villages v. FTC*, No. 24-13102. PLF's advocacy for constitutional principles and broad separation of powers litigation experience offer the Court an important perspective that will assist it in deciding whether the FCA's *qui tam* provision violates the Executive Vesting, Take Care, and Appointments Clauses of Article II of the U.S. Constitution.

## SUMMARY OF THE ARGUMENT

Appellants' attempt to justify the FCA's *qui tam* provision with the existence of English *qui tam* statutes improperly discounts that the Executive created by Article II was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited. Their

argument ignores that our Constitution's Executive is stronger than the English monarch in one relevant respect: the President's powers can never be altered by statute. The FCA's *qui tam* provision is unconstitutional because it is essentially an attempt by Congress to resurrect parliamentary supremacy and alter the President's constitutional discretion not to bring a lawsuit. Also, Appellants' focus on prevailing English practice and the First Congress's enactments omits discussion of the period between independence and the Constitution's ratification, when the federal government was organized under the Articles of Confederation. Understanding this period is important for correctly interpreting the Constitution because Article II's Executive Vesting Clause was ratified precisely to depart from the weak Executive created by the Articles.

Additionally, Appellants are incorrect to assert that pre-ratification *qui tam* statutes enacted by the States justify the modern FCA. Any such statutes were enacted under state constitutions that, like the Articles, created a far weaker Executive than that created by Article II. Indeed, the Supreme Court recently noted that the Framers did not view state governors as a reliable guide in fashioning the Federal Executive. The six state constitutions highlighted by the Amici Professors[2]

---

[2] The "Amici Professors" refers to Amici Curiae Professors Randy Beck (Doc. 54), James Pfander, Diego Zambrano, and Jared Lucky (Doc. 68).

have notable structural and textual differences that make them irrelevant when interpreting Article II.

In addition to this originalist analysis, three criteria that courts consider when determining if there is an Article II violation indicate that the FCA's *qui tam* provision is unconstitutional. First, the *qui tam* provision threatens liberty by subjecting defendants to the inconstant and uncertain enforcement of law because it allows private relators to bring the very claim the Executive Branch has chosen not to pursue. In this way, the *qui tam* provision impinges on the President's ability to employ prosecutorial discretion, which is a core executive function. Although prosecutorial discretion protects individual liberty by selective non-enforcement of federal statutes, FCA *qui tam* suits prevent the proper operation of Article II by allowing private plaintiffs to sue when they disagree with the Executive's decision not to sue.

Second, the Framers built an accountability mechanism into Article II by making the President subject to regular elections. This keeps him dependent on the people, who can hold him accountable for poor decisions or reward good ones. However, *qui tam* statutes undermine accountability by (1) shattering the solitary nature of the Executive Branch; (2) allowing the over-enforcement of federal law without democratic accountability; and (3) allowing the President to skirt the

Appointments Clause's accountability mechanism, as he no longer has to make tough nomination choices.

Third, the FCA's *qui tam* provision forecloses certain indirect methods of Presidential control by allowing relators to receive funds outside the appropriations process. Normally, a President could recommend or veto spending bills pertaining to law enforcement to influence an agency's enforcement decisions. But because relators self-fund, this is not possible. For these reasons, and those advanced by Appellees, the Court should affirm.

## ARGUMENT

### I. Due to Differences in Constitutional Text and Structure, Pre-Ratification *Qui Tam* Statutes Do Not Justify the Modern FCA's *Qui Tam* Provision

#### A. Article II's Executive Vesting Clause Represented a Break from the English System of Parliamentary Supremacy

Appellants' attempt to justify the FCA with the existence of English *qui tam* statutes, *see* Doc. 39 at 19; Doc. 41 at 35, ignores "that the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited." *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 450 (2023) (Thomas, J., dissenting) (citation omitted). Their argument is based on the flawed premise that, because the American colonists objected to the King's abuses, the Executive created by Article II is necessarily

weaker than the English monarch. "In fact, our Constitution's executive is stronger than the English counterpart in at least one very significant respect. While the English executive's powers were subject to modification by ordinary legislation . . . our executive's powers can never be altered by statute." Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 717-18.

Indeed, the Supreme Court's most recent Article II precedent confirms that our federal system of government is not one of parliamentary supremacy. In *Trump v. United States*, all nine Justices agreed that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." 603 U.S. 593, 609 (2024); *see id.* at 678 (Sotomayor, J., dissenting). This appeal implicates a subject within the President's conclusive and preclusive constitutional authority because the Executive Branch has "traditional discretion over whether to take enforcement actions against violators of federal law." *United States v. Texas*, 599 U.S. 670, 684 (2023). Congress violated this prohibition through the FCA's *qui tam* provision by empowering private citizens to execute federal law when the President exercises his constitutional discretion to not bring suit.[3]

---

[3] Although Professor Beck argues that Blackstone's views on *qui tam* suits support Appellants, *see* Doc. 54 at 12-14, he ignores that Blackstone discussed English *qui tam* practice under parliamentary supremacy, from which Article II was a departure. "[T]he founding generation did not subscribe to Blackstone's view of parliamentary

**B. Article II's Executive Vesting Clause Represented a Break from the Weak Executive Under the Articles of Confederation**

A proper consideration of the period between independence and the Constitution's ratification, when the federal government was organized under the Articles of Confederation, bolsters Appellees' arguments. Understanding this period is important for correctly interpreting the Constitution, because the "Framers drafted and approved many provisions of the Constitution precisely to depart from rather than adhere to certain pre-ratification laws, practices, or understandings." *United States v. Rahimi*, 602 U.S. 680, 720 (2024) (Kavanaugh, J., concurring) (noting that "the 'defects' of the Articles of Confederation inspired some of the key decisions made by the Framers in Philadelphia"). One of the Articles' defects that the Framers sought to remedy was the absence of an independent national Executive. Prakash, *supra*, at 764–68. Because under the Articles there was no independent Executive vested with the executive power, "Congress either made or superintended executive decisions without even the pretense that another entity was constitutionally

_____

supremacy." *Dep't of Transp. v. Ass'n of Am. R.R.s.*, 575 U.S. 43, 74-75 (2015) (Thomas, J., concurring in judgment) (discussing James Wilson's explanation during Pennsylvania's ratification convention regarding "the Constitution's break with the legislative supremacy"). Further, Blackstone describes *qui tam* actions as including various "penal statutes" that are the equivalent of criminal fines, and no party or amicus argues that criminal *qui tam* statutes are consistent with Article II. *Cf.* 3 William Blackstone, Commentaries *160 (discussing "penal statutes, that is such acts of parliament whereby a forfeiture is inflicted for transgressing the provisions therein enacted").

empowered to direct law execution." *Id.* at 767. "Congress was the plural executive power," and "there were neither checks and balances nor a separation of powers." *Id.* at 764. Rather than having an Executive to nominate officers, the Articles allowed Congress to appoint "committees and civil officers as may be necessary for managing the general affairs of the United States under [Congress's] direction." *See* Articles of Confederation of 1781, art. IX, ¶ 5. Thus, Congress accomplished execution by making "appeals to the state executive," established ad hoc or standing committees, and only "belatedly created executive departments." Prakash, *supra*, at 765–66 (footnotes omitted).

Most relevant to the issues on appeal, the Congress under the Articles even "sought to transfer 'executive business' to separate boards composed of people outside Congress." *Id.* at 766 n.359 (citation omitted). This led Alexander Hamilton to lament "that one defect" under the Articles was "'the want of a proper executive.'" *Id.* at 765 (footnote and citation omitted). Eventually, the Constitution he supported departed from the flawed Articles and "would create a national executive capable of executing the laws across the nation" that would be neither a "servant[] of Congress" nor "a creature of statute." *Id.* at 753, 768. "Rather, the executive was a creature of the Constitution itself, with rights and powers that Congress was bound to respect." *Id.* at 768.

As this review shows, although the American colonists sought to depart from the English monarch's abuses, they essentially overcorrected by creating a weak Executive. But when the Framers then departed from the Articles, they did not return to the English system of parliamentary supremacy. Indeed, as elaborated more in the following section, their experiences in the 1770s and 1780s "under the state constitutions led many to decry legislative supremacy and executive impotence and laid the groundwork for a resurgence of executive power in the federal Constitution." *See* Prakash, *supra*, at 757. Thus, with Article II, they created the President; a strong, independent Executive.[4] Therefore, early *qui tam* statutes carry little if any weight on the question of the FCA *qui tam* provision's constitutionality.

### C. Because the Framers Sought to Depart from State Constitutions that Created Weak Executives, the Existence of Pre-Ratification State-Level *Qui Tam* Statutes Is Irrelevant

The existence of pre-ratification *qui tam* statutes at the State level does not justify the modern FCA. The Framers sought "to depart from rather than adhere to"

---

[4] The implications of these changes in governing structure support Appellees' argument that the First Congress's enactments of *qui tam* statutes "are entitled to little weight" because they were actions "'taken thoughtlessly, by force of long tradition.'" *See* Doc. 91 at 62 (quoting *Marsh v. Chambers*, 463 U.S. 783, 791 (1983)). "That is particularly so when it comes to longstanding British practices that conflict with the Constitution's structure, because 'American-style separation of powers had never been put into practical operation before the 1780s,' and the founding generation 'could not possibly have grasped all of the questions that it raised, let alone worked out coherent answers to them.'" *Id.* (quoting Ann Woohandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 727 (2004)).

pre-ratification State constitutions, *Rahimi*, 602 U.S. at 720 (Kavanaugh, J., concurring), because they too lacked strong, independent executives that are comparable to the President created by Article II. For example, (1) the power of State executives "was exercised at the sufferance of the legislature"; (2) "state executives lacked veto authority"; (3) most "state constitutions left selection of the chief executive with the legislature"; and (4) "[n]ominal chief executives often lacked appointment and removal authority and thus had a difficult time controlling other executives." *See* Prakash, *supra*, at 760-61 (footnotes omitted). Indeed, "the Framers hardly viewed State Governors as a reliable guide in fashioning the Federal Executive." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 n.10 (2020); *see also* Prakash, *supra*, at 763 ("The anemic and defenseless state executives were not the templates for the federal chief executive. Rather, most state executives stood as reminders of what to avoid.").

The Amici Professors highlight only six state constitutions that they claim vested state governors with powers comparable to the President. *See* Doc. 54 at 19-20; Doc. 68 at 27-28, 34. But they are incorrect that these six support the constitutionality of the FCA's *qui tam* provision. To be sure, New York's 1777 Constitution "stood as an example for the federal Constitution" because it had certain provisions the Framers favored: vesting and take care clauses, and clauses giving the governor veto power, a share of the appointment power, and allowing for popular

elections. *See* Prakash, *supra*, at 761-62. But despite some similarities, two textual differences make New York's Constitution unhelpful to the question of whether Article II precludes *qui tam* suits.

First, New York's Constitution contained a clause that incorporated existing English and colonial law, which would have included *qui tam* statutes:

> that such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall, from time to time, make concerning the same.

N.Y. Const. of 1777, § 35. Thus, there is no tension between New York's vesting clause and the existence of New York *qui tam* suits because Section 35 incorporated existing *qui tam* statutes. Tellingly, the U.S. Constitution lacks any clause incorporating pre-ratification statutes, *qui tam* or otherwise.

Second, there is a critical textual difference between the vesting clauses in Article II and New York's Constitution. The people of New York vested only "the *supreme* executive power and authority of this State . . . in a governor." *Id.* § 17 (emphasis added). This clause can be contrasted with Article II, which vested "[t]he executive Power," and the Supreme Court has interpreted this to mean that "the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law*, 591 U.S. at 203 (citation omitted); *see id.* at 213 ("The entire 'executive Power' belongs to the

President alone."). Tellingly, at the 1787 Philadelphia Convention, Hamilton proposed a clause similar to New York's, vesting "the supreme Executive authority," but the Framers opted for the now-operative language. *See* Prakash, *supra*, at 771 (footnote omitted). Because only the "supreme" executive power was vested in the governor, the people of New York might have retained a portion of executive power, which in turn might have allowed them to pursue *qui tam* suits.

The Pennsylvania and Vermont Constitutions had the same textual difference and, for the same reason, do not shed light on the constitutionality of *qui tam* statutes under Article II. *See* Pa. Const. of 1776, ch. 2, § 3 ("supreme executive power"); Vt. Const. of 1777, ch. 2, § 3 ("supreme executive power"). These differences matter because "the executive power" had a publicly understood meaning at the time of the Framing. *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1133-36 (11th Cir. 2021) (Newsom, J., concurring); Prakash, *supra*, at 701. After all, "the text controls." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022). Tellingly, Appellants do not really grapple with the "original meaning (which controls)" of the Executive Vesting Clause. *Rahimi*, 602 U.S. at 739 n.* (Barrett, J., concurring). Rather, their arguments focus on "expectations about how the text would apply (which do not [control])." *Id.* (citation omitted). They ignore that "[c]ontemporary government actors might have been 'wrong about the consequences of their own constitutional rule,' or they 'might not have fully and faithfully implemented the

adopted constitutional rule themselves.'" *Id.* (citation omitted). Justice Barrett's admonition about errors regarding the consequences of, and failure to faithfully implement, Article II pertains directly to early Congresses' enactments of *qui tam* statutes, which are contrary to Article II's vesting of all executive power in the President.

Further, Pennsylvania's and Vermont's Executives lacked the unitary nature of Article II, as those States' "supreme executive power" was vested in a "president and council" and "Governor and Council," respectively. *See* Pa. Const. of 1776, ch. 2, § 3; Vt. Const. of 1777, ch. 2, § 3; *see also* Prakash, *supra*, at 763 ("Unlike the divided state executives, the Constitution's executive is unitary."). And the Amici Professors fail to explain why South Carolina's Constitution, which post-dated Article II's ratification, is entitled to such great weight. *See* Doc. 68 at 27 (discussing S.C. Const. of 1790, art. II, § 1). Post-ratification history has relevance only to "guide our interpretation of an ambiguous constitutional provision." *Bruen*, 597 U.S. at 36 (citation omitted). But the Executive Vesting Clause is unambiguous. *See Seila Law*, 591 U.S. at 203, 213; *City of Hallandale Beach*, 996 F.3d at 1133-36 (Newsom, J., concurring); Prakash, *supra*, at 701. Thus, consideration of a post-ratification *State* constitution should receive little weight.

The Massachusetts and Virginia Constitutions are particularly irrelevant because they lacked executive vesting clauses. *See* Doc. 68 at 28 (quoting Mass. Const. of 1780, pt. 1, art. XXX); *id.* at 34 (quoting Va. Const. of 1776). This is critical because "the Vesting Clauses would categorically preclude" "a private entity," such as a *qui tam* relator, "from exercising the legislative, executive, or judicial powers of the Federal Government." *Ass'n of Am. R.R.s.*, 575 U.S. at 88 (Thomas, J., concurring in judgment); *see Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 872-73 (5th Cir. 2022) ("[T]he Constitution vests federal power only in the three branches of the federal government. Congress defies this basic safeguard by vesting government power in a private entity . . . ."). In contrast, these two State constitutions lacking executive vesting clauses might not have prohibited private people from exercising the States' executive power (because those people never delegated it to the State executive).[5]

Thus, due to these differences, *qui tam* statutes might have been permissible under State constitutions. But because State constitutions "paid lip service to the separation [of powers] adage," "made their executive powers appendages of the legislature," and made "the executive . . . the legislature's pawn[]," *see* Prakash,

---

[5] Zafirov's argument regarding "modern qui tam provisions," *see* Doc. 41 at 51-52, ignores that "comparatively recent" and "modern" enactments have little, if any, relevance. *Seila Law*, 591 U.S. at 221-22; *see also Rahimi*, 602 U.S. at 737-38 (Barrett, J., concurring) ("History (or tradition) that long postdates ratification" is not "the history that matters most.").

*supra*, at 756, 763, these pre-ratification governing documents shed little light on whether *qui tam* statutes are constitutional under Article II.

## II. The FCA's *Qui Tam* Provision Fails Three Criteria that Courts Consider When Evaluating if Congress Violated Article II

When considering if a Congressional enactment violates Article II, courts examine whether it undermines liberty, impairs accountability, and prevents indirect methods of Presidential control. *Seila Law*, 591 U.S. at 223–26. The FCA's *qui tam* provision does all three.

### A. The FCA's *Qui Tam* Provision Threatens Liberty

"'The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.'" *Seila Law*, 591 U.S. at 223 (citation omitted); *see also Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[T]he separation of powers is designed to preserve the liberty of all the people." (citations omitted)). To preserve liberty, they "thought it necessary to secure the authority of the Executive" in a single man to ensure "'the steady administration of the laws.'" *Seila Law*, 591 U.S. at 223-24 (quoting *The Federalist No. 70*, p. 471 (J. Cooke ed. 1961) (A. Hamilton)). The FCA's *qui tam* provision undermines the steady administration of the laws and leads to a loss of "liberty as described by Locke," which was "to be free from 'the inconstant, uncertain, unknown, arbitrary will of another man.'" *Ass'n of Am. R.R.s.*, 575 U.S. at 75-76 (Thomas, J., concurring in judgment) (quoting John Locke, *Second Treatise of Civil Government* § 22, p. 13 (J.

Gough ed. 1947)). The *qui tam* provision subjects defendants to the inconstant and uncertain enforcement of law because it allows private relators to bring the very claim the Executive Branch has chosen not to pursue.

In this way, the *qui tam* provision impinges on the President's ability to employ prosecutorial discretion, which is "one discrete aspect of the executive power." *Texas*, 599 U.S. at 684; *id.* at 689 (Gorsuch, J., concurring in judgment) (the Executive Vesting and Take Care clauses "give the President a measure of discretion over the enforcement of *all* federal laws, not just those that can lead to arrest and prosecution"). "The Presidential power of prosecutorial discretion is rooted in Article II," and "the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against violators of a federal law." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (opinion of Kavanaugh, J.). The Supreme Court's most recent Article II precedent confirms that Congress may not create *qui tam* provisions to second-guess the Executive Branch's enforcement decisions.

In *Trump v. United States*, the Court reiterated that "'the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law,'" and this authority finds its source in Article II. 603 U.S. at 620 (citations omitted). It also held that, "once it is determined that the President acted within the scope of his exclusive

authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 608. All nine Justices agreed that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609; *see id.* at 678 (Sotomayor, J., dissenting). Through the FCA's *qui tam* provision, however, Congress violated this prohibition by empowering private citizens to bring the very claims the President decided to not pursue.

Prosecutorial discretion "protect[s] individual liberty by essentially under-enforcing federal statutes regulating private behavior." *Aiken Cnty.*, 725 F.3d at 264; *see also Donziger v. United States*, 143 S. Ct. 868, 869 (2023) (Gorsuch, J., dissenting from denial of cert.) (the decision to not sue "is one that belongs squarely within 'the special province of the Executive Branch'" and "[t]his 'structural principl[e]' serves to 'protect the individual' just as much as the Executive Branch" (alteration in original) (citation omitted)). But because FCA *qui tam* suits prevent the proper operation of Article II, any private plaintiff who disagrees with the Executive's decision not to enforce can bring suit and deprive a defendant of the liberty Article II sought to secure. As originally understood, the Executive Vesting Clause gave the President "the power to execute the laws," Prakash, *supra*, at 701, and the Supreme Court has repeatedly affirmed that this includes the President's and his subordinates' power to decline to sue. *Texas*, 599 U.S. at 678; *Heckler v.*

*Chaney*, 470 U.S. 821, 831-32 (1985); *Aiken Cnty.*, 725 F.3d at 262. Congress undermined that prerogative with FCA *qui tam* suits.

### B. The FCA's *Qui Tam* Provision Undermines Accountability

To justify the vesting of the entire executive power in the President, the Framers "made the President the most democratic and politically accountable official in Government" by making him be "elected by the entire Nation." *Seila Law*, 591 U.S. at 224. His "political accountability is enhanced by the solitary nature of the Executive Branch, which provides 'a single object for the jealousy and watchfulness of the people.'" *Id.* (quoting *The Federalist No. 70*, at 479). *Qui tam* statutes, however, interfere with this accountability mechanism in three ways.

*First*, by allowing individuals outside of the Executive Branch to enforce the law, "the solitary nature of the Executive Branch" is violated, and the people no longer have "a single object for the[ir] jealousy and watchfulness." *Id.* Thus, if a *qui tam* suit is litigated poorly and fails to remedy the alleged frauds, "the public can only wonder 'on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *United States v. Arthrex*, 594 U.S. 1, 16 (2021) (quoting *The Federalist No. 70*, at 476). Should the public blame the President, or relators? The public is left guessing.

*Second*, the FCA's *qui tam* provision undermines Article II's accountability mechanism by allowing the over-enforcement of federal law without democratic

accountability, which creates an incentive for Presidents to accept infringements on their executive power. Because it vested enforcement power and discretion in the President alone, Article II allows voters to hold the President accountable for either the under- or over-enforcement of federal law. For example, if the President over-enforces the FCA, this could lead to business closures, with resulting job losses, or higher prices if businesses pass the costs of defending such suits on to consumers. If voters are frustrated with these consequences, they can hold him accountable at the ballot box. However, because relators pursue them, *qui tam* suits allow the FCA to be over-enforced without Presidential involvement.

Importantly, this sets up a perverse incentive for Presidents who want to ramp up FCA enforcement and avoid accountability for adverse, unintended consequences. To skirt accountability, Presidents need only sign, rather than veto, *qui tam* bills. Even though these statutes limit Presidents' enforcement discretion, now "the Government can regulate without accountability . . . by passing off a Government operation as an independent private concern." *Ass'n of Am. R.R.s.*, 575 U.S. at 57 (Alito, J., concurring). This reasoning provides an important response to Zafirov's assertion that early Presidents' signing of *qui tam* bills indicates that these Presidents did not perceive *qui tam* statutes as a threat to their Article II powers and duties. *See* Doc. 41 at 38. She ignores that Presidents "may be happy to wash their hands of these decisions" rather than face tough

questions from the electorate. *Arthrex*, 594 U.S. at 30 (Gorsuch, J., concurring in part); *see also Consumers' Rsch. v. FCC*, 109 F.4th 743, 783 (5th Cir. 2024) (en banc) ("Delegations to private entities undermine accountability . . . [because] private entities are 'neither legally nor politically accountable to . . . government officials or to the electorate.'" (citations omitted)), *cert. granted*, 145 S. Ct. 587 (2024); *Black*, 53 F.4th at 880 ("If . . . people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion." (citations omitted)).[6]

**Third**, *qui tam* statutes prevent the Appointments Clause's accountability mechanism from functioning. "Assigning the nomination power to the President guarantees accountability for the appointees' actions because the 'blame of a bad nomination would fall upon the president singly and absolutely.'" *Arthrex*, 594 U.S. at 12 (quoting *The Federalist No. 77*, at 517 (A. Hamilton)). Because a "private relator under the FCA, however, is not 'appointed as an officer of the United States' under Article II," the President no longer has to make tough nomination choices. *Polansky*, 599 U.S. at 449 (Thomas, J., dissenting) (citation omitted). Also, Congress lets itself off the hook for tough confirmation votes because it no longer "shares in

---

[6] To be sure, the Government may, post-seal, intervene and dismiss a *qui tam* suit "upon a showing of good cause." *Polansky*, 599 U.S. at 423-24. But even if this has been interpreted as a low bar that the Government will usually clear, *id.* at 437-38, "the Constitution prohibits even [such] 'modest restrictions' on the President's power." *Collins*, 594 U.S. at 256 (citation omitted).

the public blame 'for both the making of a bad appointment and the rejection of a good one.'" *Arthrex*, 594 U.S. at 12 (quoting *Edmond v. United States*, 520 U.S. 651, 660 (1997)) ("The Appointments Clause adds a degree of accountability in the Senate . . . ."). This Court should not allow the political branches to devise a mechanism that allows them to escape Article II's promise of political accountability.

## C. The FCA's *Qui Tam* Provision Prevents Certain Indirect Methods of Presidential Control

The FCA's *qui tam* provision "also forecloses certain indirect methods of Presidential control" by allowing relators "receipt of funds outside the appropriations process." *Seila Law*, 591 U.S. at 225-26. "The President normally has the opportunity to recommend or veto spending bills that affect the operation of administrative agencies." *Id.* at 226 (citing U.S. Const. art. I, § 7, cl. 2; *id.* art. II, § 3). Although "Presidents frequently use these budgetary tools 'to influence the policies of independent agencies,'" "no similar opportunity exists for the President to influence" relators' pursuit of FCA *qui tam* suits. *Id.* (citation omitted).

For example, if the U.S. Department of Justice ("DOJ") exercises its discretion contrary to his wishes, the President can exert control by either removing DOJ officers or limiting DOJ's funding through a budget bill veto. Private relators,

however, are immune from this latter pressure because they self-fund.[7] "This financial freedom makes it even more likely that [relators] will 'slip from the Executive's control, and thus from that of the people.'" *Id.* (quoting *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010)). Appellants assert that the FCA's *qui tam* provision should be upheld because relators "receive no money . . . from the Government during the pendency of their litigation." Doc. 41 at 65; *see* Doc. 39 at 40. Properly understood, however, this aspect "'aggravates' the separation-of-powers problem." *See* Doc. 91 at 56 (quoting *Seila Law*, 591 U.S. at 226).

## CONCLUSION

For these reasons, this Court should affirm the District Court's grant of Appellees' Motion for Judgment on the Pleadings.

DATED: March 17, 2025.

Respectfully submitted,

/s/ Sean J. Radomski
SEAN J. RADOMSKI
Pacific Legal Foundation
1000 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 807-4929
SRadomski@pacificlegal.org

*Counsel for Amicus Curiae Pacific Legal Foundation*

---

[7] Also, the FCA does not allow the President to remove and replace a relator. *See* Doc. 91 at 44-45.

# CERTIFICATE OF COMPLIANCE

### Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 29(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    **X**      this document contains 5,260 words, or

            this brief uses a monospaced typeface and contains [state the number of] lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    **X**      this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14 pt. Times New Roman.

DATED: March 17, 2025.

/s/ Sean J. Radomski
SEAN J. RADOMSKI
*Counsel for Amicus Curiae*
*Pacific Legal Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Sean J. Radomski
Sean J. Radomski
*Counsel for Amicus Curiae*
*Pacific Legal Foundation*