**Nos. 24-13581, 24-13583**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Movant-Appellant*,

UNITED STATES *ex rel.* CLARISSA ZAFIROV,
*Plaintiff-Appellant*,

vs.

FLORIDA MEDICAL ASSOCIATES, LLC, d.b.a. VIPCARE; PHYSICIAN PARTNERS, LLC; ANION TECHNOLOGIES, LLC; FREEDOM HEALTH, INC.; and OPTIMUM HEALTHCARE, INC.,
*Defendants-Appellees*,

PHYSICIAN PARTNERS SPECIALTY SERVICES, LLC, et al.,
*Defendants.*

On Appeal from the United States District Court for the Middle District of Florida,
No. 8:19-cv-01236-KKM-SPF, Hon. Kathryn Kimball Mizelle

**BRIEF OF *AMICUS CURIAE***
**THE CHAMBER OF COMMERCE OF THE UNITED STATES OF**
**AMERICA IN SUPPORT OF DEFENDANTS-APPELLEES**

MICHAEL H. MCGINLEY
BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

ANDREW R. VARCOE
JANET GALERIA
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
  *Counsel of Record*
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

J. CARTER ANDERSEN
HAROLD DOUGLAS HOLDER III
BUSH ROSS, P.A.
1801 North Highland Ave.
Tampa, FL 33602

*Counsel for the Chamber of Commerce of the United States of America*

Nos. 24-13581, 24-13583

*United States ex rel. Zafirov v. Fla. Med. Assocs., LLC, et al.*
*United States v. Fla. Med. Assocs., LLC, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, I hereby certify that the following persons and entities have an interest in the outcome of this appeal:

Andersen, J. Carter

Bush Ross, P.A.

Chamber of Commerce of the United States of America

Dechert LLP

Engel, Steven A.

Galeria, Janet

Holder, Harold Douglas III

Kulp, Brian A.

McGinley, Michael H.

U.S. Chamber Litigation Center

Varcoe, Andrew R.

The Chamber of Commerce of the United States of America ("Chamber") is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

Nos. 24-13581, 24-13583
*United States ex rel. Zafirov v. Fla. Med. Assocs., LLC, et al.*
*United States v. Fla. Med. Assocs., LLC, et al.*

I am unaware of any other person or entity that has an interest in the outcome

of this appeal, other than those listed in the prior party and *amicus curiae* briefs filed

in this matter.

Dated: March 17, 2025                     */s/ Steven A. Engel*
                                          Steven A. Engel
                                          DECHERT LLP
                                          1900 K Street, NW
                                          Washington, DC 20006
                                          (202) 261-3369
                                          steven.engel@dechert.com

                                          *Counsel of record for* Amicus Curiae

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*..............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

STATEMENT OF THE ISSUES...............................................................5

ARGUMENT ...................................................................................5

I.    The *Qui Tam* Provisions of the False Claims Act Are Unconstitutional. .......5

    A. The *Qui Tam* Provisions Violate Article II's Vesting Clause. .................6

        1.  The Framers' Understanding of Executive Power Predated the Constitution. ........................................................................6

        2.  Article II Vests All Executive Power in the President...................8

    B. The *Qui Tam* Provisions Violate the Appointments Clause...................10

    C. The *Qui Tam* Provisions Violate the Take Care Clause. .........................16

II.    History Cannot Salvage the *Qui Tam* Provisions' Affront to Article II. ......18

    A. Abuses in Early English *Qui Tam* Practice Led to Its Decline...............19

    B. Early Congressional Enactments Do Not Support the Constitutionality of the False Claims Act's *Qui Tam* Provisions..................................21

    C. The False Claims Act Revived an Unconstitutional Practice.................25

CONCLUSION ....................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,

    725 F.3d 255 (D.C. Cir. 2013)...........................................................................16

*United States ex rel. Atkins v. McInteer*,

    470 F.3d 1350 (11th Cir. 2006) .......................................................................22

\**Buckley v. Valeo*,

    424 U.S. 1 (1976)...............................................................................10, 11, 12

*Confiscation Cases*,

    74 U.S. 454 (1869)......................................................................................9, 10

*Dep't of Transp. v. Ass'n of Am. R.R.*,

    575 U.S. 43 (2015)..................................................................................8, 13, 15

*Edmond v. United States*,

    520 U.S. 651 (1997)........................................................................................12

*Free Enter. Fund v. PCAOB*,

    561 U.S. 477 (2010).....................................................................................2, 13

*Freytag v. Commissioner*,

    501 U.S. 868 (1991)..........................................................................4, 13

*Hayburn's Case*,

    2 U.S. 409 (1792)..................................................................................24

*Heckler v. Chaney*,

    470 U.S. 821 (1985)..............................................................................17

*Hughes Aircraft Co. v. United States ex rel. Schumer*,

    520 U.S. 939 (1997).................................................................3, 18, 26

*United States ex rel. Hunt v. Cochise Consultancy, Inc.*,

    887 F.3d 1081 (11th Cir. 2018) .......................................................4, 9

*United States ex rel. Kelly v. Boeing Co.*,

    9 F.3d 743 (9th Cir. 1993) ...................................................................9

*King v. Burnell*,

    Carth. 478 (K.B. 1700) .......................................................................11

*Marbury v. Madison*,

    5 U.S. 137 (1803)..................................................................................23

*Marsh v. Chambers*,

    463 U.S. 783 (1983)..........................................................................23

*Martin v. Hunter's Lessee*,

    14 U.S. 304 (1816)......................................................................8, 21

*United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*,

    961 F.2d 46 (4th Cir. 1992) ...........................................................25

*\*Morrison v. Olson*,

    487 U.S. 654 (1988)..................................................................14, 15

*\*N.Y. State Rifle & Pistol Ass'n v. Bruen*,

    597 U.S. 1 (2022).................................................4, 18, 21, 22, 24

*N.Y. Times Co. v. Sullivan*,

    376 U.S. 254 (1964)........................................................................24

*\*United States ex rel. Polansky v. Exec. Health Res., Inc.*,

    599 U.S. 419 (2023)...........................................3, 4, 8, 9, 21, 25

*Printz v. United States*,

    521 U.S. 898 (1997)........................................................................16

*Riley v. St. Luke's Episcopal Hosp.*,

    252 F.3d 749 (5th Cir. 2001) ....................................................13, 14, 21

*Robertson v. United States ex rel. Watson*,

    560 U.S. 272 (2010)..................................................................................6

*\*Seila Law LLC v. CFPB*,

    591 U.S. 197 (2020)................................................................8, 14, 24

*Springer v. Gov. of Philippine Islands*,

    277 U.S. 189 (1928).............................................................................14

*TransUnion LLC v. Ramirez*,

    594 U.S. 413 (2021).............................................................................17

*United States v. Arthrex, Inc.*,

    594 U.S. 1 (2021)..................................................................................16

*United States v. Comstock*,

    560 U.S. 126 (2010).............................................................................21

*United States v. Everglades Coll., Inc.*,

    855 F.3d 1279 (11th Cir. 2017) ...........................................................9

v

*United States v. Germaine*,

    99 U.S. 508 (1878)................................................................................14

*United States v. McNinch*,

    356 U.S. 595 (1958)............................................................................25

*United States v. Nixon*,

    418 U.S. 683 (1974)..............................................................................9

*United States v. Texas*,

    599 U.S. 670 (2023)........................................................................9, 18

*\*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,

    529 U.S. 765 (2000)..............................................................14, 19, 20

*Walz v. Tax Comm'n of City of New York*,

    397 U.S. 664 (1970)............................................................................18

*Wisc. Bell, Inc. v. United States ex rel. Heath*,

    145 S. Ct. 498 (2025)............................................................................3

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ............................................................2, 4, 8

U.S. Const. art. II, § 2, cl. 2 ................................................................10

U.S. Const. art. II, § 3 ........................................................................2, 4, 18

**Statutes**

31 U.S.C. § 3729(a)(1)...........................................................................10, 26

31 U.S.C. § 3730 ..........................................................................................15

31 U.S.C. § 3730(b)(1)................................................................................10

31 U.S.C. § 3730(c)(1)............................................................................13, 26

31 U.S.C. § 3730(d) ...............................................................................15, 26

Act of Apr. 30, 1790, ch. 9, 1 Stat. 112 .....................................................24

Act of Aug. 4, 1790, ch. 35, 1 Stat. 145 ....................................................22

Act of Feb. 25, 1791, ch. 10, 1 Stat. 191 ...................................................22

Act of July 20, 1790, ch. 29, 1 Stat. 131 ...................................................22

Act of July 31, 1789, ch. 5, 1 Stat. 29 .......................................................22

Act of Mar. 2, 1863, ch. 67, 12 Stat. 696...................................................25

Act of Mar. 3, 1791, ch. 18, 1 Stat. 215 .....................................................22

Act of May 31, 1790, ch. 15, 1 Stat. 124 ...................................................22

Act of Sept. 1, 1789, ch. 11, 1 Stat. 55 ....................................................22

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 ....................................................22

12 Edw. 2, ch. 6 (1318) (Eng.)..................................................................19

5 Edw. 3, ch. 5 (1331) (Eng.)....................................................................19

18 Eliz., ch. 5 (1509) (Eng.).....................................................................20

31 Eliz., ch. 5 (1318) (Eng.).....................................................................20

1 Hen. 8, ch. 4 (1576) (Eng.) ...................................................................20

21 Jac. I, ch. 28 (1623) (Eng.)..................................................................20

**Other Authorities**

1 *Annals of Cong.* (1789) .....................................................................8, 21

5 Matthew Bacon, *A New Abridgement of the Law* (7th ed. 1832) ...........................7

J. Randy Beck, *The False Claims Act and the English Eradication of*

   Qui Tam *Legislation*, 78 N.C. L. Rev. 539 (2000).................................19, 20, 26

*1 William Blackstone, *Commentaries on the Laws of England* (1765) .............7, 9

*3 William Blackstone, *Commentaries on the Laws of England* (1768) .............7, 8

*4 William Blackstone, *Commentaries on the Laws of England* (1769) .................7

James T. Blanch, *The Constitutionality of the False Claims Act's* Qui

    Tam *Provision*, 16 Harv. J.L. & Pub. Pol'y 701 (1993).....................................13

Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power*

    *to Execute the Laws*, 104 Yale L.J. 541 (1994)...................................................23

3 Sir Edward Coke, *Institutes of the Laws of England* (4th ed. 1797) ...................20

Cong. Globe, 37th Cong., 3d Sess. 956 (1863) ........................................................25

*Constitutionality of the* Qui Tam *Provisions of the False Claims Act*,

    13 Op. O.L.C. 207 (1989)............................................ 3, 5, 17, 18, 20, 22, 23, 26

Edward S. Corwin, *The President: Office and Powers 1787-1957* (4th

    ed. 1957) ...........................................................................................................11

Timothy Cunningham, *A New and Complete Law-dictionary* (1765).....................12

4 William S. Holdsworth, *A History of English Law* (1924)...................................20

Harold J. Krent, *Executive Control over Criminal Law Enforcement:*

    *Some Lessons from History*, 38 Am. U. L. Rev. 275 (1989)..............................24

8 Legal Observer, No. 204 (1834) ...........................................................................20

Letter from James Madison to President Monroe (Dec. 27, 1817), in 3

*Letters and Other Writings of James Madison* (J.B. Lippincott &

Co. 1867) ..................................................................................23

\*John Locke, *Two Treatises on Civil Government* (George Routledge

& Sons ed., 1884) ..........................................................6, 7, 17

Floyd R. Mechem, *A Treatise on the Law of Public Offices and*

*Officers* (1890) .........................................................................12

*Officers of the United States Within the Meaning of the Appointments*

*Clause*, 31 Op. O.L.C. 73 (2007) ..............................................3

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution*

*in American Government, 1780–1940* (2013) ..........................15

Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev.

1701 (2005) ..............................................................................17

Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67

Vand. L. Rev. 671 (2014) .........................................................16

S. Rep. No. 99-345 (1986) ...............................................................26

*The Constitutional Separation of Powers Between the President and*

    *Congress*, 20 Op. O.L.C. 124 (1996).....................................................................3

The Federalist No. 29 (Alexander Hamilton) (Clinton Rossiter ed.,

    1961) ...........................................................................................................12

The Federalist No. 39 (James Madison) (Clinton Rossiter ed., 1961) ....................12

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961) ....................16

The Federalist No. 72 (Alexander Hamilton) (Clinton Rossiter ed.,

    1961) ...........................................................................................................12

*The Test for Determining "Officer" Status Under the Appointments*

    *Clause*, 49 Op. O.L.C. __ (Jan. 16, 2025) ............................................................3

U.S. Dep't of Justice, *Fraud Statistics—Overview* (Jan. 15, 2025),

    https://bit.ly/4bfrXgs....................................................................................26, 27

Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing*

    *Doctrine?*, 102 Mich. L. Rev. 689 (2004) ...........................................................22

2 Noah Webster, *American Dictionary of the English Language*

    (1828)...........................................................................................................12

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The False Claims Act ("FCA") affects nearly every sector of the economy. Despite its worthy goal of protecting the federal fisc against fraud, the FCA's *qui tam* mechanism has been abused, particularly in recent years, by profit-driven relators who pursue cases that do not involve genuine fraud against the government. That transfer of core executive power to private hands has exacted a substantial economic toll.  Companies frequently spend millions of dollars conducting investigations, fielding discovery demands, and engaging in motions practice—all to defend against baseless allegations that the government has deemed unworthy of

---

[1]  No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  Counsel for all parties consented to this brief's filing.

prosecution. Those litigation costs quickly add up, and the FCA's prospect of punitive liability always looms large. Even meritless cases can be used to extract enormous settlements.

The Chamber has a significant interest in avoiding that result. It thus submits this brief to explain why *qui tam* lawsuits violate Article II. The Constitution does not allow unappointed and unharmed private parties—like the relator here—to litigate on the United States' behalf.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Article II vests "[t]he executive Power" in one elected President and confers upon him the solemn duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. The Framers adopted that unitary structure to promote accountability and ensure that "a President chosen by the entire Nation" would "oversee the execution of the laws." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 499 (2010). Yet the President can ensure that the laws are faithfully executed only when he "oversee[s] the faithfulness of the officers who execute them." *Id.* at 484.

The FCA's *qui tam* provisions violate this core constitutional requirement because they wrest the enforcement of the laws out of the President's hands. Private relators are not injured parties seeking to recover for personalized harms. They are unaccountable bounty hunters charged with pursuing claims that, in their judgment, the United States should have asserted. All the while, they are "motivated primarily

by prospects of monetary reward rather than the public good." *Hughes Aircraft Co.
v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997).

Three Justices have rightly recognized "[t]here are substantial arguments that
the *qui tam* device is inconsistent with Article II." *United States ex rel. Polansky v.
Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting); *see id.* at
442 (Kavanaugh, J., joined by Barrett, J., concurring); *Wisc. Bell, Inc. v. United
States ex rel. Heath*, 145 S. Ct. 498, 515 (2025) (Kavanaugh, J., joined by Thomas,
J., concurring).  Shortly after the 1986 amendments to the FCA "resuscitat[ed] the
dormant qui tam device," the Office of Legal Counsel of the Department of Justice
likewise concluded that this private enforcement scheme for the vindication of
public rights is "patently unconstitutional."  *Constitutionality of the* Qui Tam
*Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 209, 238 (1989) (William P.
Barr, Ass't Att'y Gen.) (hereafter, "OLC Memo").[2]

Indeed, when measured against Article II's text, "this is not even a close
question."  *Id.* at 209.  The Framers vested the entire "executive Power" in the

---

[2] OLC later took a different view about the Appointments Clause.  *See Officers of
the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C.
73, 77 (2007) (relators are not Officers because their position is not "continuing");
*The Constitutional Separation of Powers Between the President and Congress*, 20
Op. O.L.C. 124, 142 n.52 (1996) (relators are not Officers because they are not
federal employees); *The Test for Determining "Officer" Status Under the
Appointments Clause*, 49 Op. O.L.C. __ (Jan. 16, 2025) (slip op. at 12) (adhering to
those positions).  The Office's original position was correct and consistent with
subsequent Supreme Court precedent.

President alone. U.S. Const. art. II, § 1, cl. 1. And they "carefully husband[ed] the appointment power" to ensure that the President remained accountable for the "Officers of the United States" who wielded executive Power in his name. *See Freytag v. Commissioner*, 501 U.S. 868, 881-84 (1991). The FCA runs roughshod over these structural safeguards, empowering "self-appointed private attorney[s] general" to exercise substantial executive Power outside the Executive Branch. *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1087 (11th Cir. 2018) (citation omitted), *aff'd*, 587 U.S. 262 (2019). Article II forbids such privatization of the President's responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

The "primary counterargument" for upholding the FCA's *qui tam* provisions emphasizes *qui tam*'s "historical pedigree." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). But the "adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text"—even laws passed near the Founding— "cannot overcome or alter that text." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 36 (2022) (citation omitted). And *qui tam*'s historical roots are limited at best. Unlike the FCA, many of the early enactments provided relators with only a bounty, not a cause of action, and many provided redress to relators who *themselves* suffered injury. In all events, the early *qui tam* statutes—some of which authorized private *criminal* enforcement—reflected an ill-considered, pre-ratification

4

understanding of the Chief Executive. *Qui tam* thus "rapidly fell into disfavor" with the establishment of the Executive Branch. OLC Memo 235. Decades later, the Civil War Congress revived *qui tam* with the original FCA, only for the practice to quickly fall into desuetude once again. Such scattered (and often inapposite) historical episodes cannot excuse the manifest conflict between the modern FCA's *qui tam* provisions and Article II's text.

## STATEMENT OF THE ISSUES

Whether the FCA's *qui tam* provisions violate Article II's Vesting Clause, the Appointments Clause, or the Take Care Clause.

## ARGUMENT

## I.    The *Qui Tam* Provisions of the False Claims Act Are Unconstitutional.

The district court correctly held that the FCA's *qui tam* provisions conflict with the Appointments Clause "by permitting unaccountable, unsworn private actors" to hold an executive office. Dist. Ct. Dkt. 346 ("Op.") at 51. But the constitutional errors do not stop there, because Article II's provisions operate as a coherent whole. By empowering self-appointed private persons to initiate and conduct litigation on behalf of the United States, the *qui tam* provisions likewise violate Article II's Vesting Clause. And they inhibit the President's prosecutorial discretion and control over *qui tam* actions, in violation of the Take Care Clause.

A.    The *Qui Tam* Provisions Violate Article II's Vesting Clause.

Congress may not authorize bounty hunters to litigate on the United States'

behalf.  Rather, the Framers understood that "[a] basic step in organizing a civilized

society" was to take the "sword" of law-enforcement actions "out of private hands

and turn it over to an organized government, acting on behalf of all the people."

*Robertson v. United States ex rel. Watson*, 560 U.S. 272, 282-83 (2010) (Roberts,

C.J., dissenting from dismissal of writ of certiorari as improvidently granted).  To

that end, the Constitution established a unitary and accountable Executive who alone

was charged with the responsibility for enforcing federal law.

### 1.  The Framers' Understanding of Executive Power Predated the Constitution.

The Framers' conception of centralized executive authority finds roots in the

influential political theory of John Locke.  As he explained, "in the state of Nature[,]

every one has the executive power of the law of Nature."  John Locke, *Two Treatises*

*on Civil Government* 197 (George Routledge & Sons ed., 1884) ("Locke").  But

"when they enter into society," individuals "give up" the "executive power they had

in the state of Nature into the hands of the society."  *Id.* at 258.  That is, the people

delegate their executive authority to public officials, whose power is "to be directed

to no other end but the peace, safety, and public good of the people."  *Id.* at 259.

William Blackstone's *Commentaries* reflect a similar understanding.  "In a

state of society," he reasoned, the right "to put [the law] in execution" is "transferred

6

from individuals to the sovereign power," who "alone" bears "the sword of justice by the consent of the whole community."  4 William Blackstone, *Commentaries on the Laws of England* *7-8 (1769) ("Blackstone").   And because the public "delegate[s] all its power and rights, with regard to the execution of the laws, to one visible magistrate," that officer is "the proper person to prosecute for all public offences."  1 Blackstone *258-59.

This understanding of the executive power was not strictly limited to "criminal" offenses.  It instead extended to the pursuit of relief for all "infraction[s] of the public rights belonging to th[e] community."  4 Blackstone *2.  Vindicating those public rights is the prerogative of the sovereign actor whom the people have empowered to administer the laws.  *See id.*

The common law recognized that one who personally "suffered the damage" from a public infraction might have a *concomitant* right to demand redress "in his own name."  Locke 196.  But that would not permit him to pursue relief on behalf of the public writ large.   "[N]o person" other than the official entrusted with the executive authority "can have an action for a public nuisance, or punish it," unless that "private person suffers some extraordinary damage."  3 Blackstone *219-20.  Because individual persons give up the executive power by entering society, "the law gives no *private* remedy for any thing but a *private* wrong."  *Id.* at *219; *see also, e.g.*, 5 Matthew Bacon, *A New Abridgement of the Law* 798 (7th ed. 1832)

(explaining that "common nuisances against the public are only punishable by a public prosecution").[3]

### 2. Article II Vests All Executive Power in the President.

The Framers enshrined this basic understanding in Article II's text, which vests "[t]he executive Power" in a single "President."  U.S. Const. art. II, § 1, cl. 1.  By entrusting "the President alone" with "all" the Nation's executive Power, the Framers sought to ensure that he would remain accountable for all those who would act on his behalf.  *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 213 (2020).

Consistent with this need for accountability, the Framers opted not to vest "[p]rivate entities" with "the 'executive Power.'"  *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring).  They instead insisted "that the first Magistrate should be responsible for the executive department" in its entirety.  1 *Annals of Cong.* 480 (1789) (James Madison).  Given that design, it would be "utterly inadmissible" for Congress to vest executive authority "in any other person" besides the President.  *Martin v. Hunter's Lessee*, 14 U.S. 304, 330 (1816).

---

[3] While Blackstone described *qui tam* suits as "popular actions," he also recognized such suits to enforce "penal statutes."  3 Blackstone *159-60.  Parliament may have occasionally allowed that private delegation of executive authority.  But Article II, which vests all the executive Power in the President, represents a "structural departure from the English system of parliamentary supremacy."  *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting) (citation omitted).

8

But that is precisely what Congress did with the FCA's *qui tam* provisions. The legislature "sought to disperse some quantum of executive authority amongst the general public." *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 750 (9th Cir. 1993). That defies Article II. A "*qui tam* relator has suffered no invasion of his own rights," *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1287-88 (11th Cir. 2017), *abrogated on other grounds by Polansky*, 599 U.S. 419, for the alleged harm, by definition, was "suffered by the United States," *Hunt*, 887 F.3d at 1091. Such "public offences" may be prosecuted only by the President, who is vested with all the Nation's executive Power. 1 Blackstone *259. To uphold a redelegation of that power to private entities would dash the constitutional scheme.

Supreme Court precedent confirms the point. The executive Power includes the "*exclusive* authority and absolute discretion to decide whether to prosecute a case" on the United States' behalf. *United States v. Nixon*, 418 U.S. 683, 693 (1974) (emphasis added); *see also United States v. Texas*, 599 U.S. 670, 678-679 (2023). And the "[s]ettled rule" has long been that courts cannot entertain "any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States," unless the government is represented by the Executive. *Confiscation Cases*, 74 U.S. 454, 457 (1869). "[A]ll such suits, so far as the interests of the United States are concerned, are subject to the direction, and within the control of, the Attorney-General," who answers to the President and may thus exercise

9

executive Power on his behalf. *Id.* at 458-59. Because *qui tam* plaintiffs are not similarly accountable, the FCA contravenes the Vesting Clause.

**B.** **The *Qui Tam* Provisions Violate the Appointments Clause.**

As the district court recognized, *qui tam* litigation also conflicts with the Appointments Clause, which works in tandem with the Vesting Clause to ensure that "executive Power" is exercised only by officers accountable to the President. Op. 20-21. All such "Officers of the United States" must be appointed by the President, with the advice and consent of the Senate, or for inferior executive officers, by the Heads of Departments, if Congress so provides. U.S. Const. art. II, § 2, cl. 2.

The key test for an "Officer" is whether the person "exercis[es] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). Such authority includes the power to "conduct[] civil litigation in the courts of the United States for vindicating public rights." *Id.* at 140. And that describes the power of an FCA relator to a tee: The relator may sue "for the United States" and "in the name of the Government" for "penalt[ies]" and "damages which the Government [has] sustain[ed]." 31 U.S.C. §§ 3729(a)(1), 3730(b)(1).

*Buckley* forbids such a diffusion of executive Power. There, the Court struck down the original structure of the Federal Election Commission, which permitted congressional leaders to appoint commissioners. *See* 424 U.S. at 113. That violated the Appointments Clause, because the commissioners performed executive

10

"functions" by wielding "enforcement power" to "seek judicial relief" for violations of law. *Id.* at 138-40. As *Buckley* explained, "[a] lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* at 138 (citation omitted). Thus, "[s]uch functions may be discharged *only* by persons who are 'Officers of the United States' within the language" of the Appointments Clause. *Id.* at 140 (emphasis added). Congress cannot vest civil law enforcement authority in any other person—like the relator here—who has not been appointed through that constitutionally prescribed method. *See id.*

In considering whether one exercises an executive "function," *Buckley*'s interpretation reflects the original public meaning of an "Officer." "Etymologically, an 'office' is an *officium*, a duty; and an 'officer' was simply one whom the King had charged with a duty." Edward S. Corwin, *The President: Office and Powers 1787-1957*, at 70 (4th ed. 1957). In keeping with that understanding, the Crown argued prior to the Founding that "every Man is a publick officer who hath any duty concerning the publick." *King v. Burnell*, Carth. 478, 479 (K.B. 1700). And if one had "any part of the King's publick care," it does not matter that "his authority is confined to narrow limits, because 'tis the duty of his office, and the nature of that duty, which makes him a publick officer, and not the extent of his authority." *Id.* Later dictionaries reflected the same understanding of the term. *See, e.g.*, *Officer*, 2

11

Timothy Cunningham, *A New and Complete Law-dictionary* (1765) (tracking *Burnell* formulation); *Officer*, 2 Noah Webster, *American Dictionary of the English Language* (1828) ("A person commissioned or authorized to perform any public duty.").

The Framers likewise regarded an "Officer" as one "invested with some portion of the sovereign functions of the government." Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* 2 (1890). In Alexander Hamilton's words, persons to whose "management" the "executive details" of government "are committed ought to be considered as the [President's] assistants or deputies" and thus "ought to derive their offices from his appointment." The Federalist No. 72, at 435-36 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Those executive appointees alone are "the officers who may be [e]ntrusted with the execution of [the] laws." The Federalist No. 29, at 183 (Alexander Hamilton); *see also* The Federalist No. 39, at 241 (James Madison) (observing that "persons holding their offices" "administer[]" the government and so should "be appointed, either directly or indirectly, by the people").

This understanding of the word "Officer" explains why the Appointments Clause was no mere matter of "etiquette or protocol." *Buckley*, 424 U.S. at 125. It was instead viewed, for multiple reasons, to be "among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651,

659 (1997).  First, "[t]he Appointments Clause prevents Congress from dispensing power too freely" to those who might wield it improperly.  *Freytag*, 501 U.S. at 880.  And second, it "ensures that those who exercise the power of the United States are accountable to the President, who himself is accountable to the people."  *Ass'n of Am. R.R.*, 575 U.S. at 63 (Alito, J., concurring); *see Freytag*, 501 U.S. at 884.

The FCA's *qui tam* provisions place both concerns in stark relief.  Indeed, Congress could hardly have dispensed the executive Power more freely, "effectively permit[ting] all private persons in the entire world to appoint themselves special fraud prosecutors in the name of the United States."  James T. Blanch, *The Constitutionality of the False Claims Act's* Qui Tam *Provision*, 16 Harv. J.L. & Pub. Pol'y 701, 742 (1993).  Congress also shielded relators from removal—and thus presidential supervision—by providing them a "right to continue as a party" even after duly appointed officials intervene.  31 U.S.C. § 3730(c)(1).  The result is a relator "that is not accountable to the President, and a President who is not responsible for the [relator]."  *Free Enter. Fund*, 561 U.S. at 495.  That violates Article II.

In holding otherwise, some courts have reasoned that relators do not occupy a "continuing and formalized relationship of employment with the United States."  *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc).

13

*But see id.* at 767-69 (Smith, J., dissenting). Yet there are two problems with that argument.

*First*, relators unquestionably wield "core executive power." Op. 2. So, whether or not relators are "public officers in a strict sense," they may not be "charged with the exercise of executive functions" unless appointed through the method Article II commands. *Springer v. Gov. of Philippine Islands*, 277 U.S. 189, 203 (1928). Certainly, they cannot exercise the core executive function of prosecuting claims on the public's behalf for statutory damages and penalties that are "essentially punitive in nature." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000). This "power to seek daunting monetary penalties against private parties on behalf of the United States" is a "quintessentially executive power." *Seila Law*, 591 U.S. at 219.

*Second*, the employment argument reads "Officer" too narrowly. It is true the word often "embraces the ideas of tenure, duration, emolument, and duties" as *indicia* of officer status. *United States v. Germaine*, 99 U.S. 508, 511 (1878). But the Supreme Court has never held that all such indicia must be present. To the contrary, *Morrison v. Olson* held that an independent counsel—a temporary prosecutor responsible for a single investigation—was "clear[ly]" an "'officer' of the United States." 487 U.S. 654, 671 & n.12 (1988).

14

Like the independent counsel in *Morrison*, *qui tam* relators function as single-case officers empowered to sue on the government's behalf. *See* 31 U.S.C. § 3730. While their "office is limited in tenure" and "'temporary' in the sense that [they are] appointed essentially to accomplish a single task," those limits do not foreclose officer status "in the constitutional sense." *Morrison*, 487 U.S. at 671-72 & n.12. Rather, "the office of an FCA relator is continuous" by operation of law, "even if it is not continually filled." Op. 31. And the FCA empowers individuals to appoint themselves to that office.

Relators also receive "emoluments." *See* 31 U.S.C. § 3730(d). Indeed, their fractional share of recovery may dwarf the compensation of presidential appointees and mirrors the "bounties" many officers received, instead of "fixed salaries," in the first century of the Nation's existence. Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 1-48 (2013).

At bottom, "there is not even a fig leaf of constitutional justification" for empowering "private entities" to prosecute alleged FCA offenders on the United States' behalf. *Ass'n of Am. R.R.*, 575 U.S. at 62 (Alito, J., concurring). The legitimacy of such an exercise of executive Power depends upon both (1) a constitutional appointment and (2) ongoing accountability to the President—who is the lone actor to whom the people have entrusted the power to vindicate public

rights.  *See United States v. Arthrex, Inc.*, 594 U.S. 1, 11-12 (2021).  Relators possess neither of those constitutional prerequisites.  As independent and self-appointed bounty hunters, they operate well outside Article II's carefully crafted scheme.

### C.    The *Qui Tam* Provisions Violate the Take Care Clause.

*Qui tam* litigation violates the Take Care Clause too.  The Framers knew there "can be no liberty" if a single body "should enact tyrannical laws," to have them then "execute[d]" "in a tyrannical manner."  The Federalist No. 47, at 303 (James Madison) (emphasis and citation omitted).  So they divided the Nation's lawmaking and law-enforcement powers.  That "separation of legislative and executive functions helps prevent tyranny precisely because a discretionary decision by executive officers intervenes between the enactment of the prohibition and its application to any particular individual."  Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 702 (2014).

At the same time, "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress"—and exercise discretion in their execution.  *Printz v. United States*, 521 U.S. 898, 922 (1997).  "[T]he President, it says, 'shall take Care that the Laws be faithfully executed,' personally and through officers whom he appoints."  *Id.* (internal citation omitted).  Included within that charge "is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior," *In re Aiken County*, 725 F.3d 255, 264

(D.C. Cir. 2013) (opinion of Kavanaugh, J.), especially "where the public good demands not the execution of the law," Locke 196. That "special province of the Executive branch" covers both criminal and civil realms. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *see* Op. 24-25.

Simply put, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). And there are good reasons for that constitutional design. "Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.*

The FCA's *qui tam* provisions cannot be squared with these principles either. They permit unharmed private parties to commandeer the Executive's enforcement discretion and decide whether, where, when, and how to sue alleged violators. This "allows Congress to circumvent the Executive's check and to have its laws enforced directly by its own private bounty hunters." OLC Memo 211. That "do[es] not fit with the Constitution's vision of executive control of law execution." Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 1701, 1778 (2005). Not only does this reallocation of power threaten individual liberty, but it can also undermine the "overall policies" of the Executive Branch. *Heckler*, 470 U.S. at 831. The

interests of profit-driven relators and their counsel seldom align with the Executive's priorities. *See Schumer*, 520 U.S. at 949.

That is why the Framers entrusted these sorts of enforcement decisions to one, publicly accountable President. "[O]nly a unitary executive properly can balance the competing interests at stake, including law enforcement, foreign affairs, national security, and the overriding interest in just administration of the laws." OLC Memo 232. That is, only the President can "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, so as to best serve the "public-welfare needs of the American people," *Texas*, 599 U.S. at 680.

## II.    History Cannot Salvage the *Qui Tam* Provisions' Affront to Article II.

The FCA's *qui tam* provisions conflict with the original meaning of Article II in multiple ways. And historical practice cannot wash away those shortcomings— particularly not where, as here, it is inconsistent and largely inapposite. *See* Op. 39-48. After all, "[t]he Constitution, not history, is the supreme law." OLC Memo 233; *see Bruen*, 597 U.S. at 36. Historical practice thus cannot cure constitutional infirmities even when it "covers our entire national existence and indeed predates it." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970).

At any rate, *qui tam* suffers from a checkered history. It did not become ubiquitous in this country until Congress amended the FCA in 1986—two centuries

after the Founding. And those modern amendments, of course, are the very provisions at issue.

### A.    Abuses in Early English *Qui Tam* Practice Led to Its Decline.

*Qui tam* actions originated in medieval times, "when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf." *Stevens*, 529 U.S. at 774. This practice was originally aimed at getting "private claims into the respected royal courts, which generally entertained only matters involving the Crown's interests." *Id.* But as the "royal courts began to extend jurisdiction to suits involving wholly private wrongs" in the 14th century, "the common-law *qui tam* action gradually fell into disuse." *Id.* at 775.

Around that time, Parliament was "[f]aced with limited public enforcement resources and the difficulty of implementing national policies" over an expansive region. J. Randy Beck, *The False Claims Act and the English Eradication of* Qui Tam *Legislation*, 78 N.C. L. Rev. 539, 567 (2000). It therefore began experimenting with *qui tam* litigation as a creature of statute. *See id.* at 567-73. And, unlike the common-law practice, some of these statutes permitted uninjured plaintiffs to "sue[] the Offender" and receive a bounty "as the King's gift." 12 Edw. 2, ch. 6 (1318) (Eng.); *see also, e.g.*, 5 Edw. 3, ch. 5 (1331) (Eng.).

Over the next two centuries, however, *qui tam* "proved a vexatious device that ultimately could not be reconciled with the institutions of free and responsible

government."  OLC Memo 235.  The persons "occupied in this branch of executive jurisprudence" did not "give impartial efficiency to the laws," but acted instead as "instrument[s] of individual extortion, caprice, and tyranny."  8 Legal Observer No. 204, at 20 (1834) (citation omitted).  Informers unearthed old and forgotten statutes "as means to gratify ill-will."  4 William S. Holdsworth, *A History of English Law* 356 (1924).  They threatened enforcement suits to "levy[] blackmail" against potential defendants.  *Id.*  And they stirred up litigation simply in the hopes of recovering money.  *Id.*  These abuses led to considerable outrage—leading Lord Coke to denounce the informers as "viperous vermin" who "vex and depauperize the subject" for "malice or private ends, and never for love of justice."  3 Sir Edward Coke, *Institutes of the Laws of England* 194 (4th ed. 1797).

In response, Parliament began to curb *qui tam* abuses in the late 1400s.  *See* Beck, *supra*, at 574.  Among other reforms, Parliament shortened the statute of limitations, *see* 1 Hen. 8, ch. 4 (1509) (Eng.); it required unsuccessful informers to pay the defendant's costs, *see* 18 Eliz., ch. 5, § 4 (1576) (Eng.); and it imposed strict venue requirements for claims, *see* 31 Eliz., ch. 5, § 2 (1589) (Eng.).  By the Jacobean era, "many of the old enactments were repealed" entirely.  *Stevens*, 529 U.S. at 775 (citing 21 Jac. I, ch. 28, § 11 (1623) (Eng.)).

Some English *qui tam* statutes did remain in effect up through the Founding. But even those lend little support to the constitutionality of *qui tam* litigation.  After

all, "the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting) (citation omitted). And the English history only underscores the hazards posed by legislative transfers of executive power to private hands.

Article II eliminated those hazards. The Framers vested in one publicly accountable President "the power of appointing, overseeing, and controlling those who execute the laws." 1 *Annals of Cong.* 481 (1789) (James Madison). That choice forecloses laws—like the FCA's *qui tam* provisions—that "vest" the "executive power" in "any other person." *Martin*, 14 U.S. at 330.

**B.  Early Congressional Enactments Do Not Support the Constitutionality of the False Claims Act's *Qui Tam* Provisions.**

Courts that have upheld the FCA's private-enforcement mechanism have noted that "the First Congress enacted a number of statutes authorizing qui tam actions." *Riley*, 252 F.3d at 752. But even "a longstanding history of related federal action does not demonstrate a statute's constitutionality." *United States v. Comstock*, 560 U.S. 126, 137 (2010).

In fact, early congressional practice provides a weak precedent for the modern-day FCA. For one thing, many early *qui tam* enactments are not "relevantly similar." *Bruen*, 597 U.S. at 29. They operated differently than the current law,

which allows unharmed plaintiffs to "stand[] in the government's shoes" and litigate on the government's behalf. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006). Most of the early statutes offered only a reward to informers for bringing a matter to the government's attention, without providing a cause of action to sue for the sovereign.[4] Others sought to redress private injuries, with the government receiving only incidental recoveries.[5] These two categories fundamentally differ in kind and thus have little bearing on the inquiry. *See Bruen*, 597 U.S. at 29-30, 46-50; Op. 43-45.

As to the few enactments that allowed informers to pursue the sovereign's claims, these "were essentially stop-gap measures, confined to narrow circumstances" to assist the fledging Executive. OLC Memo 213. And the "transitory and aberrational" *qui tam* device "never gained a secure foothold within our constitutional structure." *Id.* It produced "little actual litigation." Ann

---

[4] *See, e.g.*, Act of July 31, 1789, ch. 5, §§ 8, 29, 38, 1 Stat. 29, 38, 45, 48 (penalties against collectors, naval officers, and surveyors who failed to take an oath or display rate tables, with a bounty to the informer); Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60 (similar for a maritime law); Act of Aug. 4, 1790, ch. 35, §§ 55, 69, 1 Stat. 145, 173, 177 (similar for a customs law); Act of Sept. 2, 1789, ch. 12, § 8, 1 Stat. 65, 67 (similar for Treasury officials who violated bribery laws); Act of Mar. 3, 1791, ch. 18, § 1, 1 Stat. 215, 215 (similar); Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 191, 195-96 (similar for U.S. Bank agents engaged in improper trading).

[5] *See, e.g.*, Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124-25 (giving half of statutory penalty to authors who recovered for copyright infringement of their works); Act of July 20, 1790, ch. 29, § 1, 1 Stat. 131, 131 (giving, on top of damages, half the penalty to seamen deprived of pre-departure shipping contracts).

Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 728 (2004); *see* Dist. Ct. Dkt. 266 at 8-13.  And, "[w]ithin a decade, 'the tide had turned against' qui tam," leading Congress to "curtail[] its use."  OLC Memo 235-36 (alterations adopted; citation omitted).

There is also "no evidence" Congress ever "considered the constitutional status of qui tam."  *Id.* at 214.  The early *qui tam* statutes instead have all the hallmarks of action "taken thoughtlessly, by force of long tradition" from an archaic English device, "and without regard to the problems" presented to the new constitutional order.  *Marsh v. Chambers*, 463 U.S. 783, 791 (1983).  The Framers themselves recognized that early congressional practice should receive little weight where, as here, "the question of Constitutionality was but slightly, if at all, examined."  Letter from James Madison to President Monroe (Dec. 27, 1817), in 3 *Letters and Other Writings of James Madison* 54, 55-56 (J.B. Lippincott & Co. 1867).

In addition, the Constitution created a novel system of separated powers, and so it is unsurprising that "members of the First Congress were not infallible interpreters of the constitutional text."  Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 556 (1994).  The Supreme Court famously struck down part of the Judiciary Act of 1789 as "repugnant to the constitution."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  The

Second Congress directed the circuit courts to register war pensioners subject to correction by the Secretary of War—a non-judicial function that violated the separation of powers. *See Hayburn's Case*, 2 U.S. 409, 410 (1792). And later that decade, Congress adopted the Sedition Act, which prohibited seditious libel in stark violation of the First Amendment. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 275-76 (1964).

Even the Department of Justice must admit that some early *qui tam* enactments were unconstitutional. For many "qui tam provisions authoriz[ed] individuals to sue under *criminal* statutes to help enforce the law." Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 296-97 & n.104 (1989) (emphasis added). An early larceny statute, for example, gave half the fine "to the informer and prosecutor," and provided that, "on conviction," the offender would "be publicly whipped." Act of Apr. 30, 1790, ch. 9, §§ 16-17, 1 Stat. 112, 116. The Government can hardly dispute that outsourcing such "core executive power" to the plaintiffs' bar would violate Article II. *Seila Law*, 591 U.S. at 219.

For all these reasons, "postenactment history" should not receive "more weight than it can rightly bear" in discerning the original meaning of Article II. *Bruen*, 597 U.S. at 35.

### C.    The False Claims Act Revived an Unconstitutional Practice.

The early *qui tam* provisions had fallen into disuse by the antebellum period. During the Civil War, however, Congress revived the concept following investigations that "painted a sordid picture" of wartime fraud. *United States v. McNinch*, 356 U.S. 595, 599 (1958).  With the country's resources stretched to the breaking point, Congress passed the FCA "to stop this plundering of the public treasury." *Id.*

Congress viewed aggressive enforcement as critical to the war effort.  It thus instructed the "district attorneys of the United States" to "be diligent in inquiring into any violation" and initiating actions.  Act of Mar. 2, 1863, ch. 67, § 5, 12 Stat. 696, 698.  But the legislature feared that wartime fraud might outpace enforcement. So, it turned to the "unusual" practice of "authorizing private parties" to sue "on the Government's behalf."  *Polansky*, 599 U.S. at 423.  In the legislature's view, allowing "any person" to sue "for the United States" and share in the proceeds, *see* Act of Mar. 2, 1863, § 4, was the "most expeditious way" of "bringing rogues to justice," Cong. Globe, 37th Cong., 3d Sess. 956 (1863) (Sen. Howard).  To that end, Congress "let loose a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992).

After the Civil War crisis receded, *qui tam* once again "fell into relative desuetude." OLC Memo 209. Eventually, "both Houses of Congress voted to repeal the FCA['s] *qui tam* provisions" in the early 1940s, albeit in different sessions. Beck, *supra*, at 558. Congress then restricted the role and recovery of relators in 1943. *See id.* at 559-61. Those restrictions signaled the death knell for the "anachronism" of *qui tam*. OLC Memo 209.

By 1986, though, Congress had become "dissatisfied with the way the executive branch was enforcing government procurement laws." *Id.* So it sought to "encourage more private enforcement suits" and "check" the Executive's enforcement discretion. S. Rep. No. 99-345, at 23-24, 26 (1986). For instance, Congress "eliminate[d] a defense to a *qui tam* suit—prior disclosure to the Government—and therefore change[d] the substance of the existing cause of action." *Schumer*, 520 U.S. at 948. It also afforded relators "the right to continue as a party," even where the government chooses to intervene. 31 U.S.C. § 3730(c)(1). And it significantly increased the bounty for relators and their attorneys. *See id.* §§ 3729(a)(1), 3730(d).

The 1986 amendments thus ushered in a new era of litigation, with *qui tam* actions surging more than a hundredfold—to a clip of almost 1,000 per year. *Compare* U.S. Dep't of Justice, *Fraud Statistics—Overview* (Jan. 15, 2025), https://bit.ly/4bfrXgs, *with* Op. 6-7 (citing pre-1986 statistics). That explosion of

26

relator-driven litigation has exacted a substantial toll on businesses and has created major problems for the Executive in ensuring the faithful execution of the laws. For even though many *qui tam* actions are meritless or contrary to the public interest, their sheer volume prevents the government from effectively supervising the litigation. *See* Op. 7-8. As a result, the 1986 amendments have threatened the Executive's authority in a way that even the earlier FCA did not. Indeed, private relators now far surpass the Executive Branch as the primary executor of the statute. *See Fraud Statistics*, *supra*.

As explained above, this alternative regime of federal law enforcement violates the original understanding of Article II several times over. *See supra* Section I. Plaintiff's *qui tam* suit therefore cannot proceed, and the district court correctly dismissed it.

# CONCLUSION

The judgment below should be affirmed.

Respectfully submitted,

/s/ Steven A. Engel

MICHAEL H. MCGINLEY

BRIAN A. KULP

DECHERT LLP

Cira Centre

2929 Arch Street

Philadelphia, PA 19104

ANDREW R. VARCOE

JANET GALERIA

U.S. CHAMBER LITIGATION

CENTER

1615 H Street, NW

Washington, DC 20062

STEVEN A. ENGEL

   *Counsel of Record*

DECHERT LLP

1900 K Street, NW

Washington, DC 20006

(202) 261-3369

steven.engel@dechert.com

J. CARTER ANDERSEN

HAROLD DOUGLAS HOLDER III

BUSH ROSS, P.A.

1801 North Highland Ave.

Tampa, FL 33602

*Counsel for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(5), I hereby certify that the foregoing Brief contains 6,495 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 28-1, as determined by the word-counting feature of Microsoft Word. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Dated: March 17, 2025                     */s/ Steven A. Engel*
                                          Steven A. Engel

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I caused the foregoing Brief to be filed electronically with the Clerk of Court of the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system.  All participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.


Dated: March 17, 2025                    */s/ Steven A. Engel*
                                         Steven A. Engel