## Nos. 24-13581, -13583

# United States Court of Appeals
### *for the* Eleventh Circuit

UNITED STATES ex rel. CLARISSA ZAFIROV,

*Plaintiff-Appellant,* and

UNITED STATES OF AMERICA

*Intervenor-Appellant,*

– v. –

FLORIDA MEDICAL ASSOCIATES, LLC, *et al.*,

*Defendants/Appellees.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA, CASE NO: 8:19-cv-01236-KKM-SPF

## BRIEF OF FORMER U.S. ATTORNEYS GENERAL EDWIN MEESE III AND MICHAEL B. MUKASEY, LAW PROFESSORS STEVEN G. CALABRESI AND GARY S. LAWSON, AND THE LANDMARK LEGAL FOUNDATION AS *AMICI CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE

AMIT R. VORA
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel for Amici Curiae*

Nos. 24-13581, 24-13583
*United States ex rel. Zafirov v. Fla. Med. Assocs., LLC, et al.*
*United States v. Fla. Med. Assocs., LLC, et al.*

## CERTIFICATE OF INTERESTED PERSONS

Under 11th Cir. Rule 26.1-1 and Fed. R. App. P. 26.1, amici curiae certify that the below persons and entities have an interest in this appeal's outcome:

1. Edwin Meese III, Amicus Curiae for Defendants–Appellees.

2. Michael B. Mukasey, Amicus Curiae for Defendants–Appellees.

3. Steven G. Calabresi, Amicus Curiae for Defendants–Appellees.

4. Gary S. Lawson, Amicus Curiae for Defendants–Appellees.

5. Landmark Legal Foundation, Amicus Curiae for Defendants–Appellees.

6. Amit R. Vora, Counsel for above Amici Curiae.

7. Kasowitz Benson Torres LLP, Counsel for above Amici Curiae.

Taken together with the earlier filed Certificates of Interested Persons by all parties and amici curiae, this constitutes a correct and complete list of those persons that have an interest in this appeal's outcome, to the best of my knowledge.

Dated: March 17, 2025

/s/ Amit R. Vora
Amit R. Vora

*Counsel for Amici*

Nos. 24-13581, 24-13583
*United States ex rel. Zafirov v. Fla. Med. Assocs., LLC, et al.*
*United States v. Fla. Med. Assocs., LLC, et al.*

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae Landmark Legal Foundation, a nonprofit corporation, states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public, and no publicly held company has 10% or greater ownership in it. The other amici curiae are natural persons.

Dated: March 17, 2025          /s/ Amit R. Vora
                                     Amit R. Vora

                                     *Counsel for Amici*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...............................................C-1

CORPORATE DISCLOSURE STATEMENT ...............................................C-2

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF AMICI ........................................................................1

ARGUMENT .....................................................................................4

   A.  The Constitution's Text and Structure Require Federal Law
       Enforcement to Be Subject to Presidential Direction. ...................................4

      1.    Article II's Text Vests the President with All "Executive
           Power." ........................................................................4

      2.    The "Executive Power" Encompasses Power to Enforce the
           Law. ...........................................................................8

      3.    The Constitution Requires Presidential Control of False Claims
           Act Litigation................................................................ 13

      4.    The Constitution's Structure Confirms That Congress Cannot
           Create Private Federal Law Enforcers. ............................................. 15

   B.  History Does Not Overcome the Textual and Structural Case Against
       Qui Tam Actions Outside Presidential Control. ........................................ 18

CONCLUSION...................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Dunn*,
19 U.S. (6 Wheat.) 204 (1821) ........................................................ 17

*Consumers' Rsch., Cause Based Com., Inc. v. Fed. Commc'ns Comm'n*,
88 F.4th 917 (11th Cir. 2023) ........................................................ 1

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ........................................................ 5

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................ 6

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ........................................................ 20

*Marsh v. Chambers*,
463 U.S. 783 (1983) ........................................................ 19

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir.), *reh'g en banc granted, opinion vacated*, 72
F.4th 1346 (11th Cir. 2023) ........................................................ 1

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ........................................................ 6

*Transunion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................ 16

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ........................................................ 6

*Walz v. Tax Comm'n of City of New York*,
397 U.S. 664 (1970) ........................................................ 19

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987) ........................................................ 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................5

*Wilkes v. The King*, 97 Eng. Rep.
123 (K.B. 1768) ..............................................................9

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 11 ............................................ 17

U.S. Const. art. I, § 8, cl. 18 .............................................. 7

*U.S. Const. art. II, § 1, cl. 1 .............................5, 7, 8, 12, 14, 15, 16

U.S. Const. art. II, § 2, cl. 2 .......................................... 14

U.S. Const. art. II, § 3 .................................................... 8

U.S. Const. art. III, § 1 ................................................... 5

**Statutes**

Act of June 1, 1789, ch. 1, § 3, 1 Stat. 23 (1789) ................... 19

31 U.S.C. § 3730(b)(1) ................................................... 13

31 U.S.C. § 3730(b)(2) ................................................... 14

31 U.S.C. § 3730(c)(1) ................................................... 15

31 U.S.C. § 3730(c)(3) ...............................................14, 15

31 U.S.C. § 3730(c)(4) ................................................... 15

**Rules**

Fed. R. App. P. 29(a) ......................................................2

Fed. R. Crim. P. 42(a)(2) ............................................... 17

Fed. R. Crim. P. 48 ....................................................... 17

## Other Authorities

Nitisha Baronia, Jared Lucky & Diego A. Zambrano, *Private Enforcement at the Founding and Article II*, 114 Cal. L. Rev. — (forthcoming 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4821934 ............... 10, 13

William Barr, *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207 (1989) ................................................................. 20, 21

William Blackstone, *Commentaries on the Laws of England* ....................................... 9

Steven G. Calabresi, *The Vesting Clauses as Power Grants*, 88 Nw. U. L. Rev. 1377 (1994) ................................................................................................ 5

*Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* (2008) .............................. 8, 12-13, 22

Christine Kexel Chabot, *The Founders' Purse*, 110 Va. L. Rev. 1027 (2024) ........... 16

Theodore M. Cooperstein, *Letters of Marque and Reprisal: The Constitutional Law and Practice of Privateering*, 40 J. Maritime L. & Commerce 221 (2009) ..................................................................................... 17

The Federalist No. 70 (Alexander Hamilton) ............................................................. 7

Gary Lawson, *Command and Control: Operationalizing the Unitary Executive*, 92 Fordham L. Rev. 441 (2023) ............................................................ 6

*Gary Lawson, *The Constitution's Congress*, 89 B.U. L. Rev. 399 (2009) ................................................................................................................ 19-20

Gary Lawson, *Territorial Governments and the Limits of Formalism*, 78 Cal. L. Rev. 853 (1990) ...................................................................................... 16

Gary Lawson & Guy Seidman, *The Jeffersonian Treaty Power*, 2006 U. Ill. L. Rev. 1 .......................................................................................................... 5

Gary Lawson & Guy Seidman, *Originalism as a Legal Enterprise*, 23 Constitutional Commentary 47 (2006) ............................................................. 19

Julian Davis Mortenson, *Article II Vests the Executive Power, Not the Royal Prerogative*, 119 Colum. L. Rev. 1169 (2019) ............................................. 8

Letter from A Farmer, II, Balt. Md. Gazette (Feb. 29, 1788), *in* 5 *The Complete Anti-Federalist* (Herbert J. Storing ed., 1981) ......................................10

Letter from Richard Harrison to Alexander Hamilton (May 24, 1791), *in Founders Online*, National Archives (2025), https://founders.archives.gov/documents/Hamilton/01-08-02-0326 ....... 24, 25

Letter from Thomas Jefferson to George Hammond (June 5, 1793), *in Founders Online*, National Archives (2025), https://founders.archives.gov/documents/Jefferson/01-26-02-0190 ..............12

Letter from George Washington to Alexander Hamilton (Oct. 1, 1792), *in Founders Online*, National Archives (2025), https://founders.archives.gov/documents/Washington/05-11-02-0094..........10

Letter from George Washington to William Rawle (Mar. 13, 1793), *in Founders Online*, National Archives (2025), https://founders.archives.gov/documents/Washington/05-12-02-0243 ......... 11

Pacificus No. 1 (Alexander Hamilton).....................................................................4

*Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521 (2005) ... 9, 13

Proclamation of Neutrality (Apr. 22, 1793), *in Founders Online*, National Archives (2025), https://founders.archives.gov/documents/Washington/05-12-02-0371..........12

Amit Vora, *Constitutional Crowding and Article II*, 85 Alb. L. Rev. 857 (2022).........9

## INTEREST OF AMICI

The Honorable Edwin Meese III served as the seventy-fifth Attorney General of the United States. Previously, Mr. Meese was Counselor to the President. He is now the Ronald Reagan Distinguished Fellow Emeritus at the Heritage Foundation. During his tenure as Attorney General, the Department of Justice defended the executive branch against unconstitutional encroachment.

The Honorable Michael B. Mukasey served as the eighty-first Attorney General of the United States. Previously, Mr. Mukasey was an Assistant United States Attorney and a federal district court judge for the Southern District of New York. During his tenure as Attorney General, the Department of Justice defended the executive branch against unconstitutional encroachment.

Steven G. Calabresi is the Clayton J. & Henry R. Barber Professor of Law at Northwestern Pritzker School of Law, and Gary S. Lawson is the Levin, Mabie & Levin Professor at the University of Florida Levin College of Law. They are scholars of the Constitution's original public meaning. Judges on this Court have cited their work. *See, e.g.*, *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir.) (citing Professor Calabresi), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023); *Consumers' Rsch., Cause Based Com., Inc. v. Fed. Commc'ns Comm'n*, 88 F.4th 917, 931 (11th Cir. 2023) (Newsom, J., concurring) (citing Professor Lawson).

Landmark Legal Foundation is a national public-interest law firm committed to preserving the principles of limited government, separation of powers, federalism, originalist construction of the Constitution, and individual rights.

Amici submit this brief to assist this Court in interpreting Article II's original understanding, especially as it relates to the False Claims Act's qui tam component.[1]

## SUMMARY OF ARGUMENT

This case can be resolved by a syllogism: (1) The Constitution's text and structure require all federal law enforcement to be subject to the control and direction of the President. (2) The qui tam provisions of the False Claims Act purport to allow federal law enforcement outside of full presidential control. (3) The qui tam provisions of the False Claims Act are unconstitutional.

Textually, the Constitution vests the "executive Power" in a single President. Law enforcement is the quintessence of executive power, and federal law enforcement is thus vested in the President unless the Constitution itself provides otherwise. Subordinates can aid the President in this task, but they must be subordinates. The False Claims Act authorizes relators to sue "in the name of the

---

[1] This brief is filed under Fed. R. App. P. 29(a). Counsel for all parties have been notified of and have consented to the brief's filing. No party's counsel authored this brief, no party or its counsel contributed money to prepare the brief, and no person other than amici, its members, or its counsel contributed money intended to fund the preparation or submission of the brief.

Government" but sharply limits the President's power to control the actions of qui tam relators. This is a blatant violation of the Article II Vesting Clause.

The Constitution contains one specific exception to its otherwise blanket rule of presidential control and direction.[2] Congress is authorized to "grant Letters of Marque and Reprisal," which effectively provides authorization for the equivalent of qui tam relators in one specific form and context. There is no equivalent provision for ordinary law enforcement outside of presidential control and direction. The Constitution's structure thus confirms the Constitution's text.

The only plausible defense of qui tam actions such as those in the False Claims Act is history. But history is a tool for resolving ambiguities, not for overriding clear textual and structural provisions. Founding-era figures were entirely capable of constitutional error, especially when circumstances, such as limited resources and communication, made executive control of law enforcement difficult in practice. Crucially, none of the founding-era statutes expressly purported to restrict presidential control and direction of qui tam actions. Presidents understandably would be reluctant to exercise any such supervisory power, especially given the logistical constraints of founding-era law execution, but the power was there in the background. Finally, even if the False Claims Act provisions matched those of

---

[2] There are perhaps two implicit exceptions as well. See *infra* at 17 n.9.

founding-era statutes, which they do not, they would still be unconstitutional because of the inexorable commands of Article II.

## STATEMENT OF THE ISSUE

Whether the False Claims Act's qui tam provisions violate Article II.

## ARGUMENT

**A.    The Constitution's Text and Structure Require Federal Law Enforcement to Be Subject to Presidential Direction.**

**1.    Article II's Text Vests the President with All "Executive Power."**

Article II of the U.S. Constitution opens with this salvo: "The executive Power shall be *vested* in *a* President of the United States of America." U.S. Const. art. II, § 1, cl. 1 (emphasis added). Two features of this text are crucial. The first is the article "a." The second is the verb "vested."

The executive power is *vested* in *a* President—not in multiple presidents, not in subordinate executive officials, and not in private actors. Article II does not mimic Article I by saying, for example: "All executive Powers herein granted shall be vested in a President of the United States." *Cf. id.* art. I, § 1; *see also* Pacificus No. 1 (Alexander Hamilton) (drawing this distinction and observing that the enumerated powers in Article II do not "derogat[e] from the more comprehensive grant contained in the general clause": "The general doctrine then of our constitution is, that the Executive Power of the Nation is vested in the President; subject only to the

4

exceptions and qu[a]lifications which are expressed in the instrument.").[3] Nor does Article II mimic Article III by saying, for example: "The executive Power of the United States shall be vested in a President and in such inferior officers as the Congress may from time to time ordain and establish." *Cf.* U.S. Const. art. III, § 1.

Instead, Article II's Vesting Clause grants *all* the executive power to the President alone. It is the irreducible and unavoidable textual source of the "unitary executive"—a term that, in recent times, has pierced the zeitgeist, though not always with a consistent or accurate meaning. To say that the executive is unitary is to say *only* that whatever constitutes federal "executive Power" is vested in the President. By itself, the unitary executive thesis makes no claims about the extent or scope of that "executive Power"—for example, whether it includes the power to seize steel mills in wartime absent statutory authorization, *see Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952), or to order the dismissal of federal lawsuits to effectuate an international agreement, *see Dames & Moore v. Regan,* 453 U.S. 654 (1981). Rather, whatever constitutes "executive Power"—however broad or narrow

---

[3] For a detailed account of how the specific enumerations of presidential functions in Article II explain, clarify, and in some cases limit the "executive Power" vested by Article II's first sentence, see Gary Lawson & Guy Seidman, *The Jeffersonian Treaty Power,* 2006 U. Ill. L. Rev. 1, 22-43. On the Article II Vesting Clause as a grant of power rather than a mere designation of office, see Steven G. Calabresi, *The Vesting Clauses as Power Grants,* 88 Nw. U. L. Rev. 1377, 1378 (1994).

that term may be—it must, as a matter of unambiguous textual command, be vested in the single President of the United States.

In the words of one of the undersigned amici, Professor Gary Lawson:

[T]he "executive Power" is constitutionally vested specifically in the hands of one person. Period. This is the inescapable textual feature of the Constitution that establishes, as conclusively as anything in constitutional interpretation can be established, the basic fact of a "unitary executive." Whatever the federal "executive Power" encompasses is vested in the person of the President and in no one else.

Gary Lawson, *Command and Control: Operationalizing the Unitary Executive*, 92 Fordham L. Rev. 441, 444 (2023).

The Supreme Court has repeatedly recognized that "[u]nder our Constitution, the 'executive Power'—all of it—is vested in a President, who must 'take Care that the Laws be faithfully executed.' The entire 'executive Power' belongs to the President alone." *Seila Law LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 213 (2020); *see also, e.g.*, *United States v. Arthrex, Inc.,* 594 U.S. 1, 6 (2021); *Free Enter. Fund v. Public Co. Acct. Oversight Bd.,* 561 U.S. 477, 483 (2010).

There was purpose to this textually mandated unity. Federal ineptitude during the post-revolutionary period—consider, for example, Shays's Rebellion—had made it plain that, to remain a going concern, the fledgling republic would need an energetic Chief Executive. As Alexander Hamilton recognized, executive "energy" was essential for the "steady administration of the laws," to protect "property

against those irregular and high-handed combinations which sometimes interrupt the ordinary course of justice," and to secure "liberty against the enterprises and assaults of ambition, of faction, and of anarchy." The Federalist No. 70. He continued: "That *unity* is conducive to energy will not be disputed. Decision, activity, secrecy, and despatch will generally characterize the proceedings of one man in a much more eminent degree than the proceedings of any greater number; and in proportion as the number is increased, these qualities will be diminished." *Id.* (emphasis added).

To effectuate this unity, the Constitution provides that "executive Power *shall be vested*" in the President. The Constitution does not merely identify "executive Power" as a category of governmental power. It specifies where that power is located. It is located in the person of the President and nowhere else. The Constitution elsewhere notes this granting of power to the President by giving Congress power to make necessary and proper laws for carrying into execution "Powers vested by this Constitution" in other actors. U.S. Const. art. I, § 8, cl. 18. When the Constitution speaks of vesting powers, it means vesting powers.

One of the undersigned amici, Professor Steven Calabresi, has summarized the Article II Vesting Clause in this way:

> [T]he Constitution creates a unitary executive to ensure energetic enforcement of the law and to promote accountability by making it

crystal clear who is to blame for maladministration. The Constitution's creation of a unitary executive eliminates conflicts in law enforcement and regulatory policy by ensuring that all of the cabinet departments and agencies that make up the federal government will execute the law in a consistent manner and in accordance with the president's wishes. As a matter of constitutional law, the theory of the unitary executive holds that the Vesting Clause … is a grant to the president of all of the executive power … . The president is thus not only the commander in chief of the military, *but also the law enforcement officer in chief of the federal government.*

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* 4-5 (2008) (emphasis added).

Whether or not one thinks this choice of unity was wise policy, the *fact* of unitary executive power under the Constitution is textually inescapable.

### 2.    The "Executive Power" Encompasses Power to Enforce the Law.

The executive power vested in the President—and in the President alone—encompasses the power to enforce the law. Some have argued (we think incorrectly) that this is the *only* power possessed by the President as a matter of constitutional command, *see* Julian Davis Mortenson, *Article II Vests the Executive Power, Not the Royal Prerogative,* 119 Colum. L. Rev. 1169, 1175 (2019), but there cannot be dispute that *at a minimum* the "executive Power" includes the power of law execution. That is why the Constitution further provides that the President "shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and must swear or affirm to "faithfully execute the Office of President of the United States," and "to the best of

my Ability, preserve, protect and defend the Constitution of the United States," *id.*, § 1, cl. 8. *See also, e.g.*, Amit Vora, *Constitutional Crowding and Article II*, 85 Alb. L. Rev. 857, 861 (2022) (exploring the Presidential Oath Clause).

This executive power to enforce the law—again, vested in the President alone—encompasses the power to control prosecutions, both civil and criminal. The undersigned amici agree with Professor Saikrishna Prakash, who has urged: "Because the executive power is the power to execute the law and because prosecution is the vital means of executing the law, the executive power encompasses the right to control prosecutions." Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 546 (2005). Indeed, it is hard to see what else the execution of the laws might entail.

This is most readily true in criminal law. The framing generation—following Blackstone and pre-revolutionary English practice—embraced this elemental proposition. *See* 1 William Blackstone, *Commentaries on the Laws of England* 269 (observing that the king was the "proper person to prosecute for all public offences and breaches of the peace, being the person injured in the eye of the law"); *Wilkes v. The King*, 97 Eng. Rep. 123 (K.B. 1768) (Wilmot, C.J.) ("By our Constitution, the King is entrusted with the prosecution of all crimes which disturb the peace and order of society … . All indictments and informations, granted by the King's Bench,

are the King's suits, and under his controul; informations filed by his Attorney General, are most emphatically his suits, because they are the immediate emanations of his will and pleasure."); Letter from A Farmer, II, Balt. Md. Gazette (Feb. 29, 1788), *in* 5 *The Complete Anti-Federalist* 21 (Herbert J. Storing ed., 1981) (observing that the president would be "a vindex injuriarum—an avenger of public wrongs"). Even critics of our argument, we believe, acknowledge this much with respect to criminal prosecutions. *See* Nitisha Baronia, Jared Lucky & Diego A. Zambrano, *Private Enforcement at the Founding and Article II,* 114 Cal. L. Rev. — (forthcoming 2026).[4]

It accordingly caused no controversy when President Washington both directed prosecutions of law-breakers in the Whiskey Rebellion *and* directed that particular prosecutions be dismissed. In October 1792, for example, Washington "directed" Attorney General Edmund Randolph to "see that the Indictments [were] legally prosecuted & properly supported." Letter from George Washington to Alexander Hamilton (Oct. 1, 1792), *in Founders Online*, National Archives (2025).[5] And in March 1793, after William Rawle, the U.S. district attorney in Pennsylvania, had indicted accused rebels William Kerr and Alexander Beer, Washington

---

[4] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4821934.

[5] https://founders.archives.gov/documents/Washington/05-11-02-0094.

instructed Rawle to enter a *nolle prosequi* on the indictments simply because it

appeared to Washington that Kerr and Berr were innocent:

> Whereas it appears to me, from the representation of several respectable persons, and from sundry affidavits, that William Kerr and Alexander Beer, who were lately indicted in the circuit-court of the United States, holden in the town of York, in the state of Pennsylvania, for a riot, were innocent of the offence, with which they stand charged; and they may be exposed to great trouble and expence in defending themselves, unless the indictment be discontinued: I have therefore thought fit, to instruct, and I do hereby instruct you, forthwith to enter a nolle prosequi on the indictment aforesaid: and for so doing let this be filed, as your warrant.

*See* Letter from George Washington to William Rawle (Mar. 13, 1793), *in Founders*

*Online*, National Archives (2025).[6]

Nor was it controversial when, in April 1793, President Washington

accompanied his proclamation of neutrality between warring France and Great

Britain with the following prosecutorial directive:

> And I do hereby also make known that whosoever of the citizens of the United States shall render himself liable to punishment or forfeiture under the law of nations, by committing, aiding or abetting hostilities against any of the said powers, or by carrying to any of them those articles, which are deemed contraband by the modern usage of nations, will not receive the protection of the United States, against such punishment or forfeiture: and further, that I have given instructions to those officers, to whom it belongs, to cause prosecutions to be instituted against all persons, who shall, within the cognizance of the courts of the United States, violate the Law of Nations, with respect to the powers at

---

[6] https://founders.archives.gov/documents/Washington/05-12-02-0243.

war, or any of them.

Proclamation of Neutrality (Apr. 22, 1793), *in Founders Online*, National Archives (2025).[7] And Washington kept his word. As recounted in a letter from Thomas Jefferson to English representative George Hammond, for example, Washington had directed the "prosecution" of French privateers who had captured English ships and their prizes. Jefferson went so far as to reassure Hammond that "no measures will be spared to bring them to Justice": "You will see, Sir, in these proceedings of the President, unequivocal proofs of the line of strict right, which he means to pursue." Letter from Thomas Jefferson to George Hammond (June 5, 1793), *in Founders Online*, National Archives (2025).[8]

What is true of control over federal criminal proceedings is also true of control over federal civil proceedings. The Article II Vesting Clause does not textually distinguish executive criminal power from executive civil power. It speaks only of "executive Power." The law is the law, both civil and criminal. Thus, "[President] Washington exercised sweeping and comprehensive control over the district attorneys, the secretaries of state and the treasury, and the attorney general in criminal and civil cases of all kinds even though no statute authorized his

---

[7] https://founders.archives.gov/documents/Washington/05-12-02-0371.

[8] https://founders.archives.gov/documents/Jefferson/01-26-02-0190.

administration's control" over such prosecutions. Calabresi & Yoo, *supra*, at 50. Moreover, "no one regarded Washington's constitutionally asserted powers of control as being even remotely questionable." *Id.* at 51.

All this compels the following conclusion: "The reason Congress did not statutorily prescribe that these officials worked subject to the president's direction was that it was obvious under the Constitution that they did so." *Id.* Even if that conclusion were in doubt (and it should not be), the succeeding administrations confirmed it. Presidents Adams and Jefferson, like Washington before them, "directed the district attorneys and the attorney general in all matters, large and small," despite "the lack of statutory authority." Prakash, *supra*, at 563. "The presidents believed that, because they were in charge of law enforcement and because law enforcement encompassed prosecution, they were empowered to control official prosecutors." *Id.*

When the Constitution vests the "executive Power" in the President, it vests the President with control over law enforcement, both criminal and civil. This proposition is as textually plain as is any proposition about the Constitution.

### 3. The Constitution Requires Presidential Control of False Claims Act Litigation.

Qui tam relators under the False Claims Act enforce federal law. *See* 31 U.S.C. § 3730(b)(1) ("The action shall be brought in the name of the Government."). Other

amici explain, as did Judge Mizelle, why this likely makes them "Officers of the United States" under the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. But apart from the Appointments Clause, once one recognizes that enforcement of the False Claims Act is enforcement of federal law, the Article II Vesting Clause locates control of that enforcement in the President. In multiple respects, the provisions in the False Claims Act violate this principle.

The statute gives the government sixty days to decide whether to take control of the action, with additional extensions of time requiring court approval. 31 U.S.C. § 3730(b)(2). After that, the government's ability to intervene and prosecute or dismiss an action is subject to the court's determination that the government has shown "good cause." *Id.* § 3730(c)(3). But the Constitution vests control of law enforcement in the President at all times, not just at times specified by Congress. Congress cannot time-limit the President's exercise of constitutional power within a statute of limitations period, no more than Congress could pass a law limiting the President's ability to grant pardons to sixty days after a conviction.

Further, one administration's choice not to take control of a qui tam action cannot lawfully bind a successor administration, no more than a decision not to prosecute a crime (short of a pardon) does not prevent a subsequent administration from having different enforcement priorities. Still more, even if the government

14

chooses to intervene, the statute still gives rights to the qui tam relator that constrain the government's ability to fully and completely control the litigation. *Id.* § 3730(c)(1). This, too, is a violation of the Article II Vesting Clause.

Finally, and most importantly, the statute purports to strictly limit the President's ability to control the actions of qui tam relators after the government makes its initial intervention election. After that, as noted, the government must secure court approval to intervene, *id.* § 3730(c)(3)—and if it does not intervene, the government is relegated to the sidelines, from where it may request merely that the court notify it of case filings and stay (but not stop) the relator's discovery, *id.* § 3730(c)(4). This is hardly presidential control of law enforcement. It is hardly what Article II requires.

### 4.    The Constitution's Structure Confirms That Congress Cannot Create Private Federal Law Enforcers.

When private actors enforce private rights of action created by federal law, as when plaintiffs bring actions under federal civil rights or securities laws, they to some extent "enforce" federal law, but they do so as an incident to the enforcement of private rights. Nothing in Article II forbids Congress from creating private rights enforceable by those in whom those rights are vested.

The ability to create private rights of action, however, does not authorize Congress to create law enforcers bringing actions "in the name of the Government."

Qui tam relators get a share of the recovery, but the bulk of the recovery goes to the government. Had Congress given the full measure of the recovery to the private actors and provided that the suits were purely for the benefit of the private parties and not brought in the name of the government, so that False Claims Act suits were purely private rights akin to private antitrust or securities actions, there might be Article III problems with giving such rights to persons who suffer no injuries, *see Transunion LLC v. Ramirez,* 594 U.S. 413 (2021), Article II problems if this makes those relators "Officers of the United States" subject to the Appointments Clause, and perhaps even Article I problems with Congress creating such rights—but there would not be an Article II Vesting Clause problem. That is not, however, how qui tam actions under the False Claims Act are structured.

The bounty to private relators is essentially a salary for bringing actions on behalf of the United States. Indeed, federal officers in the founding era were often paid "salaries" in the form of fee-for-service bounties. This was true of district attorneys and marshals, *see* Christine Kexel Chabot, *The Founders' Purse,* 110 Va. L. Rev. 1027, 1093-99 (2024), and of justices of the peace, who were paid by the case, *see* Gary Lawson, *Territorial Governments and the Limits of Formalism,* 78 Cal. L. Rev. 853, 880-81 (1990). The fact that the private qui tam enforcers get paid, in the form of a bounty, presents rather than solves the problem, as it confirms that the relators

16

are acting on behalf of the United States rather than in their own capacities as holders of private rights, which means that the President must have full control over their actions.

But might it sometimes be convenient to allow Congress to supplement federal enforcement with private enforcement, especially in the founding era when federal enforcement machinery was sparse, the military was in an early stage of development, and there was not even a Department of Justice?

Of course it might, which is why the Constitution specifically provides for supplementation of presidential law enforcement in one specific circumstance.[9] The "executive Power" includes the power to execute the law of nations, including the laws of war and conflict. Nonetheless, Article I expressly allows Congress to "grant Letters of Marque and Reprisal." U.S. Const. art. I, § 8, cl. 11. *See* Theodore M. Cooperstein, *Letters of Marque and Reprisal: The Constitutional Law and Practice of*

---

[9] The Supreme Court has also recognized other constitutionally grounded exceptions to the President's exclusive control of law enforcement when other branches of the federal government need to protect their own decorum or the integrity of the judicial process. *See Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821) (recognizing a congressional power to arrest and imprison for contempt of Congress); *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) (courts may appoint prosecutors for criminal contempt of court); Fed. R. Crim. P. 42(a)(2) (same); Fed. R. Crim. P. 48 (requiring "leave of court" for dismissal of "an indictment, information, or complaint"). These separation-of-powers-based exceptions are obviously far removed from qui tam litigation.

*Privateering,* 40 J. Maritime L. & Commerce 221 (2009). This is specific authorization for private actors to function essentially as qui tam relators, acting on behalf of the United States in their private capacities, but only in the limited circumstances encompassed by those letters. Thus, where the Constitution wants to authorize Congress to create private law enforcers, it knows how to do so.

There is no "Qui Tam Clause" equivalent to the Marque and Reprisal Clause. This is structural confirmation of the basic textual point that all federal law enforcement must be channeled through and controlled by the President, unless the Constitution specifically carves out an exception. The False Claims Act provisions do not qualify as letters of marque and thus have no constitutional authorization.

Text and structure both say the same thing: The President is vested with the "executive Power" and must have control over all its exercises, unless the Constitution directs otherwise. In the case of qui tam relators, the Constitution does not direct otherwise.

**B.    History Does Not Overcome the Textual and Structural Case Against Qui Tam Actions Outside Presidential Control.**

The arguments in favor of the False Claims Act's qui tam provisions all come down to history: it was done in the founding era, so it must be all right. For multiple reasons, those arguments are unavailing.

First, and most fundamentally, "[s]tanding alone, historical patterns cannot

18

justify contemporary violations of constitutional guarantees." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it."). The Constitution is the standard for the evaluation of historical practice, not the other way around. History can sometimes help resolve textual and structural ambiguities, but here we deal with textual and structural clarity. History is the handmaiden of legal interpretation, not the other way around. *See* Gary Lawson & Guy Seidman, *Originalism as a Legal Enterprise,* 23 Constitutional Commentary 47, 51 (2006).

Second, practices of early Congresses are dubious guides to constitutional meaning. It is tempting to venerate the constitutional judgments of early Congresses because some eminent figures were members of that body, but one must be leery of such practice. The Constitution itself is suspicious of Congress, *see* Gary Lawson, *The Constitution's Congress,* 89 B.U. L. Rev. 399, 401 (2009), and with good reason. Literally the very first statute that Congress enacted was wildly and obviously unconstitutional, because it tried to specify the precise form of the Article VI oath for state officials, *see* Act of June 1, 1789, ch. 1, § 3, 1 Stat. 23 (1789), which is something clearly beyond Congress's enumerated powers, *see* Lawson, *supra*, 89

19

B.U. L. Rev. at 404-06. Also, the Supreme Court held that the first Congress had unconstitutionally tried to expand the Court's original jurisdiction. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 173-76 (1803). The Sedition Act is not a testament to the constitutional wisdom of early Congresses, either. Congressional practice may be relevant in some circumstances to clarify ambiguities, but it is not a reason to ignore clear textual and structural commands.

Third, the absence of presidential objection to early qui tam statutes is also not good evidence of constitutional meaning. As former Attorney General Bill Barr observed in a 1989 memorandum that he penned as the Assistant Attorney General for the Office of Legal Counsel, "because of the unique historical contexts in which qui tam statutes were adopted, the device's incompatibility with executive law enforcement functions would not have been immediately apparent," and the device "did not bite hard enough for the Executive to recognize or resist it as a usurpation of its authority." William Barr, *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 214 (1989). Adopted before the Executive had developed a comprehensive law-enforcement apparatus, the early qui tam "statutes were essentially stop-gap measures, confined to narrow circumstances where the Executive lacked the resources to enforce the law. Their intent was to assist a fledgling Executive, not supplant it. As the Executive's law enforcement capabilities

20

gathered strength, qui tam rapidly fell into disfavor." *Id.* at 234. The device remained an idle idiosyncrasy until 1986, when Congress suddenly "sought to breathe new life into this dormant device." *Id.* at 209.

Put simply, communication was difficult in 1789. It was impossible for presidents to effectuate control over many actions of far-flung actors, including district attorneys. Presidents might well have welcomed law enforcement help that did not come out of the federal budget, just as modern presidents are generally welcoming of even obviously unconstitutional subdelegations of legislative authority. Indeed, the remarkable thing about presidential action in the founding era is not the absence of presidential intervention in law enforcement but its prevalence, as discussed earlier. Presidents may not have fully exercised the power they had because of financial and logistical limitations. But it does not mean that the power did not exist.

Nonetheless, there is no denying that early Congresses passed, and early presidents signed, legislation providing for qui tam actions or their equivalents. *See* Baronia, Lucky & Zambrano, *supra.* For the above reasons, this would be unpersuasive evidence of constitutional meaning even if those statutes closely resembled the False Claims Act. But as it happens, early American statutes do not support the constitutionality of the modern FCA's qui tam provision.

Those early statutes did not expressly authorize an uninjured private party to sue on the United States' behalf and to continue vindicating the United States' interests even when (i) the government has declined to bring the action, (ii) the government has chosen to bring the action, or (iii) the government has sought to dismiss the action. Only the modern FCA's qui tam provision is so bold as to insulate a prosecution from presidential control under such circumstances.

To be sure, the early qui tam or private enforcement statutes did not contain provisions expressly authorizing the President to direct and control the prosecutions. But the Judiciary Act of 1789, which established the district attorneys, similarly did not contain provisions expressly authorizing executive direction and control. In both instances, the statutes did not mention that the prosecutions were subject to executive direction and control because "the point was too obvious to require mentioning": "We know that [President] Washington did not hesitate to direct and control the district attorneys when he thought he needed to, and we can presume he would have done the same if he had had to with an out-of-control qui tam relator." Calabresi & Yoo, *supra*, at 53.

For the already noted reasons of logistics and communication, it is not surprising that early presidents would not try to control qui tam relators. Nothing in the early statutes, however, purported to forbid such presidential direction and

22

control if the President ever chose to exercise it. Our present argument does not claim that Congress cannot enact qui tam statutes. It says only that any such authority granted to private relators to sue on behalf of the United States must be subject to presidential direction and control under Article II. The False Claims Act does precisely what the founding-era qui tam statutes did not do: it purports to insulate qui tam actions from full presidential supervision and control. Congress simply cannot do that.

Notwithstanding the constitutional background rule of presidential control of federal litigation, it is, we suppose, possible that some members of Congress, and some early presidents and their advisers, believed that they had crafted a system in which qui tam relators could indeed function as a shadow body of government enforcers outside the President's Article II control. They may have acted in accordance with those expectations. But the Constitution does not consist of expectations or beliefs. It consists of provisions, and those provisions dictate presidential control of federal law enforcement.

If Congress wants to authorize the hiring of more enforcers, it can do so. It can even provide for those enforcers to be paid by the job rather than by a fixed salary. But those enforcers must be subject to the control and direction of the President

under Article II.[10]

One final note: Appellants and their amici misplace their reliance on a 1791 letter from Richard Harrison, the Treasury Department's auditor, to Hamilton. Samuel Dodge, a customs inspector, had permitted a boat to unload its cargo at night, allegedly in violation of federal law. Dodge was subsequently indicted by an informer suing in the name of the United States, and he was fined. Pursuant to the Collection Act of 1790, a portion of the fine was paid to the relator. Dodge appealed to President Washington for a pardon, and he had a strong case: the loading law had gone into effect only a few days before the infraction, and Dodge was not aware of the new law. The problem, though, was that the government and the relator had already collected their payments. Hamilton asked Harrison for his advice on how Washington's pardon would affect the payments, and Harrison opined that, while the pardon should require the United States to remit its portion, the pardon should be deemed a "nullity" with respect to the relator's portion. Letter from Richard Harrison to

---

[10] Alternatively, if Congress wants more enforcement than the President provides, Congress can hope that state governments, or conceivably even foreign governments, will view federal law as part of the law that their officials are charged with enforcing. Enforcement power in those circumstances would stem from those sovereigns' own internal powers, not from anything in the federal Constitution. *See* Lawson, *supra,* 78 Cal. L. Rev. at 866-67. Congress of course cannot *force* those other sovereigns to enforce federal law, and Congress can *forbid* states from enforcing it if Congress deems that action inconsistent with federal aims. But that is a far cry from allowing private parties to serve as a shadow executive department.

Alexander Hamilton (May 24, 1791), *in Founders Online*, National Archives (2025) (framing the issue as: "The Question then naturally recurs, how is the constitutional power of pardoning to be exercis'd, so as not to interfere with the principles of Justice?").[11] Harrison closed his letter by emphasizing that "upon these subjects there must be great room for variety of opinion":

> The Questions depend upon the peculiar frame of Laws which in many instances have been drawn without attention to technical precision. Indeed, I am by no means assured that my own ideas are correct, with relation to these new & untried points.

*Id.* Washington ultimately took Harrison's advice, pardoning Dodge and remitting only the United States' portion.

As the text of Harrison's letter should make clear, it is inapposite to the present issue. The letter offers Harrison's tentative analysis of the interaction between the President's pardon power and an informer's vested interest in a paid fine. It says nothing meaningful about the constitutionality of statutes impinging on the President's power to control law enforcement.

## CONCLUSION

This Court should affirm the district court's judgment.

---

[11] https://founders.archives.gov/documents/Hamilton/01-08-02-0326.

Dated: March 17, 2025

Respectfully submitted,

/s/ Amit R. Vora
Amit R. Vora
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Tel. 212.506.1834
avora@kasowitz.com

*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(g)(1) because it contains 5,969 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 28-1. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

Dated: March 17, 2025        /s/ Amit R. Vora
                                   Amit R. Vora

                                   *Counsel for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing Brief of Amici Curiae with the clerk of this Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

Dated: March 17, 2025            /s/ Amit R. Vora
                                 Amit R. Vora

                                 *Counsel for Amici*