Nos. 24-13581, -13583

# In the United States Court of Appeals for the Eleventh Circuit

UNITED STATES EX REL. CLARISSA ZAFIROV,

*Plaintiff-Appellant*, and

UNITED STATES OF AMERICA,

*Intervenor-Appellant*,

*v.*

FLORIDA MEDICAL ASSOCIATES, LLC, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Florida, Tampa Division

## BRIEF OF AMICUS CURIAE CENTER FOR CONSTITUTIONAL RESPONSIBILITY IN SUPPORT OF APPELLEES

Karen R. Harned
CENTER FOR CONSTITUTIONAL
RESPONSIBILITY
4532 Cherry Hill Rd., No. 538
Arlington, VA 22207

Steven P. Lehotsky
   *Counsel of Record*
Gabriela Gonzalez-Araiza
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com

Andrew B. Davis
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701

*Counsel for Amicus Curiae*

*United States ex rel. Zafirov v. Florida Med. Assocs., LLC*, Nos. 24-13581, -13583

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The Center for Constitutional Responsibility ("Center") states that it is a non-profit, tax-exempt organization incorporated in Virginia. The Center has no parent corporation, and no publicly held company has 10% or greater ownership in the Center. Counsel further certifies that, in addition to the persons listed in the briefs of Plaintiff-Appellant, Intervenor-Appellant, and Defendants-Appellees, the following persons may have an interest in the outcome of this case:

The Center for Constitutional Responsibility

Lehotsky Keller Cohn LLP

Harned, Karen R.

Lehotsky, Steven P.

Davis, Andrew B.

Gonzalez-Araiza, Gabriela

Dated: March 17, 2025                    Respectfully submitted,

                                        */s/ Steven P. Lehotsky*
                                        Steven P. Lehotsky

# TABLE OF CONTENTS

**Page**

Interest of Amicus Curiae ................................................................ 1

Statement of the Issue ................................................................... 1

Summary of the Argument ............................................................. 2

Argument ...................................................................................... 4

    I.   Private parties may not exercise the President's exclusive
authority to litigate on behalf of the United States. ............................ 4

        A.   Article II vests the executive power exclusively in the President
and his subordinates. ......................................................... 5

        B.   Litigation enforcing federal law on behalf of the United States is
the exercise of executive power vested exclusively in the
President. ......................................................................... 7

        C.   Private persons acting as private attorneys general violate
Article II multiple times over. .......................................... 10

    II.  The False Claims Act's *qui tam* mechanism violates
Article II. ........................................................................ 12

        A.   The False Claims Act authorizes private individuals to litigate
on behalf of the federal government in violation of Article II.  12

        B.   The checkered history of *qui tam* actions cannot dislodge
Article II's clear instruction about who may exercise executive
power. ............................................................................. 17

        C.   *Qui tam* actions under the False Claims Act raise the precise
concerns that Article II was designed to solve. ..................... 21

Conclusion ................................................................................. 24

Certificate of Service .................................................................. 25

Certificate of Compliance ........................................................... 25

i

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) .................................................... 8, 21

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................. 8, 9, 16

*The Confiscation Cases*,
    74 U.S. 454 (1868) ...................................................................... 9

*Dep't of Transp. v. Ass'n of Am. R.R.*,
    575 U.S. 43 (2015) ................................................................. 7, 10

*Edmond v. United States*,
    520 U.S. 651 (1997) ..................................................................... 7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)) ........................................................... 3, 14, 15

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ..................................................................... 9

*U.S. ex rel. Herbert v. Nat'l Acad. of Scis.*,
    Civ. A. No. 90–2568, 1992 WL 247587 (D.D.C. Sept. 15, 1992) ................. 24

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928) ..................................................................... 7

*Laufer v. Arpan LLC*,
    29 F.4th 1268 (11th Cir. 2022), *vacated as moot*, 77 F.4th 1366
    (11th Cir. 2023) ................................................................. 11, 15, 23

*Lucia v. SEC,*
    585 U.S. 237 (2018) ........................................................ 16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................. 10, 11

*Marsh v. Chambers,*
    463 U.S. 783 (1983) ......................................... 3, 17, 18, 20

*Martin v. Hunter's Lessee,*
    14 U.S. 304 (1816) ........................................................... 5

*McCreight v. AuburnBank,*
    117 F.4th 1322 (11th Cir. 2024) .................................... 15

*Morrison v. Olson,*
    487 U.S. 654 (1988) ..................................................... 5, 8

*Myers v. United States,*
    272 U.S. 52 (1926) ........................................................... 6

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) .......................................................... 17

*Nike, Inc. v. Kasky,*
    539 U.S. 654 (2003), 2003 WL 899100 ...................... 22, 23

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ......................................................... 6

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) ...................................................... 18

*U.S. ex rel. Polansky v. Exec. Health Res., Inc.,*
    599 U.S. 419 (2023) ........................................... 13, 19, 20

*Riley v. St. Luke's Episcopal Hosp.,*
    252 F.3d 749 (5th Cir. 2001) ................................... 14, 20

*Robertson v. U.S. ex rel. Watson,*
    560 U.S. 272 (2010) ................................................................................. 8

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ................................................................................. 5

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................... 11, 12

*Springer v. Gov't of Philippine Islands,*
    277 U.S. 189 (1928) ................................................................................. 7

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014) ............................................................................... 17

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................................ 9, 11

*Trop v. Dulles,*
    356 U.S. 86 (1958) ................................................................................. 16

*Trump v. United States,*
    603 U.S. 593 (2024) ................................................................................. 5

*Trump v. Vance,*
    591 U.S. 786 (2020) ................................................................................. 5

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) ..................................................................................... 6

*United States v. McNinch,*
    356 U.S. 595 (1958) ............................................................................... 19

*U.S. ex rel. v. Muskingum Watershed Conservancy Dist.,*
    No. 5:13-CV-2145, 2017 WL 4102369
    (N.D. Ohio Sept. 15, 2017) .................................................................. 23

*United States v. Nixon*,
    418 U.S. 683 (1974) ......................................................... 9

*United States v. San Jacinto Tin Co.*,
    125 U.S. 273 (1888) ......................................................... 9

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000) .............................................. 2, 13, 14

*Walz v. Tax Comm'n of City of N.Y.C*,
    397 U.S. 664 (1970) ....................................................... 18

*Yates v. Pinellas Hematology & Oncology, P.A.*,
    21 F.4th 1288 (11th Cir. 2021) ....................................... 13

## Constitutional Provisions

U.S. Const. art. II ...............................................1-3, 5, 8, 10-18, 21, 24

U.S. Const. art. II, § 1 ................................................... 2, 4, 5, 10

U.S. Const. art. II, § 2 ................................................ 2, 4, 6, 7, 12

U.S. Const. art. II, § 3 ............................................ 2, 4, 5, 6, 7, 9, 11

U.S. Const. art. III...................................................... 2, 13, 14

## Statute and Rule

31 U.S.C. § 3730(b)(1)............................................................ 13

Fed. R. App. P. 29.................................................................. 1

## Other Authorities

4 Holdsworth, A HISTORY OF ENGLISH LAW (1924) ........................... 22

Constitutionality of the Qui Tam Provisions of the False Claims
    Act, 13 Op. O.L.C. 207 (1989) (William Barr, Ass't Att'y Gen.)... 18, 19, 20,
    22

Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 Yale
L.J. 341 (1989) ................................................................. 19

Jonathan H. Adler, *Stand or Deliver: Citizen Suits, Standing, and
Environmental Protection*, 12 Duke Env't L. & Pol'y F. 39
(2001) ............................................................................. 22

J. Randy Beck, *The False Claims Act and the English Eradication of
Qui Tam Legislation*, 78 N.C. L. Rev. 539 (2000) ........................... 20

James B. Helmer, Jr., *False Claims Act: Incentivizing Integrity for
150 Years for Rogues, Privateers, Parasites and Patriots*,
81 U. Cin. L. Rev. 1261 (2013) ......................................... 19

Richard J. Pierce, Jr., *Agency Authority to Define the Scope of
Private Rights of Action*, 48 Admin. L. Rev. 1 (1996) .................... 22

Saikrishna Prakash, *The Chief Prosecutor*,
73 Geo. Wash. L. Rev. 521 (2005) ..................................... 20

Tara Leigh Grove, *Standing as an Article II Nondelegation
Doctrine*, 11 U. Pa. J. Const. L. 781 (2008) ......................... 23

Thomas M. Cooley, *A Treatise on the Constitutional Limitations
Which Rest upon the Legislative Power of the States of the
American Union* (2d ed. 1868) ........................................ 6

U.S. Dep't of Just., False Claims Act Settlements and Judgments
Exceed $2.9B in Fiscal Year 2024 (Jan. 15, 2025),
https://perma.cc/4PT6-6G4V ........................................... 23

## INTEREST OF AMICUS CURIAE

The Center for Constitutional Responsibility is a nonprofit organization dedicated to preserving the separation of powers and the accountability of the political branches at all levels of government in the United States.[1] In particular, the Center is concerned with the increasingly common delegation of the Executive's exclusive power to enforce public laws to politically unaccountable private parties. This delegation—which deputizes the plaintiffs' bar and private citizens to act as roving, unaccountable "private attorneys general"—is a threat to democratic accountability and the cohesiveness of our union. Laws, especially on contentious topics, should be enforced by governmental officials who answer to the Constitution and the people. The Center aims to prevent the unwise and unconstitutional delegation of sovereign enforcement authority.

## STATEMENT OF THE ISSUE

Whether the *qui tam* provision of the False Claims Act ("FCA") violates Article II of the U.S. Constitution.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for Appellants and Appellees consent to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

## Summary of the Argument

The False Claims Act's *qui tam* provision empowering private individuals to litigate on behalf of the United States is unconstitutional multiple times over. Not only do *qui tam* actions violate the Appointments Clause of Article II, as the district court correctly held, but they violate the Vesting Clause and the Take Care Clause as well.

Our constitutional structure places *all* executive power in the President and those accountable to him. Article II vests "the executive Power" in the "President of the United States," U.S. Const. art. II, § 1, and charges him to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. The Appointments Clause, moreover, ensures that anyone who exercises the executive power vested exclusively in the President is accountable to him through appointment and removal. U.S. Const. art. II, § 2. Together, these clauses ensure that the President and his subordinates—and no one else— wield the executive power to execute federal law.

The *qui tam* device plainly violates these provisions because it allows unaccountable private individuals to exercise executive power in the form of lawsuits on behalf of the federal government. Worse, it incentivizes private individuals to bring suit even when suit is against the public interest by offering them a share of any recovery. This bounty gives private plaintiffs a stake in the litigation sufficient to satisfy Article III. *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 769 (2000). But it does nothing to cure the Article II violations because no amount of injury can entitle a private

2

party to exercise executive power reserved exclusively for the President and his subordinates. Indeed, the government seeks to analogize *qui tam* relators to private plaintiffs under federal antidiscrimination statutes and environmental statutes like the Clean Water Act. Gov't Br. 9. But where private plaintiffs under those statutes seek to enforce public rights, they too violate Article II. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring); *id.* at 209 (Scalia, J., dissenting). The rule is simple: private plaintiffs unaccountable to the President may not litigate claims that properly belong to the federal goverment.

The anemic history of *qui tam* statutes in this country does not and cannot alter this rule. When the Constitution's text and structure are clear, as they are here, no amount of history can override that clear meaning. *Marsh v. Chambers*, 463 U.S. 783, 790 (1983). Even if it could, the history here provides no basis on which to conclude that the *qui tam* device was understood to be consistent with Article II. The statutes employing the *qui tam* device in the early Republic were borne out of necessity, thoughtlessly adopted English practice inconsistent with the federal Constitution, and quickly fell into desuetude. With no evidence that anyone at the time even considered the constitutional question, this history has no probative value.

Enforcing Article II's prohibition on private parties litigating the federal government's claims is critical not only as a matter of law and constitutional hygiene, but because it protects individual liberty. Unlike the President, who

3

is accountable to the people, a private plaintiff is accountable to no one. This means that there is no check on the private plaintiff's appetite for the FCA's financial bounty. As with other statutes that turn private plaintiffs loose as roaming Attorneys General, the result is not only more litigation, but abusive litigation driven by the prospect of personal gain rather than the public interest.

This Court should affirm the district court's judgment.

## ARGUMENT

### I. Private parties may not exercise the President's exclusive authority to litigate on behalf of the United States.

Our constitutional structure unmistakably prohibits private individuals from exercising executive power, including the power to litigate on behalf of the United States. That is because the Constitution vests *all*—not just *some*—executive power in the President as Chief Executive of the Executive Branch. U.S. Const. art. II, § 1. And it charges the President—and the President alone—to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The only individuals other than the President who can exercise executive power are the President's subordinates who are accountable to him through appointment and removal. *See* U.S. Const. art. II, § 2, cl. 2. Because private individuals are *not* accountable to the President as the Constitution requires, they cannot exercise executive power.

### A. Article II vests the executive power exclusively in the President and his subordinates.

The principle that only the President and his subordinates may exercise executive power is so fundamental to our Constitution that no fewer than three constitutional provisions in Article II work in concert to ensure that executive power does not escape the President's control.

Most directly, the Vesting Clause provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1. The executive power in Article II is of "unrivaled gravity and breadth." *Trump v. United States*, 603 U.S. 593, 593 (2024) (quoting *Trump v. Vance*, 591 U.S. 786, 800 (2020)); *see also id.* (listing various executive powers). But the power is not diffuse. Rather, it has long been established that the Vesting Clause not only vests the executive power in the President but prohibits the vesting of the executive power in anyone else or in any other branch of government. *Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020). The notion that Congress could "vest [the executive power] in any other person" is "utterly inadmissible." *Martin v. Hunter's Lessee*, 14 U.S. 304, 330 (1816) (Story, J.); *see also Morrison v. Olson*, 487 U.S. 654, 705 (1988) (Scalia, J., dissenting) (Article II does not vest "*some* of the executive power, but *all of* the executive power" in the President).

The Take Care Clause—which states that the President "shall take Care that the Laws be faithfully executed"—likewise makes clear that a species of the executive power vested exclusively in the President is the execution of

5

federal law of behalf of the federal government. U.S. Const. art. II, § 3. As the Supreme Court wrote in *Nixon v. Fitzgerald*, "the enforcement of federal law" is vested firmly in the hands of the President as "the chief constitutional officer of the Executive Branch." 457 U.S. 731, 750 (1982). The Take Care Clause thus necessarily gives the President, as "the chief constitutional officer of the Executive Branch," "supervisory . . . responsibilit[y]" over those who execute the law. *Id*. If the President were deprived of the "general administrative control of those executing the laws," it would be "impossible" for him "to take care that the laws be faithfully executed." *Myers v. United States*, 272 U.S. 52, 117, 163-64 (1926); *see also* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 63 (2d ed. 1868) ("[W]here a general power is conferred or duty enjoined, every particular power necessary for the exercise of the one, or the performance of the other, is also conferred.").

Finally, the Appointments Clause ensures that "the President remains responsible for the exercise of executive power" by mandating that every "exercise of executive power . . . must at some level be subject to the direction and supervision of an officer nominated by the President." *United States v. Arthrex, Inc.*, 594 U.S. 1, 27 (2021). The Clause states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States . . . which shall be established by Law." U.S. Const. art. II, § 2, cl. 2. It also states that "Congress may by Law

vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* Requiring *every* person exercising executive power to be accountable to the President is "among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (recognizing that the Appointments Clause provides the President with "the exclusive power to select the principal (noninferior) officers of the United States"). Without it, executive power could be exercised by those that are not "accountable to the President" and thus not "accountable to the people." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 63 (2015) (Alito, J., concurring).

The Vesting Clause, Take Care Clause, and Appointments Clause thus together ensure that the power to enforce federal law—and accountability for enforcement decisions—rests solely with the President and his duly-appointed designees in the Executive Branch.

**B. Litigation enforcing federal law on behalf of the United States is the exercise of executive power vested exclusively in the President.**

The executive power in the domestic context is broad. It includes, among other things, making "public regulations interpreting a statute and directing the details of its execution." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406-07 (1928) (collecting cases); *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928) (describing enforcing laws and "appoint[ing] the agents charged with the duty" to enforce them as executive functions). But, at its

7

core, it is the power to institute litigation and prosecute in court those who violate federal law.

It is well-established that criminal prosecutions are an exercise of executive power within the exclusive province of the President and his subordinates. For instance, when presented with the question whether an independent counsel performed an executive power, the Supreme Court explained that "[t]here is no real dispute that the functions performed by the independent counsel"—namely, criminal investigation and prosecution—"are 'executive' in the sense that they are law enforcement functions." *Morrison*, 487 U.S. at 691. Justice Scalia in dissent was even more forceful, stating that "[g]overnmental investigation and prosecution of crimes is a quintessentially executive function." *Id.* at 706 (Scalia, J., dissenting) (collecting cases); *see also Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 278 (2010) (Roberts, C.J., dissenting) ("Our entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another.").

Civil suits to enforce alleged violations of federal law on behalf of the federal government are likewise within the President's "exclusive Executive power" as they are "to some extent analogous to criminal prosecution decisions and stem from similar Article II roots." *In re Aiken Cnty.*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (Kavanaugh, J.). As the Supreme Court explained in *Buckley v. Valeo*, a "*lawsuit is the ultimate remedy for a breach of the law,* and it is to the President, and not to the Congress, that the Constitution

entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" 424 U.S. 1, 138 (1976) (emphasis added); *see also United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888) (the Attorney General "is undoubtedly the officer who has charge of the institution and conduct of the pleas of the United States, and of the litigation which is necessary to establish the rights of the government"); *The Confiscation Cases*, 74 U.S. 454, 458-59 (1868) ("[I]t is clear that all such suits [on behalf of the United States], so far as the interests of the United States are concerned, are subject to the direction, and within the control of, the Attorney-General.").

Moreover, the power to *refuse* to bring an action falls within the President's exclusive authority. The "refusal to institute [civil enforcement] proceedings" by the federal government must be vested in the Executive Branch. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (citing U.S. Const. art. II, § 3). Accordingly, both the decision whether the federal government should enforce an alleged violation of federal law, as well as the enforcement action itself, must rest exclusively with the President and his subordinates. *Buckley*, 424 U.S. at 138; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys).");  *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[.]" (citation omitted)).

**C. Private persons acting as private attorneys general violate Article II multiple times over.**

Because both the exercise of prosecutorial discretion (in the civil and criminal context) and litigation on behalf of the United States to enforce an alleged violation of federal law are executive powers vested solely in the President, private individuals outside the President's control cannot exercise these powers consistent with Article II. Indeed, there is not "not even a fig leaf of constitutional justification" for private parties to exercise executive power "which belongs to the President." *Ass'n of Am. R.R.*, 575 U.S. at 62 (Alito, J., concurring); *see id*. at 88 (Thomas, J., concurring) (explaining that the Vesting clause "categorically preclude[s]" private individuals "from exercising … [the] executive … power[] of the Federal Government").

This is not to say that private individuals can never enforce federal law. Congress may from time to time create private rights of action for private citizens to sue to redress concrete and personalized injuries caused to them by violations of federal law. But Article II limits them to redressing only "[i]ndividual rights," not "public rights." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992) (internal quotation marks omitted). A private individual who has personally been injured (say, because she was fired due to a disability) may file suit to redress that injury (seeking, for example, reinstatement and backpay) provided she has a cause of action. *See id*. at 577-78. That kind of suit incidentally advances the public interest in deterring the activity made unlawful by federal law, and Congress is within its authority to consider that

effect when choosing whether to create a private cause of action. But the primary result of such a suit must be the redress of the plaintiff's personal, specific injuries. *See Laufer v. Arpan LLC*, 29 F.4th 1268, 1291 (11th Cir. 2022) (Newsom, J., concurring)., *vacated as moot*, 77 F.4th 1366 (11th Cir. 2023).

By contrast, suits on behalf of the government or that primarily advance "the *public* interest," are "the function of Congress and the Chief Executive" alone. *Lujan*, 504 U.S. at 576 (emphasis added). If private citizens were to share the power to advance "the undifferentiated public interest in . . . compliance with the law," they would usurp "the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Id.* at 577 (quoting U.S. Const. art. II, § 3). Accordingly, when "*unharmed* plaintiffs . . . sue defendants" merely because they "violate[d] federal law," they "infringe on the Executive Branch's Article II authority." *TransUnion*, 594 U.S. at 429.

This distinction between suits that redress private injuries and those that advance the public interest traces to common law. "Common-law courts" had "broad power to adjudicate suits" brought by plaintiffs "involving the alleged violation of private rights"—rights "belonging to individuals," like "personal security . . . property rights, and contract rights." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 344 (2016) (Thomas, J., concurring) (quoting 3 W. Blackstone Commentaries *2). But the rule was different for public rights. When the suit involved "a harm borne by the public at large, such as the violation of the criminal laws" or "general compliance with regulatory law,

11

. . . . only the government had the authority to" sue. *Id.* at 345 (internal quotation marks and citation omitted).

And this distinction maps onto Article II. To ensure the appropriate separation of powers mandated by the Constitution, only individuals who are accountable to the President consistent with the Appointments Clause can exercise executive power to advance the public interest. Private individuals are not accountable to the President because, by definition, they have not been appointed by the President as officers of the United States and are not government officials operating under the supervision of a duly appointed officer. They therefore cannot act as free-floating private attorneys general exercising the Executive Branch's exclusive authority to enforce federal law. They may only act as citizens suing to redress real and concrete injuries that they have personally suffered. Anything else would constitute the exercise of executive authority outside the President's control in violation of the Vesting Clause, Take Care Clause, and Appointments Clause.

## II. The False Claims Act's *qui tam* mechanism violates Article II.

### A. The False Claims Act authorizes private individuals to litigate on behalf of the federal government in violation of Article II.

The FCA's *qui tam* provision does exactly what Article II prohbits: it authorizes private individuals who are unaccountable to the President to exercise executive power.

Despite the government's protest that claims brought by a private relator under the FCA's *qui tam* provision involve "private litigants pursuing private interests," Gov't Br. 7, there is not and has never been any doubt that *qui tam* relators are litigating on behalf of the government as sovereign. The descriptor of "*qui tam*" is short for the Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," which means "who pursues this action *on our Lord the King's behalf* as well as his own." *Stevens*, 529 U.S. at 768 n.1. The Supreme Court has likewise made clear that in an FCA *qui tam* action, the government is the "real party in interest." *U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 425 (2023) (citation omitted). And it remains the real party in interest even though the partial assignment of the United States' damages claim provides Article III standing. *See Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1310 (11th Cir. 2021). A private relator is thus undisputedly exercising executive power in violation of Article II.

The fact that a private relator also sues in part on his or her own behalf, 31 U.S.C. § 3730(b)(1) (a person brings a "civil action . . . for the person and for the United States Government"), is no answer to the Article II violation. As the Supreme Court explained in *Stevens*, a private relator is uninjured, 529 U.S. at 772, and thus a person who ordinarily could not enforce federal law in a way that is consistent with *either* Article II *or* Article III. It is only because the FCA provides a bounty "generally ranging from 15 to 25 percent if the Government intervenes . . . and from 25 to 30 percent if it does not"

13

that the relator obtains any interest in the suit because that bounty is a "partial assignment of the Government's damages claim." *Stevens*, 529 U.S. at 769-70, 773. This satisfies Article III by giving the relator a personal stake in the suit, but it cannot satisfy Article II because "the part of the claim the relator is not litigating for himself he is litigating for the government." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 772 (5th Cir. 2001) (Smith, J., dissenting).

The government tries to escape the conclusion that relators are litigating on behalf of the government—*i.e.* exercising executive power—by arguing that relators are "functionally similar to . . . private plaintiffs under statutes like Title VII, the antitrust laws, or the Clean Water Act." Gov't Br. 9. These are curious examples because, where private plaintiffs use these private rights of action to litigate claims and remedies that are fundamentally public in nature, then they, too, run afoul of Article II.

In *Friends of the Earth*, for instance, multiple members of the Supreme Court explained that Article II precludes a private plaintiff from litigating a claim that is fundamentally the government's, even if the plaintiff has Article III standing. Justice Kennedy explained in a concurrence that "[d]ifficult and fundamental questions are raised when we ask whether exactions of public fines"—that is, fines payable to the Treasury—"by private litigants, and the delegation of Executive power which might be inferable from the authorization, are permissible in view of the responsibilities committed to the Executive by Article II." *Id.* at 197 (Kennedy, J., concurring). Justice

14

Scalia, joined by Justice Thomas, agreed, explaining that allowing private individuals to seek penalties payable to the Treasury intrudes on the President's Article II powers by "turn[ing] over to private citizens the function of enforcing the law." *Id.* at 209 (Scalia, J., dissenting).

Likewise, tester plaintiffs under the Americans with Disabilities Act exercise core executive power in violation of Article II because they enforce general compliance with the law at their sole discretion. As Judge Newsom explained: "[A] self-avowed 'tester' plaintiff who alleges . . . discrimination-based 'stigmatic' injury but who, by her own admission, principally seeks to advance the rights of disabled people generally" is "impermissib[ly] exercis[ing] 'executive Power' in violation of Article II." *Laufer*, 29 F.4th at 1284 (Newsom, J., concurring).

Statutes creating private rights of action only comply with Article II to the extent they authorize remedies for private injuries. And that is exactly why FCA *qui tam* actions are different from minerun private suits alleging violations of Title VII or the ADA. In most instances, where a private plaintiff sues under Title VII or another anti-discrimination statute, she is litigating to remedy a private injury, such as workplace harassment, and any law-enforcement benefit is incidental. *See, e.g.*, *McCreight v. AuburnBank*, 117 F.4th 1322, 1326 (11th Cir. 2024) (plaintiffs alleging they were terminated based on age). There is no Article II problem with these types of suits, even if remedying the private injury also advances Congress's policy goals, such as combatting and deterring discrimination. *See supra* 10-12.

15

The *qui tam* relator's suit under the FCA, by contrast, is not remedying a private injury because the relator suffered no injury. The relator's only personal interest is instead wholly manufactured through the bounty created by the FCA itself. But a bounty—including a bounty in the form of a partial assignment of an interest in the outcome of the suit—cannot be consistent with Article II without blowing a seismic hole in our constitutional structure.

Our structure requires that anyone exercising executive power must be accountable to the President because the President is accountable to the people. *See supra* at 7. That is why anyone exercising "significant authority" in a "continuing" office established by law must be appointed (and subject to removal) by the President or one of his subordinates. *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (cleaned up); *Buckley*, 424 U.S. at 126. The government's position, however, would make this requirement a dead letter. Congress could outsource virtually any and all law enforcement to self-interested bounty hunters outside the President's control simply by authorizing monetary penalties payable to the government, assigning private plaintiffs an interest in that penalty, and permitting them to litigate on behalf of the U.S. government. The Constitution cannot be so easily cast to the side; its provisions "are not time-worn adages or hollow shibboleths . . . . They are the rules of government." *Trop v. Dulles*, 356 U.S. 86, 103 (1958).

### B. The anemic history of *qui tam* actions cannot dislodge Article II's clear instruction about who may exercise executive power.

The history of *qui tam* actions cannot save the FCA's constitutionality because there is no Constitutional ambiguity: Article II limits the exercise of executive power to individuals who are accountable to the President, and *qui tam* relators are not accountable to the President. The fact that Congress created short-lived *qui tam* actions without reflecting on their constitutionality cannot overcome Article II's clear text and well-recognized principles of separation of powers.

The government argues otherwise, stating that "congressional enactments may sometimes supply 'contemporaneous and weighty evidence of [the Constitution's] true meaning.'" Gov't Br. at 40 (quoting *Marsh*, 463 U.S. at 790). That is true so far as it goes. No one doubts that history can be a useful guide to understanding the meaning of unclear or ambiguous provisions in the Constitution. In *Marsh*, for example, the Court found that history supported the conclusion that religious invocations in a legislative session are compatible with the Establishment Clause and so did not apply the doctrinal tests it would otherwise apply. *Marsh*, 463 U.S. at 790.

Still, "to the extent [history] contradicts what the text says, the text controls." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022). As the Supreme Court explained in *Town of Greece v. Galloway*, "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." 572 U.S. 565, 576 (2014). *See also*

17

*Marsh*, 463 U.S. at 790 ("Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees."); *Walz v. Tax Comm'n of City of N.Y.C*, 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it."). And there can be no doubt that, if not for the supposed historical foundations that the government relies upon, *qui tam* provisions would undoubtedly violate Article II. Article II must therefore be applied as written.

In any event, the history of *qui tam* actions in this country is far too sporadic and unthinking to have any material weight. Historical practice can "guide [the] interpretation of an ambiguous constitutional provision" "where [that] practice has been open, widespread, and unchallenged since the early days of the Republic." *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment). For example, religious invocations before legislative sessions existed at the time of the founding and have continued openly ever since. *See Marsh*, 463 U.S. at 790.

*Qui tam* statutes, however, have not been widespread or consistently in use since the early days of the Republic. The *qui tam* statutes passed early in our history were "stop-gap measures . . . . to assist a fledgling executive" and quickly "fell into disfavor." Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. 207, 235 (1989) (William Barr, Ass't Att'y Gen.) ("OLC Memo"). They were passed because the nascent Executive

18

Branch lacked the resources necessary for effective local law enforcement and required support. *Id*. They "rapidly fell into disuse" as enforcement capabilities developed, and "never gained a secure foothold within our constitutional structure because of [their] fundamental incompatibility with that structure." *Id*. at 213; *see also* Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. 341, 342 (1989) ("Most early qui tam statutes have long been repealed; of those remaining, most lie essentially dormant."); James B. Helmer, Jr., *False Claims Act: Incentivizing Integrity for 150 Years for Rogues, Privateers, Parasites and Patriots*, 81 U. Cin. L. Rev. 1261, 1264 (2013) ("Eventually all of these early qui tam statutes would be repealed.").

Congress revived the *qui tam* device in the 1860s to deal with another crisis requiring expediency. As the Civil War raged, Congress saw that "the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *United States v. McNinch*, 356 U.S. 595, 599 (1958). Congress therefore created a *qui tam* action for private individuals to stop this plunder hindering the war effort. *Polansky*, 599 U.S. at 424. But as with the *qui tam* actions from the late 1700s, this cause of action "fell into relative desuetude" as soon as the Civil War concluded. OLC Memo at 209. And put together, none of these statutes ever generated substantial litigation of a scale that would suggest sustained and widespread practice such that it could inform constitutional meaning. J. Randy Beck, *The False Claims Act and*

*the English Eradication of Qui Tam Legislation*, 78 N.C. L. Rev. 539, 541-42 (2000).

There is no reason to believe that Congress ever thought about the lawfulness of these statutes. "A careful review of the history of *qui tam* laws leads one to conclude that they should be classified among those statutes that have been passed more from expediency than from reasoned constitutional analysis." *Riley*, 252 F.3d at 773 (Smith, J., dissenting). Indeed, "[t]here is no evidence that the Framers considered the constitutional status of *qui tam*." OLC Memo at 214. Congress simply adopted the English practice unthinkingly to solve an immediate problem. And that is precisely the circumstance when history is more likely to lead astray than illuminate. *See Marsh*, 463 U.S. at 791 (noting the problems with relying on "action . . . taken thoughtlessly, by force of long tradition and without regard to the problems posed").

Moreover, early statutes thoughtlessly adopting the English tradition are especially unhelpful in discerning constitutional meaning where, as here, the English tradition is contrary to the American system of government. As Justice Thomas has explained, "we should be especially careful not to overread the early history of federal *qui tam* statutes given that the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting) (citing

Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 589 (2005) (noting that "we ought to be cautious about importing English constraints or exceptions to the executive power, when those limitations might be based on the principle of parliamentary supremacy")).

For all these reasons, the abbreviated and uncritical history of *qui tam* actions in this country cannot come close to doing the work the government asks of it. It cannot support a practice of private law enforcement that is anathema to our constitutional design.

### C. *Qui tam* actions under the False Claims Act raise the precise concerns that Article II was designed to solve.

Article II's prohibition on private parties exercising executive power serves an important purpose: it protects individual liberty by leaving to the elected Executive the discretion *not* to enforce violations of law when enforcement would be unjust or unwise. As then-Judge Kavanaugh explained in *In re Aiken*:

> One of the greatest *unilateral* powers a President possesses under the Constitution, at least in the domestic sphere, is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior . . . . After enacting a statute, Congress may not mandate the prosecution of violators of that statute. Instead, the President's prosecutorial discretion and pardon powers operate as an independent protection for individual citizens against the enforcement of oppressive laws that Congress may have passed.

725 F.3d at 264.

The FCA's *qui tam* provision robs the Executive of this discretion. And history bears out the consequences for individual liberty. In England, there was a long history of abuse, as "qui tam proved a vexatious device that ultimately could not be reconciled with the institutions of free and responsible government." OLC Memo at 235. "Litigation was stirred up simply in order that the informer might compound for a sum of money," as well as a "means to gratify ill will." *Id.* citing (4 Holdsworth, A HISTORY OF ENGLISH LAW 356 (1924)).

Unsurprisingly then, statutes like the FCA that empower private individuals to litigate fundamentally public claims in exchange for a bounty raise serious concerns about "vexatious and abusive litigation." Br. for the United States Solicitor General as Amicus Curiae Supporting Petitioners, *Nike, Inc. v. Kasky*, 539 U.S. 654 (2003) (No. 02-575), 2003 WL 899100, at *23. Unlike the President and his subordinates, private plaintiffs "face no significant political repercussions for setting unwise enforcement priorities." Jonathan H. Adler, *Stand or Deliver: Citizen Suits, Standing, and Environmental Protection*, 12 Duke Env't L. & Pol'y F. 39, 49 (2001). *See also* Richard J. Pierce, Jr., *Agency Authority to Define the Scope of Private Rights of Action*, 48 Admin. L. Rev. 1, 12 (1996) (noting that a critical shortcoming with private rights of action is the "lack of political accountability for important policy decisions"). As a result, they face no pressure to take a broad view of enforcement priorities, and instead often enforce the law in service of their own ideological or policy goals. As Justice Breyer explained: "The delegation of

state authority to private individuals authorizes a purely ideological plaintiff . . . to bring into the courtroom the kind of political battle better waged in other forums." *Nike, Inc. v. Kasky*, 539 U.S. 654, 679 (2003) (Breyer, J., dissenting).

Worse, private enforcers can mix ideology and policy with plainly improper motivations for enforcement because they are "unencumbered by the legal and practical checks that constrain public enforcement agencies." *Arpan*, 29 F.4th at 1295 (Newsom, J., concurring) (quoting Tara Leigh Grove, *Standing as an Article II Nondelegation Doctrine*, 11 U. Pa. J. Const. L. 781, 837 (2008)). There is nothing stopping private enforcers from selecting their targets for improper reasons, like the resources the defendant has available to fight the allegation or the defendant's political stances.

This concern about improper and vexatious litigation is exacerbated by the fact that *qui tam* actions under the FCA are now routine. In 2024, relators filed 979 qui tam suits, "the highest number [of suits filed] in a single year." Press Release, U.S. Dep't of Just., False Claims Act Settlements and Judgments Exceed $2.9B in Fiscal Year 2024 (Jan. 15, 2025), https://perma.cc/4PT6-6G4V. With so many suits brought by so many different relators, it is not only impossible to have a unified approach to enforcement, but courts can expect more and more actions motivated by something more than concern for the public fisc. *See, e.g.*, *U.S. ex rel. v. Muskingum Watershed Conservancy Dist.*, No. 5:13-CV-2145, 2017 WL 4102369, at *5 (N.D. Ohio Sept. 15, 2017) (defendant alleging that "relators brought

the present action . . . for the improper purpose of halting the fracking activities associated with the gas and mineral rights leases" (cleaned up)); *U.S. ex rel. Herbert v. Nat'l Acad. of Scis.*, Civ. A. No. 90–2568, 1992 WL 247587, at *5 (D.D.C. Sept. 15, 1992) ("Herbert is seeking to use the qui tam provisions to redress a private grievance between him and [defendant]. As such his action is an abuse of the qui tam process.").

Article II was designed to avoid the abuses inherent in private law enforcement, and its provisions should be enforced.

## CONCLUSION

The district court's judgment should be affirmed.

Dated: March 17, 2025                    Respectfully submitted,


                                         */s/ Steven P. Lehotsky*

Karen R. Harned                          Steven P. Lehotsky
CENTER FOR CONSTITUTIONAL                Gabriela Gonzalez-Araiza
RESPONSIBILITY                           LEHOTSKY KELLER COHN LLP
4532 Cherry Hill Rd., No. 538            200 Massachusetts Ave. NW
Arlington, VA 22207                      Washington, DC 20001
                                         (512) 693-8350
                                         steve@lkcfirm.com

                                         Andrew B. Davis
                                         LEHOTSKY KELLER COHN LLP
                                         408 W. 11th St., 5th Floor
                                         Austin, TX 78701

                                         *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

On March 17, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,997 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky