# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES ex rel. CLARISSA ZAFIROV,

Plaintiff-Appellant, and

UNITED STATES OF AMERICA,

Intervenor-Appellant,

v.

FLORIDA MEDICAL ASSOCIATES, LLC, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Middle District of Florida

## REPLY BRIEF FOR APPELLANT UNITED STATES OF AMERICA

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

GREGORY W. KEHOE
  *United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

To the government's knowledge, the following persons and entities have an interest in the outcome of this appeal:

Aimonetti, Justin W.

\* Akowuah, Kwaku A.

Altman, Stephen D.

Altman Dispute Resolution

\* American Association for Justice

Andersen, J. Carter

\* Andrews, Cory L.

\* Andrus, Lori

Anion Technologies, LLC

Anti-Fraud Coalition

Arias, Elizabeth A.

Auerbach, Marcella

\* Baron & Budd, P.C.

\* Beck, Randy

\* Additions to previous certificate marked with an asterisk.

* Becker-Cohen, Miriam

Bentley, Arthur Lee III

* Berry, Brent

* Better Health Group, LLC

Bock, Elizabeth M.

Boyd, Ginger

Boynton, Brian M.

Bradley Arant Boult Cummings LLP

Buffaloe, William T.

Bush Ross, PA

* Butler, Brian

* Calabresi, Steven G.

* Capesius, Kenneth D.

* Center for Constitutional Responsibility

Chamber of Commerce of the United States of America

* Chappell, Glenn E.

* Chess, Gabriel

* Chizewer, David J.

Clark, Havan M.

* Coffin, Tristram J.

* Constitutional Accountability Center

* Davis, Andrew B.

Deaton, David M.

Dechert LLP

DeMar, Jacklyn

* Dorsey, Catherine H.

Drake, Scott P.

* Durling, James

* Edelson PC

Elevance Health, Inc. (NYSE: ELV)

Engel, Steven A.

Estes, Jillian Levy

* Farley, Robert

Florida Medical Associates, LLC, doing business as VIPcare

Flynn, Hon. Sean P.

Foley, Jack

Foley & Lardner LLP

* Fougere, Joshua J.

Freedom Health, Inc.

* Fuentes, Dr. Manuel

* Galeria, Janet

Gerencir, Samantha Marie

Ghosh-Murthy, Priyanka

Giarratana, Giovanni P.

* Gilbert, Dominique

* Goldberg Kohn Ltd.

* Gonzalez-Araiza, Gabriela

* Goodman, Anna J.

* Gorod, Brianne J.

* Gose, Sean

* Granston, Michael D.

* Grassley, Senator Charles E.

Grover, Steven F.

Gunster, Yoakley & Stewart P.A.

* Gupta, Deepak

* Gupta Wessler LLP

Handberg, Roger B.

Hanower, Patricia L.

* Harned, Karen R.

Hartman, Anne Hayes

* Havian, Eric

* Hindman, Evan

Holder, Harold Douglas III

Jonathan Kroner Law Office

* Jones, Jamie L.M.

* Kasowitz Benson Torres LLP

Keefe, Sean P.

* Kehoe, Gregory W.

* Kerska, Gerald S.

Koh, J. Jennifer

Kroner, Jonathan

Krueger, Matthew D.

Kulp, Brian A.

Lafferty, LaTour Rey

* Landmark Legal Foundation

* Law Office of Priyanka Ghosh-Murthy

* Lawson, Gary S.

* Lehotsky, Steven P.

* Lehotsky Keller Cohn LLP

* Leukemia & Lymphoma Society

* Lewis, Roger A.

Lischak, Jonathan M.

* Loevy, Debra

* Loevy + Loevy (incorporated as Elgron, Inc.)

* Lucky, Jared

* Mansour, George

* Marcus, Beverly

* Martin, Jerry E.

Matthews, Michael P.

McDonnell, Kelly A.

McGinley, Michael H.

* Meese, Edwin III

Mehta, Jason Paul

* Merryday, Hon. Stephen D.

* Metlitsky, Anton

\* Meyers, William C.

\* Miller-Gootnick, Benjamin M.

Mizelle, Hon. Kathryn Kimball

Morgan Verkamp LLC

Morrissey, Tara

\* Mukasey, Michael B.

Nagle, Catherine

Napora, Chandra

\* National Association of Manufacturers

\* Nealon, James

\* Nelson, Scott L.

Nelson Mullins Riley & Scarborough LLP

\* Nettles, William

Nolan, Kenneth J.

Nolan, Auerbach & White, LLP

O'Melveny & Myers LLP

Optimum Healthcare, Inc.

\* Pacific Legal Foundation

\* Pagidipati, Siddhartha

* Paul, Weiss, Rifkind, Wharton & Garrison LLP

* Pfander, James

* Pharmaceutical Researchers and Manufacturers of America

* Phillips & Cohen LLP

Physician Partners, LLC

* Public Citizen

* Public Citizen Litigation Group

Raab, Michael S.

Rabin, Adam T.

Rabin Kammerer Johnson

* Radomski, Sean J.

* Rich, Noah M.

* Ronickher, Mike

* Roth, Yaakov M.

* Russell & Woofter LLC

Santella, Amanda M.

Scarborough, Charles W.

* Shanmugam, Kannon K.

* Sidley Austin LLP

\* Simpson, Matthew H.

Singer, Benjamin D.

Singh, Tejinder

Sparacino PLLC

\* Stein, Scott D.

Steven F. Grover P.A.

Swanson, Joseph W.

\* Sylvia, Claire M.

\* Tayabji, Jaclyn S.

\* Twetten, Daniel

\* Tycko, Jonathan K.

\* Tycko & Zavareei LLP

U.S. Chamber Litigation Center

\* U.S. Department of Justice

Valiente, Lauren Lisette

\* Vance, Joyce White

Varcoe, Andrew

Verkamp, Jennifer M.

VIPcare

\* Voldman, Max

\* Vora, Amit R.

\* Washington Legal Foundation

\* Wenthold, David J.

\* Wessler, Matthew W.H.

\* Whistleblower Partners LLP

\* White, Jeffrey R.

Winik, Daniel

\* Woofter, Daniel

\* Wydra, Elizabeth B.

Yavelberg, Jamie A.

Zafirov, Clarissa

\* Zambrano, Diego

\* Zieve, Allison M.

/s/ *Daniel Winik*
Daniel Winik

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION AND SUMMARY ................................................. 1

ARGUMENT .................................................................................... 3

I.   Relators Need Not Be Appointed In The Manner Prescribed By The Appointments Clause ......................................................... 3

    A.   Relators Do Not Occupy Continuing Positions ............................3

    B.   Congress Did Not Vest Relators With Uniquely Governmental Authority ..................................................7

II.  The Qui Tam Provisions Are Consistent With The Vesting And Take Care Clauses ...................................................... 11

    A.   History Establishes The Constitutionality Of The False Claims Act's Qui Tam Provisions ...................................11

    B.   If Necessary, Limits On The Government's Control Mechanisms Can Be Held Invalid And Severed .........................19

III. This Appeal Does Not Present The Question Whether The Qui Tam Provisions Are Facially Unconstitutional ................................... 21

CONCLUSION ............................................................................... 23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Alyeska Pipeline Service Co. v. Wilderness Society*,
  421 U.S. 240 (1975) ........................................................ 10-11

*Ayotte v. Planned Parenthood of Northern New England*,
  546 U.S. 320 (2006) ............................................................21

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262 (2019) ..............................................................8

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022) ............................................................12

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969) ............................................................12

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
  520 U.S. 939 (1997) ..............................................................8

*Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter*,
  575 U.S. 650 (2015) ..............................................................5

*Marvin v. Trout*,
  199 U.S. 212 (1905) ............................................................15

*Office of U.S. Trustee v. John Q. Hammons Fall 2006, LLC*,
  602 U.S. 487 (2024) ............................................................21

*Riley v. St. Luke's Episcopal Hospital*,
  252 F.3d 749 (5th Cir. 2001)...................................... 12, 14

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ............................................................19

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ...........................................................................20

*United States v. Griswold*,
    24 F. 361 (D. Or. 1885) ...................................................................8

*United States v. Maurice*,
    26 F. Cas. 1211 (C.C.D. Va. 1823) ...................................................4

*United States v. NEC Corp.*,
    11 F.3d 136 (11th Cir. 1993)............................................................5

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) ................................................................... 8, 16

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
    599 U.S. 419 (2023) .........................................................................7

*United States ex rel. Spicer v. Westbrook*,
    751 F.3d 354 (5th Cir. 2014)............................................................6

*United States ex rel. Zafirov v. Florida Medical Associates, LLC*,
    751 F. Supp. 3d 1293 (M.D. Fla. 2024) ................................... 4, 9, 21

*Valley Forge Christian College v. Americans United for
    Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) .......................................................................22

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) .................................................. 2, 7, 12, 14, 15

*Yates v. Pinellas Hematology & Oncology, P.A.*,
    21 F.4th 1288 (11th Cir. 2021) .....................................................8, 9

**Statutes:**

31 U.S.C. § 3730(b)(1) .........................................................................8

31 U.S.C. § 3730(b)(2)-(4) ...................................................9

31 U.S.C. § 3730(b)(5) ...................................................4

31 U.S.C. § 3730(c)(2)(A) ...................................................20

31 U.S.C. § 3730(c)(2)(B) ...................................................20

31 U.S.C. § 3730(c)(2)(C) ...................................................20

31 U.S.C. § 3730(c)(3) ...................................................20

## INTRODUCTION AND SUMMARY

Defendants fail to justify the district court's novel conclusion that relators under the False Claims Act are officers of the United States whose manner of appointment violates the Appointments Clause. Relators do not occupy continuing offices. And Congress did not make them part of the government's workforce; rather, it assigned to them a share of the government's right to a monetary recovery for fraud. Relators possess none of the indicia of officeholders within the meaning of the Appointments Clause.

Nor do defendants offer a persuasive argument for affirmance on the basis of their theory—which the district court did not adopt—that the qui tam provisions of the False Claims Act are inconsistent with the Vesting and Take Care Clauses. As a general matter, Congress undoubtedly can authorize private parties who have suffered Article III injury to sue to enforce federal laws. Defendants point out significant ways in which qui tam actions under the False Claims Act differ from, for example, private suits under Title VII or the antitrust laws. If Congress's authorization of qui tam suits were a recent development, those differences would raise substantial questions about whether the qui tam provisions of the False Claims Act comport with the Vesting and Take Care Clauses. Those questions are resolved, however,

by the extensive body of evidence that qui tam provisions have, since the Founding, been understood as established features of American law. The Supreme Court found that body of history "well nigh conclusive" in the Article III context, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 777 (2000), and it is equally conclusive here. Defendants' response is to assert repeatedly that the embrace of qui tam provisions in the Founding era was "thoughtless[]" (Br. 53; *see* Br. 49, 50, 55), but they can make that assertion only by ignoring much of the evidence described in our opening brief and the amicus briefs.

Finally, defendants assert that this Court should hold the False Claims Act's qui tam provisions facially unconstitutional—that is, unconstitutional even in cases (unlike this one) where the government has intervened or is still considering whether to intervene. That request is baseless. Defendants have not addressed, and the district court did not address, the distinct constitutional issues that would arise in those sorts of cases—and for good reason, because they have nothing to do with this case. Regardless of how the Court answers the constitutional question presented in this case, it should make clear it is not answering broader questions that are not presented.

**ARGUMENT**

## I. Relators Need Not Be Appointed In The Manner Prescribed By The Appointments Clause

As our opening brief explains, the district court erred in concluding that the False Claims Act's qui tam provisions are inconsistent with the Appointments Clause. Relators possess none of the indicia of officeholders within the meaning of the Appointments Clause: Their roles are limited in time and scope, confined to a particular case, and fundamentally personal in nature. Defendants have no persuasive response.

### A. Relators Do Not Occupy Continuing Positions

The most straightforward basis for reversal of the district court's Appointments Clause holding is that relators' roles are limited in time and scope rather than continuing from officeholder to officeholder over time. Defendants' contrary arguments lack merit.

Defendants assert that relators are "materially identical" to "special prosecutors" and others appointed to "act in only a single matter." Br. 22. But as our opening brief explains (at 36-38), the roles that defendants invoke as analogous were not specific to the individuals appointed to perform them. Those offices were continuing in the crucial sense that their "duties" would

"continue" even "though the person" performing them "be changed," *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.). That is not true of the relator's role. If a particular relator decides she is no longer interested in pursuing a qui tam action she has brought, another person cannot simply take her place. "When a person brings an action under" the qui tam provisions of the False Claims Act, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

Like the district court, *see United States ex rel. Zafirov v. Florida Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1316 (M.D. Fla. 2024), defendants suggest (Br. 24) that the role of a relator is continuing because "any qualified person may appoint himself" to the role. But as our opening brief explains (at 39), it is irrelevant whether multiple people can hold the so-called office of "relator" at any given time. What matters is whether the duty associated with that supposed office—that is, the duty of litigating a *particular* qui tam action—can continue from inhabitant to inhabitant of the office. And the answer is clearly that it cannot. A relator's pursuit of a qui tam action is personal to that relator and not transferable from relator to relator.

Defendants dispute that proposition—that a relator's pursuit of a qui tam action is not transferable to a different relator—on two grounds. First, they cite *Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter*, 575 U.S. 650, 662-664 (2015), for the proposition that "if a relator's complaint is dismissed on procedural grounds, another relator may step into the role and raise the same claims." Br. 24-25; *see* Br. 45. But the Supreme Court's holding in that case does not allow one relator to take over a qui tam action brought by another relator. It simply allows a relator to bring a *different* qui tam action, based on the same facts underlying a prior action, if that prior action has been dismissed on non-merits grounds. Because a relator's pursuit of a given qui tam action cannot be passed on to successive relators—as the duties of any actual office are passed on from one officeholder to his or her successors—the relator's role is not a continuing office.

Second, defendants suggest that "one relator may be replaced by another" if the first "relator dies or becomes bankrupt." Br. 25; *see* Br. 45. But the cases that defendants invoke do not support that proposition. In *United States v. NEC Corp.*, 11 F.3d 136 (11th Cir. 1993), this Court held that a personal representative of a relator's estate—not a different relator—could continue to pursue the relator's qui tam action after his death, just as the estates

of deceased plaintiffs routinely maintain other types of actions that are personal to the deceased plaintiffs.  And in *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354 (5th Cir. 2014), the Fifth Circuit similarly held that a bankruptcy trustee could assert False Claims Act claims belonging to the relator's bankruptcy estate.  Neither of those decisions suggests that a new relator can take over a qui tam action other than as a representative of the original relator.  To the contrary, as our opening brief notes (at 39-40), the duties of an actual office obviously cannot be passed on to the officeholder's estate (in probate or in bankruptcy) because they are not personal to the officeholder.

Finally, defendants appear to suggest (Br. 25) that it does not matter whether the pursuit of a *particular* qui tam action can be passed from relator to relator.  They do so by attempting to reframe the duty of relators at a higher level of generality, to include "conducting civil fraud litigation on behalf of the United States" rather than pursuing a particular action (*id.*).  But that reframing cannot help them, because the duty of "conducting civil fraud litigation on behalf of the United States" surely includes the duty of pursuing each qui tam action that is brought.  And that duty—the duty of pursuing each qui tam action—cannot be passed from occupant to occupant of the so-called office of relator.

### B. Congress Did Not Vest Relators With Uniquely Governmental Authority

Relators also are not officeholders because Congress envisioned their roles as fundamentally personal rather than governmental in nature.

1. In *Stevens*, as our opening brief explains, the Supreme Court rejected the theory that relators bring suit as "agent[s] of the United States." 529 U.S. at 772. Rather, the Court explained that the False Claims Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. *Id.* at 773; *see United States ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 425 (2023) (similar). And in the part of its opinion holding that relators cannot pursue qui tam actions against States, the Court emphasized that qui tam actions are "private suit[s]" brought by "private parties." *Stevens*, 529 U.S. at 780 n.9, 786 n.17.

*Stevens* thus recognized that, when Congress authorized relators to bring qui tam suits under the False Claims Act, it did not intend to create a governmental office subject to the Appointments Clause. Rather, Congress was authorizing relators to pursue a personal monetary recovery—employing "the theory, based on experience as old as modern civilization, that one

of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting … under … the hope of gain." *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) (quoted in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997)).

2.      Defendants' contrary arguments are unpersuasive.

a.      Defendants invoke (Br. 34-35) the fact that relators bring suit "in the name of the Government," 31 U.S.C. § 3730(b)(1).  But as the Supreme Court recently explained in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019), the statutory provision for qui tam actions to be brought "'for the [relator] and for the … Government,'" and "'in the name of the Government,' … does not make the relator anything other than a private person" as opposed to an "'official of the United States.'"  *Id.* at 272.

Defendants also invoke (Br. 35) this Court's statements in *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. 2021), that a relator "'act[s] as a stand-in for the government,'" *id.* at 1309, and as "a government actor," *id.* at 1310, taking action with "'governmental character,'" *id.*

But those statements, the first of which was describing the reasoning of *Stevens*, must be read in a manner consistent with *Stevens*. The relevant holding of *Yates* was that monetary judgments in non-intervened qui tam actions—which are paid to the United States, before the United States pays the relator her share—are "imposed by, and attributable to, the United States" such that they are subject to the Eighth Amendment's Excessive Fines Clause. *Id.* at 1309-1310. That is consistent with *Stevens*'s holding that, when relators sue under the False Claims Act, they are asserting a private interest in their share of the judgment.

b.    Nor is there a basis to conclude that relators occupy governmental offices because they "independently decide whether to commence litigation on behalf of the United States and can force the government to investigate and take action" (Defendants' Br. 40). As our opening brief explains (at 28), qui tam actions cannot proceed—indeed, they cannot even be unsealed—until the government determines whether to "intervene and proceed with the action," intervene and move to dismiss it, or allow the relator "to conduct the action" subject to ongoing government oversight. 31 U.S.C. § 3730(b)(2)-(4). This is not, as the district court and defendants claim, "back-end … supervision," 751 F. Supp. 3d at 1312 (quoted in Defendants' Br. 41).

It is front-end screening, and it makes clear that relators are not acting as government officials when they bring suit. Only after they bring suit does the government determine whether their action should go forward and, if so, who should litigate it.

3. In our opening brief, we argued that the Appointments Clause applies only to the appointment of members of the government's workforce. Since the filing of our opening brief, the government has refined that position, explaining to the Supreme Court in a different case that a "private actor" who is "empower[ed] … to adopt binding rules governing private conduct on a continuing basis" would be "an officer of the United States subject to the Appointments Clause." Reply Br. for the Federal Petitioners, *FCC v. Consumers' Research* (Nos. 24-354, 24-422), 2025 WL 838506, at *19 (U.S. Mar. 13, 2025). That is because the adoption of binding rules governing private conduct on a continuing basis is a function that only the government can constitutionally perform.

Relators, however, do not act on a continuing basis, and they do not perform a function that only the government can constitutionally perform. Congress routinely chooses "to rely … on private enforcement to implement public policy." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 263

(1975).  And as we explain below, abundant evidence shows that Congress and the courts have historically viewed private qui tam suits as a constitutionally permissible means of redressing and deterring violations of federal law.

*   *   *

For all these reasons, relators need not be appointed in a manner consistent with the Appointments Clause.  The district court's contrary conclusion was erroneous.

## II.  The Qui Tam Provisions Are Consistent With The Vesting And Take Care Clauses

Defendants alternatively ask the Court to affirm the judgment on the basis of their theory—which the district court did not adopt—that relators exercise executive power in a manner inconsistent with the Vesting and Take Care Clauses of Article II.  That theory is no more meritorious, and the Court should reject it.

### A.  History Establishes The Constitutionality Of The False Claims Act's Qui Tam Provisions

Congress unquestionably has the power to authorize private parties who have suffered Article III injury to sue to enforce federal statutes, like Title VII or the antitrust laws.  It is long established that Article II "does not

require Congress to prescribe litigation by the Executive as the *exclusive means of*" protecting the government's interests. *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc).  Indeed, private suits generally do not raise Article II concerns even if Congress has created a private right of action for the *purpose* of supplementing government enforcement actions.  The Supreme Court has routinely described private suits as a means of enforcing federal statutes for the benefit of the public, not just as a means of redressing private injuries.  *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' … antidiscrimination statutes[.]"); *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition.").

Defendants correctly observe that private suits under other statutes differ in significant respects from qui tam suits under the False Claims Act.  Qui tam relators are authorized to pursue False Claims Act suits solely on the basis of the government's partial assignment of a share of its right to a monetary recovery, *see Stevens*, 529 U.S. at 773, whereas private plaintiffs under other statutes must establish a personal injury as a basis for standing.  A

judgment on the merits in a qui tam action under the False Claims Act can have claim-preclusive effect against the United States, whereas judgments in private suits under other statutes do not. And the United States receives a share (indeed, the majority) of a monetary judgment in a qui tam action under the False Claims Act, whereas judgments in private suits under other statutes are payable solely to the plaintiffs.

If Congress's use of the qui tam mechanism were a new development, these features of qui tam actions under the False Claims Act would give rise to substantial questions about whether such actions are consistent with the Vesting and Take Care Clauses of Article II. But abundant evidence makes clear that Congress and the courts have not historically viewed qui tam suits as inconsistent with those Article II provisions. As our opening brief explains (at 19-21, 40-49), qui tam suits date to the Founding, and qui tam suits to vindicate pecuniary harms to the government date to at least the enactment of the False Claims Act during the Civil War.

Two amicus briefs, including a brief from three historians on whose work the district court relied, provide extensive additional evidence for that conclusion. *See* Randy Beck Amicus Br. 5-32; Legal History Scholars' Amicus

Br. 8-33.  The Supreme Court found this body of history "well nigh conclusive" in the Article III context, *Stevens*, 529 U.S. at 777, and it is just as "conclusive with respect to the Article II question" raised here, *Riley*, 252 F.3d at 752; *see Stevens*, 529 U.S. at 801 (Stevens, J., dissenting).

Defendants offer essentially two responses to the historical evidence against their position.  Both are meritless.

1.      First, defendants repeatedly suggest that the embrace of qui tam provisions in the Founding era was "thoughtless[]" (Br. 53; *see* Br. 49, 50, 55).  At one point, they go so far as to claim that our opening brief "acknowledge[s]" an absence of "evidence that the founding generation considered whether *qui tam* suits violate Article II."  Br. 50 (citing Opening Br. 48).

Those assertions are incorrect.  The cited passage of our opening brief did not say there was no "evidence that the founding generation considered whether *qui tam* suits violate Article II" (Defendants' Br. 50); it said there had been no *judicial challenge* to the constitutionality of qui tam provisions, presumably because the constitutionality of such provisions was well accepted (Opening Br. 48).  And our brief presented extensive evidence that the enactment and enforcement of early qui tam provisions was anything but

"thoughtless." It explained that the First Congress enacted "a considerable number of" qui tam provisions, including those that "provided both a bounty and an express cause of action" for informers, *Stevens*, 529 U.S. at 776-777, 777 n.6; that the Second Congress recognized the established character of qui tam litigation when it enacted a provision governing the award of costs in such suits; that the early Executive Branch likewise recognized qui tam litigation as an established feature of American law when it included, in draft legislation, a cost-shifting provision like the one the Second Congress had adopted; and that the Supreme Court repeatedly recognized qui tam provisions as common and legitimate. Opening Br. 43-47.

Defendants' failure to address the last of those points is particularly striking. In *Marvin v. Trout*, 199 U.S. 212 (1905), for example, the Supreme Court commented—in upholding the constitutionality of a state qui tam provision—that to reach a contrary conclusion "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. That passage expressly characterizes qui tam provisions as an established and accepted feature of the American legal system. It cannot be

squared with defendants' suggestion that qui tam provisions were only "thoughtlessly" accepted (Br. 53). And defendants do not even try to address it; they never once cite *Marvin*.

The same is true of the Supreme Court's statement in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), that a court of appeals had been wrong to construe the False Claims Act narrowly "on the premise that qui tam or informer actions 'have always been regarded with disfavor,'" *id.* at 540-541. That was wrong, the Supreme Court explained, because "[q]ui tam suits have been frequently permitted by legislative action" and "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." *Id.* at 541-542. Again, it is impossible to square that statement with defendants' claim that no one thought much about the legality of qui tam provisions—and, again, defendants make no effort to do so. Their brief never addresses that part of *Marcus*.

The amicus briefs only add to the pile of historical evidence that the Founding-era embrace of qui tam provisions was far from "thoughtless." Consider, for example, the debate over the availability of a presidential pardon for Samuel Dodge, a customs inspector who had been sued under a qui tam provision that "awarded half of the $400 fine to the United States, and

divided the other half between the private informer and local treasury officials." Legal History Scholars' Br. 25-26. President George Washington sought advice on the availability of a pardon from Secretary of the Treasury Alexander Hamilton, who in turn sought advice from the Auditor of the Treasury Department. *Id.* at 26. The Auditor informed Washington that he "could remit only the United States' portion of the fine," as well as "the other criminal punishments in the Act," but not "the portions of the penalty awarded to private individuals." *Id.* And Washington took that advice. *Id.* at 26-27. This episode—involving one of the authors of the *Federalist Papers*, as well as the first President—sharply illuminated the intersection between qui tam provisions and one of the President's core powers under Article II. Yet no one, apparently, came away from the episode thinking that the President's inability to pardon the private liability of qui tam defendants raised a constitutional concern. That could not possibly have been a "thoughtless" conclusion on the part of such constitutional luminaries as Washington and Hamilton.

Or consider a similarly prominent suit brought by the New York Manumission Society against a slave trader under the qui tam provisions of the 1794 Slave Trade Act. Legal History Scholars' Br. 28-29. Remarkably, the

amicus brief notes, two of the three authors of the *Federalist Papers*—John Jay and Alexander Hamilton—"were founding members and later presidents of" the plaintiff in that suit, which "financed [the] case[] with charitable contributions and membership dues." *Id.* at 29. Surely Jay and Hamilton, who thought more deeply than nearly anyone else in the Founding era about the intended roles of the three Branches under our Constitution, did not "thoughtlessly" overlook what defendants characterize as a major incursion on the constitutional prerogatives of the President. They simply did not perceive one.

In short, there is no evidence for defendants' claim that qui tam provisions were only "thoughtlessly incorporated into the American legal system" (Br. 53). And there is extensive contrary evidence, which defendants simply ignore.

2.    Defendants' other response to the early qui tam provisions is to note that "none of those statutes" provided for the government to control qui tam litigation in the way that it controls qui tam suits under the False Claims Act. Br. 54. For that reason, defendants contend, we "must either" treat the modern mechanisms of control as "constitutionally superfluous[,] and thus defend *qui tam* litigation even in the absence of such controls," or

else "concede that the early *qui tam* statutes were unconstitutional and thus are irrelevant." *Id.*

But that is a false choice. The fact that early qui tam statutes were regarded as uncontroversially consistent with Article II only underscores the constitutionality of the False Claims Act's qui tam provisions, which provide greater means for governmental control. That is true whether or not the early provisions would pass muster under modern Article II doctrine.

## B. If Necessary, Limits On The Government's Control Mechanisms Can Be Held Invalid And Severed

Defendants contend (Br. 29-34) that, if relators exercise executive power, then the various statutory mechanisms for the government to control qui tam litigation do not suffice to provide adequate presidential supervision. Defendants are correct that, if relators exercise executive power, then constraints on the President's "ability to supervise and remove" relators would be unconstitutional. *Seila Law LLC v. CFPB*, 591 U.S. 197, 238 (2020). But defendants are incorrect to suggest that the appropriate remedy in that situation would be to hold the qui tam provisions unconstitutional in full. Rather, the appropriate remedy would be to hold invalid—and sever from

the rest of the qui tam provisions—the statutory constraints on the government's ability to control qui tam litigation, including (1) the requirement of good cause for the government to intervene after an initial decision not to, 31 U.S.C. § 3730(c)(3); (2) the constraints on the government's settlement or dismissal of an action over a relator's objection, *id.* § 3730(c)(2)(A), (B); and (3) the relator's right to participate in litigation even after the government's intervention, *id.* § 3730(c)(2)(C).

That is consistent with the Supreme Court's treatment of what it regarded as unconstitutional restrictions on the supervision of administrative patent judges in *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021). Rather than accepting the plaintiff's request "to hold the entire" administrative review process "unconstitutional," the Court held only that a provision of the statute could not "constitutionally be enforced to the extent that" it prevented the head of the agency from reviewing the judges' decisions. *Id.* at 24-25 (plurality opinion); *see id.* at 44 (Breyer, J., concurring in the judgment in part and dissenting in part) (agreeing with the plurality's "remedial holding"). This approach respects the judicial obligation to "limit the solution to the problem" "when confronting a constitutional flaw in a statute," by "sever[ing] its problematic portions while leaving the remainder intact."

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-329 (2006); *see also, e.g.*, *Office of U.S. Trustee v. John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 496 (2024) ("[O]ur ultimate aim is to remedy the constitutional wrong consistent with congressional intent, not to provide the complaining parties' preferred form of relief.").

## III. This Appeal Does Not Present The Question Whether The Qui Tam Provisions Are Facially Unconstitutional

Finally, defendants end their brief with a cursory assertion (at 56) that "this Court should hold that the [False Claims Act's] *qui tam* provisions are facially unconstitutional"—that is, unconstitutional even as applied in cases where the government has intervened or is still considering whether to intervene. That is a remarkably aggressive request, and a groundless one.

The basis for the judgment this Court is reviewing, the dismissal of this non-intervened qui tam action, was that relator is "the only litigant on her side of the" action. 751 F. Supp. 3d at 1323; *see id.* at 1323 n.9 (observing, in a footnote appended to that sentence, that the government had "shown no desire to … take over" the litigation). Nothing in the district court's opinion would provide any basis for holding that Article II requires the dismissal of a qui tam action that the government has taken over. Nor would anything

in the opinion provide a basis for holding that Article II requires the dismissal of a qui tam action in its earliest stages, where the complaint is under seal and the government is still considering whether to intervene. And defendants' brief says nothing about the distinct issues that would be presented in those circumstances, even as defendants ask the Court to resolve them.

The reason neither the district court nor defendants have addressed these issues is that they have nothing to do with this case. Federal courts do not possess "unconditioned authority to determine the constitutionality of legislative or executive acts"; their constitutional role is "'to adjudge the legal rights of litigants in actual controversies.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). Here, the Court's constitutional role begins and ends by determining whether Article II permits this case—a case in which the government has declined to intervene—to be maintained. Regardless of how the Court answers that question, it need not and should not answer the broader questions that defendants seek to bring before the Court.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

GREGORY W. KEHOE
*United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH

*/s/ Daniel Winik*

DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*
*daniel.l.winik@usdoj.gov*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,686 words. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*

Daniel Winik